## STATE OF DELAWARE.

### *vs.*

## CHARLES T. FLEMING.

*Kent, Sept. T. 1867.*

An information by the Attorney General, upon the relation of the individuals composing the Levy Court of the county, will lie for the removal of the trustee of a charitable use, for the benefit of the poor white citizens of Kent county, who, by a little timely assistance, might be kept outside of the walls of the Poor House.

20

INFORMATION AGAINST THE TRUSTEE OF A CHARI-
TABLE USE.—This was an information filed by the Attorney
General upon the relation of the persons who were, for
the time being, Commissioners of the Levy Court of Kent
county, on behalf of the poor white citizens of Kent
county, generally, outside of the walls of the poor house.

The defendant was the trustee of what is commonly
known as the Potter Estate, being the lands devised by
Benjamin Potter, deceased, for the benefit of the poor
white citizens of Kent county.

The will of Potter will be found, fully recited, in the
report of the case of *State vs. Griffith*, 2. *Del. Ch.* 392.

The information set out the will and codicils at
length, and that the residue of the estate of the testator
comprehended within the devise, consisted of certain
real estate in Kent county; also the renunciation of the
trustees originally appointed to execute the bequests, and
the appointment of the defendant as trustee.

It was further alleged that the defendant had failed
and neglected to perform his duty as trustee, and that,
although the property had been in his charge for more
than eighteen years, and, if properly managed, would
yield a large income, yet, up to the time of filing the in-
formation, no proceeds which accrued therefrom, had been
distributed among the objects of the charity.

The information also alleged waste and destruction
of timber and wood, the improper tillage of arable land,
and neglect of the repairs of the buildings and fences, to
such an extent that the land was worth, intrinsically, less,
at the commencement of the suit, than at the death of
the said testator; and that, by reason of the increased
prices of real estate, it might realize more money if sale
could be made. It was alleged that the trustee had sold
large quantities of wood and timber from off the trust
property, at grossly inadequate prices; that he had
allowed waste of the timber; that he had rented the

farms at grossly inadequate rents, and to improper tenants; that he had removed good farmers, and supplied their places by persons unacquainted with the business of agriculture; that in the administration of the trust, he had been influenced by the desire of self-aggrandizement; that he had appropriated to his own use, and failed to account for, large sums of money; and various other breaches of trust were alleged, in almost every possible form, both generally and, afterwards, specifically, with respect to each particular farm.

The information charged that, by reason of the breaches of trust alleged, the trust property had failed to be productive, and the objects of the charity had lost the benefit thereof.

The prayer was for an account of the trust property which had been received by the trustee, or, but for his willful fault or neglect, might have been received; and for a decree for a payment of what might appear to be due from him upon such account, and, also, that the defendant might be removed from his trusteeship, and some suitable person, or persons, appointed in his stead, and, also, for further relief.

The answer set forth the appointment of the trustee in the year 1846, and that the estate had been involved in litigation almost continually ever since, to the great detriment of the same.

The answer also described the dilapidated and worn out condition of the estate when it came into the charge of the defendant; and this fact, together with the continued drain upon its resources, arising from the litigation referred to, were stated to be the principal causes of the failure of the trustee to make an application of the trusts arising from the estate, for the purposes of charity, as designated by the testator. The course of management of the estate was described, and it was alleged that, under the decrees of the Court, the sale of timber, &c., had

been by public auction on due notice, and, generally, the management of the estate was clearly and definitely set forth, and all the charges of mismanagement were denied, both generally and specifically. Voluminous depositions were taken, all bearing upon the questions of fact involved in the case, and the cause came to a hearing at the September Term, 1867.

*Ridgely* and *Hillyard*, for the State.

The legal question involved concerns not the jurisdiction, which is not seriously in controversy, but the nature and extent of the liability of a trustee. To show its stringency, we cite *Hill on Trustees*, 677 ; also the remarks of Lord Langdale in *Attorney General vs. Keen, 2 Beav.* 428.

It is objected that proper relators are not made.

Relators in the case of a charity are not necessary at all. 1 *Dan. Ch. Pr.* 11, and cases cited. And where relators are not necessary, they should have an interest. The practice of requiring relators is adopted only to secure costs, it being beneath the dignity of the Crown, and so of the State, to pay costs. It was, therefore, a benefit or favor to the defendant to put in relators ; otherwise there could be no decree in his favor for costs.

Here the relators have an interest, representing the Levy Court of the county, which is interested in the matter of taxation. Besides, in the will, the Levy Court (or Orphans' Court) are made the distributors of the fund.

The Levy Court is not an incorporated body, and we could not, in any other form, have made the body relators.

We do not controvert the authorities cited, as to grounds of removing trustees, but we distinguish this case on the ground that this trustee was not appointed by the founder. The personal confidence of the founder is a consideration. The only question here is, whether there

is ground for the confidence of the Court who appointed him. He is but the servant of the Court, having his authority, not under the will as original trustee, but from the Court, and subject to its pleasure. The Court has power to remove him without cause..

*Comegys* and *Causey*, for the defendant.

We might have objected to the jurisdiction for want of proper parties, who would be the poor, as described, or some of them, the *cestuis que trust*, yet this we could safely waive and ask the dismissal of the bill upon the merits. But the Court must take notice that the case is not properly before it. The relators should be parties interested in the trust. The Levy Court is no party to these proceedings. It is a corporation, capable of acting as such.

It may have a sufficient interest, but the relators are mere individuals, described as members of the Levy Court ; but that does not make the levy court, as a corporate body, a party. If the bill be dismissed, the Levy Court cannot be made to pay costs.

The defendant is not an ordinary trustee, but is the mere agent of this Court, which has taken on itself the management of the trust through its agent. He is not an ordinary trustee, who could be compelled to account only by bill. All his acts have been the acts of the Court and approved as such. His accounts are presumed to be correct, because they have been passed upon by the Court.

But if he be dealt with strictly as a trustee, no sufficient grounds are shown for his removal.

A trustee should not be removed because he has not, in all things, acted according to the judgment of a court of equity, nor for mistake of judgment. He is appointed to use his best discretion. There must appear to have been corruption, willful neglect, positive misconduct, or abuse of trust. This trustee has title and authority,

---

---

coupled with discretion, to a large extent. To remove him is a very serious step. The very confidence reposed by the founder of the charity must be, to a great extent, regarded. These principles are fully sustained by the authorities. 2 *Sto. Eq. Jur. Sec.* 1289; *Portsmouth vs. Fellows,* 5 *Madd.* 450 ; *Mayor of Coventry vs. Attorney General* 7 *Bro. P. Cas.* 235 ; *Ex parte Greenhouse,* 1 *Madd.* 92 ; *Attorney General vs. The Coopers' Company,* 19 *Ves.* 187 ; *Harper vs. Straus,* 14 *B. Mon.* 48 ; *Cook and wife vs. Day,* 1 *Rich. Eq.* 26 ; *Gibbs vs. Smith,* 2 *Id.* 131.

The use of money is not a ground of reasonable removal, but only to charge the trustee.

Constructive fraud, as by buying at a sale, is no ground. *Hill on Trustees,* 291 ; 7 *W. & S.* 401.

THE CHANCELLOR delivered a long opinion, entering fully into the merits of the case, upon the proof, and not considering the allegations of the information sustained, a decree was entered, dismissing the bill.

NOTE.—In the examination of the Chancellor's manuscripts, the reporter laid this case aside as of no value, there being in the notes of the opinion, found among the papers, no discussion of any legal questions. Subsequently, however, it appeared to him that, as forming a part of the extended litigation concerning this estate, it should not be altogether overlooked. Upon reading the opinion carefully, it seemed proper that the detailed examination of the management of the property therein contained should be preserved as a part of the history of the administration of a public trust, under the direct supervision of the Court of Chancery. This impression was strengthened by the subsequent public discussion of the management and history of the trust, evoked by a serious proposal of legislation upon the subject, of a very radical character. The length of the opinion and the fact that it concerned the facts alone, seemed to preclude its insertion here, and it was finally deemed best to make this brief report of the case, in course, and to publish the opinion referred to, or full extracts therefrom, in the Appendix.

PHILLIP W. MATTHEWS, ADMINISTRATOR OF JOHN S. MATTHEWS, DECEASED, AND JACOB W. CANNON.

*vs.*

SILAS DODD AND TEMPERANCE, HIS WIFE, AND PETER R. GORDY.

*Sussex, Sept. Term, 1867.*

Where the defense to an action at law is a legal defense, it is no ground of equitable interference that the defendant at law desires to examine the plantiffs, and that he fears to call the only witness who can prove the defense, lest he may deny it, and cannot be impeached by the party calling him. The parties may be examined at law under the statute, and a court of equity cannot aid the complainant in the impeachment of the witness.

BILL FOR AN INJUNCTION TO RESTRAIN PROCEEDINGS AT LAW.—The bill alleged that, on the 19th of September, 1837, in the Orphans' Court, at Georgetown, on the petition of Stephen H. Gordy, an order was made by the Orphans' Court, for the partition of the lands of Aaron Gordy Sr., deceased, and for the assignment of dower therein to Sally Gordy, his widow. Aaron Gordy Sr. left a widow and nine children as heirs at law, Stephen H., Burton H., Aaron W., John, Peter B., (a defendant,) Jackson, Cyrus, Eleanor, (wife of Daniel Dexter,) who died, leaving, as heirs at law, two sons, and Temperance, wife of Silas Dodd, the other defendant. Pursuant to the order there was assigned to the widow, for life as dower, a tract marked "A," containing $101\frac{1}{4}$ acres. On November 17th, 1848, the widow, Sally Gordy, married one Downs, after whose death, said Sally Downs, (late Gordy,) and Stephen Burton, John, and Peter, and their wives, made a deed to Aaron N. Gordy, conveying their interests in said tract. Afterwards, on November 3rd, 1849, Jackson Gordy con-

veyed his right to Aaron N. Gordy, and sometime during the year 1850, Aaron N. and wife conveyed to Peter B. Gordy, and on November 17th, 1853, Cyrus J. and wife conveyed his share to Peter. On August 26th, 1854, Peter and wife conveyed to John S. Matthews.

Sally Downs, late Gordy, died, and, on petition of John S. Matthews for partition of said lands, the commissioners having reported that the lands would not divide, the tract was assigned to John S. Matthews, and he entered into recognizance on March 15th, 1855, for $393.21, payable in one year, with Jacob W. Cannon as surety, under which he was liable for only two shares,—those of Silas Dodd, and Temperance, his wife, and of the two children of Eleanor Dexter.

When Peter conveyed his share, in addition to a covenant of warranty, he gave to John S. Matthews his judgment bond, dated 20th of July, 1854, as an indemnity against all claims and demands of said Daniel Dexter, and Eleanor, and Silas Gordy, and Temperance, and their heirs. Judgment was entered on the bond, August 4th, 1857, execution and goods sold, and proceeds to the amount of seven dollars applied. The purchase money mentioned in the deed of Peter B. Gordy was paid to him, and he represented that he had paid Dodd and wife, and Greensbury G. Dexter, child of Eleanor, their full shares of the purchase money, and complainants have heard, and believe, that at the death of John S. Matthews, nothing was due to Dodd and wife, and Greensbury G. Dexter. John S. Matthews died, November 16th, 1865, and Phillip W. Matthews became his administrator. Peter B. Gordy is wholly insolvent. Up to John S. Matthews' death, no demand had been made on him by Dodd and wife, or Greensbury G. Dexter, or any one for them. That since John S. Matthews' death, Peter B. Gordy had denied saying that they had never received their shares. Silas Dodd has sued out recognizance against complainants, as administrator and surety of Phillip S. Matthews, for share of

Temperance, his wife, which suits are pending for trial. As Gordy denies his former declarations, complainants could not be allowed to call him as a witness, and then contradict him in the suits at law, nor can they examine Silas Dodd and Temperance as witnesses.

The bill prays a discovery from defendants as to the facts charged, and for an injunction to restrain Dodd and wife from prosecuting their actions of *scire facias*, at law.

The several answers of Dodd and wife, and of Gordy, admit the records and proceedings set forth in the bill, and, also, the execution of a bond by Gordy, the condition of which is fully set forth in both answers, and is as an indemnity against liens generally, making no reference to Dodd and wife, or their interests in the land. The answers deny that the bond has any relation to, or connection with, the interest of Dodd and wife. They also deny the alleged declarations of Gordy, and Dodd and wife deny that their share and interest in the recognizance was ever paid or satisfied in any way. Both answers deny the equity of the bill, and the jurisdiction of the Court, upon the ground that there is an adequate remedy at law and also that there is a misjoinder in making Gordy a party.

On the 5th of October, 1866, *Layton*, for the complainants, having filed the bill, moved for an injunction.

THE CHANCELLOR :—

I feel much doubt whether it is a case for equitable relief, the defense to the *scire facias* being of a legal nature, it being before judgment, so that the defendants have opportunity to make it, with power to examine the plaintiffs in the *scire facias*, and Gordy at the trial, with as much effect, so far as I can see, as by answer in equity. But not being willing to decide such a question without examination, for which there is not sufficient time before

a trial would be reached, I have concluded to order the injunction so that the question may be deliberately considered.

The answers having been filed at the September term, 1867, defendants moved to dissolve the injunction and dismiss the bill.

*Wright*, for the defendants.

1. We rely on the want of equity in the bill. The only ground alleged is, that complainants can prove payment of the recognizance only by Peter B. Gordy, that they are apprehensive that he would deny payment, and being complainants' own witness, could not be impeached by proving contradictory statements. This is not a sufficient ground. The complainants have nothing to gain in equity, but a discovery by Dodd and wife, and they can as well have this relief at law, by examining the plaintiffs in the suit at law.

Again, the statement of the bill of the two material facts, the bond of indemnity and the payment, is only upon information and belief; it is vague and uncertain, and, therefore, not sufficient to support an injunction. An averment of a fact must, in form, be positive. 1 *Dan. Ch. Pr.* 411. Besides, there is no privity of contract between the complainants and Dodd and wife, the parties at law. The bond was between Matthews and Gordy, Dodd and wife having no connection with it. The bond affords no defense to an action by them upon the recognizance against Matthews.

2. The answer fully denies the facts relied upon to constitute the equity of the bill, and on this ground the injunction should be dissolved. 1 *Eden on Inj.* 145, 1.

And the allegations of the answers, as to the object of the bond respecting these two shares, are supported

by the bill.   Gordy did not convey the two-ninths ; Matthews (as charged) proceeded on the bond before any demand was made for these two shares, or process issued to recover them, and this lien was created not by Gordy, but by Matthews.   Why then should the former indemnify against it ?   Besides, the bond was given the year before the recognizance was entered into.

*Layton*, for the complainants, opposed the motion and insisted that the charges of fraud in the bill constituted a sufficient ground of relief.

THE CHANCELLOR :—

The motion to dissolve the injunction is urged upon two grounds.   The first, which sustains the motion, is that there is no equity in the bill to support the injunction. There are two grounds upon which this Court interferes with suits at law.   (1.) When the defense is an equitable one, as, for example, where a contract under seal is discharged by a release not sealed, or when, in an ejectment, an equitable title is set up against the legal holder. (2.) When the defence is legal, but equity can aid in making it effectual.   In these cases the injunction is only temporary, as where an account is sought, or a discovery was required, before the Statute authorizing the examination of parties at law.

In the present case the suit at law is upon a recognizance given by John S. Matthews in the Orphans' Court on his acceptance of land of Aaron Gordy, senior, which had been assigned to his widow as her dower.   The first question to be considered is, whether the defense is legal, or, equitable.   The defense alleged by the bill is payment by Peter B. Gordy, the vendor of Matthews, and Gordy's warranty in writing.   The warranty is not to be considered. It is no defense, legal or equitable, where, as originally

alleged in the bill, there was no privity with Dodd and wife, and it does not affect the question of payment. With respect to the defense of payment, it is strictly available at law.

But in the second place, it is alleged that the complainants cannot, at law, make their defense good. Even if this be true, equity cannot help them. All that they can do here they can do there. They can examine the adverse parties. They can also examine Gordy as a witness, in the suit at law, more effectually than here as a party. If they cannot impeach him, this Court cannot help them to do it, nor would it avail to do it here. It does not move a step in the direction of proving payment, to impeach the only witness who knows the fact about it.

As to the allegation of fraud, the complainant can shew that in the suits at law as well as here and, indeed, better. The result then is that complainants allege payment and cannot prove it, and this Court cannot advance him a step towards the proof of it. Ought the Court then to interfere?

So the case stood at the filing of the bill, but now it is far worse, since, after exhausting all that equity can do, all that could not be done at law, the case not only fails to establish the desired proof, but the contrary appears.

The injunction, therefore, must be dissolved.

# RICHARD F. HASTINGS,

## *vs.*

# ZORABABEL H. H. CROPPER, WILLIAM HITCH AND AARON B. MARVEL, LATE SHERIFF, &C.

*Sussex, Sept. T.,* 1867.

Upon the death of two or more co-plaintiffs or co-defendants in a judgment, the proper practice is to suggest the death upon the record, and take execution for or against the survivor or survivors.

Irregularity of an execution is not a ground for equitable interference to restrain its operation, it is only where a conflict arises between a claim to the fund under the execution and a claim arising under some other process, involving parties not within the jurisdiction of the court of law, that equity need interfere under a bill of interpleader.

Under the seventh section of chapter 104, of the Revised Code, the garnishee is *ipso facto* discharged at the expiration of the second term after he was summoned, but, if the Statute be so construed as to make the discharge take effect ·only upon the order of the Superior·Court, upon application by the garnishee, still, as his right to be discharged is absolute, and he has the means of relieving himself, and can by no means be held responsible to the attaching creditor under the summons, he has no need for relief in equity.

A bill of interpleader is an appropriate remedy in equity for the relief of a party against whom there are, at law, separate and conflicting claims, whether in suit or not, for the same debt, duty or thing, and where *a recovery by one of the claimants will not, at law, protect the party against a recovery for the same debt or duty by the other claimant.*

Where a suit is pending to recover a debt, and the debtor is summoned as a garnishee of his creditor for the same debt, so long as judgment in the attachment may be reached before the creditor can ·prosecute his suit to judgment, a bill of interpleader will not lie, otherwise if the debt is attached after judgment recovered for it.

Where the facts present a proper case for an interpleader, equity will not entertain a bill simply to restrain one of the parties claiming the fund in controversy, from ·prosecuting his claim until the other party has failed to establish his claim.

When a court of equity interferes to restrain a party from prosecuting his legal rights, it must, at the same time, secure the protection of all parties inter-

ested in the subject matter, and afford them the means by which their respective rights may be ascertained, and satisfaction obtained by the party really entitled. This is accomplished under a bill of interpleader, by the requirement that both the fund or property in dispute, and all parties claiming, be brought before the Court and, also, that the party filing the bill accompany it with his oath denying collusion.

Where, upon a bill filed for an injunction to restrain one of two claimants for a single fund or property, a case appears proper for an interpleader, leave may be given, upon proper terms, to amend the bill so as to make it a bill of interpleader, by adding proper parties, bringing the fund or property into Court and filing the proper affidavit denying collusion.

BILL FOR AN INJUNCTION TO STAY PROCEEDINGS AT LAW.—The principal facts of this case were alleged by the bill and admitted by the answers. It appeared that on the 12th of October, 1849, judgment was recovered by the defendant, Cropper, and Samuel B. Hitch, deceased, late trading as Cropper and Hitch, against the complainant and James C. Dunning, late trading as Hastings and Dunning, for $544.94 and costs, with interest from the same date. On the 20th of July, 1863, Hitch died, leaving the judgment wholly unpaid. The bill alleged that Cropper, as surviving partner, was entitled to collect the judgment, and that no assignment of the judgment or any part of it, was made before or since Hitch's death, while the answers claimed that, in 1850, the partnership was dissolved and that, in a division of debts due to the firm and deemed hopeless, this judgment was taken by Hitch and from that time treated as his property, though no actual assignment was made, as Cropper resided in Baltimore, and it was not deemed worth the trouble and expense ; and the proceeds, if collected, would belong to Hitch's estate. It further appeared that execution upon the judgment was caused to be issued by William Hitch, the executor of Samuel B. Hitch, whose death had, however, not been suggested, nor his executor made a party. Under the execution, the Sheriff, Marvel, levied upon complainant's goods and advertised them for sale, November 30th, 1864.

On November 23rd, 1864, a foreign attachment at suit of Nathaniel Horsey was issued against complainant and Thomas J. Cropper, trading as Cropper and Brother, and on November 24th, complainant was summoned as a garnishee.

The defendants denied that Cropper was indebted to Horsey, and alleged that the attachment was got out through collusion with the complainant, and, also, that it was a misjoinder to make Marvel and Hitch parties.

There were no depositions, and the proofs consisted of the records of the various proceedings at law, referred to in the pleadings.

*Cullen*, for the complainant.

The question raised is, who is entitled to the money, whether Cropper and Hitch, (as the record stood,) or the surviving partner. If complainant had paid, as the record stood, he might be made liable again to the survivor. The execution is irregular, because, (1,) not at suit of the surviving partner alone, and (2,) even if Hitch's interest has not survived, his executor should have been made a party, and this irregularity is material, for the reason stated.

The claim that, under the alleged division of assets, Cropper had no interest in the judgment to be affected by the attachment, does not avail, for want of an assignment on the record, as required by rule of Court, under which no interest in a judgment can be recognized unless assigned.

Hitch being dead, the judgment survived to Cropper, but the interest of one partner, as ascertained after debts are settled, may be attached, even if both were alive. *Colly. on Partn. Sec.* 818, 821 *and note ;* and this, unquestionably, where there are no joint debts. *Drake on Att. sec.* 567. All cases cited in the books to the contrary,

proceed upon the ground that there are joint debts. *Hawes vs. Langston*, 8 *Pick.* 71 ; *McCarty vs. Emlen*, 2 *Dall.* 277 ; *Pierce vs. Jackson*, 6 *Mass.* 242. Here no debts. of the firm are shewn, and it is presumed there were none, and this allegation of an assignment to Hitch of this judgment, shews there were none.

A debt due by judgment and execution levied, is subject to a foreign attachment. *Belcher vs. Grubb*, 4 *Harring.* 461 ; and debts due to the survivor are always attachable. *Drake on Att. Secs.* 571, 622, 623, 624, 627 *and* 88 ; *McCarty vs. Emlen*, 2 *Dall.* 277.

*W. Saulsbury* and *Wright*, for the defendants.

This is the only instance in which a debtor has sought to restrain his creditor on the ground of an attachment, without a bill of interpleader, which, in such a case, is necessary. 2 *Eden on Inj.* 395. Such a bill usually prays an injunction, and on bringing the money into Court, would prevent sale. *Sto. Eq. Pl. Sec.* 297. And such a course would be proper to decide the issue here, which is between an equitable claim under the assignment to Hitch, and one at law, under the attachment. 2 *Eden on Inj.* 400, *note* 2 ; *Langston vs. Boylston*, 2 *Ves. Jr.* 101 ; *Hillyard on Inj.* 163, 200.

Under such a bill collusion must be negatived.

If the execution were irregular, there is a complete remedy at law. But it is not so, because it follows the judgment, which it must do. *Bing. on Judg.* 58 (136) ; *Hamilton vs. Lyman*, 9 *Mass.* 13.

As to the validity of the attachment, we do not question that a debt in execution may be attached, as decided in this State, in *Belcher vs. Grubb.* The question we raise is, whether Cropper has any attachable interest in this debt. It is a settled principle that the attaching

creditor can stand on no better footing than his debtor. *Drake on Att. Sec.* 604. The equitable assignment to Hitch is sufficiently shewn, and the rule of the Superior Court, as to assignments, does not apply here ; the record of the judgment is not conclusive on a court of equity as to who is really entitled. *Barber vs. Hartford Bank,* 9 *Conn.* 407 ; *Drake on Att. Sec.* 604.

The record of Horsey's foreign attachment shews collusion ; they have the same counsel, and Horsey, proceeds to judgment against Cropper, yet Hastings has not answered, and there is no judgment against him. Where special relief is prayed, a Court cannot relieve under the general prayer. Here a relief cannot be granted as prayed, *i. e.* an injunction, until the attachment is dissolved, and the proper relief, an order to bring the money into Court, have the debts of Cropper and Hitch paid, and the residue applied to the attachment, cannot be granted because other special relief is prayed.

Hastings had an ample remedy, at law. As he admits he owed the money, he could pay the Sheriff, and apply to the Court to stay payment until the attachment should be determined.

*Moore,* for the complainant, in reply.

The defendants are benefited by the non-joinder of Horsey, and cannot take advantage of it. They have not, by demurrer, pleading, petition or otherwise, up to hearing, objected to the want of a bill of interpleader, nor sought to have Horsey brought in. They even object that Hitch (who they, by the same answer, allege to be the real party intended) ought *not* to be a party. It is now too late for this objection. A bill of interpleader is not required for such case as this. *Atkinson vs. Manks,* 1 *Cowen* 703.

As to the execution, whether regular or not, Cropper as surviving partner is entitled to the control of it and its proceeds.   9 *Mass.* 19 ; 1 *Dall.* 248 : *Rev. Code.* 375—6.

There is no interest in Hitch. No formal legal assignment ; the answer does not shew an equitable sssignment, it is not specific, nor is it a denial, but an evasive reply which is not evidence ; the fact of assignment is not available against Hastings but only against Horsey ; and finally there is no proof to sustain the answer.

In either view of the fact, as to an equitable assignment, Hastings is not bound for costs.

THE CHANCELLOR :—

This bill is filed to restrain the execution of a judgment in the Superior Court at suit of Cropper and Hitch against Hastings and Dunning, recovered October 12th, 1849, for $544.94 and costs.

One of the complainant's grounds for relief is that, notwithstanding Samuel B. Hitch, one of the plaintiffs in the judgment, had died, and the judgment survived to Cropper, the execution was issued in the name of both the original plaintiffs, as though Hitch were still living ; whereas Hitch's death should have been suggested on the record, and execution taken in the name of the surviving plaintiff. · I think the course indicated by this objection would have been the proper one, although there is apparent authority to the contrary in *Bingham on Judgments*, (137) (13 *L. L.* 58) and 2 *Tidd. Pr.* 1120, *Ed'n. of* 1856. It is there said that where one of several plaintiffs or defendants in a judgment dies, the survivor, not being a new party, may have execution without a *scire facias* ; but these writers add, "the execution in such case should be taken out in the joint names of all the plaintiffs or defendants ; otherwise it will not be warranted by the judgment." They cite as authority only the case of *Pennoir vs. Brace*, 1 *Salk.* 319 and

1 *Ld. Raym.* 244 ; so 2 *Wms. Saund.* 72 *k.*   But this decision does not establish the rule that, after the death of a joint plaintiff or joint defendant, execution should properly be taken in the name of all the original parties, including the one deceased. . In that case, execution was issued against four defendants, one of whom was dead.   There was no suggestion of the death on the record.   The Court only held that as the death did not appear by suggestion on the record, by which, alone, it could be judicially noticed, the execution, though in the names of all the original defendants, was not erroneous, and the Court said, speaking only of the case as shown by thy record, "that if the execution taken out had been against three only, omitting the fourth, it had been erroneous because not warranted by the judgment."   But that to suggest death of one plaintiff or defendant and take execution only for or against the survivor was, in the time of Lord Raymond's Reports, considered the proper practice appears from what Ld. Holt says in *Withers vs. Harris*, 2 *Ld  Raym.* 808, that, "when there are several plaintiffs or defendants, and one of them dies, execution may be sued by or against the survivors upon suggestion of the death made upon the roll."   I have met with no other *dictum* or decision upon this point.   An examination of the records of our Courts of law would doubtless show a practice in accordance with the *dictum* of Ld. Holt.

But taking the *fi. fa.* to have been in this respect erroneous, is that a ground for equity to interfere and restrain proceedings under it ?   The complainant admits the judgment to be due and still unpaid.   Of course the irregularity in the execution does not discharge his liability to pay the judgment.   That is not contended.   But it is argued that, under the execution issued in this form, the judgment may, at law, be collected by Hitch's executor, who is not entitled to it, and that the complainant. may afterwards be compelled to repay it to Cropper, the

surviving plaintiff. If this were so, and the complainant could have no relief at law, equity would interfere so far as to permit the complainant to bring into this Court, or would order the Sheriff, if it had been collected by him, to bring it into this Court, so that it might be properly applied to the judgment, and the complainant thus protected against any further claim. But this, the only form of equitable relief applicable to such a case, cannot be here given. (1) The complainant's bill does not seek it. The complainant does not bring the money into this Court and ask to be protected in the application of it; but he simply prays an injunction against the further execution of the judgment. (2.) Even had the complainant brought the money into Court and sought to have it here applied, a sufficient ground for resort to equity would not have existed, for the Superior Court could have afforded him ample relief. With respect to the application of money raised by its own process, a court of law, as between parties claiming only under that process, having jurisdiction of them all, exercises all the powers of a court of equity. It is only when a conflict arises between a claim to the fund under the execution, and a claim arising under some other process, involving parties not within the jurisdiction of the court of law, that equity need to intervene upon a bill of interpleader.

The complainant might have paid the money to the Sheriff, (as easy to be done as to bring it into this Court for relief here,) and at the return of the writ, obtained a rule on the Sheriff to bring the money into Court, and thereupon the Court would (had its interference been necessary to the complainant's protection) have ordered payment to the surviving plaintiff. A court of equity could do no more. But (3.) It does not appear how the complainant needed such protection either in equity or at law. For his bare payment of the money to the Sheriff, or its collection under the *fi. fa.*, must have fully discharged him, notwithstanding the irregularity of the execution.

The Sheriff would have been bound to pay it to the party legally entitled to it, viz ; the surviving plaintiff. His right was not affected, nor any doubts as to it raised, by the form of the execution. The Sheriff could not have paid it to a deceased plaintiff, and had he paid it to the executor of Hitch, it would have been at his own peril. Cropper's remedy would then have been against the Sheriff, not against the defendant in the *fi. fa.*

The fact alleged in the bill that the executor of Hitch was directing the execution, and assumed to be entitled to its proceeds, is immaterial, even if true ; because, as this circumstance could not affect the rights of Cropper, the surviving partner, (and the bill so assumes,) it would remain none the less the right of the complainant to pay the surviving partner, and discharge himself, or none the less the duty of the sheriff if the money were made on the execution, to pay it to Cropper, the party legally entitled to it.

But it was insisted in the argument that the irregularity in the *fi. fa.* must, at least, entitle the complainant to his costs, inasmuch as his goods being advertised for sale before the then next ensuing term of the Superior Court, he was obliged to resort to this Court for relief. But I have not been able to see that the complainant needed any relief in equity, that he was entitled to. All the relief anywhere, that he could be entitled to. was the proper application of the money. This, in the view already taken, the complainant was secure of in the obligation of the Sheriff to apply it properly, and his responsibility, should he misapply it. Or if this was doubtful, the money could have been ordered into the Superior Court and applied under its direction, and aside from all this, even if relief in the due application of the money was needed from this Court, the complainant has not, by this bill, sought it, *i. e.*, by bringing in the money, and submitting to this Court the application of it, so far as its application might not be affected by the attachment. What the complain-

174        HASTINGS *v.* CROPPER, ET AL.

Opinion :—the attachment now dissolved by force of the Statute.

ant seems really to have been seeking was relief against
having the money raised. But in this neither a court of
law or equity could assist him. For the judgment is
admitted to be unpaid, and due to some one. I cannot,
therefore, allow the complainant costs on this ground.

I, therefore, lay out of consideration the irregularity in
the execution, and proceed to what was the main ground
relied on for restraining the collection of this judgment,
viz ;—that the money due upon it had been attached in
the hands of the complainant, under a foreign attachment
at suit of Nathaniel Horsey against Cropper and Brother,
Zorobabel H. H. Cropper, the surviving partner of Cropper
& Hitch, and to whom, as such, the judgment had become
payable, having been also a member of the *late* firm of
Cropper & Brother, the defendants in the attachment.

It appears that, on the 24th of November, 1864, days
after the *fi. fa.* was levied on Hasting's goods, Hastings
and Dunning were summoned as garnishees under the for-
eign attachment ; and thereupon Hastings filed his petition,
praying an injunction until the attachment should be
dissolved ; and the injunction was granted. Why Dunning
was not joined in the petition and bill, does not appear.

The complainant's claim to relief against the attach-
ment I am obliged to dispose of without reaching the
questions discussed at the bar. Whether the debt secured
by this judgment was or was not subject to this attach-
ment, or, if so, whether, while the attachment was in force,
the debtor's remedy was by this bill, or only by an
interpleader—it matters not now. For under the provisions
of the seventh section of the chapter on attachments,
*Rev. Code*, 639, the garnishee is already discharged, and
the object of the injunction satisfied. The Statute gives
to the attaching creditor power to compel the garnishee
to answer, and provides that "he shall be so compelled,
"within two terms, or the attachment shall, as to him, be
"dissolved." This complainant was summoned, as a

garnishee, on the 24th of November, 1864,—so his bill states, and so it appears by the record of the foreign attachment made an exhibit in the cause. By the same record it also appears that the garnishee has not answered, nor any process been taken to compel him to answer. I take it that, by the terms of the Statute, he became, at the expiration of the second term of Court after he was summoned, *ipso facto* discharged ; but even if the Statute be so construed that the discharge is to take effect only upon the order of the Superior Court, upon application by the garnishee, still, as the right of the garnishee to be discharged is absolute, and he has the means of relieving himself, and can by no means be held responsible to the attaching creditor under the former summons, he has·no further need for relief in equity. The prayer of his bill is, that the collection of the judgment be restrained until the attachment be dissolved. The attachment is dissolved, or, at the very least, may be, upon the complainant's application to the Superior Court. I feel obliged, then, to dissolve the injunction, and to dismiss the bill, though, if the bill were properly filed under the circumstances then existing, the complainant is entitled to his costs.

This consideration renders it necessary to inquire whether, as the case stood at the filing of the bill, the foreign attachment being then in force, this complainant was entitled to the relief prayed for. The ground of relief relied on is, that the complainant,having been summoned as a garnishee of the debt secured by the judgment of Cropper and Hitch, might, after it should be collected from him under the *fi. fa.*, be still held for it under the attachment. Now, assuming that the attachment of the debt secured by this judgment was valid, as insisted by the complainant, and that he was in the situation of a double liability, still the question arises which was much discussed —in what mode will equity relieve him ? May he, as has been done here, file a bill against the execution credi-

tor only, to restrain him from collecting the judgment until the attachment shall be dissolved? Or, should he file a bill of interpleader under which both the fund contested, and the claimants to it, are brought before this Court, so that not only may the complainant be discharged, but, also, justice done between the contesting parties, and the subject-matter of the controversy finally disposed of? Upon examination of this subject I entertain no doubt that the latter was the complainant's appropriate and only remedy. Let us consider under what circumstances a bill of interpleader is the appropriate remedy.

An interpleader is a proceeding in equity for the relief of a party against whom there are, at law, separate and conflicting claims, whether in suit or not, for the same debt, duty or thing, and where a *recovery by one of the claimants will not, at law, protect the party against a recovery, for the same debt or duty, by the other claimant.* It is out of this latter circumstance that the equity to relief arises. *Badeau vs. Rogers*, 2 *Paige* 209. For although, there may be two conflicting claims or processes pending against the same party, yet if his being fixed at law for one, discharges him from the other, he needs no relief, in equity, and a bill of interpleader does not lie.

Lord Cottenham in *Sieveking vs. Behrens*, 2 *Myl. and Cr.* 591, a case between assignees in bankruptcy and attaching creditors, puts this point very clearly, when he says that the proceeding by interpleader, though necessary for the protection of the person against whom inconsistent claims are made, is yet a severe one upon the party really entitled, as it arrests him in the course of establishing a legal right, merely because some other person, who appears, ultimately, to have no title at all, sets up a claim. He, therefore, considered that so long as the course of proceedings taken, at law, by the different claimants was such as, if persevered in, would determine their respective rights as between themselves, an interpleader in equity should not be encouraged. He might

have put it more strongly and said it should not be allowed. The observations of Lord Loughborough, in *Langston vs. Boylston*, 2 *Ves. Jr.*, 109, are too broad.   They seem to imply that, under all circumstances, conflicting claims against the same party, for the same thing, are a ground of interpleader. They must be understood with the qualification here stated.   It is not, then, the mere inconvenience to a party of being subjected to different claims, but it is his liability at law, to a double payment, or double duty, from which equity will relieve him.   Thus, although a suit may be pending to recover a debt, and, at the same time, the debtor be summoned as a garnishee of his creditor for the very debt in suit, yet so long as judgment in the attachment may be reached before the creditor can prosecute his suit to judgment, equity will not intervene, because a judgment of the attachment creditor against the garnishee discharges his liability to his creditor and may, before judgment is recovered by his creditor, be pleaded in defense, at law.   But if, *after* judgment recovered for a debt, it is attached, a bill of interpleader will lie, for it is then too late—the creditor of a garnishee having recovered judgment—to plead the attachment.   It should be further remarked, in order to show the exact nature of this proceeding, that if a recovery in one of two proceedings against a party will not discharge him from the other, it matters not how doubtful may be the title of one of the claimants, this Court will, nevertheless, entertain a bill of interpleader.   The equity to it arises out of the fact that there are conflicting claims, the adjudication of one of which against the party, does not, at law, discharge him from the other.   He should not be left to weigh one claim against the other, or be at any risk as to their result, at law. *

---

*The rule as here stated is subject to a qualification which, as it does not apply to this case, is not stated in the opinion.   Agents, attorneys, tenants, &c., are not allowed to put their principals or landlords to interplead with strangers

23

From this view of the object and grounds of an inter-
pleader, it is very clear that the complainant was entitled
to relief in that mode.    Here were two conflicting
claimants—the judgment creditor and the attaching
creditor.    Both claimed the same thing—the money due
upon the judgment.    The debtor admits that he holds the
money, is indifferent between the claimants, so far. as
appears, and is only concerned so to apply it as to be
discharged from liability to pay it again.    Yet this liability
to a second payment he cannot, at law, avoid, for if he pay

---

who claim by title paramount to that of the principal or landlord; because
whatever may be the title of the principal or landlord as against a stranger,
the agent or tenant, upon grounds of good faith and public policy, is not al-
lowed to question it.    *2 Story's Eq. Jur. Sec. 816.*

The claim of the principal or landlord, as against the agent or tenant
stands upon a ground wholly independent of the title to the property or the
debt or duty in question.    He could recover at law without shewing title
He should not be put to interplead with another whose only claim rests upon
the title, debt or duty.    Nor is an interpleader requisite for the protection of the
agent or tenant for, in most cases, his recognizing the title of his principal or
landlord absolves him from liability in any other direction, or if it is otherwise in
any case, he has his remedy against his principal or landlord, as in case of a ten-
ant sued for mesne profits after an ejectment.

On the other hand, to put a principal or agent to interplead with a stranger
would have this effect.    Either his claim founded on the agency or tenancy,
independent of actual title, would be recognized, in which case the inter-
pleader would accomplish nothing,    for the question would remain still
open to controversy, at law, or his special claim would be rejected, which would
be unjustly to deprive him of a clear legal right, and would be of very mischievous
tendency.    The result is that parties can be put to interplead only where their res-
pective claims upon third persons depend upon the common ground of title to
the thing in controversy, exclusive of any personal obligation to one of the par-
ties which entitles him to assert his claim irrespective of title.    The clearest view
of this subject is found in *Crawshay vs. Thornton, 7 Sim. 391,* and *2 Myl.
Cr. 1,* on appeal before Lord Cottenham.    But where the question is whether
the principal or landlord has himself created a lien or interest in another per-
son, an interpleader between him and that person will be entertained.    The
objections before stated, obviously, do not apply. *2 Sto. Eq. Jur. 817 and cases
cited.*

the judgment creditor, or suffer it to be collected from him, the attaching creditor may still pursue him ; if the attachment was well laid, its effect is not impaired by the subsequent collection of the judgment. The attachment being issued while the execution was pending, and before its return, application for relief could not be made to the Superior Court, even if adequate relief could have been then afforded.

Then this question arises. This being a case for an interpleader, will equity relieve the debtor in any other mode ? Will it entertain a bill simply to restrain the judgment creditor from execution, until the attachment be dissolved ? For such is the prayer of this bill. I think not. This course, it is true, may avail the debtor as fully as a bill of interpleader, but it is to be considered that equity, when it interferes to protect a party situated as this complainant is, must regard, also, the rights of the other parties in the subject of controversy.

It would certainly work great injustice if this Court should interfere to restrain parties claiming the same subject-matter, from enforcing their rights at law, one of whom it is admitted, must be entitled, and yet afford them, here, no means by which their respective rights may be ascertained, and satisfaction obtained by the claimant really entitled. Besides, to allow a debtor to do what is sought to be done here, to stay the collection of a debt acknowledged to be unpaid, on the mere ground that some third person claims it, without requiring him to bring the money and the alleged claimants before this Court, would create a very dangerous temptation to fraud by the setting up of collusive claims. Hence is the proceeding by interpleader, which, though its primary object is to protect the party owing the debt or duty, or holding the property claimed, contemplates in protecting him, the due security of the rights and interests of the other parties, and therefore requires him to bring before the Court

the fund or property in dispute, and the parties claiming, so that the Court may finally adjudge the whole controversy, and do justice to all concerned ; and as a further security against fraud, the complainant is required to accompany his bill with an oath, denying collusion with either of the claimants. There is no hardship in requiring this of the complainant. For he asks relief as one owing the debt or holding the property in dispute, as being ready to pay or deliver it, and indifferent as to who may be entitled to it.

A bill of interpleader is rendered none the less necessary for the relief of this complainant by the fact that the claim adverse to the judgment creditor being under foreign attachment, he has the legal right to dissolve it by giving special bail, so that, though enjoined, he may relieve himself. For still the question presses itself upon us, why should a court of equity interfere, because of the attachment, to arrest the creditor in the collection of a debt, admitted to be unpaid, without securing the fund, when this can be done with no injustice to any one, so that the creditor interfered with may, in the result, have what is his unquestioned right, viz :—payment of it to himself, if the attachment fails, or its application in discharge of his indebtedness to the attaching creditor, if the attachment be sustained ?

The question is governed by the fundamental principle in equity, that it will so deal with any subject-matter before it, as to finally adjudicate and secure all the rights attaching to it, which are in any way involved in the controversy. Among the reported cases of relief given upon bills of interpleader, are some in which one of the conflicting claims was under a foreign attachment. Such were *Langston vs. Boylston*, 2 *Ves. Jr.* 101 ; *Sieveking vs. Behrens*, 2 *Myl. & Cr.* 581. These cases shew, at least, that as well where one of the claimants is an attaching creditor, as in other cases, an interpleader is the appropriate remedy. See also *Hilliard on Injunctions, p.* 163 & 200.

The frame of this bill seems to have been suggested by the action of the Superior Court, in *Belcher vs. Grubb*, 4 *Harring.* 461—where the Court stayed a *fi. fa.* issued against a debtor, who had been summoned as a garnishee under a foreign attachment, until the attachment should be dissolved. The Court considered that all credits, as well as those due by judgment and execution, as others, should be subject to attachment, and in order to make the attachment effectual, and to protect the debtor, stayed the execution until bail should be given. In the discussion of that case, the injurious operation of this order upon the judgment creditor was not brought before the attention of the Court. It restrained him from collecting an acknowledged debt until he should give bail in the foreign attachment, which it might be impossible for him, as a stranger, to do, to defend a claim, too, which might prove to be wholly unfounded ; the interference of the Court being grounded upon the mere formal affidavit of the attaching creditor, to an indebtedness of more than $50, and all this without requiring any guaranty against collusion, by the oath of the debtor in the *fi. fa.*, without any security from the debtor, even to the extent afforded in this Court by an injunction bond that the debt would be paid when the attachment should be disposed of,— the only security for this being the forthcoming of the goods levied on, or a suit against the Sheriff. Had the order made in that case been considered in all its bearings, we cannot doubt that the *fi. fa.* would have been stayed only upon condition of the debtor's bringing the money into Court. By this course, all the interests concerned would have been secured, for the attachment would have been made effectual, the execution debtor protected, and, at the same time, the creditor, upon dissolving the attachment, would receive the money to which he would then be entitled, without delay, or, if the attachment should be sustained, it being in the same Court, then the money might be applied to the attachment. This would have been

in accordance with the mode of relief, at law, suggested by the Lord Chancellor in *Langston vs. Boylston*, 2 *Ves. Jr.* 107. In that case Langston, a banker, having a *parcel* of value belonging to Boylston, was served with foreign attachments upon the parcel by Boylston's creditors, and, at the same time, was held to bail, in trover, for the parcel by Boylston. He filed his bill of interpleader. Lord Loughborough said that were he sitting in a court of law, he would have discharged Langston upon common bail, in the action of trover, and have stayed that action *upon his bringing into Court the parcel*, and thus have obliged Boylston to get rid of the attachments before allowing the action of trover to go on. It would seem, then, that in *Belcher vs. Green*, the payment of the money into Court should have been the condition of the Court's interference with the execution, as was the *bringing in of the parcel* in the case put by Lord Loughborough. If it so happen, in any case, that a court of law cannot conveniently thus deal with, and secure, all the interest involved in the controversy, it would seem better to remit the parties to their appropriate remedy in equity.

I must conclude, then, that even if the foreign attachment were not dissolved under the statute, the complainant could not have relief upon this bill. I should not, however, were the attachment still in force, feel obliged to dismiss the bill, but would be at liberty to give leave upon proper terms, to amend the bill so as to make it a bill of interpleader by making additional parties offering to bring the money into Court, and filing the proper oath denying collusion. But considering the attachment to be now dissolved, as against the complainant, there remains no ground for relief in any form, and I must enter a decree to dissolve the injunction and dismiss the bill with costs.

It will be observed that I express no opinion upon the question discussed at the bar, whether the judgment debt was bound by the attachment against Cropper & Brother,

the defendants, insisting that the judgment had been equitably assigned to Hitch in his life time, and that even if it had not been, and had passed to Cropper, as partner, that it was not subject to be attached for Cropper's individual debt, or for the debt of Cropper & Brother. This is a question with which the complainant has no concern. It is one between the contesting claimants, and can properly arise only under an interpleader between them. I ought not to adjudge it unless Horsey, the attaching creditor, were here, a party to be bound by the decision. The decision of such a question, in advance, would not be necessary to Hasting's right to relief by a decree for an interpleader. For it is the conflict of claims that would entitle him to relief, not the question which of the claims is valid, and which not so. The course of proceeding is this—the party subject to the conflicting claims files his bill of interpleader setting forth the claims, bringing into Court the fund, and the parties, and praying a decree for an interpleader. Thereupon it is decreed that he be discharged, and that the other parties interplead, which being done, the validity of their respective claims comes under adjudication, not before.

---

### William W. Wilson and Silas Reynolds,

*vs.*

### Louisa A. Wilson, Administratrix of Barkley Wilson, Deceased.

*Sussex, September T., 1867.*

Notice to a purchaser of lands of the mere existence of a judgment, which is a lien upon the lands, is not sufficient to affect the purchaser with any equity existing between the parties to the judgment, such as a right to have the judgment collected out of a particular tract of land.

The plaintiff in a judgment and his assignees have, as part of the contract, a right to all the remedies appropriate for its collection, including the election to enforce it against any real estate of the defendant, who cannot, afterwards, abridge this right by selling a part of his real estate, or by any special arrangement with the purchaser for the payment of the judgment out of the land sold, without the creditor's permission.

The creditor may be compelled in equity to enforce his lien first against as much of the debtor's real estate as remains unsold, but this is only at the instance, and for the benefit, of a third party, the purchaser.

PETITION FOR AN INJUNCTION TO RESTRAIN A SUIT AT LAW.—The petition set forth the following facts :— Judgment was confessed, March 2d, 1852, by William W. Wilson, as principal, and Barkley Wilson, Josiah Marvel, James Wilson and Silas Reynolds, as sureties, in favor of the Farmer's Bank, for $670, with interest from February 19th, 1852. At the same time William W. Wilson was the owner, in fee simple, of a tract of one hundred acres on which the judgment was the only lien. On September 1st, 1852, William W. Wilson and Levin Pettyjohn agreed for an exchange of farms, the above mentioned farm of Wilson, for one of one hundred and eleven acres, then held by Pettyjohn. Mutual deeds of conveyance were executed by them and their wives, the the same day. The farm, originally of Wilson, afterwards, passed by sundry mesne conveyances to Daniel J. Layton. Thus, Pettyjohn and wife conveyed to C. S. Layton, who, as is alleged, had notice of the judgment, doubtless meaning, when he bought, although the petition is not explicit ; Layton conveyed to Jacob D. Kimmey "who had like notice." Next, both farms were sold by the Sheriff under a judgment against Pettyjohn, and the original Wilson farm was bought by Caleb R. Layton, he, then and there, having like notice of the judgment," and he for the nominal sum of $100 conveyed to Jacob D. Kimmey, who conveyed to Daniel J. Layton, who had "like notice of the judgment."

On the return of the Sheriff's sale, Wilson applied to have the proceeds of the Wilson farm applied to the Farmer's Bank judgment, but the Court refused, upon the ground that only Pettyjohn's interest was sold, leaving the tract, still subject to that judgment, in the hands of the purchaser. The sale was confirmed and Wilson turned out of possession of the farm he bought from Pettyjohn. Barkley Wilson, one of the surities, paid the bank judgment, and took an assignment, but not according to the Statute. He then employed an attorney to collect it out of the Wilson farm, but died before this had been effected, and the attorney in fact of the administratrix, desired the attorney to proceed, but before the assignment was completed a *scire facias* was ordered by other attorneys, and a *non suit* was granted. Afterwards a new assignment was obtained by the administratrix, and *scire facias* No. 72 to October term, 1866, was issued at suit of the administratrix as assignee of the Farmers' Bank, against Wm. W. Wilson and Silas Reynolds, who have survived Josiah Marvel, James Wilson and Barkley Wilson, deceased. No *terra tenants* of lands of Josiah Marvel and James Wilson, nor Daniel J. Layton, nor *terre tenants* of the Wilson farm (though it was the only land of Wm. W. Wilson at the date of the judgment) were summoned or made parties in the *scire facias*. The petition charges that the object of this omission was to collect the judgment out of lands of William W. Wilson, acquired since the date of the judgment, and out of lands in possession of Reynolds as *terre tenant*. It was further alleged that the Wilson farm was of ample value to pay the judgment. The prayer was for an injunction to restrain further proceedings in the *scire facias* until the administratrix has exhausted her remedy against the Wilson farm.

*Wright*, for the petitioners, upon filing the petition, moved for an injunction.

24

THE CHANCELLOR :—

The injunction must be refused.    There are two objections.

1. One is founded upon the rights of the present holder of the Wilson farm.  He is a purchaser for a valuable consideration, deriving title also through a succession of such purchases.  So I must assume, nothing to the contrary being alleged, except as to the consideration of the deed from C. R. Layton to Kimmey, after the Sheriff's sale.  I can attach no effect to this.  Nor is he affected with notice of any equity, even if there had been such, between the original parties, Wilson and Pettyjohn, making the land chargeable with the judgment in the hands of Pettyjohn to the relief of Wilson, as if the amount of the judgment had been deducted from the purchase money paid by Pettyjohn, upon the understanding that Wilson should be relieved from the judgment.  No such arrangement is alleged, and it cannot be presumed ; but even if it had been, and out of it an equity had arisen in favor of Wilson against Pettyjohn, it would not follow a purchase from him for a valuable consideration, and without notice that Pettyjohn took the land subject to such arrangement. Notice of the existence of the judgment, which is alleged with respect to all the purchases, is not sufficient to make the purchasers of the land first liable.   A purchaser, knowing that the land he buys is subject to an existing judgment against the vendor and nothing more, may fairly rely (if he chooses to risk it) upon the ability of the vendor to pay the judgment, and upon his, the purchaser's, well understood right to have any other estate of the debtor first applied to a lien in exoneration of land sold to a purchaser for consideration.   Again, the fact that the land sold by Pettyjohn to Wilson, in exchange for the Wilson farm, was afterwards sold in execution of a judgment against Pettyjohn, so that, in the result, the consideration for Wilson's conveyance failed, does not

affect the present holder of the Wilson farm. Whether, even if the farm still remained in Pettyjohn, equity would undertake, in this indirect way, to indemnify Wilson, instead of leaving him to his legal remedy, might be questioned. But, at all events, this circumstance does in no way affect the present holder. Neither he, nor any through whom he derived his title, is alleged to have purchased with notice of it. And, in fact, the title to the Wilson farm had passed from Pettyjohn through two purchasers, C. S. Layton and Kimmey, before Wilson was divested of the land conveyed to him in exchange, so that, so far as this circumstance was concerned, the title to the Wilson farm stood complete in those two purchasers, and as it stood in them it must pass to their purchasers, even if they had had notice of the Sheriff's sale before their purchases.

2. The other objection is founded upon the rights of the judgment creditor. Wilson, in giving the Bank this judgment, gave to the Bank and to its assignees, as part of the contract, all the legal remedies appropriate for its collection, and among them the election to enforce it against any part of his real estate then held or to be acquired. It was not competent for him, afterwards, to abridge, in any degree, this right of election, by selling a part of his real estate, or even by any special arrangement (had there been such) between him and the purchaser, for the payment of the judgment out of the land sold, made without the creditor's permission. It is true that when a debtor sells part of his real estate, which is all subject to a lien, equity will oblige the creditor to proceed first against the remaining estate of the debtor, but this is done at the instance and for the benefit of a third party, the purchaser, and in consideration of his equity as a purchaser for value. It will not be done in favor of the debtor himself, conrtrary to rights arising out of his own contract. It was a long time before, even in favor of a surety, a creditor would be compelled first to proceed against the principal. *Hayes vs. Ward*, 4 *Johns, Ch.* 132. But in favor of the principal

debtor, equity will not interfere with the creditor's choice of any one of several funds to which his judgment entitles, him at law, to resort. A contrary doctrine was held by Lord Thurlow in a very remarkable case, *Wright vs. Nutt*, 1 *H. Bla.* 136, and by Lord Loughborough, extrajudicially in *Folliott vs. Ogden, Ib.* 135 ; but against these are the greater authority of Lord Parker in *Holditch vs. Mist*, 1 *P. W.* 695, and Lord Eldon in *Wright vs. Simpson*, 9 *Ves. Jr.* 728. The doctrine of Lord Thurlow is considered as overruled, 1 *Sto. Eq. Jur. Sec.* 640. It can make no difference that the lands, now held by Wilson, and against which the judgment, if recovered may be used, were acquired *after* the date of the judgment. The judgment must be supposed to have been given in contemplation of the creditor's right, under it, to take land, after acquired, as well as land then held.

It may be that the judgment was recovered adversely and not confessed under a warrant of attorney. Still the creditor's rights would be of the same nature, whether arising out of contract with the debtor in the execution of a bond and warrant, or whether attached by law to the judgment record.

I may add that Reynolds, as a surety, holds a position different from that of Wilson. He is entitled, should Wilson's other property prove insufficient, to have the Wilson farm applied to exonerate him. But this affords no ground to restrain the revival of the judgment against him,—certainly none to restrain its revival against Wilson, and it must be against both, if revived at all. Reynold's rights, as a surety, can be sufficiently protected, after the judgment, by the control of execution upon it. The omision to serve the *terre tenants* of the Wilson farm can make no difference as to him. I do not see that it would preclude the creditor from a *scire facias* against the *terre tenant*, hereafter, if necessary ; but, at all events, the creditor's omission, however it might affect *his* power to proceed

under his judgment, if the Wilson land were thus necessary to complete the collection of it, would not be allowed to prejudice the surety, but the creditor would lose his remedy against him.

---

## DANIEL C. GODWIN,

### *vs.*

## STEPHEN M. COLLINS.

### *Kent, March T. 1868.*

A specific performance will not be decreed of an agreement in writing for the sale of land, under which one-half of the purchase money was to be paid by the purchaser upon the delivery of possession of the premises, and the balance in instalments of five hundred dollars each, payable with interest, annually, commencing January 1st, 1868, there being no provision for securing such deferred payments, notwithstanding, the complainant tenders one-half the purchase money on the day appointed, and his bond and mortgage of the premises for the deferred payments, as stipulated, and in his bill submits himself to the order and direction of the Court in that particular.

A provision for securing deferred payments may not be technically one of the constituents of a contract in its legal definition, but it is a very material ingredient in considering the question of the fair and equal operation of the contract, and such provisions not having been waived, but its necessity inadvertently overlooked, the contract being in that particular immature, a court of equity, exercising that discretion which appertains to its jurisdiction for specific performance, ought not to execute the contract according to its terms, and it has not the power to supplement the contract, by prescribing some mode of security which the parties have not, themselves, stipulated for.

The vendor's equitable lien for the unpaid purchase money would be, at best, but a very imperfect and inadequate security, and, indeed, it is in doubt whether the vendor's lien is recognized in this State, the necessity for it having been superseded and the policy of our law being against liens not of record.

It is the established doctrine of courts of equity that a decree for the specific performance of a contract of sale is not a matter of course, but rests entirely in the discretion of the Court upon a view of all the circumstances.

The limit of the discretion exercised by the Court in such cases is that it must necessarily judge whether, under the circumstances of the case, the contract is or is not an inequitable one. That being determined, judicial discretion ceases, and then, and not before, supposing the contract to have been entered into by a competent party and to be in its nature and circumstances unobjectionable, specific performance becomes a matter of course.

BILL FOR SPECIFIC PERFORMANCE.—The bill was filed to obtain a specific performance of a written agreement made by the defendant for the sale, to the complainant, of a farm then owned and occupied by the former. The only written evidence of the agreement, as set forth in the bill, was a receipt under seal, as follows :—

Rec'd Aug. 20, '66, of D. C. Godwin Ten Dolls. in part payment of the purchase money of the farm and premises where I now live, containing sixty-six acres, possession to be given on or before Jan. 1., 1867, clear of all taxes or incumbrances whatever, four thousand dolls. to be paid when possession given, the remainder in instalments of $500 each, payable with interest annually, commencing Jan. 1, 1868, the said Godwin, to have the privilege of anticipating the deferred payment—Witness my hand and seal.

S. M. COLLINS     { SEAL. }

the whole purchase money to be eight thousand dollars.
    $8000         .             S. M. COLLINS.

Several grounds of defense were taken in the answer, but the view of the case taken by the Court, and upon which the decree rested, renders it unnecessary to set forth the statements of the bill and answer, or the depositions.

*Comegys*, for the complainant.

The jurisdiction here invoked is very ancient. It goes back to decisions and practice four hundred years ago, and is supposed, by some judges, to have existed *ab initio.* It is likewise a very beneficial jurisdiction resting upon strictly just principles and its propriety was never questioned. It is not derived from the civil law, but was of English origin, and was not founded upon statute. The origin and object of the jurisdiction are clearly stated in the authorities. 3 *Pars. on Cont.* 350 ; 1 *Fonbl. Eq.* 27—8 ; *Lumley vs. Wagner,* 1 *DeG., M. and G.* 604, 619. *and* 13 *E. L. and Eq.* 557 ; *Mitf. Eq. Pl.* 96 ; *Alley. vs. Deschamps,* 13 *Ves* 228 ; *Halsey vs. Grant, Ib.* 76 ; *French v. Macale,* 2 *Dru. and War.* 272.

Undoubtedly the exercise of the jurisdiction rests in the discretion of the Court. But the discretion is judicial and not arbitrary. If the parties are competent and the contract unobjectionable it is as much of course to decree performance in equity as to give damages at law. *Hall vs. Warren,* 9 *Ves.* 608 ; *Flint vs. Brandon,* 8 *Ves.* 159 ; *Lennon vs. Nopper,* 2 *Sch. & Lef.* 682 ; 3 *Pars. on Cont.* 355.

In the present case we are remediless otherwise, since the case does not admit of adequate damages at law. Damages must be the " natural and proximate conse- " quences." 2 *Gr. on Ev. sec.* 256. And damages for the non-conveyance of land are measured by the value at the time of the breach, nothing else. *Sedg. on Dam.* 192 *note* 1.

Such damages would not make up the losses suffered in this case, such as the desire for this particular place, its suitableness for the future residence of complainant's family, and convenience to his business, the derangement of his matured plans and chagrin under the disappointment occasioned by the defendant.

The exception to the rule that performance will be

decreed is, when, from the nature of the contract, there is no value in it but such as damages would compensate.

There is nothing in the circumstances of this case which makes it improper to grant the relief. The distinction between contracts for sale of land and personalty, is in our favor, the former being usually enforced, the latter not; because breach of the former is not to be compensated, adequately, in damages. 3 *Pars. on Cont.* 364-5.

The influence of Godwin, invoked by way of defense, rests upon the proof of a single conversation in which complainant advised defendant to sell his farm   It was nothing more than is usual in the common course of such negotiations, and argues no fraud. Collins' purpose to sell, without respect to the influence of Godwin, was clearly shewn by the evidence. The defense that the farm was purchased with the money of defendant's wife, would entail such consequences as to destroy confidence in all sales of land, and to make all such dealings unsafe. But the claim is only that the farm was purchased with the proceeds of the sale of the farm belonging to her. If this be true, which we deny, still, this Court has no power over those proceeds, and no equity whatever attaches to them, as it does, for example, when a husband applies to a court of equity for aid to recover the wife's property. *Clancy on M. W.* 441-2; 2 *Kent Com.* 141.

But it is objected that the contract is defective for uncertainty, in not shewing how the balance of the purchase money is to be secured.

The law fixes terms when the contract does not, viz; that the vendor shall have a lien as between the parties. A specific mode of security is not essential to the contract, even though usual. Any special security becomes a mere substitute for the equitable vendor's lien. The mode of security need not be specified, but the Court may see to it that the party is made secure, and to this we submit ourselves. *Young vs. Paul,* 2 *Stockt. N. J. Eq.* 402.

But such an objection is avoided by our tender of security in accordance with the actual stipulation of the parties, as stated by the complainant, January 1st, 1867, and not objected to. The tendered mortgage would have been a good security, operating by way of estoppel.

The defense that the contract was not stamped, cannot avail, because it may be stamped before being read in evidence, and the Court would, if necessary, permit the cause to stand over that it might be done. *Sugd. on Vend.* 62. But the defendant cannot be permitted, in equity, to take advantage of his own omission to affix a stamp. And equity will enforce, when good conscience requires, a contract defective or void, at law. 3 *Pars. on Cont.* 355.

Respecting the power to compel execution by the wife,—if she has an equitable estate, she may be compelled to join under her own contract. If she has a legal estate, she cannot be compelled even under the most solemn contract. If the husband covenants to procure her joinder in a conveyance of his legal estate, he might, formerly, be decreed to procure it, subject to be attached if he did not ; for it is presumed that he covenanted with her consent. This is not done now, however, and we ask no decree operating on the wife either directly or by attaching the husband.

*Ridgely* and *Watson*, for the defendant.

1. A specific performance is not a matter of right, *ex debito justitioe*, but rests in the sound discretion of the Court to be exercised upon all the circumstances of the case, and any circumstances of injustice, inequity, hardship and the like, avail as a defense. *Seymour vs. Delaney* 6, *Johns, Ch.* 222 ; *S. C.* 3 *Cow.* 445. 505. 508, 526 ; *Torrey vs. Buck*, 1 *Green's Ch.* 367, 375 ; *Ely vs. Perrine Jr. Ib.* 396, 402 ; *Meeker vs. Meeker*, 15 *Conn.* 403 ; *Tyson vs. Watts*, 1 *Md. Ch.* 13 ; *Gould's Ex'r vs. Womack*, 2 *Ala.* 83

—9ĭ ; *Perkins vs. Wright*, 3 *Har. & McHen.* 327 ; *Leigh vs. Crump*, 1 *Ired. Eq.* 296, 302 ; *St John vs. Benedict*, 6 *Johns. Ch.* 111 ; 1 *Sto. Eq. Jur. sec.* 742, 769 ; *Radcliffe vs. Warrington*, 12 *Ves.* 331 ; *Harnett vs. Yeilding*, 2 *Sch. and Lef.* 548 ; 3 *Pars. on Cont.* 351 *note (e)* ; *Myers vs. Watson*, 7 *E. L. and E. Rep.* 69 ; *Gasque vs. Small*, 2 *Strobh. (S. C.)* 72, 77.

The complainant has not shewn a proper case even were there no defense. The facts assumed as a proper ground of relief, are not sustained by the proof, and there is no loss incurred by the complainant which cannot be adequately compensated in damages.

2. The contract was obtained by improper means, being executed under undue haste and influence, and instantly, upon Collins' consent being obtained, drawn on the spot by the complainant himself, and executed without a witness.

Misrepresentations, though not in writing, if calculated to mislead in any thing essential, would deprive the complainant of relief, and leave him to his remedy at law. There must be, on his part, entire propriety of conduct, and any suspicion or doubt cast upon it avails as a defense. *Miller vs. Chetwood*, 1 *Green's Ch.* 199, 208 ; *Cadman vs. Horner*, 17 *Ves.* 10, 11 ; *Pars. on Cont.* 492 ; 1 *Madd. Ch. Pr.* 320—1 ; 1 *Sto. Eq. Jur. secs.* 750, 769 ; *Cathcart vs. Robinson*, 5 *Pet.* 364, 277 ; *Mortlock vs. Buller*, 10 *Ves.* 292 ; *Campbell vs. Spencer*, 2 *Binn.* 129, 139 ; 3 *Pars. on Cont.* 416, *note k* ; *Phillips vs. Duke of Bucks.* 1 *Vern.* 227 ; *King vs. Morford*, 1 *N. J. Eq. (Sax.)*, 281.

Though there may not be what amounts to fraud, yet a want of equality and fairness in the contract will be fatal. *Fry on. Spec. Perf.* (100 *Law Lib.*) 92 ; *Twining vs. Morrice*, 2 *Bro. C. C.* 326 ; *Willan vs. Willan*, 16 *Ves.* 72.

3. Where a specific performance is asked for, the contract should be certain, fair and just in all its parts. If any of these ingredients are wanting, equity will not relieve. *Fry on Spec. Per.* 83, *sec.* 203 ; *Buxton vs. Lister,* 3 *Atk.* 382 ; 1 *Sto. Eq. Jur. sec.* 769. This contract was either incomplete or unfair. It makes no provision for securing the deferred payments. The vendor's lien would be no security if Godwin should resell to an innocent purchaser. In such case, Collins would be wholly unprotected, as the lien would not go beyond the vendee's possession, and even against him the vendor would be put to his remedy in chancery.

4. A decree for a specific performance in this case would be a wrong upon the wife's right.

(1.) The farm was purchased with the proceeds of her maiden property. The proof shows that another farm, belonging to her, was sold, on the express understanding that the proceeds should purchase this farm. The object of the sale of that property was not a conversion of it into personalty, but an exchange of properties. In equity, money may be followed by the real owner into whatever property it may pass. 2 *Sto. Eq. Jur. sec.* 1259 ; 2 *Washb. on R. P.* 171-2 ; *Tarpley vs. Poage,* 2 *Tex.* 139 ; *Graham vs. Graham,* 1 *Ves. Jr,* 275 ; *Mackreth vs. Symmons,* 15 *Ves.* 349 ; *Lyford vs. Thurston,* 16 *N. H.* 399 ; *Lloyd vs. Spillet,* 2 *Atk.* 148 ; *McLenan vs. Sullivan,* 13 *Iowa* 521 ; *Sugd. on Vend.* 443.

(2.) The Court will not compel the wife to join in a deed, and will not commit the husband, because it would constrain the wife. Hence, equity will not interfere to compel specific performance where the wife's joining is necessary and she refuses to consent. *Fry on Spec. Perf.* 202. *sec.* 266 ; *Wooden vs. Morris,* 2 *Green's, Ch.* 65 ; 4 *Vin. Abr.* 202 ; *Young vs. Paul,* 2 *Stock. Ch.* 401 ; *Martin vs. Mitchell,* 2 *Jac. & Walk* 418 ; 1 *Sto. Eq. Jur. secs.* 731-4

*and note; Davis vs. Jones,* 4 *B. & P.* 267 ; *Clark vs. Reins,* 12 *Grat.* 98 ; *Weed vs. Terry,* 2 *Doug. Mich. R.* 344.

5. The contract is void for want of a United States internal revenue stamp. The bill sets out a contract properly stamped, which is an implied allegation that it was stamped, otherwise, supposing a stamp necessary, the bill would be demurrable. Hence the answer denying the stamp is responsive. The stamp must be affixed at the time of execution. *Rev. Laws, W. S. P.* 119 ; 3 *Pars. on Cont.* 344.

6. The contract not being signed by both parties, is not of mutual obligation. Collins had no remedy upon it. *Lawrenson vs. Butler,* 1 *Sch. & Lef.* 18 ; *Fry on Spec. Perf.* 108, *Sec.* 286 ; *Bromley vs. Jefferies,* 2 *Vern.* 415. Also *see* 1 *Ves. Jr.* 334 *note* 4.

THE CHANCELLOR :—

Of the several grounds taken in argument against a decree for the specific performance of this contract, it has been found necessary to consider only one, that is, the omission in the memorandum of the contract of any provision for securing the deferred payments of purchase money. Two points must be observed at the outset, in order that we may the better appreciate the effect of this omission upon the complainant's case. First, is the gross inequality and improvidence of the contract without some security, for deferred payments of such large amount. Here is a credit given for one-half the purchase money, of real estate, a sum not less than $4000.00. The credit is to run during eight years after the vendor shall have parted with his title and possession, and yet is to be not only without the usual form of security by bond and

mortgage, but even without any evidence of the complainant's personal obligation to pay, such as a bond, note or even due bill, leaving in defendant's hands, in lieu of his lands, nothing whatever, whereby to charge the complainant. For the sole written evidence of the complainant's responsibility, viz : the receipt, is his property, and comes now from his possession. Now, though a provision for securing deferred payments may not be technically one of the constituents of a contract in its legal definition, it is certainly a very material ingredient in considering the question of the fair and equal operation of the contract, so much so that such a provision is uniformly inserted in contracts for the sale of real estate, and the present one is, doubtless, the only known exception. The other feature of the case to be here noticed, is, that provision for the deferred payments was omitted in this memorandum, not because the defendant chose to waive it, but through an oversight of the necessity for it, an oversight due to the hasty conclusion of the contract before its terms had been matured in the minds of the parties, to which result, moreover, the complainant was himself instrumental, though it should be added in justice to him, without any improper design. In the negotiation which had been pending for some two or three weeks prior to the date of the contract, (August 20, 1866,) the minds of the parties were fixed only upon the question of price, Collins insisting upon $8000.00, Godwin offering $100.00 per acre. On the 17th of August Godwin first acceded to Collins' price and to his terms of payment, *i. e.* $4000.00 to be paid in cash on the delivery of possession, and the balance in annual instalments of $500.00 or $1000.00 each, with interest annually. But nothing was at that time said, and doubtless nothing thought of, by the parties, as to the mode of securing the deferred payments. The further detail of the negotiation was held in suspense by the necessity of obtaining the consent of Collins' wife to a sale before a conclusion could be reached. For this time was given. At the next meet-

ing, three days afterward, Collins announced the decision of himself and wife to sell. Now, it is just at this point that the question would be expected to arise, how shall the deferred payments be secured? It is impossible to believe that, had the bargain been concluded with the usual deliberation and legal formalities, a provision so important, and one uniformly introduced into such contracts, would have failed, as it did, to be, at least, considered. But Mr. Godwin's anxiety to secure the bargain precipitated it to an instant conclusion, and on his suggestion, without any deliberation or opportunity to mature its terms in detail, there is written by him, not the appropriate and usual form of contract, but a receipt for $10.00 on account of purchase money, embracing a statement of the bargain, but so hastily and loosely drawn that the price of the farm is not stated in the body of the receipt, but is added in a note below. And thus the usual security for the deferred payments was not provided, neither was it waived, but it was wholly overlooked. This construction of the acts of the parties is presumable not only from the unusual and unequal character of the contract as it stands, and from the extreme haste and looseness of the transaction, but additionally and very strongly, from the evident understanding of the complainant himself, that security for the deferred payments was not waived, as shewn by his tendering a bond and mortgage, the usual form of such security, before demanding a conveyance.

Let me now state the ground of the decree dismissing the bill. Considering that the contract, without any security whatever for the deferred payments, is hard and unequal, that if so executed it would work injustice between the parties, and that such provision was not waived but its necessity inadvertently overlooked, the contract, being in this particular, immature, I am of opinion that a court of equity, exercising that discretion which appertains to its jurisdiction for specific performance, ought not to execute the contract according to its terms, and that it has

not the power to supplement the contract by prescribing some mode of security which the parties themselves have not stipulated for.

Against this conclusion several arguments were pressed by the complainant's counsel.    First, that the lack of any special security for the deferred payments would be supplied to the defendant by the vendor's lien for purchase money.    This, if true, would afford only a precarious security, since the vendor's lien does not follow land into the hands of. a purchaser for value and without notice. But whether what is known in England as the vendor's lien, is here recognized, remains in doubt since the case of *Budd vs. Busti & Vanderkemp,* 1 *Harring.* 69, in the Court of Errors and Appeals.    In that case, though the decision went upon other grounds, a majority of the judges expressed opinions decidedly adverse to the recognition in this state of a vendor's lien for purchase money.    The policy of our law is against liens not of record, and the necessity for the vendor's lien is practically superseded by the long settled and uniform habit of our people to take special securities for unpaid purchase money.    Next, it was insisted that the Court might, by its decree, direct that, bond and mortgage, or some other sufficient form of security, be given by the complainant for the deferred payments as a condition of a conveyance to him, the complainant having, by his bill, submitted himself to the direction of the Court in the premises.    But the Court cannot oblige the defendant to accept a security, however adequate it may be, which he never stipulated for, simply because the complainant is willing to give it.    Clearly, this would be to make a contract for the parties rather than to execute one made by them.    That the Court has no such general power, is a point not to be discussed. See *Ormond vs. Anderson,* 2 *Ball & Beatty* 183.    There are, indeed, a few cases, altogether exceptional, in which the Court has, in decreeing a specific performance, imposed upon a party some terms not stipulated for in the contract.

That has been done when a performance having been partially made, its completion according to the strict terms of the contract has become impracticable ; as through some defect of title or outstanding incumbrance, or change in the condition of the property.   In such case where the parties have already acted under the contract and their interests have become so involved that they cannot be put *in statu quo*, the Court, in order to prevent gross injustice, will complete the execution of the contract; making such equitable adjustment between the parties by way of compensation or indemnity as circumstances may admit of.   *Davis vs. Hone*, 2 *Sch. & Lef.* 340, and *Young vs. Paul*, 2 *Stockt. N. J. R.* 402, are cases of this class.

But the third and the more earnestly argued ground taken for the complainant, was that which challenged the discretionary character of the jurisdiction of the Court for specific performance.   It was insisted that the contract being in writing within the Statute of Frauds, sufficiently certain in what is expressed, and unimpeached for fraud or for mistake in the omission of any provision agreed upon and intended to be inserted, a court of equity is bound to enforce it without respect to consequences, the Court not having, as the argument assumes to be the now settled law, a discretion to withhold its interference and leave the parties to their legal remedies upon the ground that in its judgment a specific performance will, under the circumstances, work injustice.

A patient examination of the whole course of decisions on this subject has left with me no doubt that, as a matter of judicial history, such a discretion has always been exercised in administering this branch of equity jurisdiction.   It is the established rule that "a specific "performance of a contract of sale is not a matter of "course, but rests entirely in the discretion of the court "upon a view of all the circumstances."   So Chancellor Kent sums up his review of the authorities in *Seymour vs. Delancy*, 6 *Johns. Ch. R.* 225.   More fully stated, the

doctrine is this. In a court of law, if a contract be between competent parties, and if, when for the sale of lands, it be reduced to writing, a breach of it is actionable, notwithstanding it may be hard and unconscientious: though this a jury may consider in assessing damages. So, a court of equity will not interfere to set aside a contract upon any ground short of incompetency or fraud; but when called upon to enforce a contract specifically, the Court will go further and inquire whether the contract is an equitable one,—such as a court of equity, seeking only to do equity, ought to enforce. Not that this Court will weigh nicely the relative advantages or disadvantages of a bargain fairly made; but it will consider whether, either from gross inadequacy of consideration or inequality of terms, such as shocks the common sense of justice, or from anything in the relations of the parties or in the circumstances of the contract, it is unconscientious for a party to exact his advantage. Now, as it is impossible to reduce, within the limits of a legal definition or rule, the various and complicated transactions which may render a contract inequitable, the Court must, unavoidably, deal with each case upon its own circumstances. Herein, precisely, appear the nature and limits of the discretion assumed by the Court for this branch of its jurisdiction, and also in what sense it is that a specific performance is said to be "not a matter of course." The relief lies in the discretion of the Court so far, and only so far, that it must necessarily judge whether, under the circumstances of the case, the contract is or is not an inequitable one. That being determined, judicial discretion ceases : then, not .before, what was quoted in argument from Sir Wm. Grant, 9 *Ves. Jr.* 608, becomes applicable, that "supposing the contract to have been entered into by " a competent party and to be," he adds, "in the nature " and circumstances of it unobjectionable, it is as much of " course in this Court to decree specific performance as to " give damages at law."

26

This doctrine of the discretionary character of the jurisdiction for specific performance, if traced historically, will be found to have sprung necessarily out of the objects for which the jurisdiction came to be exercised, and to rest upon solid grounds. The jurisdiction is very ancient. According to *Fonblanque, Book I, Sec.* 5, *n.* (o), it was established as early as the reign of Edward IV, and, as was said in the argument, the relief it affords is "the natural and better remedy," which the Courts of law fail to afford only because their modes of procedure are unsuited to it. Yet, in point of fact, the courts of equity have never treated specific performance as a merely alternative relief to that of damages at law, such as might be resorted to at a plaintiff's bare election; but they have always administered it only as a supplementary remedy, in order to effect more complete justice in cases where damages afford an inadequate redress. Lord Redesdale, in *Harnett vs. Yielding,* 2 *S. & L.* 552; Sir Wm. Grant in *Hunt vs. Brandon,* 8 *Ves. Jr.,* 162. Hence it is that to contracts for chattels or money, the equitable remedy was not applied except in special cases; as where a chattel, such as a picture, has a peculiar value, not to be measured by damages. Under contracts for lands this relief came to be general, the performance of such contracts, specifically, being always considered the only adequate remedy. Lord St. Leonards, who was quoted from 13 *Eng. L. & Eq : R.,* 257, does not there claim for this jurisdiction a larger application than has been stated; and taking it to be thus limited, still it affords ample scope for his Lordship's high commendation of it as being founded in natural justice and conducive to a general spirit of good faith and fair dealing. This jurisdiction being thus, as it was often termed, an "extraordinary" one, exerted originally in order to effect more complete justice in certain cases where the courts of law failed, it came naturally to be considered that the Court ought not to exercise it when, under the circumstances, it would work injustice between the parties; and that rather than even

hazard such a consequence, it were better to remit the parties to their old remedy at law. Says Lord Redesdale, in 2 *S. & L.* 554, "under these circumstances," *i.e.*, where injustice may be done by a decree, "I think considerable "caution is to be used in decreeing specific performance of "agreements, and the Court is bound to see that it really "does that complete justice which it aims at and which is "the ground of its jurisdiction." The caution of the Court in dealing with these cases was further enforced by another consideration adverted to in the earlier decisions, viz ; that while at law, a jury may mitigate damages according to the circumstances, a court of equity, if it act at all, must do so with unmitigated severity, enforcing the contract strictly and under all circumstances. Lord Somers in 5 *Viner* 539 ; Chancellor Kent in *Seymour vs. Delancy*, 6 *Johns. Ch. R.* 230. It is an objection, of not a little force, to this doctrine of judicial discretion, that it involves some uncertainty in decisions, since different minds may be differently affected as to the equities of particular cases. But the alternative is between this and the rigorous execution of all contracts made between competent parties and in legal form, however hard and unconscionable they may be ; and it is in accordance with settled judicial sentiment, founded upon great reflection and experience, that on the whole, it will work the less inconvenience and injustice to confide each case to the sound discretion and conscience of the Court, subject to correction upon appeal.

But, whatever be the grounds of the doctrine, the discretionary character of the jurisdiction for specific performance, the power to grant or refuse relief according to the equities of the particular case, has become settled by authority of the most eminent judges of all times ; such as Lord Chancellors, Somers, 5 *Viner*, 539 ; Macclesfield, *Prec. in Chan.* 538 ; Talbot, *Cas. temp. Talb.* 234 ; and with great clearness and precision, by Lord Hardwicke in several cases, 2 *Atk.* 133 ; 3 *Atk.* 385, 388 ; 1 *Ves. Sr.* 12, 279.

That great judge said, in *Joynes vs. Stratham*, 3 *Atk.* 388, "the *constant* doctrine of this Court is that it is in their dis-- "cretion whether in such a bill they will decree a specific " performance, or leave the plaintiff to his remedy at law." In *Buxton vs. Lister*, 3 *Atk.* 385, he said, "nothing is more " established in this Court than that every agreement of this "kind" (*i. e.* of which a specific performance is sought) "ought to be certain, fair and just in all its parts. If any " of these ingredients are wanting in the case, this Court will " not decree a specific performance. For," he adds, "it is " in the discretion of the Court whether they will decree a " specific performance, because, otherwise, as I said before, " a decree might be made which would tend to the ruin of " one party." Again, in *Underwood vs. Hitchcock*, 1 *Ves. Sr.* 279, the same Judge, refusing to enforce a contract upon an inadequate consideration said. "the rule of equity in " carrying agreements into specific performance is well " known; and the Court is not obliged to decree every agree- " ment entered into, though for valuable consideration, in " strictness of law, it depending on the circumstances. And, " undoubtedly, every agreement of which there should be a " specific performance ought to be in writing, certain and " fair in all its parts, and for adequate consideration; and " on all the circumstances of this case there is not sufficient "ground to decree this." *In City of London vs. Nash*, 1 *Ves. Sr.* 12, Lord Hardwicke, in a case where a lessee, covenant- ing to rebuild some old houses, had rebuilt some and only repaired others, held, on a bill for specific performance that the covenant obliged the lessee to rebuild all; but said, "the " most material objection for the defendant and which has " weight with me is, that the Court is not obliged to decree " a specific performance, and will not, where it would be a " hardship, as it would be here, *i. e.*, to oblige the lessee to " pull down what he had repaired at considerable expense." And this ground of hardship was carried even further in *Farrie vs. Brown*, cited 2 *Ves. Sr.* 304, where a defendant had contracted to convey a small estate which he held under a

will upon condition that if he should sell it, one half the purchase money should go to his brother. Lord Hardwicke is reported to have said that the hardship alone of losing half the purchase money " was sufficient to determine the "discretion of the Court not to interfere but to leave them "to law." These latter cases are cited only to show how wide the discretion of the Court was then held. Whether we may consider the discretion to have been well exercised in all these cases is not the question. The same views have been expressed by later English judges ;—By Lord Eldon, in *White vs. Damon*, 7 *Ves. Jr.* 34; *Mortlock vs. Buller*, 10 *Ves. Jr.* 303 ; by Lord Erskine, in *Radcliff vs. Warrington*, 12 *Ves. Jr.* 332 ; by Lord Redesdale. in *Harnett vs. Yielding*, 2 *S. and L.* 552 ; by V. Ch. Plumer, in *Howell vs. George*, 1 *Madd.* 17 : by Lord Brougham, in *Gould vs. Kemp*, 2 *Myl. & K.* 304 ; by V. Ch. Sir L. Shadwell, in *Kimberly vs. Jennings*, 6 *Simons* 340, and *Talbot vs. Ford*, 13 *Simons* 173 : by Lord Langdale, M. R., in *Wedgwood vs. Adams*, 6 *Beav.* 600; (cited in 2 *White and Tudor Lead. Cas. in Eq.*, *Part* 1, 556 ;) and by V. Ch. Cranworth, in *Meyers vs. Watson*, 1 *Simons' N. S.*, 323 ; 7 *Eng. L. and Eq. R.*, 69.

I have read, with care, these later decisions. The Courts have in them exercised the same free discretion in granting or refusing a specific performance according to the equities of the case which was asserted by the early judges, and especially by Lord Hardwicke. In some of these cases hardship and unreasonableness in the terms of the contract were alone held a sufficient objection. Thus, in *Kimberly vs. Jennings*, 6 *Simons* 340, in a contract to serve the plaintiffs, who were factors and merchants, as a clerk for six years, the defendant stipulated that during the term, he would not be engaged in any other employment. By another provision, the plaintiffs reserved the power at any time to discharge him for certain causes, themselves being judges. They did discharge him and afterwards filed a bill to restrain him from

engaging in the service of other factors and merchants. It was insisted by the plaintiffs that the clause restricting the defendant from entering into any other employment applied to him after his dismissal. The Court was doubtful as to the construction of the clause, but say, "supposing, however, the meaning of the agreement to be such, still it affords a strong reason against the interference of the court ; for it would be what is commonly termed a hard bargain, and upon this, as one among other grounds, the Court refused to interfere. The authority of this decision is questioned by Lord St. Leonards, in 13 *Eng. L. & E. R.* 258, but it was upon a wholly different point not at all touching the present question. So, in *Wedgwood vs. Adams* 6 *Beav.* 600 (cited in 2 *Wh. & T. Lead. Cas.* 556) where trustees who joined their *cestui que* trust in a contract of sale personally agreed to exonerate the estate from incumbrances. There were considerable incumbrances, and it did not appear but that the purchase money would be insufficient to discharge them, in which case the trustees would be liable for the deficiency. Lord Langdale, deeming it an unreasonable contract, refused a decree for specific performance, leaving the plaintiffs to their action at law. "The Court," said the Vice Chancellor, "must always have regard to the circumstances of each case and see whether it is reasonable that it should, by its extraordinary jurisdiction, interfere and order a specific performance, knowing at the time that if it abstain from so doing, a measure of damages may be found and awarded in another Court. Though you cannot, "said he," define what may be considered unreasonable by way of general rule, you may very well in a particular case come to a balance of inconvenience and determine the propriety of leaving the plaintiff to his legal remedy by recovery of damages. In *Talbot vs. Ford,* 13 *Simons* 173, a lease of mines for a term of thirty-one years contained a covenant that the lessor might *at any time before the expiration of the lease,* upon notice, take, at a valuation,

the machinery, stock in trade, and implements used by the lessee in working the mines. Upon a bill to enforce this stipulation within five years after the date of the lease, the V. C., Sir L. Shadwell, remarking upon the unusual character and hardship of the lease, says, "it seems to me that it was by mere want of caution that this covenant was worded as it is &c.; "but," he adds, be this as it may, my opinion is, that it is so injurious and oppressive to the lessee that this Court ought not to interfere for purpose of giving effect to it ; and therefore I shall not grant the injunction.

It remains only to observe that the American courts have uniformly maintained the discretionary character of the jurisdiction for specific performance. The subject has been thoroughly examined and authorities reviewed in the leading case of *Seymour vs. Delancy*, 6 *Johns. Ch. R.* 222. The reversal of the Chancellor's decree in that case (3 *Cow.* 445), was on another point and does not touch this question. Concurring with the doctrine of that case are *Torrey vs. Buck*, 1 *Green's Ch. R.* 374 ; *Ely vs. Perrine, ib.* 402 ; *Meeker vs. Meeker*, 16 *Conn.* 408 ; *Tyson vs. Walls*, 1 *Md. Ch. Dec.* 13 ; *Leigh vs. Crump*, 1 *Ired. Eq. R.* 229; *Clitherall vs. Ogilvie,* 1 *Desau.* 257, 263 ; *Ward vs. Webber*, 1 *Wash.* 279 ; *Campbell vs. Spencer*, 2 *Binn.* 133, and *King vs. Hamilton*, 4 *Peters*, 382.

Further, all the authoritative text books are in harmony upon this point. *Fonbl. Eq. B. I. Ch. III. Sec.* 9, *note* (1) ; 1 *Sugd. on Vend. Ch.* 4. *Secs.* 3 and 29, (*Am. Ed'n. of* 1851) ; 1 *Sto. Eq. Jur. Secs.* 742, 769 ; 3 *Pars on Cont.* 351. Probably on no subject has there been more unanimity of opinion, judicial and professional. Perhaps nowhere has this doctrine been more broadly accepted than by our Court of Errors and Appeals, in *Layton vs. Hudson*, 5 *Harring.* 87, in which the Court, after stating certain objections to a specific performance in that case, conclude, " and generally, when under the circumstances of the case, "the Court is unable to do exact justice between the

" parties,a specific performance will not be decreed, but the
" complainant will be left to his remedy at law." It might
have been sufficient to rest the question upon this authority;
but the scope of the argument has led to an examination
of the history and grounds of the doctrine, and it seemed
due to the learned counsel for the complainant, and to
the importance of the subject, to state the result.

Let the bill be dismissed.

NOTE.—An appeal from the decree entered in this cause was taken, and
fully argued before the Court of Errors and Appeals, and at the June Term,
1869, of that Court the decree was affirmed.    4 *Houst.* 28.

The doctrine of the case has been also fully established by the Supreme
Court of the United States, in *Willard vs. Tayloe,* 8 *Wall.* 557, in which the
case of *Godwin vs. Collins* is cited with approval.

There is another class of cases pertinent to the present one, in which courts
of equity have refused to enforce a contract, because it was doubtful whether
a decree would effectuate the real intention of the parties.

In *Harnett vs. Yielding,* 2 *Sch.* & *Lef.* 548, a lease for twenty-one years
had been made with a covenant for renewal.    There was also a provision that
the tenant might surrender on six months' notice, which, being dissatisfied with
the rent, he did, and thereupon, the lessor indorsed on the back of the old
lease, an agreement to execute a fresh one at any time at a less rent. No sub-
stituted lease was,in fact,executed, but the tenant in fact held, at the lower rent,
until near the expiration of the twenty-one years, and then filed a bill to compel
the lessor to execute a new lease *with a covenant for renewal included.*

The question was, whether the indorsed agreement to execute a fresh lease
instead of the old one, *embraced the covenant for renewal* contained in the old
lease. Lord Chancellor Redesdale doubted, and refused to interfere, stating, as
one ground, that "courts of equity refuse to enforce the specific execution of
" agreements when,from the circumstances,it is doubtful whether the party meant
" to contract to the extent that he is sought to be charged. It is true that the Lord
" Chancellor's doubt,as to the intention of the party,arose upon the construction
" of the agreement itself,and not from extrinsic circumstances, as in the present
" case.    But a court of equity could as well construe the agreement as a court of
" law,and would have done so, had the agreement come before it for any other
" purpose. Its refusal to give some construction to the agreement in this, as it
" would do in other proceedings, was because, in the discretionary exercise of
" this jurisdiction, it will not hazard injustice by decreeing in any case of even
" doubtful intention : and such being the restraining consideration, it matters
" nothing whether the doubt arises from the face of the agreement,or from cir-
" cumstances extrinsic."

In *Lord Ormon vs.Anderson*, 2 *Ball & Beatty* 189, a lease for ninety-nine years was determined by a notice to the tenant to quit on the first of May 1807.

The defendant remaining in possession, an ejectment was brought, pending which, in August, 1809, the tenant proposed, in writing, to pay an advanced rent to the plaintiff, he executing a new lease. A dispute arising as to the time at which the new rent was to commence, the plaintiff filed a bill to compel the defendant to accept a new lease, with the rent to commence from the expiration of the notice to quit in May 1807, and not, as the tenant contended, from August 1809, when his proposal was accepted. The Lord Chancellor considered that the agreement, though not uncertain on its face, was yet, in fact an incomplete agreement, the term from which the new rent was to commence not having been considered and concluded, though, as he says, " evidently from the situation and acts of the parties it was to be deemed a material ingredient." In this feature, the case, more nearly than any other, approaches the present one.

---

JOSHUA B. WHARTON, JAMES JESTER, JAMES CLARK, JAMES D. KINNEY, BENEDICT GILDERSLEVE, WILLIAM K. EVANS, HENRY C. COOPER, JOHN P. BAUGH, DANIEL BAUGH, ROBERT F. KENNEDY, JOHN J. BAILEY, HENRY J. DAVIS, ELTON B. GIFFAND, SAMUEL W. VON CULIN, BENJ. V. MARSH, LEWIS W. HAYWARD, EDWARD G. TOWNSEND, HENRY HENDERSON, RICHARD WOOD, SAMUEL G. GODWIN, J. A. PEARCE AND JOHN E. WORDEN.

*vs.*

JOHN F. CLEMENTS, WILLIAM S. PROUSE, CHARLES H. B. DAY, JAMES W. GREEN, PRESIDENT AND DIRECTORS OF THE BANK OF SMYRNA, JOEL CLEMENTS, EZEKIEL DAWSON, JOSHUA R. CLEMENTS, THOMAS PROUSE, DANIEL L. McBRIDE, JOHN LOWDEN AND WM. WHITAKER, SHERIFF.

Kent, *March T. 1868.*

A partner, with the knowledge of his co-partner, converted, to the use of the firm, money, received by him, as a United States deputy collector of internal

revenue ; *Held*,that a bond of the firm given to indemnify the sureties of the deputy collector, was valid as a partnership obligation.

Such bond, valid as an indemnity although executed before the sureties had made good the defalcation, and although in form it was a bond for the payment of money.

The statute of insolvency, *Revised Code, ch.* 121 *sec.* 4, applies only to cases in which an assignment for the benefit of creditors is made, and does not forbid the preference by a debtor of certain creditors otherwise, even though given in contemplation of insolvency.

An answer responsive to the bill is evidence where fraud is charged as in other cases, and may, if not overcome by counter proof, establish the defense, without other evidence.

*Quere.* What remedy a court of equity would afford, to compel sureties, holding a money-bond as indemnity,to pay the debt before realizing the proceeds of the bond, or to refund them if they should have received them and should prove, ultimately, not to be damnified.

BILL IN EQUITY FOR AN INJUNCTION.—The material facts in this case were these :

John F. Clements, a United States deputy collector of internal revenue, converted the public revenue collected by him to the use of the firm of J. F. Clements & Co., of which he was a member. This was done with the knowledge and concurrence of his co-partner. The firm becoming insolvent, Clements and his co-partner executed their joint obligation to indemnify the defendants as sureties in Clements official bond. The obligation so given was an absolute bond for the payment of $5,000, with a warrant of attorney for the confession of judgment annexed. Judgment was confessed upon the bond and execution issued, under which the partnership goods were levied upon and sold. The complainants, except Wharton who had a judgment by confession, September 18th, 1865, being certain simple contract creditors of the firm, then filed this bill to restrain the Sheriff from paying to the sureties the proceeds of their execution, praying that the fund might be held, in order to meet their claims when

prosecuted to judgment. They had since obtained judgments for their respective claims.

At the time of the execution of the indemnifying bond, the sureties of Clements had sustained no damage, but since the goods were sold under their execution, and in fact since this bill was filed, they had, under legal process, made good to the United States collector Clements' defalcation to an amount exceeding the fund in the Sheriff's hands. Whether they were entitled to take the proceeds of their execution, or whether these proceeds should be held applicable to the judgments of the complainants as creditors of the firm, was the main question in controversy.

The bill originally joined, as defendants, several other execution creditors, besides Pickering *et al.*, the sureties, and the sum total of the writs of *fieri facias* levied was in excess of the amount of the proceeds in the Sheriff's hands. The bill, however, was dismissed, from time to time, as to all the defendants, except Pickering *et al.*, the sureties, and the Sheriff allowed to pay their claims. This left a balance in his hands of less than the claim of Pickering *et al.*, being about $4,000. The controversy thus became narrowed to the validity of their execution and their right to this balance as against the complainants. The facts as stated, all appeared by the bill and answer, no depositions being taken on either side. The complainant filed a list of exhibits setting forth the judgments recovered by them against J. F. Clements & Co., since the filing of the bill.

*Reed*, for the complainants.

The taking of the bond by the sureties was void under our insolvent law, *Rev. Code* 1852, *p.* 486, *Sec.* 3, having been given by Clements and Prouse while insolvent. The judgment, therefore, being contrary to the Statute, is void. *Bailey vs. Burton*, 8 *Wend.* 339 ; *Twyne's case*, 1 *Sm. L. Cas.* 1.

The use, by the firm, of the funds collected by Clements, did not make the sureties creditors *of the firm ;* nor were the sureties privies to the appropriation of the money collected by Clements, it was his money, no matter whence derived, not theirs.   The firm was already insolvent when the money was used, and had been shut up by the Sheriff.   These complainants were creditors for grain furnished in the course of the firm's business,—the very grain sold by the Sheriff.

Upon these facts the bond was without consideration, and void.  *Waters vs. Comly,* 2 *Harrington,* 131 ;  *Am. Lead. Cas.* 77 ;  *Coolidge vs. Melvin,* 42 *N. H.* 511, 532-3 ;  *Parmlee vs. Eagan,* 7 *Paige* 610 ;  *Jackson vs. Brush,* 20 *Johns.* 5.

The Court will not, against *bona fide* creditors, sustain a claim not certainly due, subject to a contingency.   If sureties had escaped liability in the pending suit between the collector and themselves, the proceeds in the hands of the Sheriff would have been payable back to Clements and Prouse, to the defeat of their real creditors.   The bond, at least, could not be legally given to the sureties until their liability became fixed, and some specific sum paid by them.

Courts of equity will not allow a mere process of a court of law to override the insolvent laws, and appropriate, entirely, partnership effects to the exclusion of *bona fide* creditors.  *Mackey et al. vs. Cairns et al.* 5 *Cowen,* 547, 562.

Upon a charge of fraud the answer is not to be relied on as to any advances, but positive proof of the payment if the money is required.  *Piddock vs. Brown,* 3 *P. Wms.* 288 ;  *Glynn vs. Bank of England,* 2. *Ves. Sr.* 38.   The bill charges the bond to be fraudulent, and the answer does not sufficiently meet it, not being specific.   Nor does it show a liability from the firm to the sureties, the charge of the bill therefore must be taken as true, and the bond treated

as void by reason of fraud. *Boardman vs. Holloway*, 10 *Paige,* 223; *Prescott vs. Hayes*, 43 *N. H.* 593; *Sands vs. Codwise*, 4 *Johns.* 594; *Lore vs. Getsinger*, 3 *Halst. Ch.* 204; *Bailey vs. Burton*, 8 *Wend.* 339; *Murray vs. Riggs*, 15 *Johns.* 585.

*Fulton*, for the defendants.

There is neither allegation nor proof of the insolvency of the firm when the bond was given, nor even when the bill was filed. The debts of complainants were contracted in the ordinary course of business, for profit, without any alleged fraud on them. There is no special equity in their favor, while sureties are always favored in equity out of regard to the necessity for them which exists in society. But even if the equities were only equal, the defendants having the advantage at law, must prevail. *Caldwell vs. Bell*, 8 *Petersdorff* 697 ; *Adams' Equity*, 75—6.

There are several specific objections to the relief prayed.

1. There is no proof by the creditors of their debts except by Wharton. The bill alleges debts, the answers of the sureties and Prouse shew nothing, and that of Clements does not admit any, to the extent of proof, and denies as to three. The judgments, except Wharton's, are all recovered since the bill was filed. What is neither admitted nor denied must be proved. *Cochran vs. Evans*, 1 *Harring*, 200.

2. Every material allegation of the bill is expressly and positively denied, and in such case there can be no relief.

3. The sale by the Sheriff worked a dissolution of the partnership, as to all the effects sold, divesting the title of

the partners ; and left nothing when the bill was filed against which the claim of joint creditors could attach ; the property had passed to the purchaser and the proceeds to the execution creditor. The creditors cannot follow the proceeds as they might the goods, had they remained. *in specie,* the execution having put the proceeds beyond their reach. A court of equity is not the forum for distributing or settling rights or liquidating claims to the assets of a dissolved partnership. The bond was legal in form, the execution regularly executed, and the funds, therefore, properly in the hands of the officer. *Ex parte Ruffin,* 6 *Ves.* 119 ; *Ex parte Williams,* 11 *Ves.* 3.

4. The bill must be dismissed because complainants are not execution creditors, having no lien on the property taken. A creditor can invoke the aid of equity only after his claim has been established at law. But this is not all, if the aid is sought with respect to particular effects, he must acquire a lien upon the property or shew a trust under which the proceeds are applicable. *Ex parte Ruffin,* 6 *Ves.* 119 ; *Ex parte Williams,* 11 *Ves.* 2 ; *Brinkerhoff vs. Brown,* 4 *Johns. Ch.* 671.

5. The money, being a trust fund, might have been followed by the Government, and the firm receiving it became legally liable to it ; and the sureties having paid it, are subrogated in equity (though not at law) to the same right, and consequently might accept the bond. *Walter de Chirton's case, Dyer* 160 ; *Lane vs. Dighton,* 1 *Amb.* 409 ; *Colly on Partn.* sec. 391 ; *Burge. on Suretyship,* 499 ; *Stone vs. Marsh,* 6 *B. & C.* 551 ; *Oliver vs. Piatt,* 3 *How. S. C.* 333 ; *Whitaker vs. Brum,* 16 *Wend.* 505 ; *Hogan vs. Reynolds,* 8 *Ala.* 60 ; *Hutchinson vs. Smith,* 7 *Paige* 26.

6. The firm, under the circumstances, had a right to make this a partnership debt, and did so. This is a consequence of the position that the money could be followed.

And further, if there were no legal obligation which would sustain a suit, nevertheless the moral obligation was a sufficient consideration to support the bond, if given.

(1.) Partners may dispose of their assets as they please ; the joint creditors have no remedy unless they have acquired a lien. *Colly. on Partn. secs.* 902-4 ; *Ex parte Ruffin,* 6 *Ves.* 119 ; *Ex parte Williams,* 11 *Ves.* 2.

(2.) The equity of joint creditors as against a separate creditor, is not directly against the partnership property, but is incidental to the equity of the partners as between themselves, *i. e.,* to have joint assets applied to joint liabilities. *Snodgrass' Appeal,* 1 *Harris* 471-4 ; *Baker's Appeal,* 9 *Harris* 79-82; *Sidgel vs. Chidsey,* 4 *Casey,* 279 ; *Hutchinson vs. Smith,* 7 *Paige* 26.

7. Debtors, whether solvent or insolvent, may lawfully prefer creditors. It is in some cases reasonable and necessary. *Fox vs. Hanbury, Cowp.* 445 ; *Cock vs. Goodfellow,* 10 *Mod.* 489; *Williams vs. Brown,* 4 *Johns. Ch.* 682 ; *McDermutt vs. Strong,* 4 *Johns. Ch.* 687 ; *McMenomy vs. Murray,* 3 *Johns.Ch.* 435 ; *McMenomy vs. Roosevelt, Ib.* 446 ; *Riggs vs.Murray,* 15 *Johns.* 583 ; *Glenn vs. Grover,* 3 *Md. Rep.* 212 ; *Tunnell vs. Jefferson,* 5 *Harring.* 206.

8. The defendants, having obtained such preference, are entitled to the fruits of their execution. *Cursus Cancellaria* 10 ; *Ad. Eq.* (159) ; *Caldwell vs. Bell,* 8 *Petersdoff* 697 ; 2 *Spence Eq. Jur.* 733 ; *Gelston vs. Codwise,* 10 *Johns.* 507 ; *Backus vs. Murphy,* 3 *Wright* 397-401.

THE CHANCELLOR.—

This bill contests the validity of a judgment confessed by the firm of J. F. Clements & Co., to indemnify the defendants, who were sureties of Clements as deputy

collector of internal revenue, against such loss as might accrue to them from his conversion of the public revenue to the use of the firm.

The purpose for which the judgment to the sureties was confessed did not appear by testimony, but it is set forth in the answer. Notwithstanding an objection to the contrary, the answer is, on this point, responsive, and there is no evidence against it. I, therefore, have accepted its statements as part of the case above set forth. The complainants' counsel insisted that because the bond is charged to be fraudulent, the defendants' denial by answer should not be admitted, but that only by testimony can a sufficient consideration be shewn. To this point cases in 3 *P. Wms.* 228, and 2 *Ves. Sr.* 516 were cited, but they do not sustain it. The case in *Ves. Sr.* bears no relation to the subject. In 3 *P. Wms.* 228, it was held that *prima facie*, a bond or mortgage was evidence of a debt, but that, where there were "manifest signs of fraud," *i. e.*, signs manifest by some evidence supporting the charge in the bill, the obligee should be put to the proof of actual consideration or payment.

This decision refers to the *onus* and not to the *mode* of proof. It holds the obligee in a bond which has been by evidence brought under suspicion of fraud, to shew a sufficient consideration for the bond, but it does not decide that the consideration, when required to be shewn, may not be proved as any other fact in issue might be, *i. e.*, by answer, if responsive and uncontradicted, as well as by any other kind of evidence. On the other hand, there are decisions directly to this point, which holds that the answer, if responsive, is evidence, although against a bill charging fraud, and may, if not overcome by counter-proof, establish the defense. 2 *Dan. Ch. Pr.* 984, *note* ; 8 *Gill & J.* 171 ; 1 *Wend.* 583, 596, *and* 619; 3 *Paige,* 557.

We now reach the main subject of controversy, which embraces two objections taken to the validity of the judgment confessed to the defendants.

The first and principal objection, taken in argument, is that the judgment was without consideration to the firm of J. F. Clements & Co., and was void as against the partnership creditors. That it was without consideration has been urged on the ground that the firm did not, by receiving and using the money collected by Clements, and for the due application of which the sureties were bound, incur any partnership debt or liability *to the sureties*, forming a consideration for the bond ; that, on the contrary, the firm as it received the money from Clements, became debtor to him alone ; that the only remedy of the sureties was against Clements ; that between the firm and the sureties there was no privity.

The fallacy of this objection lies in its assuming that the public revenue converted to the use of the partnership was the money of Clements : as if he had *borrowed* a sum of money *on his own credit* and put it into the business ; in which case, unquestionably, the firm would have been indebted to him only, and not to the person from whom he borrowed. So, if the collection of the public revenue were farmed out to a collector, who, paying to the Government a stipulated sum, should become entitled to collect the taxes for his reimbursement ; in such case, the taxes, when collected, would be his own property, and if put into the business of a partnership of which he might be a member, would create no liability on the part of the firm, except to himself. But in the present case, the money used by J. F. Clements & Co. was in Clements' hand, as the mere agent of the Collector of Internal Revenue, *whose money it was*, that is, as between the collector and Clements, though ultimately it was payable to the United States Government. It was a trust fund. Now it is a rule, that the rights of a *cestui que trust* adhere to the trust property or fund, and follow it into whosesoever hands it may come, except those of a *bona fide* purchaser for value and without notice. It was forcibly said by Lord Ellenborough, that "an abuse of trust can confer no rights on

28

"the party abusing it, nor on those who claim in privity with him:" 3 *M. & S.* 574. If the subject-matter of the trust be lands or chattels, such as can be identified, they may be followed and recovered *in specie*; if it be money, that is, converted by the trustee, whoever receives it with knowledge of the trust, or without a valuable consideration, becomes a debtor to the *cestui que trust*. Or, if the money has been used in the purchase of property, say of lands, the *cestui que trust* may, at his election, either take the property (2 *Dyer* 160; *Amb.* 409;) or he may follow the money into the hands of the vendor, holding the vendor as his debtor. This is a settled rule, founded upon the most obvious necessity, that of preventing the facilities there would otherwise be given for the fraudulent conversion of trust property. The rule is enforced at law whenever the circumstances raise a legal cause of action. In courts of equity, relief is given universally. It is one of the various applications of the equitable doctrine of implied trusts: See at large 2 *Story's Eq. Jur.*, §§ 1257–8; *Lewin on Trusts* (201–2) 24 *Law Lib.*; *Oliver vs. Piatt*, 3 *How. S. C. Rep.* 333. Among the cases to which this rule has been applied, there are some in which the party receiving trust-money, knowing it to be such, has been held liable as a debtor directly to the *cestui que trust*. Some of these may be noticed.

In *Smith vs. Jameson*, 5 *T. R.* 601, Robert Jameson, while a partner in business with Thomas Jameson, was also one of the assignees in bankruptcy of Lewis and Potter. As assignee of the bankrupt he received 2563*l.*, which he brought into his partnership with the privity of his partner Thomas Jameson. The partnership was dissolved, and all of its effects and credits assigned to Robert, he assuming the debts. After this a commission of bankruptcy issued against Robert and Thomas Jameson, and Robert was removed, as one of the assignees of Lewis & Potter. His co-assignees then claimed to prove the 2563*l.* against the estate of Robert and Thomas Jameson under the commis-

sion of bankruptcy against them.   The Lord Chancellor directed this action at law to try the question whether the assignees of Lewis & Potter could maintain an action against the partnership of Robert and Thomas Jameson for the sums received by Robert, as assignee of Lewis & Potter's estate, and appropriated by him to his own partnership.   It was *admitted* that the partners, by receiving the money, *became indebted to the estate of Lewis & Potter*, but insisted that the assignment of the partnership effects by Thomas Jameson to Robert, while the latter continued to be an assignee of Lewis & Potter, was discharged.   This objection the court overruled, and the assignee recovered.

In *Stone vs. Marsh*, 6 *B. & C.* 551, one of several trustees of stock under a will, by means of a forged power of attorney, sold the stock, and the proceeds were carried into the business of a firm of which he was a partner. Upon an issue out of Chancery to inquire whether the partnership which received the money was indebted for it to the trustees, it was so held by Lord Tenterden, who also seems to have considered it immaterial whether or not the other partners were ignorant of the fraud.

In *Hutchinson vs. Smith*, 7 *Paige*, 26, one Smith, the treasurer of Monroe county, commencing business in January 1827, used money in his hands as county treasurer, in the purchase of a stock of goods.   Soon afterwards he took into partnership with him, Phelps, whose interest in the stock and business, it was agreed, should be estimated from January.   Phelps entered the firm, knowing that the county funds had been put into the business.   In July, Smith died.   The firm was then, as it was afterwards ascertained, insolvent.   Phelps, the surviving partner, assigned all the partnership property to a creditor for the payment of the debts, preferring some ; and among other preferred debts was the obligation to the county, which was included at the instance of the sureties on the treasurer's bond.   The funds assigned proving insufficient to

pay all the debts of the firm, the non-preferred creditors filed their bill to set aside the assignment, and, among other grounds, objected that the debt due to the county was the private debt of Smith, for which the partnership was not liable: But the Vice-Chancellor and, on appeal, the Chancellor, held it to be a partnership debt, and properly provided for by the assignment.

In *Richardson vs. French*, 4 *Metc.* 577, the same principle was applied to the case of a partnership, into which one of the partners, being also an administrator, brought funds from the estate of his intestate. See further, *Collyer on Partn.* § 391, and cases cited.

We see, then, that the firm of J. F. Clements & Co., by using, with the knowledge of both partners, the funds held by Clements as deputy collector, became debtors to the United States collector. A bond of the firm securing the money to *him*, would have been, unquestionably, valid as a partnership obligation. Next, we inquire, how stood the sureties ? Did there arise out of this transaction any liability on the part of the firm to them, forming a sufficient consideration for this judgment ? Now, had the sureties before taking the judgment (as they have since done) made good, to the United States collector, Clements' defalcation, they would have succeeded, in equity, to the exact position of the collector, before stated, as a creditor of the firm. In equity, sureties, upon payment of the debt or performance of the duty of their principal, are subrogated to all rights, securities, and remedies of the creditor as means of indemnifying themselves, except only that under the English decisions, sureties paying the debt cannot take an assignment of the instrument upon which they are bound ; which right, however, is conceded to them under the American decisions, and in this state it is given by statute. *Rev. Code. Chap.* 65. But when this judgment was confessed, the sureties had paid nothing, and whether, in fact, they would sustain any loss, was con-

tingent, until the collector should elect to take his remedy against them rather than against Clements or the firm. Could they, in that position, take a bond of indemnity? And, if any, could they take an absolute bond for the payment of money, such as the bond upon which this judgment was confessed ? There can be no doubt on these points. By force of the defalcation alone, and before any payment was made by the sureties, *their* liability to pay became fixed, although whether this liability would be enforced might for a time remain uncertain. So also, the firm of J. F. Clements & Co., by the very act of converting to its own use the trust-funds for which the sureties were bound, incurred a liability directly to the sureties ; a liability, first, to answer to them in the event of their loss, according to the equitable doctrine of subrogation, in the same manner and to the same extent in which they stood responsible to the collector ; and, second. (as it seems to be now settled,) even before any loss had accrued to the sureties, the firm might have been brought into a court of equity and compelled to exonerate the sureties by paying the debt: 1 *Story Eq. Jur.*, §§ 327, 639, 730 ; Lord Chancellor in *Nesbit vs Smith*, 2 *Bro. C. C.* [582] *and note (a)* ; *Cox vs. Tyson*, 1 *Turn. & Russ.* 395 ; *Hays vs. Ward*, 4 *Johns. Ch.* 132 ; 1 *Lead. Cas. in Eq.* 87.

Such is the right of a surety as against his principal. The same right these sureties had against J. F. Clements & Co., because the firm, as well as Clements, individually, were bound to exonerate the sureties. Thus the firm were, by the very act of using this money, brought under an obligation to indemnify the sureties ; not only to make good in the future such loss as might in the event be sustained, but to exonerate the sureties, if so required, at once. Clearly, then, it was both their right and duty, promptly, to indemnify the sureties. In what form, we next inquire, might this be done? Might it be an absolute bond for the payment of a sum of money estimated as sufficient to cover the loss ? This was controverted in the

argument.   But the validity of a money-bond as a mode of indemnifying sureties, has been affirmed by the Court of Errors and Appeals in *Tunnell vs. Jefferson,* 5 *Harring.* 206.   There, a judgment-bond for $15,000 had been given by Tunnell to certain trustees, in trust, to apply the proceeds towards indemnifying the sureties of Tunnell as administrator of Miers Burton, deceased, and as guardian of his children.   The Chancellor (Johns) sustained the precise objection here made, that sureties, before actual payment of the debt for which they are bound, cannot take as an indemnity an absolute bond for the payment of money, but only a bond with a collateral condition to indemnify them, upon which judgment might be entered by virtue of a warrant of attorney, so as to effect a lien on real estate, but without the power to take execution until the damages should be ascertained through a verdict or an inquisition upon breaches of condition assigned.   The Court of Errors and Appeals held the contrary, sustaining the right of the surety to take for his indemnity an absolute bond before payment of the money or performance of the duty for which he stood liable ; before even the time fixed for payment or performance, by the principal, had arrived.   That decision is conclusive.   See, also, *Toissant vs. Martinnant,* 2 *T. R.* 100 ; *Penney vs. Foy* 8 *B. & C.* 11, 16.

What remedy a court of equity would afford to compel sureties, holding such a bond, to pay the debt against which they are indemnified, before taking the proceeds of an execution under the bond, or to compel them to refund after having taken the proceeds, if they should not ultimately be damnified, is a question which does not affect the original validity of an indemnifying bond ; nor can any such question arise here since these sureties have already sustained the loss against which this bond was executed to indemnify them.

The second objection to this bond was, that it gave a preference to the sureties against other creditors, in

contemplation of the insolvency of the firm, and, there-fore, that it is void under our statute of insolvency. *Rer. Code, Chap.* 132. *Sec.* 4. The statutory provision supposed to be violated, is in these words ; "If any person in "contemplation of insolvency, or in contemplation of "taking the benefit of any of the insolvent laws of "this State, shall make an assignment of his estate or. "effects for the benefit of creditors, and by such assign-"ment, either under its provisions or otherwise, shall prefer "any creditor to others, or shall in or by such assignment "secure or pay to any creditor a greater proportion of his "debt or demand than shall be paid or secured to all his "creditors, every such assignment, so giving a preference, "shall be void, &c."

The prohibition of this clause against a preference among creditors applies only to cases in which an assign-ment for the benefit of creditors is made, whether made "in contemplation of insolvency or in contemplation of tak-"ing the benefit of the insolvent laws." Both the terms and the policy of the Statute are clear ; what it requires is the equal distribution among all creditors of the debtor's effeçts, *under an assignment made for the* benefit of creditors, without, however, restraining the debtor, *if he makes no assignment*, from exercising his general right to prefer one creditor.to others, even though he may be in failing circumstances, or though the preference be given in direct contemplation of actual insolvency. Where no assignment is made, the law puts the creditors upon their diligence and gives to each the benefit of his diligence. This construction of the law has been uniformly acted upon since its passage in 1826, and has been several times adjudged by the Court of Errors and Appeals. In *Newells vs. Morgan*, 2 *Harring.* 228, the same objection was taken to a judgment given to a creditor in contemplation of insolvency. The judgment was sustained though without any notice taken by the Court of the objection. In *Waters vs. Comly*, 3 *Harring.* 117, the subject was more fully considered. There, a firm,

being indebted and in failing circumstances, executed a judgment bond in a large amount exceeding their assets. It was taken in the name of one creditor but in trust for certain preferred creditors named in a schedule. The Chancellor, and on appeal, a majority of the Court, held the judgment to be an evasion of the Statute, on the ground that a judgment, so given, covering all the debtor's assets, and in trust for the benefit of a number of preferred creditors, who were not parties to it, nor cognizant of it, was equivalent to a formal assignment with preferences given under it ; but the Court did not deny the validity of preferences given by debtors in the ordinary mode. The construction given to this Statute, in the elaborate opinion of Judge Harrington, has always been held and acted upon, and on the general question it was not controverted by the opinion of the majority of the Court in that case. In *Tunnell vs. Jefferson*, 5 *Harring.* 206, the Statute received the same construction, which now must be taken to be settled and beyond discussion. The case before us is the ordinary one of a debtor's preferring certain creditors without, however, making any assignment for the benefit of his creditors at large, and therefore such preference, even though given in contemplation of insolvency, is not forbidden by the Statute.

It results that the judgment confessed by J. F. Clements & Co., to the sureties of Clements, is valid as an obligation of the firm, and the defendants are entitled against the partnership creditors to the fruits of their execution.

Bill dismissed, and the injunction dissolved.

NOTE.—This case is also reported in 8 *Am. Law Reg.* (*N. S.*) 299.

GEORGE W. SPARKS, EDWARD MOORE, WILLIAM G.
LOWE, ROBERT D. HICKS, AND HENRY S. McCOMB,

*vs.*

THE PRESIDENT, DIRECTORS AND COMPANY OF THE
FARMERS' BANK OF THE STATE OF DELAWARE.

*New Castle, Sept. T.*, 1868.

An issue should not be directed to try a question of mixed law and fact; nor a
question which simply involves a legal conclusion, from uncontroverted
facts.

An application to direct an issue to try the question whether the office of cash-
ier of a bank was an annual one, refused.

An application for an issue to try the amounts and dates of the defalcations of
a cashier, also refused.

The granting of an application to direct an issue to be tried by a jury, is a
matter to be determined by the sound discretion of the Court.

Upon a bill, filed by sureties for the cashier, for an injunction against the suit of
a bank upon his official bond, an order was made for the production at the
banking house for the inspection of complainants, their agents, solicitors,
&c., of minutes, official bonds, by-laws and ordinances, account books and
other papers of the bank, pertinent to the matters in controversy.

INJUNCTION BILL.—APPLICATION FOR ISSUES. — PRO-
DUCTION OF DOCUMENTS.—The complainants' application
arose in the course of proceedings upon a bill in equity, to
restrain the collection of the official bond of Joseph A.
Heston, late cashier of the Farmers' Bank.

Heston was alleged to have made certain defalcations.
The pleadings disclosed that the principle controversy
was, whether the office of cashier was an annual one
The bonds were dated, one, January 1st, 1862, and the
other, January 6th, 1865; and the complainants contended
that each rendered the sureties liable only for defalcations
occurring in the years in which the bonds were taken,

29

respectively.   This raised the other important question of fact as to the precise amounts and dates of the alleged defalcations.*

After the filing of the answer the following order for production of document was entered :

And now, to wit, this fifth day of February, A. D. 1868, upon bill and answer thereto filed, and it appearing by the answer of the defendants that certain books, documents, and paper writings hereinafter specified, which are referred to in the bill as containing evidence relevant to the case upon the part of the complainant, are in the custody and control of the defendant.   On motion of Thomas F. Bayard Esq., solicitor for the complainants, it is ordered by the Chancellor that the defendants do, until further order, have at their banking house in the city of Wilmington, the books, documents and papers hereinafter specified, and that the complainants, their solicitors and agents, be at liberty, at all seasonable times, to inspect and peruse the same, or such parts thereof as are hereinafter designated, and to take copies thereof and extracts and abstracts therefrom.   And it is further ordered that the said books, documents and paper writings be produced by the defendants at the hearing of this cause.

The following are the books, documents and paper writings which are subject to this order, viz :

1. So much and such parts of the Minutes of the proceedings of the Board of Directors, of the defendants, at Dover, since the creation of the Branch Bank at Wilmington, as shew or in any way relate to any and every election, or appointment, or continuance in office by the

---

*The facts of this case, as alleged in the pleadings, and ascertained upon the proofs, will be found fully stated in report of this case upon the merits, *post*.

Order for production of documents.

said Board, of any and every cashier of said Branch Bank at Wilmington, and particularly of Joseph A. Heston, late such cashier :—Also, so much and such parts of said Minutes as shew that any and every cashier of said Branch Bank, and particularly the said Joseph A. Heston, took an official oath or affirmation as such cashier, and the times when such oaths or affirmations were respectively taken, together with all such oaths or affirmations filed among the papers of said Board, and particularly the oaths of office of the said Heston, which are in the answer specified.

2. So much and such facts of the Minutes of the proceedings of the Board of Direction of the said Branch Bank at Wilmington, as shew or relate to the election of the said Joseph A. Heston to the office of cashier of said Branch Bank in the month of February or of March, A. D. 1858.

3. The several official bonds executed by said Joseph A. Heston as cashier of said Branch Bank, and which are specified in the answer.

4. All by-laws and ordinances of the defendant, the said corporation.

5. The cash book of the said Branch Bank at Wilmimgton kept since the first day of January 1858, also the monthly and semi-annual statements and balance sheets of the said Branch Bank during the same period : also all accounts of the said Joseph A. Heston with the defendants ; and also all other such accounts, entries or memoranda contained in any books or documents of said Branch Bank, which may be relevant to the purpose of shewing any and all acts and transactions of the said Joseph A. Heston, and whether any defalcations were committed by the said Joseph A. Heston while he was cashier of such Branch Bank and the times at which, and the amounts in which, such defalcations, if any, were, respectively, committed.

At the September Term, 1868, *T. F. Bayard,* for the complainants, moved that certain issues be directed to be tried at the bar of the Superior Court, and submitted the following as the form of the issues to be directed.

" 1st. Whether any and what sum or sums of money, " belonging to the said corporation defendant, were " abstracted by Joseph A. Heston, cashier, since January " 29th, 1862, and at what dates and times, respectively, " were such acts of abstraction committed by the said " Joseph A. Heston, cashier?

" 2nd. Whether the office of cashier for the branch of " the said corporation defendant, at Wilmington, which was " held by the said Joseph A. Heston, from February, 1858, " until March, 1867, was or was not *an annual office to which,* " *regularly, every year an election was held* by the General " Board of Directors of the said corporation defendant, at " their annual meeting held at Dover in the month of Jan- " uary each year."

The second proposed issue having been, in the first instance, framed as above, was afterwards amended by the substitution, in lieu of the words above printed in italics, of the following, *"filled regularly every year by an election."*

Both forms are alluded to by the Chancellor in the course of his remarks made at the time of refusing the motion.

*E. G. Bradford,* for the defendant, opposed the application upon the ground that one of the proposed issues was not an issue of facts, but of law, and the other was not one "proper to be tried by a jury."

*First.* As to the sums of money abstracted, this is not the only breach charged, but false entries also.

If the office is not annual there is no necessity to inquire, by issue, as to the abstraction of money, because that is admitted and the liability is certain. On the other hand, if the office is annual, then the sureties, I admit, are not liable.

We are to shew the *fact* of defalcation, amounts and dates. This is not matter proper to be tried by a jury, resting upon accounts very voluminous and such as cannot be intelligently considered by a jury. The evidence being wholly documentary, justice in such a case could not be done.

At all events the matter in issue could not now be tried by a jury, nor until the Court shall determine whether the office is annual or indefinite.

*Second.* Whether the office is annual or indefinite is a question of law,—a legal conclusion from facts—from a combination of facts.

The answer admits all the facts upon which this question can rest, viz :—the fact of an annual election. Besides, the question rests upon documentary evidence, the effect of which is a question of construction for the Court and not for a jury. No fact controlling this question is disputed. Upon the trial of an issue, if ordered, the Superior Court would necessarily instruct the jury, and the result would be, simply, to substitute that court in the place of this one.

*T. F. Bayard*, for the complainants.

1. The phrase, "proper to be tried by a jury," applies to any matter of fact strongly contested. 2. *Dan. Ch. Pr.* 1192, 1285—6. (*Edn. of* 1851.) When such a question is, necessarily, to be determined, the Court will direct an issue, and this is so whether the evidence be oral or written.

The fact that such an issue involves complicated transactions is not an objection to its being tried by a jury. *Adam's Eq.* 815    In many of the States the discretion to grant or refuse an issue has become merely nominal.

2. We deny that the question, whether or no the office was an annual one, is a question of law.    On the contrary, it is a question of fact, and one which should be submitted to a jury.    We are willing to take an issue in any form or terms, the result of which would settle the question, whether the office continued beyond one year.

THE CHANCELLOR :—

The application is one made to the sound discretion of the Court.    With respect to the first proposed issue, it does not appear to me to be such an one as, in the proper exercise of that discretion, should'be ordered.    The matter involved arises upon complicated accounts which can be tried by the Court more satisfactorily than by a jury. Besides, the time of the alleged defalcations is admitted, by the defendant, to be such, that if the office of cashier was an annual one, the sureties are not liable.

The object of the second issue, as proposed, is, to establish the real defense, which is, that even if there were defalcations, they are not covered by the two bonds of these sureties.    The ground on which this defense rests is, that there was an election in each year by the general board, the effect of which was to constitute this an annual office, the term created by one, expiring with the next, and the bond covering only the transactions of the year which constituted the term for which it was taken.

Now this defense, as set up by the bill, embraces two elements ; first, that elections were held ; this is a matter of fact ; secondly, their effect in constituting the office an annual one.    The answer admits the first and denies the

second. The issue first asked, comprehended both questions, but the modified issue, the first only.

I can direct no issue in any way applying to this subject, because,

*First.* The fact of an election every January, is admitted, and were it not, it rests upon documentary evidence.

*Secondly.* The question whether "the election" created a new office or only recognized and sanctioned an authority already existing, and which even without it would have continued, is a purely legal conclusion. In some sense a fact, it is, yet, a conclusion from other facts.

The bill so puts it, as a conclusion resting upon acts, admissions, usages, &c. But suppose, as complainants will contend, that the simple transaction *per se* constituted an election in the proper sense, and the office an annual one,—still it is no less a legal conclusion though brought nearer to the premises.

What, then, would be the result of an issue embracing, in any terms the question, whether the election made the office annual, or it remained indefinite? Simply a struggle before the jury as to the legal effect of uncontroverted facts. They would not decide this without instruction from the Superior Court, which would, in effect, transfer the case to that Court.

The application must be refused.

JAMES P. LATTOMUS

*vs.*

RANDALL B. GARMAN, GEORGE COLLIER AND WILLIAM
WHITAKER, SHERIFF.

*Kent, Sept. T., 1868.*

Set off does not, under the English, as under the civil law, operate immediately
as a satisfaction *pro tanto*, leaving the balance of the larger demand as the
only indebtedness between the parties.   It is a privilege of the defendant,
which may or may not be asserted in an action for the counter demand,
depending not upon a mutuality of debts in their origin, but upon a mutu-
ality of indebtedness between the parties to the action.

A bond sued upon by an assignee is subject, by way of set-off, only to a cross
demand against him, but a credit actually allowed, or which the original
parties had agreed to allow, before assignment, would attach itself to the
debt and bind an assignee for value, whether with or without notice.

A statement in the answer, of such matters as in their nature could not be known
to the defendant, personally, unless by means of such investigation as is not
to be presumed, without being specially stated, will, although responsive,
have only the force of an answer upon information and belief, and is not
evidence.

Great credit is due to a list of sales made at a public vendue, as the evidence
provided by the parties as to what was sold, and the prices bid.

An admission relied upon to charge a defendant, made, not in the case but in
conversation or writing, must be taken as a whole, as made, and subject to
any qualification of its effect which was coupled with it.   Such admissions
differ in this respect from a confession and avoidance by answer in the case.

BILL FOR AN INJUNCTION TO RESTRAIN PROCEEDINGS
AT LAW.—The defendant, Collier, held the complainant's
judgment bond for $340, dated February 28th, 1865,
payable in six months, with interest from date. On March
1st, 1866, this bond was assigned by Collier to Garman,
who proceeded to collect it by execution.   The bill sought
to restrain its collection on the ground that the bond, be-
fore its assignment to Garman, had been discharged.   It

was claimed that the bond had been partly paid by the complainant's share of the proceeds of a peach crop, sold on account of Lattomus and Collier, complainant's net share thereof being $194.06.

Prior to the time when the share of the peach crop was due and payable to the complainant, he was indebted to Collier for a vendue bill amounting to $713.27 which had been partly settled by the bond in question, for $340, and the check of Lattomus for $200, leaving $173.27 due, and to the payment of which the defendents claimed that Collier had a right first to apply the $194.06 received from the sale of the peach crop. But it appeared to be satisfactorily proved that the balance of $173.27, on the vendue bill had been settled between the parties by the due bill of Lattomus for that amount accepted by Collier, and that the proceeds of the peach crop remained applicable as a credit upon the bond. A small reduction in the amount of this credit was sought to be made, for the reason, as claimed in the answer, that there was error in the amount of the vendue bill as it had been rendered, that the sales to complainant really amounted to $744.28, in lieu of $713.27, and that the difference of $31.01 should be deducted from the proceeds of the peach crop before they were applied as a credit to the bond. The difference was claimed as a mistake in the amount of certain carpet and hay sold to complainant, which was stated in the answer as greater than in the bill of sale. But the answer did not allege that the defendant making it had, himself, measured the carpet or weighed the hay.

It was further claimed that as to the residue of the bond, it was subject to a credit arising out of certain charges of the complainant against Collier, stated upon a paper filed, marked A. The question of the proof of these items turned upon the proof of certain admissions of Collier at a trial, before referees, that the amounts were due from him. The proof, however, was, that while he admitted

them to have been originally due, he, at the same time, claimed that they had been settled.

So much of the opinion delivered, as was devoted to an examination of the evidence, is here omitted, the facts, as found, so far as they are material, having been above stated.

*Smithers*, for the complainant.

*E. Saulsbury*, for the defendant, Collier.

*J. B. Penington*, for the defendant, Garman.

THE CHANCELLOR :—

The proof shows that, while Collier held the bond of the complainant, to restrain proceedings upon which this bill is filed, and before it was assigned to Garman, Collier became indebted to the complainant for the sum of $194.06, being the share of the latter of the net proceeds of a peach crop sold for their joint account, and the proceeds of which came into Collier's hands. Next we are to inquire whether this sum of $194.06, in Collier's hands, became a credit to the bond. I do not find that there was, as is alleged by the bill, a special agreement between the parties for such application. Collier's answer denies it. and there is no proof of it. Nevertheless, I am convinced upon all the evidence that, when this sum came into Collier's hands, this bond was the only debt he held against Lattomus, and under these circumstances, being claimed as a set-off, whether with or without any agreement as to the application of the money, it became, by law, a part payment upon the bond ; and Garman becoming subsequently assignee of the bond, took it subject to the credit.

It was insisted in the defense on this point, that there was a balance of $173.27 due to Collier on a vendue bill, for goods sold to the complainant, and that Collier was at liberty to apply the proceeds of the peach crop in his hands to that balance. The proof is wholly irreconcilable with the statement of the answer on this point, and is sufficient to prevail against it, and to establish as a fact in this cause, that the balance of the vendue bill was settled by a due bill given by the complainant, and accepted by Collier.

I have noticed the allegation in Collier's answer, that the sales to complainant amounted to $744.28, instead of $713.27, the amount of the vendue bill rendered and settled by, being an excess of $31.01, which sum, at least, it is claimed, Collier was entitled to have paid out of the proceeds of the peach crop, before they are applied to the bond.

The discrepancy results from a difference as to the quantity of carpet and hay sold to complainant, the answer alleging a larger quantity of each than was charged on the list of sales from which the vendue bill was copied. This statement of Collier is responsive, but it cannot be taken as made upon his own personal knowledge of the fact. The exact quantity of carpet and hay sold, could only be known by Collier, personally, from actual measurement of the carpet or weighing of the hay by him or under his cognizance, which is not suggested. Without this, his answer can have only the force of an answer upon information and belief, and is not evidence under the rule. 2 *Dan. Ch. Pr.* 984 and *note* (1). On this point, great credit is due always to a list of sales, which is the evidence, provided by the parties, as to what was sold and the prices bid, subject to correction, it is true, but only upon a clear mistake either apparent on the face of the list or shewn by proof. In this case the list is entitled to more than usual credit, having been accepted by Collier as

correct, and made the basis of a settlement on April 4th, 1865.

I conclude, then, on this subject, that the complainant, when his net share of the proceeds of the peach crop came to Collier's hands, was indebted only on the bond, to which the share became applicable as a part payment. The exact time when Collier received the money is not proved. I assume it to have been September 15th, allowing the full close of the peach season. There was then due on the bond with its interest, $351.27. Crediting the money in Collier's hands, $194.06, there remained a balance of $157.21. Is this balance subject to any further credit? This brings us to the other branch of the case.

The complainant claims, in addition to his share of the peach crop sales as a credit to the bond, the amount of certain charges against Collier. which are stated on the paper A. These charges amount, in the whole, to $332.67; but the controversy has narrowed itself to such of them only as are marked with the word "Rec'd," amounting to $105, and also a charge for difference on carpet, ($18.33.) These charges, if proved, could not, as mere cross demands, be set off against Garman, who holds the bond, as assignee, pursuant to the statute, for the assignment of bills and specialties. (*Rev. Code* 184.) Set-off does not, under the English law, as under the Civil, operate immediately as a satisfaction, *pro tanto*, leaving the balance of the larger demand as the only indebtedness between the parties. It is, under our law, only a defense, which may, or may not, be asserted in an action for the counter demand. It does not attach itself to the debts so as to pass with them. It is a personal privilege of the defendant, and depends not upon a mutuality of debts in their origin, but upon a *mutuality of indebtedness between the parties to the action.* Rev. Code, 380; *Greene vs. Darling*, 5 *Mason* 214-15; *Howe vs. Sheppard*, 2 *Summ.* 409. Garman, as assignee under the statute, holds this bond in his own right, with power to

sue in his own name.   Therefore, clearly, it is subject, by way of set-off, only to a cross demand against him.   But it is insisted that these items, amounting to $105, were, before the assignment, a credit against the bond, allowed, as such, by Collier, with notice of which Garman took the bond, that thus the credit became an equity attaching to the bond.   An agreement, express or tacit, between the original parties, for crediting a debt in any particular mode with it, or a credit actually allowed between them before assignment, would certainly attach itself to the debt, and bind an assignee even for value, and whether he take with or without notice of such equity ; for of necessity the assignee must take the thing assigned in whatever condition it may then be, and, if injured, is put to his remedy against the assignor.   This principle is quite clear.   Was there, then, before the assignment of this bond to Garman, such an allowed credit against it for the items of charge on paper A ?   As proof of it, the complainant relies upon an alleged admission, that he was chargeable with these items, made by Collier before the referees, and more than this, that the amount of them, $105, was a *sum in his hands applicable to the complainant's indebtedness to him*, which indebtedness of the complainant was the bond alone, so that, in effect, the $105 became an acknowledged credit against the bond, and the right to it an equity attaching to the debt.

After a patient and anxious consideration of the whole evidence, I cannot find such an admission by Collier sufficiently proved.   Upon the evidence presented by this record, I feel obliged to conclude that Collier, before the referees, while admitting that these charges on paper A, were originally due, claimed, nevertheless, that they had been settled.   It is hardly necessary to add that this does not support the allegation of the bill, that he admitted the amount of these charges to be then in his hands as a credit applicable to the bond. The admission, as proved, taken alone, would be insufficient to charge, in any way, the party

making it. For the claim, by prior settlement, to a dis-
charge, if not discredited, must be taken as part of the
admission and qualifies its effect. Some evidence, though
it may be little, is necessary to discredit it, and there is
none. *Gresley's Eq. Ev.* 357 ; *Randle vs. Blackburn*, 5
*Taunt.* 245 ; *Carver vs. Tracy*, 3 *Johns.* 427; *Wailing
vs. Toll*, 9 *Johns.* 141 ; *Credit vs. Brown*, 10 *Johns* 365 ;
*Smith vs. Jones*, 15 *Johns.* 229; *Cowen & Hill's Notes to
Phillips on Ev. Part I, note* 214. In this respect an admis-
sion made not in the cause, but in conversation or writings,
put in evidence, is distinguishable from a confession and
avoidance, by answer in the cause. The latter is admission
by way of pleading, made to form the issues in the cause,
and as well in equity as at law, the defendant is held to
his confession, and put to prove the matter of avoidance.
2 *Evans Pothier*, 157–8 ; *Hart vs. Ten Eyck*, 2 *Johns. Ch.*
90.

It remains only to notice the argument of the com-
plainant's counsel, that Collier, by his answer, admits his
indebtedness upon the items marked "Rec'd.," as well as
upon the charge for difference on carpet which is not so
marked. On examination of his answer, however, I do not
find that he admits himself to be justly charged with any
of these items, except three ; viz:—the seed, oats, the
repairs on pump, and the difference upon the carpet. As to
these three, there is a sufficient admission to charge Col-
lier in a suit by Lattomus to have sustained a set-off
against the bond while it was held by Collier. But the
admission does not go far enough to establish the amount
of these three items as a credit allowed upon the bond be-
fore its assignment—an equity attaching to it, and,
therefore, enforceable against the assignee.

My conclusion upon the whole case is, to credit this
bond only with the complainants net share of proceeds of
the peach crop, $194.06, as of September 15th, 1865. This
will leave due a balance of $157.21, with interest from

September 15, 1865, and costs on the judgment. The decree will be to dissolve the injunction, so far as it restrains the defendant, Garman, from collecting that sum, and to make the injunction perpetual against the collection of any further sum,—the defendants to pay the costs.

----

WM. MARSHALL AND MARY MARSHALL IN THEIR OWN RIGHT AND AS TRUSTEES AND EXECUTORS UNDER AARON MARSHALL'S WILL,

*vs.*

ELIZA P. RENCH, SAMUEL D. R. MARSHALL, EDW. P. JONES AND EMILY J., HIS WIFE, THOS. J. MARSHALL, AARON M. MARSHALL AND JOHN P. MARSHALL.

*Sussex, Sept. T. 1868.*

A testator, after providing for the payment of his debts and funeral charges, directed that his whole estate, real and personal, should be divided equally among eight of his children, excluding one son, each child to be charged, in the division, with any advances in money which he or she had received in his or her lifetime; the division and apportionment to each child to be made by five judicious and impartial freeholders of the county, appointed by the Chancellor of the State, according to law. It was also provided that if such division should be found to give each child, included, more than $4,000, the excess should be divided into nine equal parts, of which the eight children before named should each take one, in the manner before directed, and the remaining one-ninth of the excess was devised to trustees, in trust, for the son excluded in the original distribution. Subsequently to the date of the will, the testator executed conveyances to several of his children, of seven out of twenty-five parcels of real estate of which he was seized at the date of the will; *Held*, that the parcels so conveyed could not be considered in the partition, and that the conveyances operated neither as an advancement, a satisfaction, or implied revocation, of the devise, nor as a trust implied from the admitted intention of the testator to effect an equal division of the property among the eight children.

The doctrine of advancement applies only, under the law of this State, to cases of intestacy, and never to lands devised.

A conveyance of lands to one, to whom, by will executed prior thereto, the same lands had been devised, would operate as a satisfaction of the devise, precisely as the settlement of a portion on a legatee, is an ademption of the legacy, otherwise, when the conveyance is not of the same lands which were devised.

Conveyance to a devisee of lands other than those devised, or any interest in lands, different from that devised, has never been held an imp'ied revocation of a will. Such revocations arise only out of certain alterations of the estate devised, which are incompatible with the operation of the devise or out of such a complete change in the relations of the testator as impose a new obligation, and necessarily implies a change of testamentary purpose, such as marriage and the birth of issue after the will.

The effect to be given to any instrument, a will, conveyance, or agreement of any kind, must be such, and only such, as arises from its terms, or from its legal operation on its face, whenever the instrument embodies all the terms and provisions which were intended to be imbodied, and those terms and provisions have, on their face, a clear meaning.

Where a testator provides for the partition or division of his estate among certain of his children to be made " by five judicious and impartial free-"holders of the county aforesaid, appointed by the Chancellor of the said " State, according to law," the Court of Chancery has jurisdiction by bill for parti ion, and not by petition under the Statute.

Trustees are not obliged to sacrifice their own right as individuals because of their relation, as trustees, to other parties interested in the subject-matter of the estate; and to submit a question as to the operation of deeds affecting the interest of the *cestui que trust*, to the decree of the Court, is the legitimate mode of ascertaining what the rights of the parties are, and is not a breach of their duty as trustees.

BILL IN EQUITY FOR PARTITION OF LANDS UNDER A DEVISE.—Aaron Marshall, by his will, dated July 13th, 1855, after providing for the payment of his debts and funeral charges, directed that his whole estate, real and personal, should be divided equally among eight of his children, excluding his son John P. Marshall, each child to be charged in the division with any advances in money, which he or she had received from the testator in his lifetime. The division of the estate of the testator is di-

rected to be made "by five judicious and impartial "freeholders, of the county aforesaid, appointed by the "Chancellor of the said State according to law, who "shall," the will provides, "after making the division "aforesaid, and making due allowance for the sums to be "deducted from the share or portion of each of said "children as are hereafter mentioned, lay off and assign to "each by metes and bounds, or in such manner as they "may deem best for the interests of each, his or her share, "to be held in the manner and form hereinafter provided.'

Then the testator proceeds by direct devises to give to his children the shares which shall, by the freeholders, be allotted to them respectively, to some of them directly, in fee simple, and for others of the children their shares are settled in trust, at the same time specifying in the case of each child, the amount of the advance, if any, to be charged against his or her share. It is further provided that, if it should be found that a division of the estate into eight parts would give to each of the eight children named more than $4,000 in value, the excess shall be divided into nine equal parts, each of the said eight children taking one of them, in the same manner as before directed, with respect to the original shares, and the remaining one-ninth of the excess is devised to the trustees, in trust for John P. Marshall, the son excluded in the original division. There is also a provision that upon the decease of any one of the eight first named children, without child or children, the share of the one so dying, should be equally divided among all the surviving children of the testator. These are all the material provisions of the will.

At the date of the will, the testator was seized of twenty-five (25) parcels of real estate, which are described in the bill, and numbered from 1 to 25. After the making of his will, at sundry dates, he executed conveyances of portions of his real estate, being Nos. 19 to 25, inclusive, to

several of his children.  In these conveyances his wife did not join him.

The testator died in February, 1865, seized of the parcels numbered from 1 to 18, inclusive, leaving his will in full force and without any codicil.  One of the daughters, Hannah M. Marshall, died, unmarried and without issue, in the year 1860, after the date of the will, but before the death of the testator.

Since the death of the testator, under proceedings in the Orphans' Court, dower has been assigned to his widow, Elizabeth M. Marshall, (with whom he inter-married after the making of his will,) out of the real estate, Nos. 1 to 18, held at his death.   The bill describes the part assigned for dower and the residue.   The estate of the testator has been settled, and there remains an unappropriated balance of $2035.18⅔, subject to the directions of the will for division of the estate.

It is alleged in the bill that the conveyances by the testator to the defendants, after the making of his will, "were intended by him as, and by way of, an advance-" ment towards the distributive shares of the said Thomas "J. Marshall, Eliza P. Rench, Emily Jane Jones, wife of "said Edward P. Jones, and the said Aaron M. Marshall, "respectively, the value of which said tracts and parcels "of land should be ascertained by the said freeholders, "&c., so as to effectuate the intention of the said "Aaron Marshall, deceased, as exhibited in his said last "will and testament, of constituting and making his "said children the recipient of his bounty, as in said last "will and testament specified,"

The object of the bill is to obtain a partition of the whole estate, subject to the provisions of the will, claiming that in such partition the defendant be charged with the value of the lands conveyed to them, respectively.

. To this bill two of the defendants, Mrs. Rench and Samuel D. B. Marshall, answer, admitting all the allegations of the bill. The other defendants demur, assigning various causes of demurrer, all which resolve themselves into four objections. These are :

1. To the jurisdiction.

2. To the frame of the bill.

. 3. To the right of the complainants, being trustees under some of the deeds, to allege that they were made by way of advancement.

4. To the claim made by the bill to have the lands conveyed, treated as advancements.

At the September term, 1868, the cause came on and was heard on the Demurrers.*

*Moore*, *J. H. Paynter* and *Wright*, for the demurrants.

There are some material facts to be borne in mind. The will stood some ten years, from 1855 to 1865. The deeds bear different dates, one, at least, being two years prior to the testator's death. The tract conveyed to Dr. William Marshall upon a consideration stated as

---

* The argument was in the following order : Mr. *Paynter* opened for the demurrants, and was followed by Judge *Layton* for the complainants, then Mr. *Wright* argued for the demurrants, and was, in turn, followed by Mr. *Robinson*, representing two of the defendants in the same interest as the complainants, and Mr. *Cullen* for the complainants; Mr. *Moore* for the demurrants closed the argument. The arguments of the three counsel for the demurrants being upon the same general grounds, are, as is usual and necessary, reported together, but the arguments of counsel on the other side, each proceeded upon a different view of the case, and it was found necessary, to a fair presentation of them, to report them separately.

$500, it is not sought to bring in. The interests under the will and the deeds differ as to two.

To Mrs. Rench—and Mrs Jones, both are in trust.

To Aaron M. Marshall and Thos. Marshall, the will gives absolutely ; the deeds convey in trust only.

1. The first ground of demurrer is to the claim that the conveyances should be treated as advancements.

The doctrine of advancements applies only to intestate estates. *Rev. Code*, (1852,) 279. In this our statute is similar to the English statute. 4 *Kent Com.* (419) *note c.* ; 3 *Sandf. Ch.* 120 ; *Walton vs. Walton,* 14 *Ves.* 318 ; *Hawley vs. James* 5 *Paige,* 450 ; *Vachell vs. Jeffereys, Prec. in Ch.* 170 ; 1 *Bouvier's Law. Dict.* 76 ; *Arthur vs. Arthur,* 10 *Barb.* 9.

The doctrine proceeds upon the natural presumption, in the absence of a will, that the conveyance is a gift in anticipation of the parent's death, and that he intended equality ; but a subsequent disposal by will rebuts the presumption. A will leaves nothing open to presumption, it is an express disposal, and, whatever it may be, it must take effect, even though it works an inequality, because the testator is master of his property.

This will expressly excludes the idea of future advancements of real estate. It devises only the real estate of which he shall die seized, &c. All advancements contemplated are specified, which are of money, and this excludes the idea of advancements of real estate.

The second item specifies, all property "of which I "shall die seized ;" the personal estate is made first subject to the advances, which are described as heretofore made, and therefore cannot apply to any made after, and all the expressions apply to personalty, such as "sums," balances, none to realty.

There is also other evidence of intent appearing otherwise than by the will. The provisions of the deeds vary materially from those of the will, and cannot, therefore, be taken to be made in part execution of the will. Compare the devise for Emily and the deed to Jones; the devise is to Emily only for life, with remainder to her children, the deed to Jones and wife, jointly, with the remainder to the children of both by name. So, to Thomas, the will devises in fee simple, and the deed conveys in trust.

The testator must be presumed to have understood the terms used, and to have intended what he expressed by them. Besides ,the deeds were drawn by counsel.

The conveyances are alleged to be by bargain and sale. These imply consideration, and the fact of consideration cannot be impeached. We must assume that they were sales and not gifts. The claim of advancement is, therefore, contrary to the effect of both will and deed.

The adoption of the idea of advancements would work unjustly. Improvements may have been put on which the estimate of value cannot justly include; yet it is impracticable to estimate its value ten years ago. The same reasoning applies to dower.

Again, there is nothing to connect the conveyances with the will, and parol evidence is insufficient to connect a will with any other paper, without some reference in the papers. *Broom's Leg. Max.* (525).

Any assumed presumption of intended advancement is clearly rebutted, both by the failure of the will to provide for it, and by the fact that the will was left to stand after the deeds, without a codicil. But proof of such intention would be ineffectual, because the effect of a written instrument cannot be contradicted, impaired or altered, by parol evidence of intention, or by an intention unexecuted.

The doctrine of advancement is never applicable to a devise of a residue, which this is, in substance, nor to a devise of realty. *Arthur vs. Arthur,* 10 *Barb. S. C.* 18.

The effort to apply the doctrine of ademption by way of analogy to this case must fail.

(1.) This doctrine is applicable only to personalty. 2 *Sto. Eq. Jur. Sec.* 1115. An ademption is an advancement of a personal bequest, allowed as to personalty but not as to realty, because gifts of the latter are of a more formal and solemn character.

(2.) But even if it were applicable to realty at all, it never is to a residue; even as to money, this objection would operate. 2 *Sto. Eq. Jur. Sec.* 1115; *Arthur vs. Arthur,* 10 *Barb. S. C.* 18.

2. Another ground of demurrer is that a bill for partition will not lie. The will itself provides its own mode of partition, which must be followed by application simply for the appointment of freeholders. This is all the power the Court has on the subject.

As to the power of the Chancellor for partition, the Court must ascertain shares, not the Commissioners, 1 *Sm. Ch. Pr.* 478, but this the testator has done, and even directed the mode of proceeding. Nothing is left but for the Chancellor to make the appointment. The Court cannot decree partition, for this is in effect done by the will, therefore there can be no subpœna upon us to shew cause.

Partition in equity rests upon conveyances, 1 *Sto. Eq. Jur. Secs.* 652–2 ; 1 *Madd. Ch. Pr.* (245). Therefore, when parties are not competent to convey, the partition cannot be made. 2 *Ves.* 129; 1 *Sm. Ch. Pr.* 477.

3. A third objection is that the complainants are trustees for some of the defendants. They cannot be allowed to proceed adversely against their *cestuis que trust,* and that for their own benefit. 2 *Sto. Eq. Jur. Sec.* 1275. It is the duty of trustees to maintain the title of their *cestuis que trust. Tiffany and Bullard on Trusts,* 815. The present position of these trustees is not consistent with their trusts.

4. The bill is informal as a bill for partition. It should pray the appointment of commissioners. *Equity Draftsman*, 298. Besides, there is no prayer for relief, only for a subpœna, and there is no prayer to instruct commissioners as to advancements. 1 *Dan. Ch. Pr.* 448, *note 2.*

Upon these grounds we claim that the bill should be dismissed, and no proceeding entertained, except for the appointment of commissioners under the will.

*Layton*, for the complainants.

The answer of two *cestuis que trust* admits the purpose of advancement, and we contend that the deeds must be so treated. The will cannot be executed according to its intent without considering these lands in the division, for the intent of the will was that each devisee take one-eighth *of the whole as then held*, not an eighth of a part of it.

As to the objections to the form of the bill we cite *Mitf. Eq.*, *Pl.* 73, and as to the jurisdiction of the Court in partition, 1 *Madd.*, 243.

*Robinson*, for the two defendants who answered, their interests being identical with those of the complainants.

"Advancement" is not the proper term ; these depend upon statute, and are, by the statute, confined to cases of intestacy. This is not really a case of advancement, but one of ademption. It is not a residuary devise, nor a devise at all, but a bequest of $4000, with direction as to the mode of ascertaining it. But there may be ademption even of a residuary devise. We claim an ademption or satisfaction *pro tanto*, *i. c.*, the lands are to be taken at their value as satisfaction *pro tanto* of their shares of the whole, as contemplated by the will. As to the connec-

tion of the will and the deeds, there is no necessity of parol testimony to connect them. Our averment to that effect, as to the testator's intention, is admitted by the demurrer, and must be taken as a fact.

The doctrine of ademption, or satisfaction, is applicable to real estate. 2 *Sto. Eq. Jur.,* Sec. 1111 ; 1 *Roper on Leg.,* 257. The case of *Arthur vs. Arthur,* cited from 10 *Barbour* 17, agrees with our statement as to legacies, and on page 19 treats of it as to real estate. It is true that 2 *Sto. Eq., Jur.,* Sec. 1115, states the exceptions to the doctrine of ademption, and among them the case of residue ; but the later edition of that work refers to *Thynne vs. Earl of Glengall,* 2 *Ho. of Lds. Cases* 131, to the contrary, that case holding that a devise of residue may be a satisfaction of a portion.

*Cullen,* for the complainants.

1. It is urged that the Court has not jurisdiction by bill, but that the proceedings should be under the direction of the will. The Court has a general jurisdiction for partition, concurrently with the courts of law. The statutory provisions for a more convenient proceeding, does not exclude the general jurisdiction. *Barton's suit in Eq.* 97. The statute is inapplicable to such a case, and, from necessity, the general jurisdiction must be invoked. The direction of the will does not exclude, but recognizes and invokes, the jurisdiction of Chancery. It is not as though the testator had authorized some private person to appoint commissioners, the direction is "appointed by "the Chancellor according to law."

2. We do not contend that the conveyances were in full of the shares under the will. The question concerns the intention of those conveyances ; according to such intention they must be taken.

What are the evidences of intention, that they were to be taken as part of the shares ?

(1.) The trustees, the parties to three, so state, and the statement is admitted by the demurrer.

(2.) Another grantee by her answer, so admits.

Suppose a devise of lands equally between two sons; afterwards the father conveys to one, his share in severalty, under an agreement that he would accept it in satisfaction, and not under the will,—cannot such an agreement be enforced? and does it matter whether it be an agreement express or implied?

THE CHANCELLOR :—

The first question for our consideration is, the demurrer to the jurisdiction of the Court. The objection is, that the partition cannot be made as under the statute, because the statute is inapplicable; that neither does a bill lie for partition under the general jurisdiction of the Court, because the testator has, himself, provided a mode of partition which excludes that jurisdiction, and that the only proceeding is by petition to the Chancellor for the appointment of five freeholders; that upon such petition the Chancellor will appoint the five freeholders, in whom will then vest the whole authority to deal with the estate for the purpose of partition, and to determine all questions involved without any decree, order, or instruction of the Court. Such is the theory of the defendants.

It is quite certain that this case is not within the Statute for partition between joint tenants and tenants in common. For the shares of the tenants in common are not ascertained, nor are ascertainable, through any powers conferred on the Court by the Statute. But the shares may be ascertained and the partition made by the Court in the exercise of its general jurisdiction, for under its general jurisdiction for partition, the Court may exercise any power necessary to ascertain the rights of parties, and to effect a partition according to their rights. I am

32

not able to foresee, that, in order to give full effect to this testator's will, any orders or proceedings will be required which are not within the jurisdiction of this Court upon a bill. Its powers, under this head of jurisdiction, are by no means stinted. 2 *Sto. Eq. Jur. Sec.* 656. So would stand the case before us were it not for the direction in the will for the appointment of freeholders to make the division, which is supposed to exclude the general jurisdiction of the Court. But by this provision I do not understand the testator as meaning to withdraw his estate from such jurisdiction of the Court, for partition, but rather to invoke it. It is not a mere nomination of freeholders by the incumbent for the time being of the office of Chancellor, that the provision directs, but it is evidently an appointment by the Court, acting judicially and by such proceeding as might be appropriate to the subject-matter, that the testator contemplated. Hence, his expression "to be appointed by the Chancellor *according to law.*" The Court will then entertain a bill for partition among the devisees under this will, and will deal with the case, in all respects, according to the course of its general jurisdiction for partition.

The second cause of demurrer is to the frame of the bill. This bill is very inartificial, the consequence, no doubt, of its being originally drafted as a petition for partition, under the Statute, and then only partially modified with a view to its answering as a bill. Some of the parts of a bill it contains, such as the address, the names and description of the complainants, and a statement of the facts, answering to a stating part of a bill. It omits the charge of confederacy and the jurisdiction clause, but these are wholly unnecessary, and were so before the adoption of the new rules. 1 *Sto. Eq. Pl. secs.* 29, 34. It also does not contain the charging part of a bill which alleges pretences with counter allegations by way of answer to the supposed defense, but this is not a necessary part of a bill, and should be used only

when it is requisite in order to enable the complainant to introduce, and put in issue, an answer to some anticipated matter of defense. There are also no interrogatories, but the use of these has always been, discretionary. It is said that in the original forms of bills, special interrogatories were not used. I. *Sto. Eq. Pl. sec.* 38. The bill is, however, defective in several respects. (I.) It is not correct in its statement as to what real estate is to be divided, and what are the shares of the devisees. The partition must include the whole estate of which the testator died seized, as well the reversion in the parts assigned to the widow for dower, as the residue. We cannot deal with the residue alone now, and await the widow's death before dividing the parts assigned to her; for the shares of the parties entitled are to be ascertained now, by the result of a division of the whole, whether that would give to each devisee less or more than $4,000 in value. Again, the bill is in error in stating that the partition is to be made originally into seven parts instead of eight, in consequence of the death of Hannah M. Marshall. By her death before the testator, the original eighth part devised to her, lapsed ; there is no provision under the will under which it can pass; it cannot pass to the other seven original devisees under the devises made to them ; for these devises are expressly of one-eighth part, and can pass no more. The provision for survivorship upon the death of either of the eight devisees without issue, must be taken to apply to a death occurring *after* and not before the decease of the testator ; but if we suppose Hannah's share to pass under this clause, then it goes to all the eight surviving brothers and sisters, John P. Marshall included, which would not give the surviving seven original devisees a seventh instead of an eighth, but an eighth with an eighth of one-eighth. But, in point of fact, Hannah's share is intestate, and in the partition, whatever she would take if living must be allotted to all the surviving children of the testator to hold together as his heirs at law, the surviving

children to take by devise precisely as if she were living, *i. e.* one eighth, or, if this shall amount to more than $4,000, one-ninth and an eighth of the excess. (2.) A second defect in the bill in the absence of any formal *prayer for relief*, which, in this case, would be a prayer for partition among the parties entitled, according to their shares and interests as previously set forth. (3.) There are prayers for subpœna and answer, but they are too informal. It will be necessary to remodel the whole of the latter part of the bill, including the statement of the interests of the parties and the prayer for answer, relief and subpœna.

Another cause of demurrer to be next considered is to the right of the complainants being themselves trustees, under some of the deeds, to claim to have the deeds treated as advancements. The assertion of such a claim, being contrary to the interests of their *cestui que trusts*, it is complained of as a breach of trust. But the complainants are themselves devisees in their own right. Their own right as individuals, whatever they may be, they are not obliged to sacrifice because of their relation as trustees to some of the devisees. To submit the question whether the deeds operate as an advancement to the decree of the Court, is the legitimate mode of ascertaining what are the rights of the parties, and is not a breach of their duty as trustees. such breach would arise upon a failure to maintain the rights of their *cestui que trusts*, as they shall be ascertained and adjudged by the Court.

The remaining cause of demurrer, is that upon which rests the main controversy. It contests the claim set up by the bill that, in the partition, the lands conveyed by the testator to some of the devisees, be estimated in the partition directed by the will, and be held by the grantees as part of their respective shares. The complainants maintain this claim upon several distinct grounds. Among these, the ground taken by Judge Layton naturally presents itself first ; that is, that the will contemplates the partition

of the whole estate as it was then held, the intent of the testator being that each devisee take one-eighth of the lands then held, and not one-eighth of a part only of them.    The answer is obvious.  Under any circumstances, a will can operate only on such lands as the testator may hold at his decease.  In this case the testator so expressly directed.    Afterwards, by these conveyances, the legal effect of which he must be presumed to have understood, he withdrew part of his lands from under the devise, leaving it to apply only to the residue.    Nothing beyond this residue, then, can be included in the partition by *force of the will*.    If the lands taken out of the devise can be estimated in allotting to the grantees their shares of the remaining lands, it must be through some legal effect arising from the conveyances themselves.  That they have such effect has been earnestly argued upon these grounds.

*First*, that taken by the bill which treats the conveyances as advancements.  But an advancement, properly so called, though a thing known under certain ancient customs in England, is now a creature of the statute, and by the statute, is confined to intestate estates, and never applied to lands devised.  Under the statute for the distribution of intestate estates in England (22 and 23 *Car. II.*) and in many of the States, a child of an intestate having, in the intestate's lifetime, received a portion, either in real or personal estate, shall be charged with it against the share of the estate, which, otherwise, he would have taken.    He may keep the whole of the portion advanced, whether it be more or less than his distriburive share would have been, but he cannot claim anything in addition without bringing his portion into hotch-pot as was the homely English phrase, or collecting it, in the language of Civil law.    2 *Williams on Ex'rs.*  (1285 *&c.*)  Under our statute (*Rev. Code,* 279) only gifts of real estate by a parent are treated as advancements, and these only when the parent afterwards dies intestate.  It is only in the partition

of the intestate real estate that the question of advancement arises. The reason why the doctrine of advancement is copied in our law, is obvious. The parents having left it to the law to distribute his estate, the law, making for him what Lord Raymond, in 2 *P. Wms.* 443, aptly calls a "Parliamentary will," divides it upon the just principle that, among those standing in the same relation to the intestate, equality is equity. But where the parent has, by will, disposed of his estate, the law does not interfere, leaving him to be master of his own property and the judge whether, under all the circumstances, an unequal distribution may not be just and necessary. The strict limitation of this doctrine of advancements to estates distributable *by the law*, may be traced in that feature of the ancient custom of hotch pot, in force between daughters taking by descent, which restricted the custom to lands descending in fee simple, excluding from its operation estates tail, for the reason as stated by *Blackstone*, (*2nd Vol.*, 191,) that "lands descending in fee simple are distributed by the "policy of the law, for the maintenance of all the daughters ; "and if one has a suffieient provision out of the same "inheritance equal to the rest, it is not reasonable that "she should have more ; but lands descending in tail "are not distributed by the operation of the law, but "by the designation of the giver *per formam doni ;* it "matters not, therefore, how unequal this distinction may "be." The same policy extends into the Statute of Distributions of Car. II, in which were embodied this common law as to coparceners, and the ancient local customs of London and York, in the distribution of goods and chattels, (2 *Williams on Exrs.* (1286), and both in England and in the United States, the law of advancements has been applied only in cases of intestacy. Never, where there is a will, not even as held in many cases, though there may be a surplus undisposed of by the will, is a gift in the testator's lifetime required to be brought into the distribution of such surplus. The cases on this subject are, *Vachell vs.*

*Jeffereys, Prec. in Chanc.* 170; Sir William Grant, in *Walton vs. Walton,* 14 *Ves.* 323 ; 2 *Williams on Ex'rs.* (1287) ; *Hawley vs. James,* 5 *Paige* 450 ; *Arthur vs. Arthur,* 10 *Barb. S. C.* 24 ; *Thompson vs. Carmichael's Ex'rs.,* 3 *Sandf. Ch.* 120 ; *Christman vs. Seigfried,* 5 *Watts and S.* (*Pa.*) 400 ; *Newman vs. Wilbourne,* 1 *Hill's* (*S. C*). *Ch.* 10 ; *Newill's case, Browne* 311 ; *Brown vs. Brown,* 2 *Iredell's Eq.* 309 ; *Richmond vs. Vanhook,* 3 *Iredell's Eq.* 581 ; *Needles vs. Needles,* 7 *Ohio St.* 435.

The *Second* ground, for the complainants, was taken by Mr. Robinson, (whose clients, though defendants, were in interest with the complainants,) viz; that the conveyances, though not within the Statute as advancements, might be held to operate as a satisfaction of the undivided interests devised to the grantees, as a part execution of the direction for partition, by analogy to the doctrine of ademption applied to legacies. The principle upon which this doctrine of ademption goes is, that the legacy bequeathed in the will, and the portion settled, afterwards, upon the legatee, are presumed to be for the same purpose, are, in fact, the same thing, the settlement being treated as the satisfaction of the legacy in advance. Now, in some cases a conveyance to a devisee after the making of a will would operate in like manner as the ademption of a legacy, that is, where the conveyance to the devisee is of *the same land* which was devised to him. By such a conveyance the testator executes his devise, precisely as the settlement of a portion on a legatee, is an ademption of the legacy. In the present case had the testator made, by the will, a partition of his lands, devising a specific parcel to each child, and had afterwards conveyed to some of the children the tracts devised to them in severalty, then the conveyances would have been a part execution of the will, and like the ademption of a legacy, by a subsequent settlement of *a portion on the legatee.* But here the conveyances cannot be legally held to be of

the same lands which were devised to the grantees. The will speaks from the death of the testator, and devises to the grantees a share of such lands as the testator *should die* seized of, *i. e.*, the remaining lands other than those conveyed. In no legal sense can a conveyance of specific tracts in severalty be deemed a satisfaction or execution of a devise of other lands, or of an undivided share of the remaining lands. Nor, to carry the question a little beyond the line of the argument, can the conveyances operate as a *revocation* of the devise to the grantees in whole or in part, because, under the Statute of Wills, (Sec. 10,) a will can be revoked only in the form therein prescribed, except in the case of implied revocation. Implied revocations arise only out of certain alterations of the estate devised, which are incompatible with the operation of the devise, or out of such a complete change in the relations of the testator as imposes new obligations, and necessarily implies a change of testamentary purpose, such as marriage and birth of issue after the will. *Cruise's Dig. Title Devise, chap. VI, secs.* 44, 45. The conveyance to a devisee of lands, other than those devised, or of an interest in lands different from that devised, has never been held an implied revocation of the devise. On the contrary, the devisee under such circumstances has been held entitled both under the devise and under the conveyance. *Clarke vs. Berkeley*, 2 *Vern.* 720 ; *Rider vs. Wager*, 2 *P. W'ms.* 328 ; *Davys vs. Boucher.* 3 *Yo. & Coll. Exch.* 397 ; *Arthur vs. Arthur*, 10 *Barb.* 20.

I can see no legal ground to hold that these conveyances operated either as a satisfaction or execution of the devise to the grantees, or as an implied revocation of the devise.

A *Third* ground for the complainants was that of Mr. Cullen. Going beyond those before taken, he argued, in substance, that these conveyances, though not strictly

by their own force operating as advancements, or as a satisfaction, or part execution of the will, yet that, in this case, being made by the testator, with the express intent that they should be so taken, (so admitted by the demurrer,) and being made to volunteers, the lands should be held by the grantees for the purpose of their conveyance, to effect which purpose equity may imply a trust that these lands be estimated in the partition, and treated as satisfaction *pro tanto* of their shares of the whole estate as it stood at the date of the will.  This argument is even more persuasive than those before considered, because it proposes not only to effect equality among the children, but to do so by carrying out the intention of the testator in these very conveyances.  To such an object this court would be ready to lend its aid, but that a rule of law forbids.  It is this :  Where the question concerns the effect of any instrument, a will, conveyance, or agreement of any kind, the effect to be given to it must be such, and only such, as arises from its terms, or from its legal operation on its face.  Any latent ambiguity in its terms may be explained by evidence shewing to what subject-matter the terms used were intended to apply, or if, through mistake or fraud, a provision intended to be inserted has been omitted, equity will reform the instrument, and execute it, as reformed.  But where the instrument embodies all the terms and provisions which were intended to be embraced in it, and those terms and provisions have, on their face, a clear meaning, then no extrinsic evidence of intention, nor even an admitted intention, can, in any way, vary or enlarge the legal operation of the instrument. This is a rule well settled, of great importance, and binding as well in equity as at law.  Now, as to its application. Upon these conveyances there appears no ambiguity to be explained ; there is no alleged omission of any condition intended to have been inserted, which, on the ground of mistake or fraud, equity can supply.  They are all the grantor intended them to be, *on their face*, and, on their

33

face, they are unqualified gifts of the lands conveyed. But the argument proposes, in effect, to engraft upon them a condition or trust, so as to oblige the grantees to bring them into the partition. This cannot be done without overturning fundamental principles.

The case was put, in argument, of a father conveying, in advance, to a son, his share of the estate, under an agreement by the son to take it in satisfaction. Such an agreement equity would enforce by obliging the son, at the father's decease to release any share of the remaining estate. What matters it, then, it was asked, whether such agreement be express or implied? Certainly it matters nothing. An agreement is of the same force, whether express or implied :—but the real question is, from what, in such a case as this, an agreement on the part of the grantees to hold the lands as an advancement, is to be implied? It might be implied from some acts on their part, which, in good faith and fair dealing, require that these lands be brought into the partition, as if these grantees had, by representing that the lands would be taken as advancements, induced the father to convey them, or to omit from the deeds any provision that the lands should be so taken, or had induced him to omit revoking, by a codical, these shares in the partition, in such case equity would imply an agreement or trust, but nothing can be implied against them, from their bare acceptance of a gift unqualified on its face, without, so far as the case shows, any knowledge of the grantor's expectations, or even any knowledge that he had made any will. We cannot, in such case, presume a renunciation by them of their rights under his will ; *non constat* that, if apprized of his will and purpose in the conveyances, they might have elected to hold their full shares under the will.

The case really presented is this. The testator and grantor either mistook the legal operation of these conveyances, or, through ignorance or inadvertence, omitted to make a codicil to his will. But for this there is no remedy.

Opinion :—mistake of law cannot be corrected.

Where a party makes just such an instrument as he intends to make, without fraud, surprise, or mistake in fact, an error as to the legal effect of the instrument cannot be corrected.   Says Chancellor Kent, in *Lyon vs. Richmond*, 2 *Johns. Ch.* 60.   "Every man is to be charged, at his peril, with a knowledge of the law.   There is no other principle which is safe or practicable in the common intercourse of mankind."   The principle has been fully discussed and applied in many cases.   The leading cases are *Worrall vs. Jacob*, 3 *Meriv.* 195 ; *Ld. Irnham vs. Child*, 1 *Bro. C. C.* 92 ; *Hunt vs. Rousmaniere's, Adm'rs.* 1 *Peters S. C. R.* 1 ; 1 *Sto. Eq. Jur. sec.* 111 &c.   See, also, especially, a late case in New York, *Arthur vs. Arthur*, 10 *Bard.* 120 very similar to the present one in its circumstances and in the questions raised.

In *Worrall vs. Jacob*, 3 *Mer.* 195, a party, having a power of appointment, executed it absolutely, without introducing a power of revocation, upon a mistake of law, that, being a voluntary deed, and remaining in her possession, it was revocable at pleasure.   The Court denied any relief—"If"—says Judge Story, 1 *Sto. Eq. Jur. Sec.* 112, "the "power of revocation had been intended to be put into the "appointment, and omitted by a mistake in the draft, it "would have been a very different matter,"—a distinction which has  already been put in this case.

After a full consideration of the whole subject, I am unable, though altogether disposed to do so, to bring the lands conveyed to the defendants, into the partition.   This result disappoints the testator's expectation and works great inequality among his children, but this is a mischief far less than it would be to relax rules of law, settled upon great eonsideration for the protection of rights of property.   Instances like this, of hardship, and even of injustice, are unavoidable.   It is not possible, by any system of jurisprudence, to administer exact justice in every case.   The best system is that which affords such rules as will  secure

justice in the ordinary course of human transactions, and to such rules once settled, it is the duty of the Court, and the part of wisdom, to adhere.

GEORGE W. ELIASON AND FRANK ELIASON, BY THEIR NEXT FRIEND AND GUARDIAN, MARTIN E. WALKER, AND KATE ELIASON AND CARRIE ELIASON, BY THEIR NEXT FRIEND AND GUARDIAN, EDWARD R. COCHRAN.

*vs.*

JOHN FRAZIER ELIASON.

*New Castle, February T. 1869.*

Whenever a lien, charge or burden of any kind, affecting several, is enforced at law against one only, he should receive from the rest what he has paid or discharged on their behalf.

The principle of equitable contribution applies equally to dower, as to other incumbrances.

If an interest is assigned out of lands of one only, of several whose lands were all liable, there should be contributed to him, as near as might be, a corresponding interest out of the lands of those who have been relieved.

Under the Statutes of this State, it rests in the discretion of the Orphans' Court to assign dower out of the whole of decedent's lands, or out of each tract separately, as well against alienees or devisees of the husband, as against his heirs under the intestate law.

BILL IN EQUITY FOR CONTRIBUTION.—John A. Eliason, deceased, by will, dated December 11th, 1864, devised his mansion house in Middletown to his eldest son, John Frazier Eliason, in fee simple ; and the residue of his real estate, consisting of three smaller houses and lots in

Middletown; he devised to his executor, in trust for all his five children, John included, with power to sell the real estate, and hold the proceeds, together with the residue of his personal estate, in trust, for the children, under certain limitations in the will contained. By the will, it is provided, that the testator's widow, Eleanor M. Eliason, should take, as he expresses it, "her right of "dower in my real estate as she would be entitled to "under the laws of the State of Delaware, if I had died "intestate," so the devise of the mansion house to John is charged with dower in these terms, "subject, neverthe-"less, to the same right of dower his mother would "have taken had I died intestate;" and a like proviso accompanies the devise of the residue, "subject, neverthe-"less, to the right of dower of my wife, in all my real "estate."

After the testator's decease, the widow presented to the Orphans' Court, at the February Term, 1864, her petition setting forth the seisin and death of her husband and the provisions of the will, and praying for the assignment of her dower in the same manner as under the intestate law ; whereupon the Court made the usual order for the assignment of the dower, under which order the freeholders assigned to the widow the three houses and lots which had been devised in trust for all the children, leaving the mansion house which was devised to John, wholly exempt. The return of the freeholders was approved, and the assignment of dower confirmed. This bill was filed on behalf of the younger children, and claims that the devisees of the residue, are entitled, by way of contribution, to one third the annual value of the mansion house, during the life of the widow, that being the share of the common burden of dower to which the devisee of the mansion house was liable, but which, under the assignment as made, the residuary devisees have been compelled to bear. The defendant demurred to the bill, and raised the question, whether, upon the facts stated, he is liable to contribution.

*Whiteley*, for the demurrant.

There is no equity for contribution among devisees. They stand like alienees.

The assignment of dower out of all the real estate is only under the intestate law; as against grantees, it must be out of each parcel, separately. True, the assignment is good so far as concerns the widow, the will giving her dower out of all the real estate; as when several grantees in decedent's lifetime submit to a widow's application for dower out of the whole.

The devisees of the parcels assigned might have objected in the Orphan's Court, to the assignment of dower out of their lands alone, and claimed that the assignment should be out of each; yet, not having objected, they have waived their only remedy, and cannot proceed in equity for contribution. Of those proceedings they are deemed to have had notice. All the world has notice of such proceedings. The law, as to alienees, in the husband's lifetime, is clear and settled. A devisee is, in like manner, a purchaser, and stands in like condition, as an alienee in the husband's lifetime. *Coulter vs. Holland*, 2 *Harring.* 330.

*G. B., & J. H. Rodney*, for the complainants.

There is a general natural equity to contribution in favor of one who discharges an incumbrance of any kind affecting property held by all. It applies alike, to every species of incumbrances. In this particular, there is no difference between dower and a judgment. Besides, this incumbrance affected the title of the devisor himself, and ran with it. The will so recognizes it, and this recognition by the testator, of the dower in all his land, put it in the same position as under the intestate law.

The testator died in possession; that makes it like a case of intestacy. In the case of alienees, the decedent is out of possession, and the question is between the widow

and each one of them. The alienation in the husband's lifetime separates the right and attaches it to each parcel separately; otherwise, when he dies seized of all. Hence, the policy of the intestate law, and its *ex parte* character, and hence, the necessity of summoning alienees.

There was no notice of application for dower given to the children. They should not, therefore, be affected *by waiver*, not being parties, nor having notice.

This case is within the general doctrine of contribution. 1 *Sto. Eq. Jur. secs.* 477 & 1233 *b*.

THE CHANCELLOR :—

If Mrs. Eliason's right of dower was a common charge or burden on all the lands devised, then the residuary devisees, having borne, out of their lands, the charge to which the whole was liable, the case is already within the reason and equity of the doctrine of contribution, as that doctrine has been held from great antiquity. The principle is, that parties having a common interest in a subject-matter shall bear equally any burden affecting it. *Qui sentit commodum sentire debit et onus.* Equality is equity. One shall not bear a common burden in ease of the rest. Hence, if as often may be done, a lien, charge or burden of any kind, affecting several, is enforced at law against one only, he should receive from the rest what he has paid or discharged on their behalf. This is the doctrine of equitable contribution, resting upon as simple a principle of natural justice as can be put. *Herbert's case,* 3 *Coke's Repts.* 11 *b* ; *Dering vs. Winchelsea,* 1 *Cox* 318 ; 2 *B. & P.* 270 ; *Campbell vs. Mesier,* 4 *Johns. Ch.* 388 ; 1 *Sto. Eq.* 477-8 ; 1 *White & Tudor's L. Cas. in Eq.* 66. Its most common application is to sureties and to owners of several parcels of land, subject to a lien or charge for the payment of money. But as is declared by Lord Redesdale, in *Sterling vs. Forrester,* 3 *Bligh,* 59, the principle is universal.

Adverting now to the present case, certainly it can make no difference as to the natural equity of the complainants to contribution, that the common charge here is a right of dower, and not, as in ordinary cases, a money demand, such as a judgment or mortgage. This difference goes, not to the principle of contribution, but only to the mode in which it is to be enforced. What is decreed contributed, will, of course, be of the same nature as the common charge borne, *i. e.*, for money due from several and paid by one, a reimbursement in money, will be decreed ; if an interest is assigned out of lands of one only, of several whose lands were all liable, there should be contributed to him, as near as may be, a corresponding interest out of the lands of those who have been relieved. The powers of this Court are adequate to any mode of relief which justice between the parties may require.

The argument for the defense is that the right of dower against devisees of the husband, equally as against alienees of the husband in his lifetime, is not a common burden ; that it is not incumbrance upon the lands *in solido*, but is a charge upon each tract separately ; and being so, is assignable, not out of the whole, but separately, out of each tract ; so that, as the tract of each alienee or devisee, if the assignment is properly made, bears only its own burden, no ground for contribution exists ; and that, although, in point of fact, in this case, the dower has been assigned in the Orphans' Court for the whole, out of the lands of the complainants only, yet, that such mode of assignment was irregular, and would have been set aside on application to that Court upon the return of the freeholders, that an application to the Orphans' Court, or an appeal from its action, was the complainants' sole remedy, having waived which they have no claim to relief in equity.

It is undoubtedly true that at common law, dower was assignable, not out of the whole of the decedent's lands *in solido*, but out of each tract or parcel separately, and

even out of each denomination of property, as a third of the arable land, a third of the meadow lands &c. ; and at common law this was the mode of assignment when made by the Sheriff, as well against the heir in a case of intestacy, as against the alienee of the husband in his lifetime, or the devisees under his will. The heir might, and usually did, voluntarily, and with the consent of the widow, assign her dower out of the whole, giving her one or more tracts instead of a third of each, but this rested wholly upon agreement, and was termed an assignment contrary to common right, the assignment out of each tract separarately, being, as was said, according to common right— *Park on Dower*, 251, 255, 262. Hence, as at common law, dower was not a charge upon all the lands, as a whole, but upon each tract separately, a burden which each alienee or devisee bore for himself alone ; dower, as assigned at common law, could not become a subject for contribution.

But under the statutes of this State, the mode of assigning dower rests in the discretion of the Orphans' Court, which may adopt the one or the other mode, as in its judgment will best promote the interest of all the parties ; and such discretion has the Orphans', Court as well in assigning dower against alienees or devisees of the husband, as against his heirs under the intestate law. The dower act of 1816, now embodied in *Chapter 87 of the Revised Code*, (being the Statute applicable to dower as against alienees and devisees,) directs that dower, under that Act, shall be assigned by the Orphans' Court of the county where the land lies, upon her petition to the said Court, by the widow, or by any party interested by the like proceeding, and in the same manner as by law is provided in the case of intestate's estates. *Revised Code p*. 292, *Sec*. 16. This provision has been judicially construed as giving to the Orphans' Court, for the assignment of dower, under this Act, the same powers and discretion exercised by it under the intestate law. Upon a full

consideration of this whole subject in *Coulter vs. Holland*, 2 *Harring*. 334-5, it was held by the Superior Court on appeal, that the Orphans' Court has authority, in all cases, whether under the intestate law or not, to assign dower, either altogether out of one tract, or in separate parcels out of several tracts, or a third part out of each tract. In the case cited the Court, exercising this very discretion, did approve an assignment of dower for the whole estate of the husband, made wholly out of land devised to his two sons, to the exemption of other land devised to his daughters. Generally, the mode of assigning dower, under the intestate law, and under the act of 1816, differs in practice, for the reason stated in *Coulter vs. Holland*, that in case of intestacy, the whole estate being in the same parties, it is more convenient to assign dower out of the whole, while, as against alienees and devisees holding in severalty, it is generally more convenient to assign dower out of the separate tracts. Nevertheless, if, in any case, from the nature of the property held by several alienees or devisees, an assignment out of each parcel is (as it may be) impracticable, or will be prejudicial to the interests of the parties, the Orphans' Court have authority to order or approve an assignment out of the whole, leaving alienees or devisees to their remedies in equity. In the present case the Orphans' Court, in assigning dower out of the whole real estate of the testator, and not separately out of the parcels devised, have exercised an authority conferred by the statute, not to be questioned except upon appeal. It is, in all respects, a legal and valid assignment. I lay no stress upon the terms of the will expressly charging the real estate with such dower as the widow would take under the intestate laws. That is a consideration addressed to the discretion of the Orphans' Court, but adds nothing to the legal effect of the assignment as made.

We may now return to the defense relied on and inquire whether the reason which excludes contribution with respect to dower assigned, as at common law, against alienees

or devisees, *i. e.*, out of each tract separately, applies to this case. The reason is that, under an assignment so made, each alienee or devisee bears his own burden, and only his own, so that there then arises, in fact, no inequality to be adjusted between them. There has been no common burden borne by one only. But here the Orphans' Court, having, under the statute, authority to assign the dower either as a charge separately upon each tract devised, or as a common charge upon the whole, has adopted the latter course ; and under its decision which cannot be called in question, the dower of Mrs. Eliason became a common charge upon the real estate as a whole, which charge the complainants have been compelled to bear out of the parcels devised to them.

This brings the case clearly within the reason and equity of the doctrine of contribution. But it was argued that the complainants, though they have, in fact, under the order of the Court, been compelled to bear the whole burden, have lost their equity by waiver or laches in omitting to move, in the Orphans' Court, at the return of the assignment of dower, to have it set aside. But this argument assumes that the assignment was irregular, and must, on application, have been set aside ; whereas, on the contrary, the assignment was made by a Court having complete jurisdiction to make it in either mode ; and it must be presumed to have exercised a sound discretion in approving of the assignment in this mode. The complainants are justified in so accepting and acquiescing in it, and are in no laches by not having experimented with a motion to set aside the return or with an appeal. We should not expect to find, among the English decisions, a case of contribution for dower, as between alienees or devisees of a decedent ; said dower, at common law, is assigned separately out of the tracts aliened or devised. In the American reports I have found only one case touching the question. *United States Bank vs. Delorac, Wright's Ohio Reports, p.* 285. It is thus cited in 1 *U. S.*

*Eq.*, *Dig.*, *p.* 182, *Sec.* 46 ;—"several creditors levied execu-
"tion upon separate parcels of a debtor's real estate. After
"his death the widow's dower in the whole was set off
"entire upon one of those parcels. The whole was sold and
"proceeds of each lot paid to the creditors, respectively,
"who had levied upon it—Held, that the creditor who had
"levied upon the tract afterwards incumbered with dower,
"was entitled to contribution from the others". In this case,
clearly, the doctrine of contribution was applied to
dower. There is, in *Coulter vs. Holland*, a *dictum* of the
Court adverse to this conclusion. The learned judge in
stating the reason why, generally, the assignment of dower
against alienees and devisees is made out of the several
tracts, remarks ; "otherwise it might, and often would so,
happen that one alienee, purchaser or devisee, might have
his whole land taken for dower without redress ; whilst
another who had purchased or taken subject to dower
would be entirely relieved of the encumbrance." This
remark seems to have been made without a view to any
equitable remedies which might reach such a case, cer-
tainly it was without any special consideration of them.
The question of such equitable redress was not at all
involved in that case, and no opinion given, with re-
spect to it, could be authority, still less, a casual remark
made without examination. I do not propose, at present,
to enter a final decree, but to make an interlocutory
decree that the defendant file an account of the rents,
issues and profits of the Mansion House devised to him,
which have accrued since the date at which the assignmeut
of dower took effect. After the settling of that account,
a final decree will be made for the complainants for
their proper share of the amount ascertained by the ac-
count, and also to secure their rights for the future.

JONATHAN E. GEORGE AND SARAH GEORGE HIS WIFE,

*vs.*

HENRY H. MCMULLIN.

*New Castle, February T.* 1869.

Two classes of legacies were charged upon real estate, first, legacies to three daughters and a son of the testatrix, to each, $300, "to be paid with interest, "the first of the said legacies at the end of two years after my death, and "the others respectively in three, four and five years thereafter, as they are "herein enumerated." The second class embraced legacies to the daughters and three sons, to each, $275, "to be paid in the order named, with interest, "annually after the payment of the several legacies mentioned in the last "item." *Held*, that the second class, as well as the first, bore interest from the death of the testatrix.

If upon a legacy payable in future and charged upon land, interest be given, but no time named, either expressly or by necessary implication, from which it shall be calculated, it bears interest from the testator's death.

A decree for the payment of a legacy charged upon land, may, at the same time, provide, in default of payment at the time specified, that an order shall issue under the seal of the Court, directing the sale of the land by . the Sheriff, returnable to the next term.

BILL IN EQUITY TO RECOVER A LEGACY CHARGED UPON REAL ESTATE.—Mary McMullen, by her will, dated December 1st, 1860, devised her real estate, in parts, to · her sons, Henry and John, charging it with all her debts, and with sundry legacies bequeathed by the will, the debts and legacies to be paid by Henry and John, in shares proportionate to the value of the real estate devised to them, respectively. The value of the real estate is fixed by the will, *i. e.*, Henry's at $10,000, and John's at $6,000.

The legacies charged upon the real estate, were bequeathed in two classes. First, legacies to three daughters and a son of the testatrix, to each, $300, "to be paid with "interest, the first of the said legacies at the end of two

" years after my death, and the others, respectively, in three, "four, and five years thereafter, as they are herein enum- "erated." The second class embraces legacies to two daughters and three sons, to each, $275, *to be paid in the* "*order named, with interest; annually after the payment* "*of the several legacies mentioned in the last Item*," *i. e.,* annually, after the payment of the first class legacies of $300 each.

The testatrix died, December 1st, 1860. The period limited for the paying the first class of legacies has elapsed ; Sarah E. George, one of the complainants, is one of the legatees of the second class, being the second named among them, and her legacy being now due, this bill is filed to recover from Henry H. McMullen the proportionate share of this legacy charged upon his real estate.

The only point in controversy is, from what time this second class of legacies bear interest, whether as the complainant claims, from the death of the testatrix, or whether, as the defendant insists, from the date at which the last one of the first class of legacies became payable.

The case was submitted upon bill and answer.

*Lore,* for complainant.

*G. B. Rodney,* for defendant.

THE CHANCELLOR: —

It is the general rule that a legacy payable *in futuro* does not carry interest. If interest be given, but no time named from which it shall be calculated, then the legacy, if payable out of the personal estate, bears interest from the expiration of one year from the testator's death ; if charged upon land it bears interest from the death of the testator. 2 *Williams on Ex'rs.* (1221) *note s* ; Lord Mac-clesfield, in *Maxwell vs. Wettenhall,* 2 *P. Wms.* 26, first

declared this rule, as to legacies charged upon land, assigning as the reason of it that the land yields a profit from the death of the testator. His authority has been followed in *Stonehouse vs. Evelyn*, 3 *P. Wms.* 253 ; *Spurway vs. Glynn*, 9 *Ves. Jr.* 483 ; *Shirt vs. Westly*, 16 *Ves. Jr.* 393. A better ground for the rule, however, is given by Lord Redesdale in 1 *S. & L.* 11, viz : that the necessity of a reasonable time, such as a year, for the executor to get in his personal estate to enable him to pay an ordinary legacy, does not apply to a legacy charged on land, which, therefore, is payable immediately, and being thus payable at testator's death, bears interest. The legacy to Sarah E. George is given, expressly, with interest, and being charged on land must, under the rule, be held to bear interest from the death of the testatrix, unless a contrary intent appear. The defendant insists that a contrary intent does appear. That the second class of legacies, among which is Sarah E. George's, were, under the terms of the bequests, to bear interest only *after the expiration of the time fixed for the payment of all the legacies* of the first class ;—and this is the precise question. The terms of the bequest are, that these legacies "be paid in the order " named, with interest, annually, after the payment of the "several legacies" mentioned in the former item. I take the words "with interest" here to be used with the same meaning which they bear as used in connection with the legacies of the first class. There the bequest was of $300, to each legatee, "to be paid with interest, the first " of the said legacies at the end of two years after my " death, and the others, respectively, in three, four and five "years, &c." In both cases interest is given as an incident to the legacy. The time for which the interest is to run is not specified, and doubtless it was not in the mind of the testatrix. The entire provision following the gift of the legacy " with interest," has respect solely to the time for payment of the legacy with the interest, and not at all to the time from which the interest is to commence.

In the first class this sentence is relieved of any possible ambiguity, by the testatrix specifying separately the time for paying each legacy; thus, "the first of said legacies, at the end of two years after my death, and the others," &c. In the second class there is an attempt, by more general terms, to effect the same thing. These legacies, with interest, are directed to be paid, "annually, after the payment of the several legacies mentioned in the last item." The intention was simply to continue, as to this second class, the same annual succession of payments following directly after the legacies of the first class. The two provisions taken together form one arrangement, the sole object of which was, that the devisees of the land should be held to pay only one legacy per annum until all were paid. There is no purpose indicated to exempt the devisees from paying interest on the legacies from the death of the testatrix. As the devisees took the whole estate of the testatrix from her death it must have been felt, by her, to be but a fair equivalent to the legatees that their legacies should bear interest for the like period ; and hence the gift of the legacies "with interest." As to the first class, it is admitted that the interest runs from the testatrix' death, there being nothing to fix a later date. Then it is presumable that she did not mean to discriminate between the two classes of legatees (all being her own children) by giving interest to some from her death, and to others only after five years later. Unquestionably she might do this, but her intent to do so should be either expressed or necessarily implied. I do not so find it. An intention to postpone interest on the second class does not arise from the terms of the bequest ; for, as we have seen, these refer only to the time for payment of the legacies, and not to the time from which interest shall commence. Nor can it be implied from the division of the legacies into two classes, as was argued, for that division clearly arises from the difference in the amount of the two classes of legacies, the first being for $300, the second for $275.

Nor, again, can such an intent be inferred, as was further argued, from the consideration that to allow the interest on the second class of legacies from the death of the testatrix, will increase the amount charged upon the lands beyond what the testatrix intended; *i. e.*, the principal sum bequeathed, or $2,575, for this begs the question by assuming the very point in controversy, viz: that the testatrix meant to charge only the principal of these legacies, without interest, or without interest until after five years. This is assumed, too, in face of the admission necessarily made, that the first class of legacies were intended to bear interest from her death.

I am of opinion that, upon the true construction of the will, all the legacies carry interest from the death of the testatrix, and the decree will be accordingly.

The decree entered required the payment by the defendant of the amount of so much of the legacy as was charged on his land; principal and interest with the cost, within sixty days, next ensuing, or, otherwise, that an order should issue under the seal of the Court, directing the Sheriff to sell the land upon notice as stated in the decree, and, in the event of such sale, to make return of his proceedings, under such order, to the Chancellor at the next term of the Court.

35

‹

George W. Sparks, Edward Moore, William G. Lowe, Robert D. Hicks and Henry S. McComb,

*vs.*

The President, Directors and Company of the Farmers' Bank of the State of Delaware.

*New Castle, Feb. T., 1869.*

Where A becomes surety for the faithful discharge of B's duties, as cashier, the obligation continues so long as B holds the office by virtue of the appointment under which the bond is given. Though the office be usually treated an elective for one year only, yet the surety will be liable for B's acts if B continue in office after the year. But on B's re-election and qualification for a second term, the liability on the old bond ceases.

If the term of an officer, created by a statute or charter, is not limited to expire at a fixed time, or upon a specified event, but there is merely a direction for his annual election, his original term continues, though after the year, until a successor be duly elected and qualified.

Where neither the charter nor by-laws of a corporation fixes the term of office of its cashier, but vests the appointment of all officers in the "directors for the time being," a cashier so appointed, holds his office during the pleasure of the directors, unless they, at the time of appointment, limit the duration of his office to a specified term.

Under such circumstances, a general resolution of a board of directors, that the cashier should be annually elected, and the practice of that and subsequent boards, to hold elections annually, constituted him an annual officer in a certain sense, but not so entirely as to make his term of office expire *ipso facto*, at the end of the year. It is a question of what term the board intended to elect for. And where the charter prescribed that the cashier, before entering on the duties of his office, should give bond, &c., it will be presumed that the board intended the old cashier to continue in office until the new one should not only be elected, but qualified to take his place.

Therefore, where a cashier was elected, and gave bond in one year, and was re-elected the next year, but failed to give a new bond, it was held that he was in office by virtue of his first election, and his sureties were liable for his acts during the second year.

The fact that the bank neglected to have the cashier's bond renewed on his re-election, whereby the bond of the original sureties remained in force

after the period they had been led to expect, does not estop the bank from proceeding on the bond; it not appearing that the expectation as to the time their bond was to be in force, was due to representations by the bank.

Nor is the bank estopped by its failure to examine the cashier's accounts with such frequency as to discover his defalcations within the year in which they took place. The bank owed the sureties good faith, not diligence.

In a court of equity, the statute of limitations on a cause of action which has been fraudulently concealed, runs from the discovery of the fraud. This principle applied to a defalcation by the cashier of a bank, though a more frequent and diligent examination of his affairs, by the officers of the bank, ought to have disclosed the defalcation within the statutory period after its occurrence.

BILL IN EQUITY BY SURETIES FOR AN INJUNCTION.— This was a bill in equity by the sureties in official bonds of Joseph A. Heston, late cashier of the Farmers' Bank, to restrain the bank from proceeding at law to collect from complainants the amount of certain alleged defalcations of Heston, committed while cashier.

The bonds bore date, respectively, January 1, 1862, and January 6, 1865. The complainants were the sureties in each, and the two bonds were precisely alike in their terms, being each in the penal sum of fifty thousand dollars, and upon condition, "that if the above bound "Joseph A. Heston shall behave himself well and faith- "fully discharge his duties as Cashier of the Branch of the "Farmers' Bank, at Wilmington, then the above obliga- "tion to be void, otherwise to be and remain in full force "and virtue in law."

Each bond contained a warrant of attorney for confessing judgment, which had been executed by the entry of judgments at the November term, 1866, of the Superior Court, in and for New Castle County, being No. 392 on the bond of January 6th., 1865, and No. 393 on the bond of January 6th., 1865. Under these judgments the bank was proceeding to collect the amount of the alleged defalcations when restrained by the injunction.

The amount claimed on account of the alleged defal-
cations was made up of a deficiency in cash, represented
by three checks on the bank, drawn by Heston to his own
order, amounting in all to $9134.90. There was also an
additional amount, in which the cash was found to be
short, on March 2nd, 1867, $986.97, making in all $10,121.87.

There were also claimed, in addition to this amount,
an over-draft on salary account of $62.31, and the amount
of a check of Samuel Biddle, for $101, found among the
assets with which he was chargeable, not charged to
Biddle, his account being balanced, but held by Heston as
cash. These two items were not treated by the Court as
established.

The three checks making up the $9134.90 were dated
as follows :—

December 1st, 1864, $3046.46 ; September 5th, 1866,
$5588.44 ; January 15th., 1867, $500, and these dates,
together with March 2nd., 1867, as to the $986.97, were
found by the Court, upon the proof, to be the respective
dates of the defalcations.

It was objected by the sureties that the books of the
bank were so loosely kept that no correct ascertainment
could be made of either amounts, or dates of defalcations,
as had been shewn by the fact that four distinct amounts
had been claimed by the bank.

The complainant's claim to relief, was based upon
three grounds of equitable defense against the right of the
bank to enforce their judgments. The chief of these was
that the office of cashier was an annual one, and that
they were liable upon each of the bonds only for defal-
cations occurring within the current official year at the
beginning of which it was given.

It was further claimed that no defaults had occurred
in the years 1862 and 1865.

The banking corporation had, what was termed, the "general board," which met at the principal bank, at Dover, twice each year, and the election of the cashier occurred at the meeting of that board, in January. This general board consisted of the directors of the principal and branch banks meeting together, each of them having a board of directors for the management of its ordinary banking business.

Heston's first appointment was a temporary one, to fill a vacancy made by the directors of the branch bank at Wilmington, February 13, 1858, and continuing until the meeting of the general board, in January 1859. He was then regulary elected, and subsequently re-elected by the general board, in January of each year, until 1867, the year in which he was removed. He gave a new official bond in each of the years 1859, 1860, 1861, 1862 and 1865. For reasons not necessary to be stated, the taking of bond was dispensed with in 1863 and 1464.

The by-laws and ordinances of the banks, the minutes of the general board and of the directors of the branch bank at Wilmington, the books of account of the latter were among the documentary evidence.

The charter of the bank was passed February 4th, 1807, and was renewed February 7th, 1822, February 27th, 1837, and February 13th, 1855. Under it the power to appoint officers, and generally to govern the corporation, was vested in the "directors for the time being." No term was annexed to the office of cashier. The charter provided for the qualification of cashiers by taking the oath and giving bond.

The practice of electing cashiers, as shewn by the minutes, was not altogether uniform. The bank was organized in 1807, and until 1810 cashiers were elected annually. From then until 1823, there were no elections except to fill vacancies. In 1823 the officers were re-elected and required to give bond. In 1824 there was no

election, but in 1825 they were elected, and the following resolution on the subject was passed:

"*Resolved further*, That the persons to fill the "respective offices of cashiers and clerks, in the different "departments of this bank, shall be balloted for at the "present meeting, and, annually, at the meeting of the "general board of directors, in the month of January of "each year hereafter, and shall, on entering upon the duties "of those offices, respectively give bond and warrant of "attorney, in the manner and form prescribed by the Act "of Assembly in such case made and provided."

An accompanying resolution directed the cashiers to to take certain proceedings for the collection of interest due and in arrears more than twenty days prior to the semi-annual dividend period, and added, "that the cashier "or cashiers who shall neglect or refuse to comply with this "provision, shall not be allowed to be nominated or voted "for at annual elections thereafter, to fill the said office, but "be wholly excluded therefrom."

In 1826, officers were elected, and the following resolution was passed:—"That the cashier and clerk of the "principal bank, and the cashiers and clerks of the respec- "tive branch banks, enter into bond with surety and sureties, "and warrants of attorney, conditioned, as provided by law, "for the faithful performance of their offices, as required by "a former by-law or by-laws of this institution, and that "such bonds be duly executed and submitted for their "approbation to the respective boards of directors, within "twenty days after their appointments, respectively, in the "present and subsequent years."

In 1827, and since, cashiers and tellers were elected or re-elected annually, and have, upon each election or re-election, given bond and taken the oaths, except in 1863, 1864, 1866 and 1867.

The further proceedings of the general board, and also of the directors of the branch bank at Wilmington,

as appearing upon the minutes, which were material to the case, are sufficiently stated, in the opinion of the Court.

The second ground of relief was the neglect of the directors of the branch bank to supervise, properly, the affairs of the bank, and upon this subject, testimony was adduced which is not material to the legal views upon which the Court proceeded.

The other ground of relief was the statute of limitations, under which it was claimed that the sureties were discharged as to so much of the defalcation as occurred more than two years prior to the entering of judgment on the bonds in March, 1867.

The cause came on to a final hearing at the February Term, 1869.

*T. F. Bayard*, for the complainants.

Consider, first, how such obligations as those here involved are affected by general statutes. The *Revised Code*, *Ch.* 123, *Sec.* 11, limits suits upon the official bonds of corporate officers to the period of two years, and directs the renewal of such bonds, at least, every six years. The object of all this was to protect sureties against indefinite liabilities, which, otherwise, by general law, they would rest under.

The office of cashier was an annual one.

The power of appointment was in the general board. *Charter*, *Sec.* 11. There is no other deposit of power except this one in the "Directors, for the time "being", *i. e.*, of the corporation. The power in the general board was, and continued to be, unqualified. There was no power of appointment vested, by the charter, in the branch bank, and appointments by the branch

banks are, in fact, as shewn by the minutes, approved at Dover.

And we find the usage of the corporation consistent only with this construction, and that usage would be sufficient for this case to establish that this was an annual office. But it does not stand on usage only, but is expressly determined by the resolutions of 1825, subsequently acted under without interruption.

Again so far as concerns the sureties if the corporation by its acts has so held itself out that no other construction can be reasonably made by a person dealing with them.

The records of the bank shew an annual election, and since 1813 the officers have been annually sworn. Upon the elections, there follow each year, official bonds regularly given, up to 1863. Such is the testimony of the records, and it cannot be controverted by parol evidence of Bank Directors. Dewey J. in *Amherst Bank vs. Luther Root and others* 2 *Metc.* 522. Hence, then, the doctrine of estoppel applies, and the bank, by its own records and proceedings, are estopped to deny that the office was filled by annual elections, and is an annual one. *Dutchess of Kingston's case,* 2 *Sm. L. C.* (459 *i.*) *English note.*

The whole proceedings and minutes of the bank if to the sureties or inquired of by them must have made the impression that their obligation would be for the year only.

Contracts of suretyship for official duty, or trust, doubtful as to extent, are construed favorably for the surety, and against *indefinite* liability. *Addison on Cont.* 663 ; *Ludlow vs. Simonds* 2 *Caines Cas. in Eq.* 1 ; *Miller vs. Stuart,* 9 *Wheat.* 981.

Where the bond states no term, but the office is, in fact limited as to term, the liability is limited to the actual term. *Add. on Cont.* 660 ; *Angell & Ames on Corp. secs.* 228, 322 ; *Lord Arlington vs. Merrick.* 2 *Saund.* 404, 415 ; *Augero vs. Keen,* 1 *M. & W.* 390 ; *Kipson vs. Julian,* 30

*Eng. L. & Eq* 326 ; *Dedham Bank vs. Chickering*, 3 *Pick* 341 ; *Amherst Bank vs. Root*, 2 *Metc.* 532.

A re-appointment of the same person is of the same effect as the appointment of a new officer. *Bigelow vs. Bridge*, 8 *Mass.* 275 ; *Southwark vs. Bostwick*, 4 *B. & P. New Edition*, 175 ; *Liverpool Water Works Co. vs. Atkinson*, 6 *East.* 512.

But the act of limitations is another distinct ground of relief. *Rev. Code* 44, *sec.* 11. The " cause of action accrued" when the default was committed, not when it was discovered. *Add. on Cont.* 1207.

In *Bank of Wil. and Br. vs. Wollaston*, 3, *Harring.* 90, relied on by the defendant, the condition was "to pay "and deliver," hence the cause of action accrued then, on default in paying over on removal.

Here we have no such condition, and the default must have occurred within two years of the entry of the judgment, and the *onus* is on the defendant to shew that fact.

*Bradford* and *Higgins*, for the defendant.

*First.* Assuming that this is an annual office, and admitting the law applicable, as stated, we could recover nothing on the bond of 1862, no defalcation being in that year. But there was a breach of the condition of the bond of 1865 within that year, under which we would be entitled to recover the amounts covered by the false entry of April 6, 1865, of $6503.65, and the deficiency shewn on a count of the funds, April 13, 1865, of $1001.93.

*Secondly.* Admitting the power of appointment to be vested in the general board, we contend that they have not made the office an annual one, and proceed to consider the liability under both bonds.

The original appointments were all for *indefinite terms*. It was not then considered or made an annual office, (1)

36

by terms of election or grant of authority ; (2,) by any declaration of charter ; (3,) by any by-law or ordinance, or, (4,) by any condition of bond.

In the proceedings of the corporation, there is nothing to indicate an annual office beyond mere re-election, which was wholly a supererogation, not necessary, and not always resorted to.

The grounds urged as evidence that the office was an annual one, are : 1, The yearly elections.  2. The orders of 1825-6.  3. The order for yearly bonds in 1826, and their being taken.  4. The annual oaths.

The claim is not based upon charter, ordinance, by-law, condition of bond, or terms of appointment.  Consider these grounds in order.

1. Yearly elections, up to 1825, do not make an annual office.  *Dedham Bank vs. Chickering*, 3 *Pick.* 335.

2. The orders of 1825-6 as an ordinance, or by-law, were void *ultra vires*, the stockholders alone having authority under the charter to make by-laws.  The resolutions were a mere declaration of purpose made to themselves only, not of any binding force, and not of itself affecting the general tenure of office.  They do not even purport to limit the term ; that must be determined only by the terms of the appointment, where the power to appoint is general, and there is no controlling law or rule limiting the office.

3. As to the yearly bonds, although the law requires a bond on entering into office, the converse is not true, that taking bond creates a new office.  For many reasons, new bonds may be periodically required, both for the benefit of sureties and the bank, to bring the responsibility of sureties under review, and, if necessary, new security may be required.  Hence, the taking of new bonds is not

conclusive as to the term of office. *Bank of the U. S. vs. Dandridge*, 12, *Wheat.* 65.

4. The same argument applies as to the inconclusiveness of annual oaths. The President and Directors were, by charter, required to be sworn ; hence, the fashion of including the other officers. There never was any order for it.

On the other hand, observe the evidence of intention not to make the office an annual one.

1. No election, at any time, by either board, in terms for a year, while it was easy and natural to do so if intended.

Though there was a form of election, it was unnecessary, and did not terminate the previous authority, but only continued it for a year. *Dedham Bank vs. Chickering*, 3 *Pick.* 340 ; *Amherst Bank vs. Root*, 2 *Metc.* 539 ; *Union Bank vs. Ridgely*, 1 *Hart. & Gill*, 327 ; *Hughes vs. Smith*, 5 *Johns.* 168 ; *Ang. & Ames on Corp. sec.* 322.

2. There was never any order to elect for a year.

3. Neither by ordinance, by-law, or regulation, has the office been declared an annual one.

4. The effect would be to discontinue the bank and its business, should a quorum not be present the next year. There is no valid election without a quorum. Here, there is a distinction between the body at large, and a select body. Of the latter, a majority must be present. 2 *Kent. Com.* 367 ; *Angell vs. Ames on Corpns. sec.* 501, *p.* 561 ; *Rex vs. Barlow, Cowp.* 248 ; *Rex vs. Bellringer*, 4 *T. R.* 810 ; *Rex vs. Miller*, 6 *T. R.* 268 ; *Rex vs. Morris*, and *Rex vs. Steward*, 4 *East.* 17 ; *Ex parte Willcock, et al.* 7 *Cow.* 402.

5. The practice of the bank, in its original appointments and dismissals, indicates the exercise of control, at all times, over its officers, by both principal and branch banks.

*Thirdly.* Consider the power of appointment in the branch board.

1. As a question of construction upon the charter.

Though but one incorporation, there were four separate organizations with distinct and independent functions.

The power of appointment is vested in the directors, in their relation to the corporation, *i. e.*, as branch directors, and not as members of the general board, as a distinct function. The directors sustain a twofold relation, *i. e.*, as directors of the principal or branch bank, and as members of the general board. They can hold no other relation to the corporation. The directors of each bank are a separate body from the general board. As directors of each bank, they are charged with the powers entering into the management of that bank. As a general board, they are charged with what concerns the interest and management of the whole.

By *sec.* 11, 4 *Del. Laws*, 94, the general power is vested in the director for the time being. This phrase is satisfied either by the general board or separate boards,— directors either in their separate relations, or as members of the general board. The power here vested is full and complete, simple, absolute, exclusive, in whatever body it is that is here described, and it cannot be delegated. No provision is made for a substitution of authority.

The objections to the theory of appointment by branch board, to be confirmed or extended by the general board, the only opposite theory open, are that it must involve a concurrent exercise of power, inconsistent with the nature of the power granted, such as has always,

in fact, been exercised, or if not concurrent, yet a division of the power, or of nomination subject to approval.

On the other hand, it may be said of our construction.

1. It is consistent with language of Section 11.

2: The only express power of appointment given to the general board is of *Presidents*. Secs, 8 *and* 9, *and expressio unius, exclusio alterius.*

3. There are some expressions to supply the vacancies, yet none for the vacancy of *cashier ;* yet the want of a quorum of the general board would disable it, sometimes, from appointing ; the presumption is, that the power is not intended to be exercised by a body in which it might sometimes fail.

4. The power is to appoint officers "under them," *i. e.,* under the respective boards ; branch cashiers are not, in a *direct* sense, *under* the general board.

5. The same Section 11, comprehends this power of appointment, with all such others as may be necessary or may be enjoined by by-laws or ordinances ; and among these are many or all of which are necessarily local, as banking hours, modes of discounting, &c.

6. The power is given to the Wilmington branch, specifically, by its charter. 4 *Del. Laws*, 594. "Management of said bank" to nine directors,—"powers co-ordinate with those of other branches."

"Management" involves control of its officers, which includes power to appoint and remove.

7. This construction is to the interest of the corporation. The power is most beneficially exercised by branch banks, from their personal knowledge.

8. This construction, *in the main*, is according to the practice, at least, not contrary, though there were exceptional acts of the general board.

The original appointments by the general board were under special power, and provisional, entering into the establishment of banks. So the first appointments at Wilmington.

The re-elections, up to 1810, are, so far as they go, against us ; but after that, for years, up to 1825, no re-election and appointments were made by branch bank, or resignations to it.

As to salaries, the practice was variant :—at first paid by the general board ; later by branch boards.

A clear construction of a power, according to the charter, is not to be set aside by mere usurpation on the part of past sets of directors.

9. Nor is this construction contrary to the act of 1849, in 10 *Del. Laws*, 392, providing that a vacancy in the branch bank is to be filled by the branch board, by appointment, to continue until the annual meeting in January of each year.

This is not conclusive. Cashiers and tellers are not named. The question is, was there, under prior acts, a power of appointment, in the branch banks, for cashiers ? This is to be determined by the prior acts alone. Then if so, the act of 1849 does not take it away. Its design was not to divest any pre-existing power, but to supply certain powers to appoint, not before given to branch banks. General terms are used, because designed to reach any appointment which, without it, the branch bank could not make ; a design best effected by not attempting to specify. The appointments, *in fact*, contemplated, were of directors and presidents, the former to hold until the meeting of stockholders, the latter

until the meeting of the general board.  All officers are thus satisfied, and is a phrase to be construed by the subject-matter, by applying it to the officers for whom the provision was necessary.

*Fourthly.*  The liability of the sureties, if the office is held to be indefinite, unquestionably, covers the whole amount claimed as in default.  They are the same sureties in both bonds and are liable under the bond of 1862, until January 1865, and under the bond of 1865, since that date.

It does not matter, in a court of equity, whether the whole defalcation can be accurately apportioned as to time between the periods covered by the respective bonds, if the two, taken together, cover the whole period of defalcation.

*Lastly.*  The Statute of limitations, as to the sum of $6503.65, did not begin to run until the date of the false entry, April, 6, 1865 which was within two years.

And even supposing the defaults occured before 1865, the case is taken out of the statute by Heston's admissions. *Amherst Bank vs. Root,* 2 *Metc.* 541—2 ; 1 *Saund. Pl. & Ev.* 62 ; *Burleigh vs. Stott,* 8 *B.& C.* 36 ; *Channel vs. Ditchburn,* 5 *M. & W.* 494 ; *State vs. Whittaker,* 2 *Harring.* 136 ; *Bank of Wil. & Br. vs. Woolston,* 3 *Harring.* 91.

In the case last cited, in applying the statute of limitations, the breach is treated as occurring when the officer, on removal, fails to pay over the assets.  The condition in Heston's bonds though, in general terms, includes all that was specified in Woolston's bond.

THE CHANCELLOR :—

The sureties claim to be relieved upon three distinct grounds.

1. The ground chiefly relied upon was, that their obligation under each of these bonds was for Heston's good behavior as cashier, *only during the current year*— commencing with his election by the general board at Dover, at its annual meeting in January next, before the taking of the bond, and ending, *ipso facto*, upon his re-election by the same board in January next following; that is to say, that under the bond of 1862, the sureties were liable only for such defaults as might be committed within the year 1862, and until Heston's re-election in January, 1863 ; and that, under the bond of 1865, they were liable only for defaults committed within that year and until his re-election in January, 1866 ; and, further, that no defaults were committed within the years 1862 and 1865.

Heston was first chosen cashier by the directors of the branch bank of Wilmington, February 13, 1858. This was a temporary appointment, continuing until the meeting of the general board, in January 1869, when he was regularly elected by the board. Subsequently, he was re-elected by the general board, in January of each year, until 1867, the year in which he was removed. After each of these elections, he took an oath'of office. He also gave a new official bond in each of the years 1859, 1860, 1861, 1862, and 1865. For reasons not necessary to be stated, the taking of bond was dispensed with in 1863 and 1864.

The bonds are taken in the corporate name of the principal bank, and to each there is a condition, without any recital preceding it, in these words :

"The condition of this obligation is such, that if the "above bound Joseph A. Heston shall behave himself "well, and faithfully discharge his duties as cashier of the "branch of the Farmers' Bank at Wilmington, then the "above obligation to be void, otherwise to be and remain "in full force and virtue in law."

Then follows a warrant of attorney for the confession of judgment, under which the bank was proceeding against the sureties when restrained by the preliminary injunction.

It will be observed that the obligation of the sureties is not, by the terms of the condition, or by any recital in the bond, limited to a definite period, as for a year ; but their undertaking is, for Heston's good behavior, "as "cashier." Then, according to a settled rule of construction, their obligation is coextensive with the duration of Heston's office. *Add. on Cont.*, 663. And to the rule, as thus stated, there should be added this qualification, viz : that the undertaking of the sureties in either bond, was for Heston's good behavior only so long as he should hold his office by virtue of that election pursuant to which the bond was given ; so that their obligation under such bond would cease, as well upon his re-election and qualification for a new term of office, as upon the election and qualification of another person as his successor. *Add. on Cont.*, 662, and cases cited ; *Bigelow vs. Bridge*, 8 *Mass.*, 274.

This leads directly to the main question discussed upon this branch of the case, viz : Whether the office of cashier is an "annual office,"—one that expires at each annual meeting of the general board in January, upon the election of a successor, or the re-election of the incumbent —and if an "annual office," then whether the term of the incumbent expires *ipso facto* upon a new election in January, or continues until the qualification of his successor by giving bond, or upon his being himself duly qualified in case of his re-election. It is upon the latter question that the case will be found to turn.

It is very clear that, by no provision of the charter, nor by any by-law or ordinance of the stockholders, is the cashiership made an annual office or a term office of any kind, such as is the office of the president of the bank.

37

The charter, by *sec.* 11, (4 *Delaware Laws*, 494,) vests the appointment of all "officers, clerks and servants," of the corporation (which includes cashiers) in the "directors "for the time being." It confers a simple, absolute power, both of appointment and removal, affixing no term to the cashier's office, but making it subject to the pleasure of the board ; so that a cashier being elected, would, so far as the charter and by-laws affect his term of office, hold until his death, or resignation, or removal by some action of the board ; or, should the board have seen fit at the time of electing or appointing a cashier, to limit his term of service to a definite time, or to the happening of some specified event, his office would, in that case, expire at the time or upon the event designated. It would so expire, not by force of any limitation attaching to the office itself, but by the terms of the incumbent's appointment to it,

But it was insisted, for the complainants, that the office, though not made an annual one by the charter, by-laws or ordinances, has become such under certain resolutions adopted by the general board in 1825 and 1826, directing the annual election of cashiers, and by the uniform usage of the corporation since the adoption of those resolutions to hold annual elections in conformity therewith. Such action on the part of the general board, the body invested by the charter with the absolute control of the subject, is claimed to have all the force of a charter provision to constitute this an annual office.

Before taking up this question, it is necessary to advert to the practice of the general board, in the election of cashiers from the period of the bank's organization.

Prior to 1825, the action of the board was governed by no rule. From the organization of the principal bank, in 1807, cashiers for that bank and for the branches, were elected annually, until 1810. From that year until 1823 there were no elections except to fill vacancies, but the

cashiers remained in office without re-election. In 1823, the cashiers and tellers then in office, were re-elected, and were ordered, by a resolution, to give bond with surety for good behavior. In 1824, there was no election. In 1825, the board elected cashiers and tellers, and then, for the first time, adopted a rule intended to govern its future action, which (with some other matters) was embodied in a series of resolutions. The resolution relating to this subject was in these words :

" *Resolved further*, That the persons to fill the respec- "tive offices of cashiers and clerks, in the different "departments of this bank, shall be ballotted for at the "present meeting, and annually at the meeting of the "general board of directors, in the month of January of "each year hereafter, and shall, on entering upon the duties "of those offices, respectively, give bond and warrant of "attorney, in the manner and form prescribed by the Act "of Assembly in such case made and provided."

Preceding this, was another resolution, by which the cashiers of the respective banks were directed to cause proceedings for the collection of interest due and in arrears more than twenty days prior to the declaring of each semi-annual dividend ; and this duty was enforced by a declaration " that the cashier or cashiers who shall neglect "or refuse to comply with this provision shall not be "allowed to be nominated òr voted for at annual elec- "tions thereafter to fill the said office, but be wholly "excluded therefrom." In the next year, 1826, cashiers and tellers were elected, and a further resolution, evidently supplementary to that of 1825, was adopted respecting the bonds of these officers:—

·" That the cashier and clerk of the principal bank, and "the cashiers and clerks of the respective branch banks, "enter into bond with surety and sureties and warrants of "attorney, conditioned as provided by law for the faithful "performance of their offices as required by a former by-law

" or by-laws of this institution, and that such bonds be duly
" executed and submitted for their approbation to the
" respective boards of directors within twenty days after
·" their appointments, respectively, in the present and subse-
" quent years."

In 1827, and from thence until this time, cashiers and
tellers have been annually elected or re-elected, and
when elected or re-elected have given official bonds and
taken oaths of office, except that, in 1863, 1864, 1866 and
1867, the bonds were dispensed with.

This reference to the transactions of the general board
of directors presents all that is at present material, and I
proceed now to state to counsel, the views formed, after
much reflection, upon the points discussed touching the
effect of the resolutions of 1825–6, and the subsequent
practice of the general board.

1. And, first, there seems to be no doubt that the
power of appointing cashiers for the branch banks is vested
in the general board—the branch boards having only
authority to fill vacancies occurring within the year, by
temporary appointments, to continue until an election by
the general board—an authority at first exercised from
necessity, and since 1849 under the statute of that year,
authorizing such temporary appointments of all officers of
branch banks.

2. Further, I am of opinion that the resolutions of
1825–6, and the practice of the general board to elect the
cashier annually, pursuant to its direction, did make the
office, for the time being, " an annual office," though not so
strictly such as to expire *ipso facto* at the end of the year,
or at the annual meeting of the board, or even upon the
election alone of a successor, or the re-election of the in-
cumbent—not until both the election and qualification of
the newly elected or re-elected officer.

It was insisted at the bar, that what purported, on the
minutes of the general board, to have been re-elections of

incumbent cashiers from year to year, were not such, in
fact, that they intended not to create a new term
of office, but rather, as an annual assent to the con-
tinuance of the old term, the officer holding throughout,
under his original appointment, so that Heston, notwith-
standing these re–elections, continued to be cashier by
virtue of his election by the branch board in 1858, without
any change in his term of office.   But the proceedings
of the general board, as shown by the minutes, will
not bear this construction.   They had all the formali-
ties of elections.    As such they were minuted on the
journals, and certified to the branch boards concerned,
were invariably followed by new official oaths, and, with
the exception before stated, by new official bonds.   The
proceedings were the same in all respects as for the
election of the president, who, by the charter, was an
annual officer.   They were manifestly intended as annual
elections of the cashier, held in direct conformity with
the resolutions of 1825-6.

In the Massachusetts cases, *Dedham Bank vs. Chick-
ering*, 3 *Pick.*, 335, and *Bank of Amherst vs. Root*, 2 *Met.*,
523, successive re-elections of a cashier were held to be
but expressions of assent to a continuing office, but these
decisions rest upon special circumstances which distinguish
those cases from the present one.

Again, it was argued that the resolutions of 1825-6,
and the practice of the board pursuant to them, could not,
of their own force, make the cashier's office "an annual
office;" that only a provision of the charter or a by-law
could have that effect.   This is true so far, that the
resolutions, and the practice of the board, did not affix a
term to the office, making it an annual one in the same
sense as is that of the president of the bank, such that
succeeding boards could not elect for a longer period than
one year.   It was a self-imposed regulation which any
board might disregard.    Nevertheless, inasmuch as the
boards succeeding those of 1825 and 1826 have chosen to

conform to the resolutions, and to elect or re-elect cashiers annually, pursuant thereto, they have, by the terms of their appointment, made the office, in fact, for the time being, an annual one, though not so by law or charter. The question is simply one of intention on the part of the general board, for what term of service they intended to elect the cashier, whether for one year or indefinitely. Their intention may be implied as well as expressed. A special resolution of the board adopted at each annual election, defining the term of office thereby conferred, would, beyond all doubt, have limited it accordingly. Certainly, the general resolutions of 1825–6 serve quite as conclusively to define the term of office under the successive elections, since held pursuant to them.

3. But this brings us to the point which is decisive against this branch of the complainants' case. Although under the practice of the general board, pursuant to the resolutions of 1825–6, the cashier's office has become, in a general sense, an "annual one," the term of the incumbent cashier does not expire *ipso facto* upon the election of his successor, or upon his own re-election, but his term continues, and, by consequence, his official bond remains in force until his successor becomes qualified for the office by giving an official bond ; or in case of a re-election, until the incumbent shall be himself qualified in like manner for his new term of office.

Such is the effect of the resolutions and of the practice of the board. For, otherwise, there would not be a proper succession of cashiers qualified, as is required by the charter. There would be, annually, an interval between the election and the giving of bond pursuant to it, during which the bank would be without any official security whatever. It is to protect the bank against this very result, that a fundamental article of the charter (Art 8 of Sec. 12) requires that the cashier, *before entering upon the duties of his office*, shall be required to give bond ; and in conformity with this article, and to secure the same end,

Opinion :—the old term continued until qualification under the new.

the resolution of 1825, in providing for annual elections, expressly directs that the cashier-elect shall give bond "*on entering*" upon the office ; and although, by the supplementary resolution of 1826, twenty days were allowed him within which to provide his sureties, it is to be twenty days after his appointment, not after his entry upon the office ; so that, clearly, the giving of bond by a cashier-elect is to precede or,at least,be cotemporaneous with his entry upon office or upon a new term of office. Now, in the absence of any expression whatever, limiting the term of the incumbent cashier to expire *ipso facto* upon the next annual election or re-election, it is the reasonable construction of the resolutions of 1825–6, that the old term shall continue until the new term is duly entered upon, by the giving of an official bond in accordance with the eighth fundamental article.

The case is not within the point ruled in *Bank of the United States vs. Danbridge,* 12 *Wheaton,* 64. It was there held that, if a bank permit a person to act as cashier without his having given bond as required by the charter, his acts as cashier *de facto* will incur against the bank the same responsibilities and, to some extent, will acquire for it the same rights as if he had been duly qualified. But here the question is whether upon a fair construction of the resolution under which the cashier was re-elected, he is to be considered after a re-election as acting in his new term of office before security given for it, or in his old term continued until he shall be newly qualified.

There is a further consideration necessary to a complete view of the subject. It is this : In holding that the term of office of the cashier, under elections by the general board, pursuant to the resolutions of 1825–6, continues until there shall be a qualified successor in the same office, I have but extended to the resolutions of 1825–6 and the elections held under them the same principle of construction which the common law applies to like provisions

made by statute or charter for the annual election of officers.

The principle is, that if the term of an officer, civil or corporate, created by statute or charter, is not limited to expire at a fixed time, or upon a specified event, but there is simply a direction for the annual election of the officer, his original term continues, though after the year, until a successor is duly elected and qualified. It is true that this, as a general common law principle, has been doubted by Chancellor Walworth, in 1 *Paige*, 595. In 2 *Kent's Com.*, 295, the principle is treated as not definitely settled upon authority, though it is supported by the author's great name. It was also affirmed by the Supreme Court of New York, in *People vs. Runkle,* 9 *Johns.*, 147, and *Trustees of Vernon Society vs. Hill,* 6 *Cowen,* 23. The apparent uncertainty of the English authorities on this point is removed by discriminating between the cases arising under statutory provisions expressly limiting the office to expire at the end of the year, or directing that the election be held on a fixed day, and the cases in which a term is implied from the direction to elect annually, without limiting the election to a fixed day. A provision for holding an election *on a fixed day* was held to be *peremptory*; but one for electing annually, without a day fixed, was treated as *directory* only. The distinction is one of questionable soundness; yet it harmonizes the cases, and gives certainty to the rule adjudged by them.

Of the former class was the *Banbury* case in 10 *Mod.*, 346, in which a corporation was held dissolved through a failure to elect a Mayor on a charter day, *it being a day fixed by the charter,* and no provision for continuing the office. It was against the mischief resulting from this class of decisions, in working the dissolution of corporations through the failure to elect on charter days, that the Statute 11, Geo. I, was passed eight years after the Banbury case—which statute provided that a corporation

should not be dissolved by a failure to elect on *charter day*. This statute simply extended to all corporate elections, even though appointed for a fixed day, or though the office was expressly limited to a year, the same principle which had already been adjudged to apply to offices held under a mere direction to elect annually. That this latter class of cases does not stand upon the Statute of Geo. 1., will appear from a slight reference to them. *The Queen vs. Durham*, 10 *Mod.*, 146, was in 11th Anne. It was a mandamus to restore to office a town clerk, to which the corporation returned that, under the charter, the clerk was to be *annually chosen*, and that the year had expired. The Court held the return to be insufficient, distinguishing between an officer made by charter *annuatim eligibilis* and an officer *eligibilis pro uno anno tantum*. "Though," said the Court, "he be *annuatim iligibilis*, he may con- "tinue town clerk, and will do so until they choose "another,"—"if the return had been *eligibilis pro uno* "*anno tantum*, his office would have expired at the end of "the year, whether they had chosen another or not." Another case, more like the present one, is in 12 *Mod.*, 256. There a successor to a constable had been elected, but not qualified ; yet he was held not to be discharged until his successor was appointed *and sworn in*, "because the par- "ish cannot be without an officer." This principle was finally settled in England on appeal to the House of Lords and upon great consideration, in *Foot vs. Prowse*, 1 *Strange*, 625 ; 2 *Bro., Parl. Cas.*, 289. The Mayor of Truro was to be chosen from among the Aldermen, and in the presence of two Aldermen. The Aldermen were *annuatim elegendi*, but no election for Alderman had been held for several years. The present Mayor was chosen from among the Aldermen last elected and holding over—two of them being present. The Court of King's Bench held the election of Mayor void, for want of an annual election of the Aldermen. But upon error in the Exchequer Chamber, and, as it is reported, "upon two solemn arguments," the

38

judgment was unanimously reversed. It was held that the words *annuatim elegendi* in the charter were only directory, and that an annual election of the Aldermen was not necessary in order to make the election of Mayor good ; and the Court compared it to the case of a constable and other annual officers who, it was said, "are good officers after the year is out *until another is elected and sworn.*" On appeal to the House of Lords, this case was argued by counsel no less eminent than Sir Philip York, afterward Lord Hardwicke, against the validity of the election, and by Lord Talbot in support of it. The House of Lords affirmed the decision of the Exchequer Chamber, sustaining the opinion that the Aldermen held over. The question was never afterwards agitated in the English courts. *Foot vs. Prowse* settled the principle as to offices held *under a general direction to elect annually.* The Statute 11 Geo. I., passed while that case was pending in the Lords, extended the principle *to all corporate offices.* In some of the States, the Statute 11 Geo. I., has been re-enacted ; but independently of that Statute, the weight of authority is in favor of the rule, so far, at least, as the English decisions carried it. And Chancellor Kent, 2 *Com.*, 296, indicates his opinion that the Statute was but declaratory of the common law : *People vs. Runkle*, 9 *Johns.*, 157-8 ; *Trustees of Vernon Society vs. Hill*, 6 *Cow.*, 23.

Returning now to the present case, I am of opinion that the resolutions of 1825-6, and the practice of the general board under them, ought to be so construed as to preserve an unbroken succession of cashiers qualified according to the requirement of the charter. Such a construction is quite consistent with the language of the resolutions, is necessary in order to harmonize them with the eighth fundamental article of the charter, is supported by a reasonable presumption as to the intent of the board, and, moreover, it is in accordance with the effect given at common law to like provisions in statutes and charters for the election of civil and corporate officers.

For it will be observed that the resolutions prescribe no term for the office of cashier ; as that it shall expire upon a day specified, or upon the annual meeting of the board, or even upon an election being held. They simply direct that a cashier be annually elected—a provision quite within the common law principle which extends the term of the incumbent until there shall be a duly qualified succession in the office.

What then, we next inquire, is the effect upon Heston's term of office, and his official bonds, under the elections of 1862 and 1865 ? The re-elections of Heston in 1863 and 1864 were rendered ineffectual to create a new term of office by his omission to give bond pursuant to those elections, as required by the eighth fundamental article. His term of office under the election of 1862 continued, until, in 1865, he gave bond pursuant to his re-election in that year. So the term of office, commencing in 1865, continued until his removal in March, 1867 ; no official bond having been meanwhile given. It follows that the liabilities of the sureties under each bond being co-extensive with the term of office for which the bond was given, covered, under the two bonds, the whole period from the date of the bond of 1862 until Heston's removal from office in 1867.

But here we are met by an objection, argued with much ability and force, that the bank is *estopped* from holding the sureties liable under either bond beyond a year from the election pursuant to which the bond was given ; and this upon the ground that the sureties undertook for Heston under an expectation that their liabilities would be limited strictly to the ensuing year, an expectation induced by the very practice or usage on the part of the bank of annually electing cashiers. And especially was it urged that the sureties ought not to suffer in consequence of the departure of the bank, after they became bound, from its previous practice of taking a new bond

annually.　This is putting the objection in its strongest possible aspect.

The case lacks the essential feature necessary to entitle the complainants to protection under the doctrine of equitable estoppel, or as it is usually termed, estoppel *in pais*.　Assuming that the sureties were induced to engage for Heston under the expectation that his term was for a year only, and not to be extended by the omission in the following year to elect or re-elect and take new bond, still such misapprehension as to the extent of the liability they were about to assume *is not chargeable to the bank*.　There is no proof of any misrepresentation on the part of the bank or of its officers, nor of the withholding of any information sought from it, or which, unsought, it was its duty to give; nor (and here is the point of the objection) was such misapprehension warranted by the practice or usage of annual elections.　For, in the first place, in the total absence of evidence to the contrary, the sureties are presumed to have understood the practice or usage according to its true construction and effect, that is, that, although the office was in a general sense an annual one, yet that the incumbent officer for whom they were about to engage would hold over until the election and qualification of a successor, or the re-election and qualification anew of the incumbent.　A mistake on this point cannot be assumed when none appears in proof.　But, in the next place, if such mistake were shown to have existed, and to have influenced the sureties to become such, still it does not appear that they were denied, by the bank, access to its records or proceedings, or any information sought for in order to ascertain the precise extent of the liability they were about to assume.　On the contrary, in must be considered that their mistake (if such existed) was due to their own passiveness, caused by over confidence in Heston, and not to any breach of duty on the part of the bank.　I now speak of the case as it stood at the time the sureties became bound.

Opinion :—the ground of negligence on the part of the bank.

The subsequent omission of the bank to renew the official bond of the cashier on his re-election in 1863-4 and in 1866-7, may have been unfortunate ; but the extension of the term of office in consequence of an omission either to re-elect or to qualify the officer re-elected, was one of the liabilities comprehended in the obligation into which, the sureties entered, which, in the absence of proof, it must be presumed they understood ; or even if they did not so understand their engagement, their mistake is chargeable to their own inattention and not to the bank.

We are now brought to inquire whether any defalcations have occurred, and if so, to what amount, within the period of the sureties' liability under these bonds. * * †

II. We now come to the second general ground of relief taken for the sureties, which, is that the board of directors of the branch bank neglected to supervise the accounts of the bank, and to count its cash funds with such care and frequency as would have led to the speedy detection of any irregularity or fraud, and so would have guarded both the bank and the cashier's sureties against loss. Having, as is allged, failed to do so, it is urged that they are equitably estopped from throwing upon the sureties a loss which but for their own neglect would not have occurred.

This defense assumes as its basis, that diligence on the part of the bank—some degree of watchfulness over the cashier, his transactions and accounts, was a duty on the part of the directors—a duty not simply to the bank, whose agents they were, but to these sureties—the performance of which was a condition to the right of the bank

---

†The discussion of the evidence is omitted, being unnecessary to a full understanding to the decision of the legal points involved, and the result of the inquiry sufficiently appearing from the conclusion reached.

to hold them liable. But whence, it must be asked, arises any such duty on the part of the bank *towards the sureties ?* Clearly not out of the terms of the bond, for by these the sureties undertake for Heston's good behavior without any qualification—in effect, therefore, undertaking absolutely and at all events. Nor does there appear to have been any collateral engagement on the part of the directors, or representations made to the sureties before they entered, that any supervision would be exercised by the directors. Though the existence of a by-law directing a periodical examination of accounts and count of funds is alleged in the bill, there was none such in fact. On the contrary, the by-laws in force since 1835 charge *upon the cashier alone* the entire responsibility for the correctness of all accounts and the safety of the funds. We cannot then consider, in order to bring the sureties under the protection of the doctrine of equitable estoppel, that they entered into these bonds upon the faith of a by-law or regulation requiring a supervision of the cashier, or of some engagement or representation on the part of the bank that such supervision would be exercised. As the case presents itself, the sureties appear to have undertaken for Heston relying on his integrity rather than upon the bank's watchfulness, and submitting themselves to whatever may be the legal responsibility of sureties, without seeking to qualify it in their own case by any special conditions. Then it only remains to add, that under those rules of law, which, in the absence of express stipulation, fix the responsibilities of sureties, *it is good faith and not diligence which is required of the creditor as a condition of his right to hold the surety.* Connivance on his part at the fraud of the principal, discharges the sureties. But the creditor, or the obligee in a bond, is not obliged, for the benefit of sureties, to watch the principal. It is because it is really impracticable for this to be done effectually and at all times, on the part of large institutions, that official bonds are required. To subject the responsi-

bility of sureties to so indefinite a question, as whether due diligence has been exercised by directors, would render these securities worthless.   To their value and usefulness, it is essential that the obligations assumed should be certain and absolute.

This distinction between the effect of *fraud* and of *laches only* on the part of a creditor or obligee upon the liability of sureties is clearly put in the *United States vs. Kirkpatrick*, 9 *Wheat.*, 720.   That was an action upon an official bond taken by the United States Government. The defense was neglect on the part of the collecting officer of the Government to sue within the time prescribed by law.   The Court, reasoning from what it considered an undisputed rule in suretyships between private parties, says "it is admitted that *mere laches without fraud* forms "no discharge of a contract of this nature, between private "individuals.   Such is the clear result of authorities."   The same distinction has been applied to the case of sureties in a cashier's official bond in *The State Bank vs. Chetwood*, 3 *Halst.*, 1, and in *Taylor vs. Bank of Kentucky*, 2 *J. J. Marshall* 565.

There is another principle quite well adjudged, which is equally decisive against this defense of the sureties.   It is this :—The obligation of the sureties being to the corporation, *i. e.*, to the stockholders by their corporate name, is not affected by the acts or omissions of the directors of the branch bank, who are themselves but servants of the corporation, and who, though they exercise many important corporate powers, have not authority to compromise or impair the official securities of the corporation.   This has been decided in two cases where the directors, whose acts were called in question by sureties, were directors of the bank to which the official bond was given, and not of a branch bank.   *Minor vs. The Mechanics' Bank of Alexandria*, 1 *Peters*, 46; *Amherst Bank vs. Root*, 2 *Metcalf*, 522.   In another case, quite like the present one, this

principle was applied with the more force where the official bond was given to the Bank of Kentucky, a parent bank, by the cashier of one of its branches, and the defense was that the directors of the branch bank had knowledge of the cashier's delinquencies and connived at them. The defense was held insufficient. *Taylor vs. The Bank of Kentucky, 2 J. J. Marshall,* 565. These cases go so far as to hold that even a fraudulent combination between the directors and cashier does not discharge the cashier's sureties from their responsibility to the stockholders, who are the corporation. It is difficult to see how this conclusion can be avoided, but the question does not arise here.

III. There remains a third and last ground of relief taken for the sureties—that is, that under the Statute barring suits on official bonds after two years from the accruing of the cause of action, the sureties are discharged as to so much of the defalcation as occurred more than two years' previous to the entering of judgment on the bonds, which was in March, 1867. It will be observed here, that two of the memorandum checks, amounting together to $6,088 44, bear date, one, September 5, 1866, the other, January 15, 1867, both within two years next before the entering of judgment on the bonds. We have seen that the defalcations represented by these checks respectively, must, in the absence of evidence to the contrary, be taken to have been committed at the date of the checks, and to these, therefore, the statutory bar can have no application.

We then take up the check of December 1, 1864, for $3046.46. This sum was abstracted more than two years before the judgments were entered. Should the bank, on that ground, be restrained from collecting this amount? I here pass by one of the questions raised in the argument, viz. : Whether Heston's failure, on March 2, 1867, when his defalcation was discoverd, to pay over the sums he had taken, was of itself a new breach of his official bond

which gave the bank two years from that date within which to proceed on the bond for any defalcation committed while it was in force. It is not necessary to decide that question ; for even supposing the abstraction of of $3,046 46 on December 1, 1864, to be the only breach of the bond as to that sum, still the bank is entitled to collect it. *Their equity to do so arises out of the fact that the defalcation was a fraud concealed from the bank, with respect to which a court of equity will not permit the statutory bar to be set up until the lapse of the prescribed term after discovery of the fraud.*

It is a settled and familiar principle that a court of equity will not permit a party to make an unconscientious use of an advantage gained at law. Hence it will deprive him of defenses when set up to protect fraud though such defenses be founded upon the most positive statutory enactments.

A familiar instance of this jurisdiction arises out of the Statute of Frauds. Although this statute was intended absolutely to avoid parol contracts for interests in land, courts of equity do not allow an unconscientious use of it, and, therefore, it is that if a party has in part performed a parol contract for the sale of lands, the statute shall not be set up against a bill seeking a complete performance. This court has long exercised the same power to restrain an unconscientious use of the Statute of limitations. A very able vindication of this power, and one now received as authoritative, is by Lord Redesdale in *Bond vs. Hopkins*, 1 *Sch. and Lef.*, 431. The adjudged cases afford many illustrations of the doctrine. In *Putney vs. Warren*, 6 *Ves.*, 73, it was applied by Lord Eldon to protect a party who had been prevented from pressing his remedy at law by his adversary's carrying on an unfounded litigation in equity until the statute had run. So in some cases where through mistake a party has omitted to prosecute his rights in time, equity has relieved against the statute, as

in *Brookshanks vs. Smith*, 2 *Younge and Coll.*, 68.    But most especially does equity relieve against any attempt to use the statute as a cover for fraud.    In such case this court will  even interfere in an action at  law to restrain a defendant from pleading the statute ; *a fortiori* will it refuse in the  furtherance of  fraud, to enforce the statute by it own decree in a case which, like this, is one of equitable jurisdiction.    It treats the statute as running *from the discovery of the fraud*, not before.    There has been controversy whether *courts of law* can  afford  this  relief against the statute, but  none whatever as to the power of a court of equity : 2 *Sto. Eq. Jur.*, 1521,1521 *a* ;   *South Sea Co.vs.Wymondsell* 3 *P. Wms.*, 143 ; *Deloraine vs. Browne.* 3 *Bro. C. C.*, 363 ; *Booth  vs. Ld. Warrington*, 4 *Bro. P. C.*, 163.

There is  nothing  in  the  present  case  to except it from the operation of the rule.    It is true that equity will not  relieve against  the  bar  of  the statute  in  favor of a ·party  who has been in *laches* in not  using means within his power to discover the fraud.    But a close supervision by large moneyed corporations over their officers, sufficient to ensure the speedy detection of fraud, is not practicable, and were it so,  would become intolerable.    These institutions must unavoidably trust their officers and rest upon the official bond as the guaranty for their fidelity.    It is to this end that the bonds are taken.    Their value would be destroyed and their purpose defeated were it in the power of a  shrewd  cashier to absolve himself and  his  sureties by covering up his frauds for two years.

If  the rules applied to  this case seem  to bear hardly upon  the sureties, it must  be remembered that  by these bonds they undertook for the cashier's fidelity, absolutely and  at  all  events, and  engaged unconditionally to make good  his  defaults.    They  had  the power to limit their responsibility expressly to one year, or to make it subject to any conditions which might be agreed upon.    But this

was not done. It would be a prudent practice and one best securing all parties, that the obligation of such bonds be expressly limited to one year, and that upon the giving of a new bond by an officer re-elected, an examination be made sufficient to test his integrity at that time.

A decree will be entered dissolving the injunction so far as to allow the bank to collect the amount of the defalcations proved, with interest.

JOHN DAVIDSON

*vs.*

BENJAMIN WILSON.

*New Castle, February T. 1869.*

Upon a bill filed by one member of a former copartnership against the other member of the firm, praying an injunction against the collection of a judgment recovered against the complainant for a partnership debt, neither the legal nor equitable plaintiff being made parties, but the collection being pressed by the former copartner of the defendant in the judgment, *Held*, that no injunction could be granted to restrain the collection of the judgment, unless the plaintiff and the party for whose use the judgment was held, were made parties to the proceedings.

An injunction, if issued in such a case, would be ineffectual and nugatory as a means of staying proceedings upon a judgment, and a court of chancery ought not to interfere at all, except in a mode which would be effectual for the purpose of the decree.

If the proof, in such a cause, presented a case for the interference of the Court, its duty would be to order the cause to stand over with leave to add the proper parties.

A denial by the answer, which is directly responsive to the bill, makes it incumbent upon the complainant to prove his allegation by the testimony of two witnesses, or of one witness with corroborating circumstances.

It is a rule of law as well as of charity that when the facts proved may be harmonized with the answer, the Court shall rather do that than impute perjury to the defendant. The Court ought not to be left to rest a decree, which is to restrain the legal rights of a party, upon evidence merely circumstantial, so long as there are sources of direct information to which the complainant might have resorted, and has omitted to do so.

Where the partnership books were lost and there was on the record all the evidence which, apart from the books, was available, an order for a partnership account refused because it would have been impossible upon, the bill, answers and testimony, to state any account.

The Court will never undertake to adjust the rights of parties without satisfactory means of ascertaining what their rights are, and when an account cannot be safely stated and the true balance between these parties ascertained.

BILL FOR AN INJUNCTION AND FOR A PARTNERSHIP ACCOUNT.—The complainant and defendant became partners under a contract for building part of the Hudson River Railroad, the work commencing in the fall of 1847, and ending in the spring of 1850. The business became a losing one. Debts of the partnership were left unpaid, for some of which actions were prosecuted against the partners, some in the State of New York where judgments were recovered against Wilson, and some in Philadelphia and in Delaware where judgments were recovered against Davidson. The present proceeding arose out of a judgment for $300.00, recoverd in the Superior Court of this county against Davidson at suit of Eli Bronson for the use of William Harvey. This judgment was recovered in an action against Wilson and Davidson as partners, founded on a judgment previously recovered against them in the State of New York. To restrain the collection of that judgment was chiefly the object of this bill in equity, but the whole relief sought by the bill includes two objects.

1st. An injunction against the judgments.

2nd. A partnership account and a settlement by Wilson of the balance which Davidson alleges would, upon

such account, be found due to him. First as to the prayer for an injunction.

*Patterson*, for the complainant.

*E. G. Bradford* and *Higgins*, for the defendant.

THE CHANCELLOR :—

To the relief prayed for in this cause, there is a preliminary objection which must be first noticed. It is the want of sufficient parties to the bill. Bronson and Harvey, who, according to the record, are parties interested under the judgment, are not parties to this proceeding. Clearly no injunction could be decreed as against them, *i. e.*, to restrain the collection of the judgment by them, their attorneys or agents, unless they were made parties here. They must be heard on the question, whether this judgment has been satisfied, before their legal rights can be interfered with. In this suit, as it now stands, an injunction could be decreed only against Wilson. But against him alone an injunction, as a means of staying the collection of the judgment, is wholly ineffectual and nugatory. The judgment might still be collected by Bronson, or by Harvey. Then, what results ? This Court ought not to interfere at all, except in a mode which shall be effectual for the purpose of its decree, that is, to restrain the collection of the judgment by any person ; and, therefore, supposing the proof, presently to be examined, should satisfy the Court that this is a case for its interference, its duty would be to order the cause to stand over, with leave to make Bronson and Harvey parties to it. I shall, therefore, proceed to examine the ground relied upon to support the prayer for an injunction, not with a view to decree for it at present, but in order to see whether

a sufficient case is presented to justify an order holding the cause open for the additional parties.

The alleged ground of relief against the judgment is, that the original judgment was recovered in New York in the absence of Davidson, he being a resident of Delaware, and in his utter ignorance of that action, or of the transactions on which it was founded ; that after the service of summons upon him in the action in Delaware, upon examining the record of the New York judgment, supposing it to have been unpaid, and suspecting no wrong, he, under the advice of his counsel, confessed this judgment for $300.00 :—that since such confession he has discovered that the judgment in New York had been paid by Wilson, though not satisfied of record, and that the proceeding here was set on foot and presented against him by Wilson alone, and for his benefit, without the knowledge or authority of Bronson, the original plaintiff, or of Harvey, for whose use it stood indorsed.

It is upon this question of fact that the present branch of the case rests, viz. : had the New York judgment been paid by Wilson, and was the action upon it in Delaware prosecuted for his benefit ? The defendant flatly denies this ; first, in his answer to the original bill, and again, and more explicitly, in his answer to the supplemental bill filed April 6, 1866. He states that he never had paid the judgment in New York, that the same was purchased from Bronson, the orginal plaintiff, by Hugh Clark, of Philadelphia, and by his direction marked to the use of Harvey ; that Clark purchased the judgment with his own money, without (Wilson's) privity or knowledge ; that the purchase was made during Wilson's absence from Philadelphia, and that he knew nothing of it until after his return, when Clark called on him for information as to Davidson's place of residence ; that the claim was placed by Clark in the hands of his Attorney in Philadelphia, Horn R. Kneass, Esq., who sent it for collection to Hon.

Leonard E. Wales, then at the bar in this county, by whom the action was brought. Wilson denies that he ever, had or now has, any interest in the money sought to be recovered, or interest in its collection other than that, by means of it, Davidson should be obliged to contribute something to the debts of the firm, the largest portion of which he (Wilson) claims to have paid.

This denial by the defendant, of the alleged payment of this judgment, and of its being prosecuted for his use, being directly responsive to the bill, makes it incumbent upon the complainant to prove his allegation by testimony of two witnesses, or, with one witness with corroborating circumstances. In this, the complainant's case for an injunction fails. There is no direct testimony, whatever, to the question, whether this judgment has been paid by Wilson. The evidence relied upon to prove that the judgment had been paid by Wilson, and was prosecuted for his use, is wholly circumstantial, and rests upon these facts, which are proved. An intimacy subsisted between Clark, who was an Alderman in Philadelphia, and Wilson, who resided in the same city. They had divers business transactions together, Clark was Wilson's real estate agent, collected his rents, and, in one instance, held, in his own name, some real estate, which was sold by the sheriff, under the defendant's judgment, as Wilson's, and was recovered in an ejectment against Clark, who then paid a sum of money toward satisfaction of the judgment in order to obtain a release of the title. The testimony of Garwin, the tenant, to some declarations made by Clark, proves that this property, though held by Clark, belonged to Wilson. Connected with these relations between Clark and Wilson, it is proved that, although Clark died in June, 1862, a month after the suit in Delaware was brought, his executors knew nothing of this claim, and had no agency in its prosecutions. It came to the hands of Judge Wales, then at the bar, from Horn R.

Kneass, Esq., of Philadelphia, since deceased ; but whom Mr. Kneass represented, Judge Wales did not know.

He never heard from Clark or Clark's executors in relation to the claim, nor from Bronson or Harvey. For two years he received instructions from no one, and one suit brought by him had been nonprossed for want of security for costs : then Wilson called, gave him a retainer to renew the suit, and thenceforth, as the Judge states, the suit was prosecuted "at his (Wilson's) "instance, and for his benefit." That is the strongest view of the complainant's case on this point which the testimony presents. Does it. then, overcome the defendant's positive denial that he had paid this judgment, and was pressing it in order to collect the money for his one use ? On much frequent reflection, I think not. The circumstances are suspicious, but they are too inconclusive to outweigh the positive denial of the answer. That feature of the case which excites suspicion, viz: Wilson's active agency can be accounted for by an interest on his part to release himself by getting the claim collected out of Davidson. This and all the circumstances relied on can be reconciled with the truth of the answer. It is a rule of law, as well of charity, that where the facts proved may be harmonized with the answer, the court shall rather do that, than impute perjury to the defendant.

There is another consideration on this point, of much force : The Court ought nöt to be left to rest a decree which is to restrain the legal rights of a party, upon evidence merely circumstantial, so long as there are sources of direct testimony to which the complainant might have resorted, and has omitted to do so. Yet, Bronson, the original plaintiff in the New York judgment, is living, and his place of residence, West Chester county, New York, is disclosed by the answer in direct response to an interrogatory of the bill. Harvey, for whose use the judgment stands of record, resides in Philadelphia.

Neither of these persons, to one of whom payment of the judgment must have been made, if made at all, has been examined. Whatever their knowledge might have been, much or little, the Court is entitled to receive it before being called upon to interfere with existing rights at law. On the whole, therefore, I should not feel warranted upon the case, as it stands, to make this injunction perpetual.

We next consider the prayer for a partnership account. The subject-matters sought to be embraced within such an account are three.

*First.* The sums contributed by the respective partners to the capital employed. Davidson alleges that, although they were to contribute equally of labor and capital, Wilson neither gave labor nor capital, while he (Davidson) contributed largely of both  In fact the original bill alleges that Davidson advanced all the money used in the work over and above the income received from it, such excess amounting to over $3000.00, in cash, expended by him, exclusive of claims against them, unliquidated. He claims that Wilson owes him, on the score of capital advanced, upwards of $12,000.00 or $14,000.00. The annexed bill is more specific as to Davidson's advances. It states that he advanced $900.00 to commence the work in 1847, $300.00 in January, 1848, and $500.00 in 1849, making in all $1700.00.

The *second* subject-matters of such an account, if taken, and which would be essential in order to ascertain the exact rights of the parties, would be the sums of money received by these partners, respectively, upon the monthly estimates and their disbursements ; how much money each received, how they applied it, and how the balance would stand between them with respect to these receipts and disbursements. Davidson alleges, on information, that Wilson drew $28,000.00, upon the monthly estimates, $520.00 from the Peekskill Bank, and $4950.00 from Wilson and Brown, of New York. An account for these sums is insisted on.

40

The *third* matter of account, sought for by the complainant, is an excess of payments, which he claims to have made since the work closed, towards the liquidation of the partnership debts. The only claim, however, which is specified as paid by him since the dissolution of the partnership, is the judgment to John O. Cole, in the Superior Court, for $400.00. This is the sum stated in the amended bill; but in fact the judgment was for $300.49, and Davidson paid, upon the testimony of Mr. Rodney, $300.00 on the 4th of October, 1853, and $62.00 on the 23rd of November, 1853.

This prayer for an account, with respect to the first two matters referred to, viz: the advances of capital and the receipts and disbursements by the respective parties, the Court is obliged to refuse, upon a ground common to both; that is, that the partnership books, which alone can afford evidence for stating such an account, are lost. It is presumable that we have, on this record, all the evidence which, apart from the partnership books, is available. The entire knowledge of the parties themselves is set forth in the bill and answers, and all witnesses having any acquaintance with these transactions have been examined. The industry shown in procuring testimony, must be supposed to have reached every available resource. But it would be impossible upon the bill, answers and testimony, to state any account. The bill and answers are flatly contradictory, and, as between these, the weight of the testimony supports the answers.

Consider them first as to the advances of capital, which Davidson alleges, he alone made in sums amounting to $1800.00, Wilson paying nothing. The answers deny that Davidson put in altogether exceeding $520.00 to $530.00. Devlin, who became a partner and the bookkeeper in January, 1849, and who, as he says, then examined the books and made a balance sheet, swears that up to that time, as shewn by the books, Davidson had put in not more than

$300.00 ; that he afterwards put in some $200.00 or $300.00 ; that his default in making up his share of the capital was a subject of occasional conversation between Davidson and Wilson, in his (the witness') presence, and was acknowledged by Davidson ; that under Wilson's urging, he went to Delaware to get more money, and returned with a small sum, how much witness does not remember, but not exceeding $100.00. Against this is only the testimony of William Galloway, who swears that Davidson paid considerable sums to wages and bills ; he supposes some $2,000.00 per month. But whence this money came witness does not state ; and that it was received from the monthly estimates and paid out of his own pocket must be presumed from the evidence of Devlin respecting the amount of his advances as shewn by the books and admitted in the communications with Wilson. It is also clear, from his claim, by the amended bill, to have put in sums not exceeding $1,800.00, that these payments on the road were not advances of capital by him, but disbursements of funds received from the work. For one month's disbursements exceed all the capital he claims to have put in. With respect to advances by Wilson, the bill alleges there were none made, the answer claims that Wilson did advance money, though in what sums is not stated. But Devlin swears that, according to the books, Wilson had advanced more than Davidson, and that there was no complaint between the parties of any delinquency on Wilson's part.

Next we inquire, how stands the evidence on the other matter claimed to be the subject for an account, viz : the receipts and disbursements of the monthly estimates ? The bill alleges that Wilson drew $2,800.00 from the railroad company, beside $520.00 from the Peekskill bank, and $49.50 from Nelson and Brown, in New York. The answer disclaims any knowledge as to the $49.50 ; admits he drew from the Peekskill bank between $200.00 and $300.00, on

Davidson's check, which, he alleges, he handed to Davidson.
Against the answer on these points, which is responsive,
there is no evidence. With respect to the monthly esti-
mates, the answer to the amended bill wholly denies that
Wilson drew $28,000.00, admits that he drew from $8000.00
to $10,000.00, the exact amount of which he cannot state
in the absence of the books, but avers that all sums
recovered by him were disbursed in the work ; and
the answer on this point further charges that Davidson
drew, upon the estimates, from $20,000.00 to $22,000.00.
With respect to the amount of estimates drawn by Wilson,
and how he disposed of them, the answer is responsive,
and is not impeached by the evidence. But on the con-
trary it is supported by the proof. For it appears from
Devlin's testimony, that after he came into the business in
January, 1849, Wilson drew the estimates, except two or
three, which Devlin drew. The estimates, after Devlin
came in, were about $12,000.00, and of these the amount
drawn by Wilson would appear to be some $8000.00 or
$10,000.00, the sum admitted in his answer. As to the
estimates made before Devlin came in, January 1, 1849,
amounting to over $18,000.00, it does not appear, by any
direct evidence, who drew them ; but Galloway's testi-
mony that Davidson, during that period, paid the wages
and bills to the amount of $2000.00 per month, together
with the fact that Davidson, by his amended bill, only
claims to have put in $1800.00, and the proof that, in fact,
he put in only from $500.00 to $600.00, all raise the
presumption that the estimates during that time, however
drawn, came to his hands for disbursement. There is, in
the evidence, ground to believe that the estimates drawn
by both the partners were honestly disbursed on the
work. Galloway's testimony renders this probable on the
part of Davidson, and Devlin proves it, positively, on the
part of Wilson. He states that, except when he drew the
estimates himself, he gave the estimates to Wilson, who
drew them and deposited the several accounts with him,

(Devlin) ; and that they were disbursed on the work, in part by himself, and, in fact, on orders drawn by Wilson. He is quite positive that all the money drawn was duly disbursed.

Upon the question, then, of ordering an account, I am brought to this conclusion. That all the evidence, short of the last partnership books, which can throw any light upon the subject-matters of such an account, is already before me ; that it is too indefinite and uncertain for the statement of an account ; moreover, that so far as it goes it is against the complainant, and supports no claim to an account, at least, on his part. The result of any attempt to state an account without the books must be wholly unsafe as a basis of a decree for the payment of a balance between the parties. The Court will never undertake to adjust the rights of parties without satisfactory means of ascertaining what their rights are, and if, as in this case, the account cannot be safely stated, and the true balance between these parties ascertained, I can proceed no further. The loss of the books is the misfortune of the parties, and they must bear its consequences. *Millar vs. Craig*, 6 *Beavan*, 433. It will be observed that I lay no stress on the charge made by the answer, that those books were last in the possession of Davidson. It is not necessary to take up that question.

The result which, in the investigation we have reached, is, that being unable to ascertain the state of the account between these parties at the termination of their work, we can charge neither, and must treat the case as if the partnership account was, at that time, balanced between them.

Then we are brought to the one remaining claim of Davidson, viz : that Wilson shall contribute for the payments which he (Davidson) claims to have made since the close of the work, towards the then outstanding partnership liabilities,—payments made with his own money after

the full disbursement of such partnership funds as he had received. With respect to these alleged payments, no order for an account is necessary. All the evidence available to the partners, touching payments made by them, respectively, since the dissolution, towards the liabilities of the partnership is before the court, and there is sufficient proof to enable the court to dispose of the complainant's claim for contribution on this score. The only debt of the partnership, discharged by the complainant, was the judgment of John O. Cole, upon which he paid $300.00 on the 4th of October, 1853, and $62.00 on the 23rd of November, 1853. For one-half these sums, and of the interest from the dates of the respective payments, Wilson is liable, except so far as he may have proved a corresponding claim for contribution toward debts of of the partnership paid by him. Wilson, by his original answer, claims that in addition to having disbursed, in the work, all partnership funds received by him, he had paid with his own money, a number of partnership debts shewn by schedule "A", annexed to the original answer, amounting to over $4000.00, and the like claim was made in his additional answer of February, 12th, 1867, to which schedule "B" is annexed, setting forth the same debts more particularly, but in a further answer of January 20th, 1868, he admits himself to have been mistaken in his former answers, as to all the debts set forth in the schedules, except two debts, which he still claims to have paid. Both these were debts due to the Depews, one being a debt of $350.00, for which no judgment had been recovered, and the other being a judgment recovered by the Depews, in the District Court of Philadelphia for $2070 66, in June 1850. Wilson's allegation that he had paid the $350.00 due the defendants, and not covered by their judgment, is proved. Isaac Depew and Charles A. G. Depew, the survivors of the Depew firm, both swear that this claim has never been paid to them. The allegation of the answer is that it was paid to Mr. Thayer as their

attorney, and Mr. Thayer was inquired of under the commission issued to Philadelphia, as to whether he had not received payment of this debt from J. Alexander Simpson, as attorney for Wilson. Mr. Thayer expresses an indistinct recollection that Mr. Simpson once paid him some money in reference to these matters, but does not remember the amount, or precisely what it was for, but that it was in some way connected with the suit of the Depews against Wilson and Davidson. This falls short of proof that it was the debt of $350.00, not in suit which was paid. The whole bearing of Mr. Thayer's testimony, and all the circumstances, negative this allegation. Then, with respect to the judgment of the Depews for $2,070.66, the whole of this judgment Wilson claims to have paid out of his own funds. It is not disputed that, of this judgment, $301.00 was raised by Sheriff's sale of property levied on as Wilson's, and that to one-half of this sum with interest, say from December 31st, 1850, Wilson is entitled to contribution. The precise time of this sale does not appear, but it was under a *venditioni exponas*, as of December term 1850, and hence I take December 31st, 1850, as the nearest approximation to it. Setting this payment by Wilson with its interest, against the judgment of Cole, and its interest paid by Davidson, there remains a difference against Wilson of less than $100. The precise amount need not be calculated ; because, upon the case as presented, it sufficiently appears that Wilson paid the whole of the defendant's judgment. So it is alleged by the original answer, and more particularly by two of the additional answers; and on this point the answers are directly responsive to the bill, which alleges that such of the partnership debts as had been paid, were paid by Davidson, and some by Wilson, and accordingly interrogates Wilson, expressly, as to what sums and debts of said late firm have they, this complainant and the defendant, respectively, paid, and whose claims ? The answer must be accepted unless it has been disproved. Let us then see if there be

sufficient contrary proof. Mr Thayer, to whom the answer alleges that Wilson paid the money, testifies, apparently, to the contrary. He states that he received it from Hugh Clark, under these circumstances. Clark held certain real estate which the Depews treated as belonging to Wilson and levied upon it under their judgment. Wilson's title was sold by the Sheriff to the Depews for $301.00. Afterwards the Depews proceeded in ejectment for the property against Clark, pending which suit Clark paid the balance of the judgment to Thayer, as attorney for the Depews, in consideration of a release of their title. Subsequently, under authority of the Depews, their judgment was satisfied of record. Does, then, Thayer's statement that he received the money from Clark overcome Wilson's answer that he paid it? I lay out of consideration the testimony of the Depews, who had no personal knowledge on the subject; so that the question rests upon a comparison of the answer, and Thayer's testimony. Now, under the technical rule which requires something more than the testimony of one witness to countervail a responsive answer, Mr. Thayer's sole statement would not be sufficient as countervailing proof, even were it irreconcilable with the answer. But taken in connection with all the attending circumstances the testimony and the answer may be reconciled. The answer is, generally, that Wilson paid the judgment to Mr. Thayer, not necessarily in *propria persona;* it may have been through Clark, from whom Mr. Thayer, in fact, received it. The circumstances, independently of the answer, strongly lead to the conclusion that it was Wilson's money which paid the judgment, though Thayer received it from Clark. I accept that as the proper conclusion from the answer, and Mr. Thayer's testimony. The result is that Davidson's claim for contribution towards his payment of the Cole judgment is more than overcome by Wilson's counter-claim upon the Depew judgment.

In the answer, the defendant claims that, upon a just settlement between this complainant and himself, he would

be found entitled to balance due from the complainant, and he prays that the complainant may, by a decree, be compelled to pay such sum as shall be due from him. I do not, however, feel authorized to proceed further than to dissolve the injunction against the collection of the Bronson judgment, and to dismiss the bill as to all relief prayed for, and shall decree accordingly.

---

## JOHN S. KERSEY,

*vs.*

## MOSES RASH,

*Kent, March T. 1869.*

The Court of Chancery in relieving against judgment, at law upon grounds impeaching their justice, should act carefully and hold itself within just limits, since the jurisdiction, though unquestioned, is one which, from the pressure of hardship, always an element in these cases, is liable to abuse; and the abuse of it is extremely mischievous, tending, as it does, to a conflict between different jurisdictions and to the promotion of needless litigation.

To warrant the interference of a court of equity, with the operation of a judgment at law, upon grounds of defense or evidence, which were cognizable at law, but not used at the trial, it must appear that the defendant at law was prevented from availing himself of such grounds of defense or evidence, either by fraud or surprise, or by what is termed, in the sense of courts of equity, accident, and without any neglect or default on the part of himself or his agents.

If a party has an equitable defense, one not cognizable at law, of which, therefore, he could not avail himself at law, and consequently has suffered judg-

41

ment, equity will always relieve against the judgment, not, however, by compelling a new trial at law, but by dealing with the subject as one of its own original jurisdiction.

An injunction to restrain proceedings under a judgment was refused for want of equity in the bill, upon allegations that the claim for which the judgment had been recovered had been paid, and that the complainant held a receipt for the whole amount; that he was prevented by sickness from attending the trial, but wrote seasonably to his attorney, enclosing a physician's certificate, but whether this was received or not, he did not know; that the attorney wrote to him for the receipt, "in ample time," but the letter did not reach him until after the trial; that the damages originally laid in the narr at $1,500, had been increased at the trial term to $3,000, upon the discovery by the plaintiff at law, that certain unscrupulous persons, utterly unworthy of belief, and whose testimony could have been wholly discredited, but for the sickness and consequent absence of the defendant from the trial, would swear that a much larger amount was owing than was then claimed, and that testimony had been discovered, too late for application for a new trial, of admissions by the other party inconsistent with the claim sued for, the judgment having been recovered but two years after suit brought.

The loss of a case at law, through a party's own *laches*, will defeat his whole title to relief, as well as that founded upon after-discovered testimony, as to that which rests upon a failure to avail himself, properly, of that which he had under his control.

To lay a ground for relief in equity against perjury and surprise in obtaining a judgment at law, the bill should name the witnesses who swore falsely, and set forth facts tending to show that their testimony was false. There must be an averment of facts—not of suspicions only.

If upon the hearing of a motion to dissolve an injunction, it appears that such dissolution might work irreparable mischief to the complainant, the injunction should be continued to the hearing; such a course being within the now settled discretion of the Court, in the matter of dissolving or continuing preliminary injunctions.

It is inconvenient and undesirable to try motions to dissolve preliminary injunctions upon affidavits, or depositions taken under Rule 23. In a case proper for affidavits under the English practice, it is preferable to let the injunction stand until the hearing, except in cases where either to dissolve or to continue the injunction would work irreparable injury, and therefore a prompt decision becomes essential.

BILL IN EQUITY TO RESTRAIN PROCEEDINGS AT LAW.—The defendant at the November Term, 1867, of the

Superior Court of New Castle county, recovered a judgment against the complainant for $3,359.68. The action was brought at the November Term, 1865, and continued from term to term. On the recovery of the judgment a *remittitur* was entered for the excess above $3000, which was the amount of damages laid in the *narr*. .A *fi. fa.* was issued to the May Term, 1868. April 13th, 1868, upon Kersey's petition, an injunction was ordered. September Term, 1868, the bill was filed, and at the March Term, 1868, the answer was filed.

The bill alleges that the claim for which the judgment was recovered had been paid, and that Kersey held receipts for the whole amount; that he was prevented by sickness from attending the trial, but wrote seasonably to his attorney, enclosing a physician's certificate; but whether this was received by the attorney he does not know. That the attorney wrote to him for the receipts "in ample time," but the latter did not reach him until after the trial. The bill further alleges that the damages, originally laid on the claim, were $1500; that at the trial term by leave of the Court, the sum was increased to $3000; that this was done upon the discovery, by Rash, "that certain unscrupulous persons, utterly "unworthy of belief, and whose testimony your orator "could have wholly discredited, had he not been disabled by "sickness, would swear that a much larger amount was "owing than was then claimed." The bill further alleges, as a ground of belief, certain after-discovered evidence, being the testimony of six persons, to the effect that Rash had, on several occasions, said that Kersey did not owe him; that such a person, naming different ones at different times, had his money; that he had sued Kersey in order to find out who had his money. That this testimony was discovered too late for application to the Superior Court. The suit at law arose out of an adventure entered into by these parties and several others associated with

them, to put in substitutes for persons drafted into the military service of the United States. Kersey was treasurer. The suit was for money alleged by Rash to have been advanced for the business, and also for his share of the profits. The persons alleged, in the after-discovered testimony, to have been named by Rash as having his money, were other members of this association. These are the material allegations.

The answer is, in effect, a denial of the facts alleged in the bill as the grounds of equity. But as the decision does not turn upon the answer, or its effect, it is unnecessary to set forth its allegations in detail.

The bill was filed at the September Term, 1868, and at the March Term, 1869, the defendant filed his answer and made a motion to dissolve the injunction, pending which the comglaiuant moved for leave to take depositions in support of the bill.

*Hillyard*, for the complainant, in support of the motion.

There is a distinction between common and special injunctions, with respect to reading affidavits against the answer ; they are allowed in the latter case. *Drewry on Inj.*, 277-8 ; 3 *Dan., Ch. Pr.*, 1810 ; 3 *Snmn.*, 73-4. There is another distinction between a motion after answer for injunction, no preliminary injunction having been obtained, and a motion to dissolve. 3 *Dan., Ch. Pr.*, 1884 ; *Drewry on Inj.*, 278-9 ; *Smythe vs. Smythe*, 1 *Swanst.*, 252. In the latter case the refusal of the application was put upon this ground. In *Morphett vs. Jones*, 19 *Ves.*, 349 ; Lord Eldon was more liberal than in *Clapham vs. White*, 8 *Ves.*, 35, as to the admission of affidavits.

Originally, this liberty was confined to cases of waste, but it has been expanded so as to include all cases of

irreparable damage.   *Peacock vs. Peacock*, 16 *Ves.*, 49;
*Gibbs vs. Cole*, 3 *P. Wms.*, 255; *Beatty vs. Beatty*, 2 *Molloy*,
541; *Potter vs. Chapman, Ambler*, 98; *Isaac vs. Humpage*,
1 *Ves., Jr.*, 427; *Poor vs. Carleton*, 3 *Sumn.*, 73; *Clum vs.
Brewer*, 2 *Curt., C. C.* 506; *Benton vs. Gibson*, 3 *Heyw., N.
C.* 136.

We do not question that the general rule is, as con-
tended on the other side, that an answer denying the equity
of the bill, dissolves the injunction, but claim this case to be
within the exception founded upon irreparable mischief.

That this is a case of irreparable damage, if the
injunction be dissolved, needs no argument.

*Smithers*, for the defendant.

After answer, on motion to dissolve, the complainant
can not, by testimony, support his bill, on which he origin-
ally relied without affidavits, not supplementing affidavits
taken; but taking them *de novo*.   Injunctions to stay
proceedings at law, are expressly distinguished from cases
of irreparable mischief.   *Capehart vs. Mhoon, Busbee's Eq.*,
(*N. C.*) 31; *Lloyd vs. Heath, Ib.* 39; *McDaniel vs. Stoker*,
5 *Ired. Eq.*, 274; *Eastburn vs. Kirk.* 1 *Johns. Ch.* 444;
*Hoffman vs. Livingston*, 1 *Johns. Ch.*, 211; *Gariss vs. Gariss*,
2 *Beasley*, 321; *Clapham vs. White*, 8 *Ves.*, 34; *Berkeley vs.
Brymer*, 9 *Ves.*, 354.

The case of *Isaac vs. Humphrey*, has been overruled
and is so stated in the note.   The case of *Poor vs. Carle-
ton*, admits the general rule, claiming only such exceptions
as rest upon the ground of irreparable mischief, as cases
of waste, partnership, patents, and copyrights.   It was
decided as a case of that class; besides, the denial in that
case was held not entitled to the usual credit, being, as to
facts, not of defendant's personal knowledge.   Certain
affidavits were held admissible, because they went to

collateral matters not touched by the answer. There were also affidavits originally filed with the bill.

THE CHANCELLOR :—

Under the English practice, it is the general rule to dissolve the injunction, upon answer fully denying the equity of the bill ; and on the motion to dissolve, generally, affidavits cannot be read in support of the bill. There are exceptions to the rule proceeding upon the ground that the dissolution of the injunction, before the hearing, may work irreparable damage to the complainant, on which account the English Courts, in these exceptional cases, admit affidavits on the motion to dissolve. These are cases of waste, infringement of patents, partnership, &c. The defendant's counsel insists that the exceptions are strictly confined to injunctions restraining acts in the nature of torts, and are never extended to injunctions staying proceedings at law. This has been the point of argument. Now, without deciding this question, I refuse the application to support this bill by affidavits, and will proceed to hear the motion upon the bill and answer only, and this upon the ground, that, in no event will affidavits be necessary. For if, upon the argument of the motion, this should appear to be a case in which the dissolution of the injunction might work irreparable mischief to the complainant, I shall continue it to the hearing, exercising the now settled discretion of the court in the matter of dissolving or continuing preliminary injunctions, (*Poor vs. Carlton*, 3 *Sumn.*, 73), and considering that no injustice will thus be done to the defendant, since he stands secured by the injunction bond. It is inconvenient and undesirable to try these motions upon affidavits or depositions taken under our new Rule. In a case proper for affidavits, under the English practice it is preferable, and, I think, more in accordance with American practice,

simply to let the injunction stand until the hearing. I can think of only one case in which it would be necessary to resort to affidavits. That is, where either to dissolve, or to continue the injunction would work irreparable mischief, and, therefore, a prompt decision becomes essential, as in the case of an injunction, to terminate a business or a partnership.

Tuesday, May 11th, is appointed to hear the motion.

On May 12th, 1869, instead of the day appointed, the motion to dissolve the injunction was heard. It proceeded upon two grounds :

(1.) Upon the denial by answer of the equity of the bill.

(2.) For want of equity in the bill.

*Smithers*, for the defendant.

*First.* Consider the effect of the answer upon this motion, under our new rule, whether it is to be treated as pleading only, or as evidence,

By 15 and 16 *Vict.* the answer is now made an affidavit only ; previously it was taken to be true. 3 *Dan. Ch. Pr.*, 1768. Such is the general practice unaffected by special rules. *Manchester vs. Day*, 6 *Paige*, 295 ; construing *N. Y. Rules* 37 *and* 38 ; *Hubbard vs. Mobray*, 20 *Md. Rep.*, 165, construing 1 *Md. Code*, 92, *Sec.* 103 ; *Perkins vs. Hallowell*, 5 *Ired. Eq.*, 26 ; *Capehart vs. Mhoon*, *Busbee's Eq.*, 31 ; *Brothers vs. Harrill*, 2 *Jones' Eq.*, 210. Our own Rule 23 is explicit that the answer is not to be "evidence at the hearing," but on motions to dissolve "with the same effect as heretofore," expressly restraining the ancient practice, which was in Delaware settled in acord-

ance with the rule as stated. Chancellor Ridgely in *Lockwood vs. Mitchell, and Dukes, unreported.**

*Second.* The equity of the bill is insufficient, either as against the answer, or alone. There are four grounds of equity suggested.

1. Complainant's sickness at the trial, which was not made the ground of any application for postponement.

2. The amendment allowing increased damages, which was matter exclusively for the discretion of the court of law.

3. That complainant has receipts not produced. This alleged defense is flatly denied by the answer, but assuming that the receipts were *bona fide*, the excuse for non-production was, that a letter was mailed to the complainant's attorney and not received. The suit having been pending two years, the failure to produce the receipts at the trial, involved gross negligence, which is a fatal objection to the complainant's case shewn upon the bill. *Adams Eq.*, 434 ; 3 *Dan. Ch. Pr.*, 1723-7, *(Ed'n of* 1865) ; *Creath vs. Sims*, 5 *How. S. C.*, 204; *Sample vs. Barnes*, 14, *How.*, 70 ; *Smith and Mead vs. Lowery*, 1 *Johns. Ch.*, 320 ; *Curtis vs. Smallridge*, 2 *Freem.*, 178 ; *Woodworth vs. Van Buskirk*, 1 *Johns. Ch.*, 432 ; *Bateman vs. Willoe*, 1 *Sch. and Lef.*, 201 ; *Deaves vs. Erwin*, 7 *Ired. Eq.*, 250 ; *Hunt vs. Coachman and Easterly*, 6 *Rich. Eq.*, 286 ; *Champion vs. Miller*, 2 *Jones' Eq.*, 194 ; *Pemberton vs. Kirk*, 4 *Ired. Eq.*, 180 ; *Stockton vs. Briggs,* 5 *Jones' Eq.*, 309 ; *Borland vs. Thornton*, 12 *Cal.*, 440.

4. The alleged after-discovered evidence is not of such a nature as to support the application to equity. It should

---

*This case is referred to as in Chancellor Ridgely's notes, Mss. Vol. 3, p. 560, but does not appear among the cases reported in Del. Ch. Rep.

be original,—not cumulative,—and conclusive. The new testimony suggested here is not an answer at all, much less, conclusive. Again, after-discovered testimony is not sufficient, which, by due diligence could have have been obtained, certainly not if there were negligence, which, clearly, there was. *Smith vs. Lowery*, 1 *Johns. Ch.*, 320; *Tovey vs. Young, Prec. in Ch.*, 193; *Burgess vs. Lovengood*, 2 *Jones' Eq.*, 460; *Taliaferro vs. Bank of Montgomery*, 23 *Ala.*, 756; *McGrew vs. Tombeckbee Bank*, 5 *Porter*, 554; *French vs. Garner*, 7 *Porter*, 553; *Knox vs. Work*, 2 *Binn.*, 582.

*E. Saulsbury* and *Hillyard*, for the complainant.

As to the effect of the answer, we think this case within the principle of irreparable damage, such that the Chancellor will not hold the answer conclusive. *Poor vs. Carleton*, 3 *Sumn.*, 75. The authorities cited in support of the general rule on the other side, all recognize such exceptions as that which we claim the benefit of. But, beyond this, it lies in the discretion of the Court, free from any iron rule, to continue the injunction, if, upon all the facts, the justice of the case so requires. The question of continuing or dissolving is to be determined by the whole case made on the record, not upon the answer only, but upon bill and answer both. *Adams Eq.*, 732, *note*; *Harrison Ch'y.*, 189, 190; *Irich vs. Black*, 2 *C. E. Green* (*N. J.) Eq.*, 189; *Chetwood vs. Brittan*, 1 *Greens Ch.*, 438; *Roberts vs. Anderson*, 2 *Johns. Ch.*, 202; *Humphreys vs. Leggett*, 9 *How.*, 313.

The bill alleges that we have proof of certain admissions by the defendant. The answer denies that he made the admissions, not that we have after-discovered testimony, which is the equity of the bill. The truth or falsity of such testimony we ought to be able to submit to a jury.

42

The admissions are not cumulative, and would have exonerated the defendant if proved upon the trial, and the subsequent discovery of such evidence is a cogent reason for continuing the injunction. *Jarvis vs. Chandler,* 1 *Tur. & Rus.* 319; *Iglehart vs. Mayer,* 4 *Md. Ch. Dec.,* 514.

This answer is not full as is required. Upon motion to dismiss and even as to facts not within the knowledge of defendant, then should be a denial upon information and belief. *Sto. Eq. Pl., sec.* 584-5; 2 *Dan. Ch. Pr.,* 256-7; *King vs. Ray,* 11 *Paige,* 237-8; *Morris vs. Parker,* 3 *Johns. Ch.,* 297; *Brooks vs. Byam,* 1 *Story,* 297.

There is sufficient equity in the bill. This question is to be considered, solely in view of the bill, as upon a demurrer, disregarding any denials by answer. For to consider the equity of the bill, in view of the answer, is, in effect, to dissolve upon answer.

Relief in equity, after a judgment at law, is frequently afforded in cases like the present one, where, after a trial, receipts or admissions have been discovered, which would have affected the right to recover at law. *Humphrey vs. Peyton,* 2 *Vern.,* 436; *Coddrington vs. Webb,* 2 *Vern.,* 240; *Edwin vs. Thomas,* 1 *Vern.,* 489; *Wharton vs. Tilly Mil',* 2 *Vern.,* 428; *Gainsborough vs. Gifford,* 2 *P. Wms.,* 424; *Protheroe vs. Forman,* 2 *Swanst.,* 239; *Hankey vs. Vernon,* 2 *Cox,* 11; *Jarvis vs. Chandler,* 1 *Turn. & Russ.* 319; *Farquharson vs. Pitcher,* 2 *Russ.,* 81; *Ocean Ins. Co. vs. Fields,* 2 *Sto.,* 72, 76, 78; *Bell vs. Cunningham,* 1 *Sumn.,* 89, 103; *Ins. Co. of Alexandria vs. Hodgson,* 7 *Cranch,* 332.

There can be no neglect in not producing evidence of which complainant knew nothing, and he had no reason to suspect its existence. Nor could he have had relief by bill of discovery, for he could not be expected to inquire as to facts of whose existence he had no knowledge. *Clifton vs. Livor,* 24 *Ga.,* 91; *Iglehart vs. Lee,* 4 *Md. Ch.,*

*Dec.*, 514 ; *Knifong vs. Hendricks*, 2 *Gratton*, 212 ; 2 *Sto. Eq. Jur.* 79, *n* (3) ; *Dunham vs. Douner*, 31 *Vt.*, 256.

In the cases where relief has been refused the equity was not equal to that of this bill, and even in those the principle we contend for was recognized. *Curtis vs. Smallwood, Eq. Cas. Abr.*, 377 ; *Barbone vs. Brent*, 1 *Vern.*, 175 ; *Barker vs. Holder*, 1 *Vern.*. 316 ; *Blynnan vs. Brown*, 2 *Vern.*, 231 ; *Tilly Mil. vs. Wharton*, 2 *Vern.*, 378 ; *Tovey vs. Young*, 2 *Vern.*, 436 ; *Williams vs. Lee*, 2 *Atk.*, 223 ; *Richards vs. Synes*, 2 *Atk.* 218 ; *Marriot vs. Hampton*, 7 *D. & E.* 269 ; *Protheroe vs. Forman*, 2 *Swanst.*, 239 ; *Harrison vs. Nettleship*, 2 *Myl.* 1 *Keene*, 423 ; *Field vs. Beaumont.* 1 *Swanst*, 207 ; *Lansing vs. Eddy*, 1 *Johns. Ch.*, 49 ; *Simpson vs. Hart*, 1 *Johns. Ch.*, 91 ; *Smith vs. Lowry*, *Johns. Ch.*, 320 ; *Woodworth vs. Van Buskirk*, 1 *Johns. Ch.*, 432 ; *Barker vs. Elkins*, 1 *Johns. Ch.*, 465 ; *Dodge vs. Strong*, 2 *Johns. Ch.*, 228 ; *Duncan vs. Lyon*, 3 *Johns. Ch.*, 351 ; *Floyd vs. Jayne*, 6 *Johns. Ch.*, 479 ; *Carrington vs. Holabird* 17 *Conn.* 534-537.

A bill for a new trial of a case at law will lie for the same ground as would support a bill of review, of a case heard in equity, on the discovery of new matter. *Dunham vs. Douner*, 31 *Vt.*,256-7 ; *Murray vs. Graham*, 6 *Paige*, 622 ; *Fletcher vs. Warren*, 18 *Vt.*, 46 ; *Truly vs. Wanzer*, 4 *Howard S. C.*,142 ; *Humphrey vs. Leggett*, 9 *How., S. C.*, 311 ; 2 *Sto. Eq. Jur. sec.* 888. *Mitford's Eq. by Jeremy*, 131 ; *Sto. Eq. Pl. secs.* 412-16 ; *Floyd vs. Jayne*, 9 *Johns. Ch.*, 471 ; *Woodworth vs. Van Buskirk*, 1 *Johns. Ch.*, 432 ; *Dexter vs. Arnold*, 5 *Mason*, 309 ; *Portsmouth vs. Effingham*, 1 *Ves. Sr.*,430 ; *Bennet vs. Lee*, 2 *Ath.*, 528 ; *Napier vs. Effingham*, 2 *P. Wms.*, 401 ; *Norris vs. Le Neve*, 3 *Atk.* 34 ; *Young vs. Keighly*, 16 *Ves.*, 348 ; *Wiser vs. Blackly*, 2 *Johns. Ch.*, 492 ; *Livingston vs. Hubbs*, 3 *Johns. Ch.*, 124 ; *Taylor vs. Sharp*, 3 *P. W.*, 371 ; *Gould vs. Tancred*, 2 *Atk.* 534 ; *Lewellen vs. Mackworth*, 2 *Atk.*, 40.

The Chancellor :

This bill impeaches the justice of a judgment recovered by the defendant in the Superior Court, and it seeks to have the collection of the judgment restrained by this Court until the defendant shall submit to a new trial at law.

That this Court has the jurisdiction invoked is unquestioned. But it is one which from the pressure of hardship, always an element in these cases, is liable to abuse ; and the abuse of it is extremely mischievous, tending as it does, to a conflict between different jurisdictions, and to the promotion of needless litigation. This Court, therefore, in relieving against judgments at law upon grounds impeaching their justice, has always acted cautiously, and held itself within strict limits. What these limits are I have been at pains to ascertain, and with that view have carefully read up, and considered the whole course of decisions on this subject.

Chancellor Kent dealt with these applications more frequently, and with more thoroughness than any other judge. Not less than six such cases are reported in first three volumes of Johnson's Chancery Reports ;—*Smith vs. Lowery*, 1 *Johns. Ch. Reports*, 320 ; *Simpson vs. Hart*, 2 *Johns. Ch. R.*, 95 ; *Woodworth vs. Van Buskirk Ib.*, 432 ; *Barker vs. Elkins, Ib.*, 436 ; *Dodge vs. Strong*, 2 *Ib.*, 228 ; *Duncan vs. Lyon*, 3 *Ib.*, 351. The result of his investigations the learned Chancellor sums up in last of these cases, *Duncan vs. Lyon*, 3 *Johns Ch. R.*, 351 ;—"It is" said he, "a "settled principle, that a party will not be aided in equity "after a trial at law unless he can impeach the justice of "the verdict or report, by facts, or on grounds of which he "could not have availed himself, or was prevented from "doing it by fraud or accident, or act of the opposite party "unmixed with negligence or fault on his part ." And he adds, emphatically," this point has been so often ruled that

"it cannot be necessary or expedient to discuss it again, "and it is one by which I mean to continue to be gov- "erned." Another great authority, Ch. J. Marshall, in *Marine Insurance Co. of Alexandria, vs. Hodgson,* 7 *Cranch* 332, had previously announced the rule in substantially the same terms. He said—" without attempting to draw " any precise line, to which Courts of equity will advance " and which they cannot pass, in restraining parties from " availing themselves of judgments obtained at law, it may "safely be said that any fact which clearly proves it "to be, against conscience, to execute a judgment, and " of which, the injured party could not have availed "himself in a Court of law, or of which he might have " availed himself at law but was prevented by fraud or " accident, unmixed with any fault or negligence in himself "or his agents, will justify an application to a Court of Chan- "cery. On the other hand it may, with equal safety, be laid " down as a general rule that a defense cannot be set up in " equity which has been fully and fairly tried at law, al- "though it may be the opinion of that Court that the defense " ought to have been sustained at law. " The precise limit "fixed by the rule, as announced by Ch. J. Marshall, are still " more clearly indicated in the application, he then proceeds "to make of it, to the case before him. He says, " In the " case under consideration, the plaintiffs ask the aid of " this Court to relieve them from a judgment on account " of a defense which, if good anywhere, was good at law, "and which they were not prevented by the act of the " defendants or by any pure and unmixed accident from " making at law." Now, whatever of strictness there may be in the rule as thus limited, it is by no means new. As far back as 1802 in *Bateman vs. Willoe,* 1 *Sch. and Lef.* 205, Lord Redesdale, among the most eminent of judges, both for learning and sound judgment, treating the subject with remarkable vigor, thus defines this jurisdiction : "There may be," he says, "cases cognizable at law and also " in equity, and of which cognizance cannot be effectually

" taken at law, and therefore equity does sometimes inter-
"fere, as in case of complicated accounts, where the party
"had not made defence because it is impossible for him to
"it effectually at law ; so where a verdict has been obtained
" by fraud, or where the party has possessed himself
" improperly of something, by means of which he has an
" unconscientious advantage at law, which equity will
" either put out of the way or restrain him from using;
" but, without circumstances of that kind, I do not know
" that equity does interfere to grant a trial of a matter
" which has already been discussed in a court of law, a
" matter capable of being discussed there, and over which
" the court of law had full jurisdiction."

These may be taken as authoritative and accurate
statements of the general rule which governs this Court
upon application for a new trial of actions at law.    More
particularly stated, the effect of the rule will appear in
two points.

1. If a party has an equitable defense, one not cog-
nizable at law, of which, therefore, as stated by Chancellor
Kent and C. J. Marshall, he could not avail himself at law,
and consequently has suffered judgment, equity will always
relieve against the judgment, not however by compelling a
new trial at law, but by dealing with the subject as one
of its own original jurisdiction.    This involves no conflict
of the two jurisdictions—for each Court, though acting
upon the same subject-matter, and to contrary results,
deals with distinct rights or relations of the parties, the
one with those which are legal, the other with those which
are equitable. Two of the cases cited for the complainant
are of this class.  *Farquharson vs. Pitcher*, 2 *Russ.*, 81,
*and Dunham vs. Douner*, 31 *Vt.*, 249.  In the former case,
in the suit at law, a defendant failed to obtain credit in an
account with the plaintiff for certain sums, collected by
the plaintiff, upon a claim, of which the defendant had made

a legal assignment to a third person, reserving, however a trust to himself. The court of law, not recognizing the trust, but giving effect to the legal assignment, disallowed the credit ; equity, upon a bill, enforced the trust. So in the Vermont case, two sureties, defendants in an action at law, set up, in their defense, an extention of credit given by the creditor to the principal. This defense was overruled and judgment went · against them. Equity relieved by a perpetual injunction, protecting what were the equitable rights of the sureties, as a subject of its own original jurisdiction.

In the case before us, whatever defense the complainant had against the action at law, was purely legal.

2. Then, with respect to grounds of defense or evidence which were cognizable at law, but not used at the trial, it must appear, to warrant the interference of this Court against the judgment, that the complainant, *i. e.*, the defendant at law, was prevented from availing himself of such grounds of defense or evidence, either by fraud or surprise, or by what, in the sense of courts of equity, is termed accident, and without any neglect or default on the part of himself or his agents. In other words, the ground of relief is something connected with the trial already had, which renders the verdict an unconscientious one, as where the case of the adversary was based upon some concealed fraud which was only developed by the trial, and could not then be met, or where the party was surprised by a claim he had no reason to anticipate and could not be prepared for, or where some decisive ground of defense or evidence has since been discovered, which he could not by any reasonable diligence have known, and which, therefore, presents a case of accident, as if an administrator after trial discovers a receipt, which, not being the party to whom the receipt was given, he was in no default in not having known and found before. Such grounds for new trials as these are allowed at law where

they are disclosed in time for application, to be then made, and hence, upon such grounds, if there has been no opportunity to apply at law, equity may well relieve, because its interference is in aid of the jurisdiction at law, and consistent with it. But, on the other hand, where, as in ordinary cases, there has been a fair trial at law, neither party having been subjected to an unconscientious disadvantage through fraud, surprise or uncontrollable accident, but, as is not at all infrequent, the result of the trial has disclosed to a party the lack of some advantage he might have used, or has put him on the track of some additional evidence not before known, and which, by reasonable diligence he might have discovered, equity will not relieve. Now great injustice may sometimes result from the severity of these rules, but, as was forcibly said by Lord Redesdale, in *Bateman vs. Willoe*, "it is more important "that an end shall be put to litigation, than that justice "should be done in every case," an object indeed, which is wholly unattainable, for as he further remarks, "owing "to the inattention of parties and other causes, exact "justice can very seldom be done."

Now, as to authority, the prevailing current of decisions from the beginning has run with the distinction taken by Lord Redesdale, C. J. Marshall, and Chancellor Kent, between unconscientious verdicts resulting from some fraud, surprise or accident, unmixed with neglect in the party on the one hand, and the ordinary cases of after-discovered, additional evidence elicited by the trial, but not previously beyond the actual power of the party, on the other hand. This distinction was observed even by the earlier decisions at a period when courts of law were less liberal than now in granting new trials. The earliest case is *Curtis vs. Smallwood*, 1 *Car. II, in* 2 *Freem.* 178, 1 *Ch., Cas.*, 43 and *Eq. Cas., Abr.*, 377. A husband had recovered in trover, for goods pawned by his wife. The defendant at law filed his bill alleging that the pawning was by the

husband's consent, and that he received the money. Relief was refused "because" the Court say, "it doth not appear that *by any accident* the defendant was hindered of his witnesses at the Court." In *Barbour vs. Brent*, decided in 1683. 1 *Vern.*, 175, the Lord Keeper, after a verdict, refused relief against a judgment at law sought by the bill on the ground that there were receipts for part of the demand recovered, which had been lost. The annotator upon this case thus puts the rule as derived from all the earlier decisions which are collected in the same note. Speaking of two grounds of equity, viz : Changing the venue and *relief against a verdict*, he says, "in both, the "Court acts with great circumspection, and only where "the application is founded on clear fraud, partiality, "corruption, perjury in the witnesses, or new evidence "discovered which *could not possibly be made use of in the* "*first*,—*i. e.*, would not have been cognizable if then "offered. Proceeding upon the same distinction were the "other older cases, which have been cited for the com- "plainant. In *Hennell vs. Kelland (28 Car. II) Eq. Cas.*, "*Abr.*, 377, a new trial was granted to *an administrator* "on the ground of a receipt found after trial, which was a "case clearly within the principle of accident." It may be added in this connection, that in no instance has a party been allowed a new trial upon the finding of a receipt given to *himself*. It is true, Sir Jos. Jekyll, speaking *obiter* in 2 *P. Williams*, 425, thought a party finding, after a trial at law, a receipt to himself, might be relieved in equity, but this *dictum* was disapproved by Lord Eldon in *Protheroe vs. Forman*, 2 *Swanst.*, 244, upon the perfectly clear ground that the party necessarily having knowledge of a payment made by himself, might, upon loss of the receipt, have filed a bill of discovery, (Lord Hardwicke in *Williams vs. Lee*, 3 *Atk*, 223,) and was in laches for omitting to do so. Another of the cases cited for complainant was *Codington vs. Webb*, in 1691, 2 *Vern.*, 240. A new trial was granted. It is said in the report, that the bond on

43

which judgment had been recovered was *forged* and that by *surprise* the plaintiff at law had recovered, all the pretended witnesses to the bond being dead. In *Humphreys vs. Peyton* and *Jones vs. Hankey*, both cited in 2 *Vern.*, 436, no facts whatever are stated. *Tilly Mil' vs. Wharton*, in 1700, 2 *Vern.*, 378 and 419, was the case of a verdict obtained on a *forged* bond. The Ld. Keeper, Wright, went so far as to refuse relief unless the defendant at law could shew a conviction of forgery or a confession, but on appeal, the House of Lords granted a new trial and, in the result, the bond proved to have been forged. This was the case of a verdict recovered by fraud, and within the rule, as before stated. *Gainsboro vs. Gifford*, 2 *P. Wms*, 424, cited for complainant, did not arise upon a bill filed for a new trial. The plaintiff at law sued upon a breach of contract by the Countess of Gainsboro, to transfer certain shares of stock, and recover the value, and the Countess paid the judgment. It turned out that the plaintiff, being the Countess' broker, had sold part of these very shares and realized the proceeds. The bill was then filed by the Countess, for discovery, and to recover these proceds, as money realized from her stock and clearly receipted to her use, and upon defendant's confession, by answer, the Court so decreed. There is nothing in the case that touches the practice of this Court in compelling a new trial at law, except the dictum of Sir Jos. Jekyll before referred to.

These are all the early cases. They practically established, for this jurisdiction, the ground and limits which afterward, in *Bateman vs. Willoe*, Lord Redesdale defined, by a rule, the same rule adopted by Chancellor Kent, and C. J. Marshall, and observed with very few exceptions by all the modern decisions in England, and in this country. *Adams Eq.*, [197] ; *Protheroe vs. Forman*, 2 *Swanst.*, 238 ; *Harrison vs. Nettleship*, 2 *M. & K.*, 423 ; *Taylor vs. Sheppard*, 1 *Y. & C.*, 271 ; *Smith vs. Lowry*, 1 *Johns. Ch.*, 321 ;

*Barker vs. Elkins, Ib.*, 465 ; *Dodge vs. Strong*, 2 *Johns. Ch.*, 228 ; *Duncan vs. Lyon*, 3 *Johns. Ch.*, 356 ; *Marine Ins. Co.*, *of Alexandria vs. Hodgson*, 7 *Cranch*, 332 ; *Deaver vs. Erwin*, 5 *Iredell's Eq.*, 250 ; *Stockton vs. Briggs*, 5 *Jones' Eq.*, 309 ; *Hunt vs. Coachman*, 6 *Rich. Eq.*, 286.

Now proceed to apply these principles to the case before us. Taking the case presented upon the face of the bill, as if the question were raised upon demurrer, or motion to dismiss solely for want of equity in the bill and without answer, I am of opinion it is not one for equitable relief. The objections are these:

1. The complainant lost his case at law through his own neglect only, and not through fraud, surprise or accident, or any controlling necessity. In this point the case is strikingly like *Dodge vs. Strong*, 2 *Johns. Ch.*, 228, and *Champion vs. Miller*, 2 *Jones, Eq.*, 194. According to his bill, the complainant had fully paid Rash's claim and held receipts under Rash's hand covering the whole amount. These, if produced, would have been a full defense. With respect to the receipts, the complainant was in gross laches in several respects. (1.) In their not having been left in the hands of his attorney in the suit. The attorney is the proper custodian of papers necessary to maintain or defend his client's case, and the omission of the complainant, during the entire two years pending of the suit, to deposit these papers with his attorney, before the very eve of trial, at which time they were subject to such risk of his detention, is far short of that diligence which prudent men exercise, and which the law requires. (2.) If we suppose that the complainant was in no default in so long withholding these receipts from his attorney, nor in his absence from the trial, being detained by sickness, still the bill shews that the attorney was apprised of the complainant's sickness and inability to attend the trial, and yet made no application to the Court

for a postponement.    The bill states that being sick and
unable to attend, complainant procured a certificate from
his attending physician to that effect, and duly mailed it
to his attorney.    The presumption is that the attorney
received it.    If he had not, the failure to receive it could
have been ascertained and alleged.    The complainant's
statement that, even up to the filing of the bill, he did not
know whether or not the letter and certificate had been
received by his attorney, strengthens the presumption
that they were received ;  and it is fully confirmed by the
fact that the attorney wrote to him for the receipt, "in
ample time," as the bill states.    This letter, the bill states,
was not received by the complainant until after trial, so
that when the case was called, the attorney was left
without the means of defense.    Now if he was in this
position through no default of his client or himself, we
must suppose the Court, upon application, would have
granted a postponement until the receipts could have
been obtained.    The case then is this :    The attorney,
waiving an appeal to that discretion of the Court, to which
the situation of his case properly addressed itself, elected
to go to trial without the receipts.    Then the client must
abide the election of his attorney.  (3.) Even after the
trial, relief might have been obtained by motion for a new
trial, yet no such application appears to have been made.
I am obliged to treat the case of the complainant, as to
these receipts, as one of laches.    Consider, then, the effect
of this.    It is not only to remove the complainant's equity
to relief founded upon these receipts, but upon any and
all other grounds, also, that might exist.    For the loss of
the case, through a party's own neglect, goes to his whole
title to relief, as well to that founded upon after-discovered
testimony, as upon the receipts.    This Court cannot allow
a party to retrieve a want of diligence fatal to his case,
by afterwards hunting up additional evidence.    The strong
language of the Supreme Court in *Crealtis, adm. vs. Sims*
is here pertinent ;   " the Court will never be called into

activity to remedy the consequences of laches or neglect, or the want of reasonable diligence." But I have considered the after-discovered testimony as a distinct ground of relief, unaffected by the complainant's neglect to use the more conclusive defense already in his possession. Still this ground encounters a fatal objection : No diligence or effort whatever to discover this, or indeed any testimony is alleged to have been made before the trial, and it does not appear, and in the total absence of effort or inquiry it cannot appear, but that, by due diligence, this testimony might have been seasonably obtained. On the contrary, the very results alleged in the bill, of the quickened diligence of the complainant within a short time after the trial, raise the presumption that as much might have been accomplished by the like diligence, or any reasonable diligence, during the two years while the suit was pending. At least, the Court cannot say that this is such testimony as, under all the circumstances of the case, *could not*, *by reasonable diligence, have been obtained.* This, and not the mere fact of after-discovery, is the ground of relief. In the old case of *Curtis vs. Smallwood*, 2 *Freeman*, 178, where the defendant at law had discovered testimony to prove that the claim was wholly unfounded, the Court say, "it doth not appear 'that by any accident the defendant "was hindered of his witnesses at the trial." Nothing appears but that the defendant at the trial might have produced this evidence, and we will not help his negligence. This principle runs through the whole course of decisions. It is unnecessary to cite authorities to it specially. It may be said that, as to any laches in not seeking proof of payment by the defendant's admission to third persons, he is excused by the consideration that he had in possession sufficient proof in the receipts. But this excuse involves him in still grosser laches, in not using the proof he had. The entire aspect of the case upon this question of diligence as the bill presents it, is this. The complainant had in his possession a full defense. Through neglect,

somewhere, he misses the opportunity to use it. Defeat stimulates him to effort, for the first time, and then he finds some additional testimony, which, equal diligence before, would have either rendered needless, or, if needful, would have brought it to light. The testimony itself is of a species always held to be most unreliable, being declarations of parties coming to the Court at second hand, greatly subject to misunderstanding, if not to misrepresentation. Now the interference of the Court in such cases would encourage neglect, promote litigation and afford temptation to perjury.

I have not found it necessary to consider the objection taken in argument, that the after-discovered testimony is cumulative and inconclusive, and not a ground for relief even had there been no neglect. On that question I express no opinion.

I must now proceed to an allegation of the bill which is directed towards making this a case of perjury and surprise. The statement on this point is that before the trial "it was discovered that" certain unscrupulous persons utterly unworthy of belief, and whose testimony the complainant could have wholly discredited, had he not been wholly disabled by sickness, would swear that a much larger amount was due Rash than was claimed by the narr, ($1500,) and thereupon at the trial term the damages, as laid in the narr, were, under leave of the Court, raised to $3000. Now, if a verdict were obtained by means of perjury which the defendant at law, through surprise or the disability of sickness, was unable to meet, a Court of law would grant a new trial, or, if the perjury were discovered too late for application to a Court of law, equity might well relieve. But for relief on the ground of perjury, the complainant's case upon this bill is defective in two respects. (1.) The allegation is not of any facts or circumstances showing, or even tending to show,

perjury. It amounts only to the complainant's suspicion, based upon the circumstance that the damages as laid in the narr, were increased by amendment at the trial term. This is a circumstance wholly inconclusive. To lay a sufficient ground of relief against perjury and surprise, the bill should name the witnesses, and wherein they swore falsely, and set forth facts tending to show that their testimony was false. But (2) were the allegations sufficient in this respect, still it does not appear that on the ground of perjury and surprise, relief might not have been had at law. It is not alleged that perjury was discovered too late to enable the complainant to move for a new trial. On the contrary, the amendment of the narr, which is the only *alleged* ground to suspect it occurred before the trial.

The complainant's counsel, with considerable research, produced many cases of relief in equity against judgments at law—all that could have any bearing upon the questions. All these cases have been carefully read and considered. In two of them, *Farquharson vs. Pitcher*, 2 *Russ.* 81, and *Dunham vs. Douner*, 31 *Vt.*, 249, there were defenses purely equitable and not available at law, forming original grounds of equitable jurisdiction and so dealt with. In two other of the cases, *Gainsboro vs. Gifford*, 2 *P. Wms.*, 424, before commented on, and *Hankey vs. Vernon*, 2 *Cox*, *C. C.* 11, relief was granted upon the ground of admissions made in the answers of the defendants in equity, a ground itself very questionable, but which at all events does not exist in this case. Of the remaining cases, *Hennell vs. Kelland*, *Eq. Cas. Abr.*, 377; *Coddrington vs. Webb*, 2 *Vern.*, 240; *Tilly Mil' vs. Wharton*, 2 *Vern.*, 378 and 419; *Ocean Ins. Co. vs. Field*, 2 *Sto.*, 72; *Bell vs. Cunningham*, 1 *Sum.*, 89 and *Iglehart vs. Lee*, 4 *Md. Ch. Dec.*, 514, all proceed upon some such ground as fraud, perjury, surprise or accident, wholly free from neglect in the complainant or his agents. Now that in the lapse of

one hundred and fifty years past, the courts should, in some instances, under the hardship which these applications often present, have been pressed beyond the strict limitations presented for this jurisdiction, would not be surprising. It is rather surprising that the industry of counsel .has discovered only two such cases. One is *Clifton vs. Livor*, 24 *Ga.*, 91. There a defendant to a suit at law to foreclose a mortgage, suffered judgment by default through sickness disabling him from filing an affidavit of defense on the first day of the term. But application for further time was made by his counsel to the court of law and refused. That was certainly an answer to the bill filed for relief in equity. Nevertheless, the court of equity did interfere, but it was the case of a mortgage obtained under circumstances of gross imposition, amounting, in the opinion of the court of equity, to fraud, such as might well have warranted its interposition, had not relief at law been applied for and refused. In that feature, the case violates settled principles, and is a precedent not to be followed. The other is a case decided by a Judge of great authority. *Jarvis vs. Chandler*, 1 *Tur. & Russ.*, 319. After a recovery, in admiralty, of wages for sea service, by a woman, in which the defense taken was that the libellant was a married woman, additional evidence of the marriage was discovered, consisting of admissions by the parties. Lord Eldon granted the injunction, though with much hesitation, and expressing his doubt. It was this case which, in my original examination of the subject upon the application for the preliminary injunction, determined me against refusing it. I am fully satisfied that Lord Eldon's action is not sustainable on the facts as they are reported. The older cases are reviewed in the opinion. The later ones commence with 1788, *Hankey vs. Vernon*, 2 *Cox.* 11, 3 *Bro.*, *C. C.*, 313.

The assignees in bankruptcy of Eliz. Taylor, sued at law her bankers, and recovered a large amount. One

defense in the action at law was, that previous to the act of bankruptcy, which was 2d, May, 1785, Eliz. Taylor had assigned to the bankers, two ships at sea as security for overdrafts by her. The ships had passed into her estate, and the bankers claimed, in the action against them, to deduct their value ; but they failed to prove an assignment, perfected before the bankruptcy, and lost the credit. Afterwards, they applied to the court of law for a new trial on the ground that they could prove that, although the assignment of the ships was not completed before the act 'of bankruptcy, yet that the bankrupt had, before her bankruptcy, deposited with them the bills of sale of the ·ships, and on this ground claimed a lien on that ship. The court of law refused a new trial, but on a bill in equity, · relief was given. The Master of the Rolls puts his decision on the ground that the assignees of the bankrupt who were the defendants in equity, admitted in their answer the deposit of the bill of sale which made an *equitable mortgage of the ship*.

The ground here stands with that of the Countess of Gainsboro, where relief was given upon the ground of a confession of the equity by the answer. Whether either can be supported against the rule that a discovery will not be granted after a judgment of a matter of defense, for which a bill of discovery might have been filed before judgment, is very doubtful ; but at all events the cases are no authority to support the present bill which does not seek relief upon an admission by the answer ; and so far as this bill seeks a new trial, in order to examine additional witnesses, *Hankley vs. Vernon*, is an authority against it. For, the Master of the Rolls says, " A court " of law certainly will not grant a new trial merely to " enable the party to get fresh witnesses to prove his " case ; nor *could this Court* interfere on such a ground ; " it would be a manifest opening to perjury after the party " saw where the shoe pinched."

44

*Ocean Ins., Co., vs: Field,* 2 *Sto.,* 72, was a clear case of a verdict obtained through fraud. Field had recovered, at law, upon a policy insuring a schooner. After the trial it was discovered that he had himself caused the loss of the schooner by secretly boring holes in her bottom. This was the case of a judgment recovered through a fraud, one of a secret, concealed nature, which the Insurance Company, did not, in fact, know at the trial, and could not be held in any laches for not discovering it. The decision is put upon the ground of fraud, and is clearly within the rule laid down by Lord Redesdale and Chancellor Kent. There are some general observations by Judge Story as to the power of the Court to grant · relief in any strong case of after-discovered testimony, of a direct and positive character. But his remarks are *obiter dicta,* loosely made and of no authority.

*Bell vs. Cuningham,* 1 *Sumn.,* 89, was a case of surprise. It was an action at law, and a recovery against foreigners for the proceeds of certain consignments of sugars. Part of the money recovered was for a claim of which the defendants at law had no knowledge, and, under the circumstances, had no ground to anticipate it, but against which they had a good defense. Judge Story, adverting with approval to the rule announced by C. J. Marshall in the case of *The Marine Insurance Company of Alexandria vs. Hodgson,* treats the case before him, as within that rule, on the ground that it was a case of surprise upon the defendants.

*Iglehart vs. Lee,* 4 *Md. Ch.,* 514, was a case of gross fraud. Iglehart, as Sheriff, had levied on the supposed interest of some minors (of whom Robinson was guardian) in one-third of the crops of a farm of which Lee was tenant. The Sheriff gave Lee an agreement of indemnity, whereupon Lee sold, paid to the Sheriff one-third the proceeds of the crop. Afterwards Robinson sued Lee to recover the rent, in which suit Lee suffered judgment to

go against him without defense, under a fraudulent arrangement that Robinson should enter satisfaction of this judgment, and then, that Lee, for Robinson's use, should sue the Sheriff upon the agreement for indemnity, using this collusive judgment against him as evidence of damages. Iglehart, the Sheriff, at the trial of the action against him, knew nothing of the fraud, nor was he in any laches for not knowing it, as it was a secret between the colluding parties. Upon its discovery, afterwards, equity relieved him.

The present case might have been like these, had there been a sufficient averment of facts shewing that the verdict was obtained through perjury, procured by Rash— I say averment of facts, not of suspicion only.

I therefore conclude to dissolve the injunction for the want of equity in the bill,—not finding it necessary to consider what would be the effect of the answer, supposing a sufficient case for relief had been made by the bill.

Injunction dissolved.

JOHN ANDREW HALL,

*vs.*

THOMAS M. LIVINGSTON AND JOHN W. STUTZER.

*Kent, September T., 1869.*

A parol trust may, in the absence of any prohibitory Statute, be set up, even agains: the grantee under a deed absolute on its face, and without any allegation in the bill that the trust was intended to be declared in the deed and was omitted through fiaud or mistake.

Parol evidence is admissible to establish a trust, as against a deed absolute on its face, when, the relation of the parties, and the circumstances surrounding the making of the deed, were such as that for the grantee to set up the form of the deed as conclusive would constitute a fraud against the grantor.

Such a parol trust, may be established against an absolute deed by verbal admissions by the parties charged, and there is no such rule of evidence as to require, in such a case, proof of facts and circumstances *dehors* the deed and incompatible with the idea of a purchase.

In Eng'and, before he Statute of Frauds, 29 *Car*. II., uses and trusts might be proved by parol where the mode of conveying the legal estate was such as might be by an act *in pais* or by parol.

The Seventh Section of the English Statute of Frauds, requiring that trusts of lands be proved by writing, was never in force in this State, having been passed after the settlement of Pennsylvania which then embraced what is now Delaware, and never having been adopted by Statute or at common law in this State.

There is a well recognized distinction between contradicting a deed or impairing its legal operation, and raising out of the transaction an equity *dehors* the deed, binding the grantee's conscience to hold the land for the real purposes of the conveyance, and not according to its legal operation, when the latter use of it would, under the circumstances, work fraud.

It is upon the ground of *mala fides*, and not of mere want of caution, that the purchaser for value is affected with notice of a prior claim.

The notice must be more than would excite the suspicion of a cautious and wary purchaser, it must have been so clear and undoubted, with respect to the existence of the prior right, as to make it fraudulent in him, afterwards, to take and hold the property.

There is no difference, in principle or upon authority, between the kind or measure of notice proper to affect a subsequent purchaser, whether his title is challenged under a prior unregistered conveyance of the legal estate, or under a mere equity or trust attaching to the legal title conveyed to him.

The true object and construction of our recording act is to extend to the purchaser for value the like protection, and no more, against a prior secret conveyance of the legal estate, which, without any Statute, courts of equity have always afforded him against prior equities, merely.

The same principle applies to the grantor under a prior unregistered deed, as to the holder of a mere equity or trust, seeking to impeach the *bona fides* of a subsequent purchaser. The failure to adopt the prescribed mode of protecting himself by recording his deed is itself *laches*, in the holder of such prior deed, and thus the equities, so far as they depend on any question of diligence between the parties, are, at least, equal. So a party, who seeks to set up as against a subsequent purchaser for value, a secret trust reserved upon an absolute deed, under which possession was given up to the grantee, is himself guilty of *laches*, in not causing the trust to be inserted in the deed, and his *laches* is aggravated by his surrender of the possession which holds the grantee out to the world as the absolute owner.

Sound policy forbids that a title, bought in good faith, and paid for, should be hazarded upon the question, whether due diligence has been exercised in looking after prior latent rights, such as are not disclosed, either by the record or by the deeds under which the purchaser takes his title.

The surety in an injunction bond may be discharged in order that he may be re-examined as a witness, his deposition having been already taken through inadvertence without the removal of the disqualification and publication having passed.

While a cause is pending, the injunction bond is under the control of the Court, and the rights of the defendant under it remain subject to such disposal of the instrument, as the Court, in the exercise of its discretion, with a view to the ends of justice in the cause, may make.

BILL IN EQUITY TO ESTABLISH A PAROL TRUST IN LANDS AGAINST THE GRANTEE IN A DEED ABSOLUTE ON ITS FACE, AND FOR AN ACCOUNT OF RENTS, AND PROFITS, AND A RE-CONVEYANCE BY THE GRANTEE, AND ONE TO WHOM HE HAD SOLD AND CONVEYED A PART OF THE LANDS.—The complainant, Hall, by three several deeds, dated, two of them on the 28th, and one on the 29th of

January, 1859, conveyed to the defendant, Livingston, in fee simple, three farms situated in Kent county, Delaware. The deeds were in the usual form of deeds of bargain and sale, without any declaration of trust, and purporting to be absolute conveyances for a money consideration paid ; the consideration stated being, in one of the deeds, $1,400, in an other, $1,000, and in the third, $200. Hall, at the time of the conveyance, occupied one of the farms, and has so continued to do, but whether he remained in possession as the beneficial owner, or as tenant to Livingston, is a point in controversy. Of the other farms, Hall has had no possession since the date of the deed, Livingston occupying one of them and receiving rent for the other, until March 22nd, 1866, when he conveyed these two farms to the defendant, Stutzer.

The bill alleges that the conveyance by Hall was made subject to a parol trust, that Livingston (who was Hall's father-in-law) should, out of the rents and profits of these farms, and the proceeds of wood and timber to be cut and sold, pay off and discharge certain liens against the premises and then re-convey them. It further charges that Stutzer purchased two farms conveyed to him with notice of this trust.

The prayer is for a decree that the trust be established ; that Livingston account for the rents and profits, and for the proceeds of wood and timber cut and sold, all which the bill charges to have been more than sufficient to satisfy the liens, and that both Livingston and Stutzer re-convey to Hall the farms now held by them, respectively.

The answer of Livingston asserts that the conveyance to him was made under an absolute purchase, without any trust or confidence, whatever, and for a money consideration amounting in the whole to $2400, of which $1800 was to be applied by him in satisfaction of certain liens

against the premises, and the residue to be applied to such other debts of Hall as the latter should approve, or to be paid directly to Hall, as he should direct. Stutzer's answer denies having received notice of any trust of the farms purchased by him, disclaims all present knowledge of such trust, and, while not admitting the alleged trust, sets up against it the equity of a *bona fide* purchaser for value paid and without notice. Thus the issues of fact presented by the record, are, (1,) the existence and terms of the alleged trust and, (2,) supposing such trust to have existed, whether Stutzer had sufficient notice of it to affect him as a purchaser. To these points a mass of evidence on both sides was read at the hearing. For proof of the trust, the complainant relied chiefly upon verbal admissions of it, by Livingston, made to several witnesses and on different occasions. As counterproof, upon this issue, the defendants adduced evidence of sundry transactions between Hall and Livingston of a nature inconsistent with the existence of any trust, also of like inconsistent declarations on the part of Hall, made upon two occasions. The material facts of the evidence are more particularly set forth in the opinion of the Court.

On the 22nd of December, 1869,—*Comegys*, for the complainant, applied for an order to discharge Wm. A. Hall, the surety in the injunction bond, in order that he might be re-examined as a witness, his deposition having been already, through inadvertence, taken without removal of the disqualification. The deposition and all the testimony had been published. Mr. C. stated that neither he nor his client had read any of the depositions, nor were acquainted with their contents.

*Ridgely* and *Smithers*, for defendant, without questioning the good faith of the application, objected, *first*, that to discharge the surety or by any means to affect his liability under the bond, would be to impair the obligation of the contract, a power prohibited to the Court by the

Federal Constitution; and, *second*, that, at all events, the application came too late, being after publication passed; that to allow any further testimony after publication passed, would give the complainant an undue advantage in knowing from the testimony published, any deficiencies in his proof, and is against the practice of the Court.

THE CHANCELLOR :—

The present application is that William A. Hall may be discharged from his suretyship in the injunction bond, or that the bond may be canceled and a new bond taken, as may be in accordance with the powers and practice of the Court; that the deposition of Hall already taken be suppressed, and the witness re-examined upon the same interrogatories and cross interrogatories.

The defendants object, *first*, the want of power in the Court to discharge this surety, since that would impair the obligation of a contract within the prohibition of the Federal Constitution.

Doubtless, the injunction bond is a contract, what is termed a contract executed; and out of it there do spring obligations and rights, which, whatever they may be, and with such qualifications, if any, as attach to them, rest upon contract, and are within the protection of this clause of the Constitution. Were this cause to proceed to a hearing, and the injunction to be dissolved, the bond remaining in force and being then delivered to the defendant, as it would be, under the order of this Court, then the right of defendants to redress upon it, and the obligation of the surety to respond having become vested and indefeasible, would be beyond the reach of any power, legislative or judicial.

I am of opinion that while this cause is pending, the bond is under the control of the Court, and that the rights

of the defendants under it remain subject to such disposal of the instrument as the Court, in the exercise of its discretion, with a view to the ends of justice in the cause, may make.

This was not a bond executed and delivered by one party to the other for a consideration received, the ordinary case vesting immediately and subject to no control or contingency as to the rights and obligations imparted by it. It is a security taken by the Court without any privity of the defendants, upon no consideration passing from them ;—it is what they could not have required, and what no law or statute·required, but was taken by the Court *sua sponte* to serve the justice of the cause, as that shall appear to its own judgment,—when taken it remains, according to uniform practice, in the custody of the Court, not delivered to the defendants ; nor could the defendants obtain possession of it, but under the order of the Court at the termination of the suit.

The result is that this bond, though taken in the name of the defendants, and intended for their benefit in a certain contingency, is not yet their property. It has not been delivered to them, nor is there any ground upon which, supposing the defendants stood in a like relation to a private party, as they now do to this Court, they could compel a delivery, or assert an equity to the benefit of it without a delivery. It must abide the disposal of the Court until the cause is determined.

I have considered with some anxiety what objection there might be to this view of the present condition of the bond, and can find none. In the first place, it violates no rule of law as to the effect of a sealed instrument. A deed may be signed and sealed and delivered conditionally or in a qualified manner, so as to pass from the control of the grantor or obligor, and yet not vest an immediate and indefeasible title or right in the grantee or obligee. Such is

45

the ordinary case of an escrow. The instrument may be delivered into any third custody, to take effect upon any conditions, or subject to any contingencies, whether stipulated for expressly, or implied from the circumstances and objects of the transaction. There is, then, no technical difficulty in treating this bond as executed, and, so far as the obligors are concerned, as delivered, but remaining temporarily in the custody and control of the Court, so as to effectuate the objects contemplated by the order under which it was taken.

Again, no right of the defendants is infringed by holding the bond under the control of the Court pending the cause. For as yet, no right of defendants has attached to the instrument. Being taken in the discretion of the Court it remains subject to that discretion until, by delivery, a legal right to the instrument is created.

Again, there is no cause for sensitiveness, that ultimate justice to the defendants is left at risk through the Courts retaining control of the bond. The same sound discretion and sense of justice to which our laws have confided the taking of any bond at all, may as well be trusted to hold and dispose of it so as to secure the just rights of parties; while, on the other hand, the exercise of such a control until the cause is determined, may be often convenient for the ready correction of mistakes to which the bonds, taken as they are out of Court, and not under the direct supervision of the Chancellor, are liable, and sometimes a change or substitution may become necessary to justice, as in the present case, where the surety is found to be a material witness. The disqualification of the witness may result from no fault of the party who would be affected by the loss of his testimony. The materiality of his testimony might arise, or it might be discovered after he has become surety. A party cannot, upon principle, be held to be apprized of all the testimony which will be

material before the cause is pleaded to and at issue ; nor ordinarily is this practicable ; so that without a reserved control of the injunction bond, pending the cause, gross injustice might ensue. Further, the weight of authority is in accordance with this view. It has been a uniform practice in the Courts of England, and of this country, to discharge sureties held under what may be termed judicial securities, in order to qualify them as witnesses in the cause, in the course of which the security was taken. The principle is, that the security taken, whatever be its form, whether recognizance of bail, or bail bond, replevin bond or stipulation for costs, is subject to the control of the Court in which it is taken, pending the cause, so far as justice in that cause may require, and that these judicial securities being taken subject to such control, its exercise does not impair any obligation arising therefrom. See, for examples, 2 *Greenl. on Ev.*, *Sec.* 392, and cases cited, and *Sec.* 430. . We have a statute to the same effect, which, however, must be taken as declaratory of a power already existing. The like control of this Court over an injunction bond rests on even clearer grounds, in as much as such bonds are taken by the Court in the exercise of its own judicial discretion, and are not like some of the securities, directed by Statute.

The decision in Maryland, *Arty and wife vs. Grove*, 21 *Md. Repts.*, 456, I have considered with great respect, but am obliged to dissent from it. I do so with the less hesitation because the question in that case was a subordinate one, and concerned only a small interest, viz : one item of credit to the amount of $68 in an account ; and the remarks of the Court do not show that much consideration was given to it.

But it is further objected that, supposing the Court have power to discharge the surety, it is now too late to allow his re-examination, in as much as his deposition already taken as well as the testimony at large, has been

published. It is suggested that his re-examination now would afford the complainant an undue advantage in the opportunity to supply any defects of proof which might be disclosed by the evidence already taken. This objection would have force against the examination of the witness as to new matter after his testimony has been once taken, but not to his re-examination upon the same interrogatories, and cross interrogatories.

If the witness shall reiterate his former testimony, the case will stand upon precisely the same proof as if he had been originally competent, and the deposition first taken were read at the hearing. If he varies from his first statements the defendants have the advantage of the self-contradiction. Statements of any new matter will not be permitted to be introduced.

The rule is, that the re-examination of a witness is against the ordinary practice, but is allowed by special order upon grounds satisfactory to the Court, as in the case of clearly accidental mistake on the part of a witness, or of the examiner. *Kingston vs. Tappan*, 1 *Johns. Ch.*, 368 ; *Denton vs. Jackson, Ib.*, 526 ; 1 *Smith's Ch. Pr.*, 358 *note* (a) ; or where the depositions already taken have been suppressed for some irregularity which the Court is satisfied was accidental and unintentional. See, at large, 2 *Dan. Ch. Pr.*, 1150-1156, and 1 *Smith's, Ch. Pr.*, 395. In *Healey vs. Jaggar*, 3 *Simons*, 494, a plaintiff having by mistake omitted to file a replication before he examined his witnesses, leave was given to him, notwithstanding publication had passed, to re-examine his witnesses on the interrogatories already filed, but not to examine any new witnesses. There are cases in which a re-examination after publication passed, has been allowed for the purpose of rendering a witness competent. *Callow vs. Mince*, 2 *Vernon*, 472, and *Sandford vs. Paul*, 3 *Bro. Ch. Rep.*, (370,) are direct decisions on the point, the latter

of Lord Thurlow, on great consideration, and after an examination and report to him by Mr. Dickens of the prior cases and course of practice. This case is most fully reported in 1 *Vesey, Jr.*, 498, and 2 *Dickens*, 750. In *Wood vs. Mann.*, 2 *Sumner*, 316, Judge Story reviews, very thoroughly, the whole subject, stating, upon authority, the various circumstances under which, after publication, further testimony, or the re-examination of the same witnesses will be permitted, and among these, (*p.* 323,) is put the present case. "Another class of exceptions," says, the learned Judge, " is where depositions have been suppressed "from the interrogatories being leading, or for irregularity, " or *where it has been discovered that a proper release has* "*not been given to make a witness competent ;* in every "such case, from the obvious necessity and in further- "ance of justice, fresh interrogatories and a re-examination "have been permitted." *Haddix vs. Haddix* 5 *Litt.*, 202, is cited in 1 *Smith Ch.*, *Pr.* 358, *note* (*a*,) as deciding that "a " witness examined while incompetent by reason of inter- "est, may be re-examined after his competency is restored."

Certainly these applications should be entertained with great jealousy and circumspection ; but the present application presents all those features which the Courts, in their most cautious exercise of this discretion, have required. The evidence of this witness is material to the issue, and its admission will be to the furtherance of justice in the cause :—the taking of it without the previous removal of the disqualification of the witness was through inadvertence, and that of a kind not involving neglect, being such as all counsel are liable to : the application is made in good faith—and to grant it involves no delay of the cause nor surprise upon the defendants, nor any other prejudice than the effect which the testimony itself may have at the hearing, which, of course, is a consequence not to be considered.

The cause came on to a hearing at an adjourned September Term, 1869.

*Comegys*, for the complainant.

This case presents two general questions, (1,) whether the fraud is proved as alleged, and, (2,) whether Stutzer is affected by notice of it. ·

*First.* The proof shows that Hall, a man of weak capacity, embarrassed, beyond his own ability, for relief applies to Livingston. The result was a conveyance absolute on its face, but, in fact, subject to the trust alleged.

In this State a trust of lands may be shewn by parol. The seventh and eighth sections of the English Statute of Frauds were not re-enacted here and not having been re-enacted are not in force. It must be presumed to have been omitted, designedly, from our Statute.

But supposing this case to be governed by the Statute of Frauds, or the defense properly taken under it, there arises a preliminary answer to this objection, that the Statute, or that feature of it, is not pleaded in the answer. The omission of a statutory defense is a waiver. The pleadings present as the issue of fact, whether a parol trust was created, its invalidity under the Statute being waived. *Mitf. Eq.*, *Pl.* (*Tyler's Ed.*), 356; 1 *Dan. Ch. Pr.*, 747; *Hill on Trustees*, 61, *note* (2) The principle is that the issue must arise out of the record. In cases where the Statute is relied on it is always pleaded. *Movan vs. Hays*, 1 *Johns. Ch.*, 339; *Brown vs. Carson*, *Busbee*, 272; *Lamb vs. Pigford*, 1 *Jones Eq.*, 196; *Briggs vs. Morris*, 1 *Jones Eq.*, 193; *Flagg vs. Mann. et al.*, 2 *Sumn.*, 486.

This is not a deed of bargain and sale. It is admitted by the answer that no consideration was paid, and this meets the objection that we cannot, against the deed, aver the want of consideration. If there was no consideration we may inquire what use passed; the Statute of

Uses executes only uses arising from a consideration of money, or value paid or given, not a contract or anything *in fieri, Roberts on Frauds,* 91. The answer admitting the falsity of one of the most solemn averments of the deed, the whole question of consideration is open, and the question, what it was, is the very question opened to the Court by the pleadings. Besides, the answer sets up in defense another parol trust, and we may meet it by shewing the true trust. Thus the answer raises the issue of trust or no trust, and opens inquiry into the facts of the case, which present a case peculiarly for equitable interference, relieved by the answer from the restraint arising from the technical effect of a deed.

Again, the exclusion of parol testimony to prove what is in writing, does not apply where an agreement originally parol is partially reduced to writing ; what is not in writing is enforced collaterally and not through the contract as reduced to writing. 1 *Gr. on Ev.,* § 284, *a.*

Upon the evidence, a parol trust is clearly proved, and the facts are entirely inconsistent with the idea of a sale. Hall lived on one farm as owner, and so acted and dealt with it ; he never paid any rent, but rented out part, and received rents ; he cut wood on these lands, and sold it to Livingston, who, upon the proof, is shewn to have been clearly unable to buy.

Against the proof adduced by complainant, the reliance is upon the papers signed by Hall. These and their effect must be considered in the light of all the circumstances. Hall's incapacity, his relationship to Livingston, and dependence upon him, and Livingston's proved control and direction of the whole proceeding with Hall's utter passiveness. Livingston was a self-appointed guardian, and Hall clearly did not understand the effect of these papers. The very office of a court of equity is to look behind formal papers and get at the real transactions and motives and aims of parties.

*Second.* With respect to Stutzer's defense, it is shewn that he had notice clearly sufficient within the authorities. *Jackson vs. Caldwell,* 1 *Cow.,* 625 ; *Pearson vs. Daniel,* 2 *Dev. & Bat.,* 365 ; *Winborn vs. Gorrell,* 3 *Ired. Eq.,* 117 ; *Polk vs. Gallant,* 2 *Dev. & Bat.,* 395 ; *Blake vs. Heyward,* 1 *Bailey's Eq.,* 208.

*Smithers* and *Ridgely,* for defendants.

*First,* as to the defense of Livingston.

1. It is a general rule that a complainant can only recover upon the case made by the bill.

There is no allegation of fraud in obtaining the deed, nor of error or mistake in the form of the conveyances, nor that in form they are other than intended. The case set up by complainant is, that they are subject to a trust *dehors* the deed, a secret, parol trust to hold the lands and apply rents and proceeds of wood and timber to pay off Hall's debts and re-convey. Hall well knew the absolute character of the deed on its face ; no fraud is alleged in its inception, only in refusing to carry out the trust.

That there was any intention to create such a trust is highly improbable. Hall was so deeply involved, his personal property sold, lands likely to follow ; the case was hopeless. The only difference to him was, if Livingston got it he would have a home.

2. It is not settled in this State that a parol trust of lands can be set up at all. *Waters vs. Comly,* 3 *Harring.* 117 ; *Newells vs. Morgan,* 2 *Ib.,* 225 ; *Roberts on Frauds,* 91, 93—4

In England, under the Statute, 29 Car. II. Section 7, no trust could be created except by writing (except some by operation of law under Section 8.) This was re-enacted in some of the states, though not in

Pennsylvania, Delaware or North Carolina, but even there a resulting trust under Section eight, cannot be proved by parol.

*Moran et al., vs. Hays*, 1 *Johns. Ch.*, 339 ; *Steere vs. Steere*, 5 *Ib.*, 1 ; *Botsford vs. Burr*, 2 *Ib.*, 405. This may be taken to be the law in all the States where the English Statute has been re-enacted or held to be in force. If Section 7, of the English Statute is in force here, that is, conclusive.

3. But even if that Statute is not in force here, no parol trust of lands can be established by mere declarations or admissions of the parties to be charged, but only by facts and circumstances *dehors* the deed, inconsistent with its absolute character. But in Pennsylvania and North Carolina, it is held that facts, and not admissions only, must appear. *Jackman vs. Ringland*, 4 *Watts & S.*, 149, 150 ; *Sample vs. Coulson*, 9 *Watts & S.*, 62, 65-6 ; *Kelley vs. Bryan*, 6 *Ired. Eq.*, 283 ; *Sowell vs. Barrett*, *Busbee*, 50 ; *Brown et al.*, *vs. Carson's Ex'r and devisee*, *Busbee*, 272 ; *Clement vs. Clement*, 1 *Jones Eq.*, 184 ; *Briggs vs. Morris*, 1 *Jones Eq.*, 193 ; *Lamb vs. Pigford et al.*, 1 *Jones Eq.*, 196.

4. Such declarations as are proved in this case are not of that clear, unequivocal character as should be required to set aside a solemn deed, not even if they stood alone. Admissions are an unsafe mode of proof, liable to be misunderstood, easily fabricated, hard to disprove, and to be received with great caution, requiring strong corroboration.

And any inference which might be drawn from the complainant's testimony is, in this case, conclusively rebutted by the evidence for the defendants. The papers and the declarations, as construed in behalf of complainant, are wholly inconsistent, and one or the other must

46

give way, and all considerations weigh most strongly in favor of the papers.

*Secondly*, as to the defense of Stutzer.

This part of the case rests upon a purchase for value, and without notice. The payment of the purchase money is clear, and Stutzer's care and diligence were beyond criticism.

There is in this case no notice proved, but the alleged notice is insufficient to charge Stutzer with knowledge of the trust if there were one. *Sugd. on Vend. Ch.*, 17 *p.*, 532 ; *Wildgrove vs. Wayland*, cited by Sugden ; *Hill on Trustees*, [510] ; *Le Neve vs. LeNeve*, 2 *Wh. & Tud. L. Cas. in Eq.*, [35] ; *Rogers vs. Jones*, 8 *N. H.*, 264.

THE CHANCELLOR :—

The grounds of defense taken in argument were two-fold ; one that the evidence was not competent in point of law to establish the alleged trust, the other, that it was insufficient to prove the trust as a matter of fact. Let us take up these objections in order.

The argument of the first objection, *i. e.*, the competency of the evidence, raised three questions of law.

First, was the broad question, treated in the argument as yet unsettled, whether, in this State, a parol trust of lands can be set up at all. If it cannot be, then the case is ended upon the threshold.

My great respect for even the doubts of the learned and experienced counsel for the defendant, and a desire not to leave, in any degree unsettled, in this Court, a question of so much importance, has led me to examine it thoroughly with this result.

· That, in England, uses or trusts before the Statute of Frauds, 29 Car. II, might be proved by parol, or, to use the more common phrase, that they were "averrable," at least, to a large extent, the fact that such a Statute was deemed necessary, sufficiently demonstrates ; but the modern text books, (*Lewin on Trusts*, (57) ; *Hill on Trustees*, [561], 2 *Sto. Eq. Jur.*, § 971,) treat it as quite uncertain whether at that period parol trusts of lands were, *under all circumstances*, valid.    They do not, however, attempt to extract from the decisions, prior to 29 Car. II, any intelligible rule on this subject, but leave the question, how far trusts might, before the Statute, be declared or proved by parol, to rest upon a distinction suggested by Ch. Baron Gilbert, in his work on Uses and Trusts, p. 27.

· The distinction put by the Ld. Chief Baron, as one likely to harmonize the earlier cases was, that where the mode of conveying the legal estate was such as might be an act *in pais* or by parol, the uses or trusts of the legal estate might be declared by parol ; but where, as in the case of a few only of the old common law assurances, the conveyance of the legal estate could only be by writing, the uses of such conveyance must also be ·declared in writing.

I have examined the passage from Gilbert, and the cases cited by him, and all other authorities of that period which are accessible.    Quite a laborious investigation of the subject has led to the conclusion that, under the old modes of conveyancing which were in use prior to 29 Car. II, excepting only two of them, the uses of the land conveyed, (or the trusts of the same, after trusts had succeeded to the ancient use under the Statute of Henry VIII,) might be declared by parol.    This was true as to lands when conveyed in the earliest times by feoffment and by fine levied of the freehold, and, also, as to lands conveyed by that form of assurance which superseded these, and which now prevails, viz ;—the bargain and sale.

The exceptions were the covenant to stand seised to uses, which, together with the uses declared, was required to be in writing ; also the uses of a fine when levied of a rent, a rent being in grant and not in livery. It need hardly be added that these two excepted forms of conveyance are unknown among us, and can afford no rule applicable to the present case.*

*The entire passage from Gilbert reads thus :—

" It seems, at common law, a use might have been raised by word, upon a " conveyance, that passed the possession by some solemn act, as by a feoffment; " but when there was no such act, then, it seems, that a deed declaratory of " the uses was necessary; for as a feoffment which passed the estate might be " made at common law by parol, so, by the same reason, might the uses of the " estate be declared by parol, but where a deed was requisite for the passing " of the estate itself, it seems, it was requisite for the declaration of uses, as " upon a grant of a rent or the like. So, it seems, a man could not covenant " to stand seised to a use without a deed, there being no solemn act; but yet a " bargain and sale by parol has raised a use without, and it has been held to " do so, since the Statute, in cities exempted out of the Statute. It has been " held that if a fine be levied of a rent, no use can be limited of it without " deed; but now by 29 Car. II. C. 3, all declarations of trust, other than such " as arise by implication of law, are to be in writing, and signed by the party " who is, by law, enabled to declare such trust, or else it must be by his last " will in writing. 2 *Roll.* 788 ; *Collard vs. Collard, Pop.* 49 ; *Moor,* 688 ; 2 " *Inst.* 675 ; *Jones* vs. *Morley, Holt,* 321 ; *Dyer,* 229 *a.*"

It will be observed that, in this passage, the question, under which forms of conveyance uses might, and under which they might not, be declared by parol, is governed by a distinction between those conveyances which, at the period, referred to might be made by parol, and those which required a deed in order to pass the estate upon which the use was to be raised. Says the learned Ch. Baron, " as a feoffment which passed the estate might be made at common law " by parol, so by the same reason might the uses of the estate be declared by " parol, but where a deed was requisite for the passage of the estate itself, it " seems, it was requisite for the declaration of uses. " This distinction will be found fully to harmonize all the early cases, and must be taken to have been the one applied by the Courts to the several forms of conveyance. Thus, with respect to a feoffment, the primary mode of assurance, inasmuch as it might be made without a deed, so the uses of the estate conveyed might be declared without a deed, though a written declaration of the uses came frequently to at-

But the seventh section of the English Statute of Frauds, the section which requires that trusts of lands be proved by writing, was never in force in this State. That Statute passed in the twenty ninth year of Car. II., did not extend to the then settled colonies,—among which were Pennsylvania, embracing, what is now, Delaware. It was early decided by the Privy Council of England upon appeal to the King, in Council, that an English Statute does not bind a colony settled prior to its passage, unless the

tend the feoffment So, upon a fine levied of the freehold, the uses of the freehold might be declared by parol. *Gilbert on Uses* (54-5-6); *Cornish on Uses*, 3 *Law Lib.*, (163); 4 *Reeves Hist. Com. Law.*, 161. This was because a fine was, in substance, but an acknowledgment of record that a feoffment had previously been made by the conusee to the conusor. From this presupposed feoffment the fine received its force as an evidence of title; and as thus the source of the estate conveyed under a fine was a supposed feoffment, which might have been made by parol, so the uses of such an estate might be declared by parol. But, further, there succeeded to both the feoffment and the fine, another mode of conveyance, which illustrates how little writing was deemed a requisite to the creation of the ancient use. This was the bargain and sale. I refer to this now as a common law conveyance before the Statute of Uses. This bargain and sale, prior to the Statute, was a mere contract of sale by one holding the legal estate, made for a valuable consideration, upon which, although no legal title passed, yet, out of respect to the consideration, equity raised and enforced the use or beneficial interest. Thus the consideration of a bargain and sale received the like force to support the use bargained for, though by parol, which, under a feoffment, the solemn act of livery of seisin had to support a parol declaration of the uses to which the feoffment was made. Now, this contract of bargain and sale might be by parol ; and thus in a very large class of cases, uses came to be created by parol. For as we learn from *Reeves' History of the Common Law, 4th Vol.*, 161, the common law bargain and sale, as a method of conveyance had obtained as early as Henry VII, being extensively introduced in that reign in consequence of a Statute of Richard III, which had given, to all *cestuis que use*, a power concurrent with the person holding the legal estate, to make the common law conveyance by feoffment and gift. There is abundant authority that parol uses were raised out of a mere verbal bargain and sale, for a valuable consideration, before the Statute of 27 *Hen.* 8, a section of which, requiring a bargain and sale to be enrolled, made a deed necessary to this form of conveyance, and even after

Statute be expressly extended to such colony. 3 _P. Wms_, 74 ; 1 _Jac. and Walk._ 22 ; 1 _Blk. Com._, 109 ; Ld. Mansfield in _Rex vs. Vaughan_, 4 _Burr_, 2500. The Statute of Frauds, in connection with the supplement to it of 25 Geo. II., bears internal evidence that it was not supposed to extend to the colonies ; for the provisions of the supplement are, by Sec. 10, expressly extended to those of the colonies, and those only, which, by their own usage or legislative acts, should have previously adopted the orginal Statute of 29 Car. II.

Nor does it appear that the seventh section of the English Statute of Frauds, or any corresponding rule of

---

that Statute, in certain cities which were excepted out of its operation, uses continued to be raised from parol bargains and sales. See _Gilbert on Uses and Trusts_ (88), (286) ; _Chibborne's Case in_ 6 _Eliz._ _Dyer_ 229 _a_ ; _Baynton's Case in_ 6 _and_ 7 _Eliz._ cited in _Popham_ 49 ; _Collard's case, Pop._ 49 ; 2 _Co._, _Inst._ 675 ; _Fonbl. Eq., Book II., Ch., II._, sec. 3 ; _Roberts on Frauds_, 93. There were only two ancient modes of conveyance in which a use could not be raised by parol. One of these was the covenant to stand seised, which was required to be by deed in order to raise the uses covenanted for ; and this because the consideration for this species of conveyance was only blood, or a consideration not deemed of sufficient force to raise a use without deed, as was money the consideration of a bargain and sale. This was the point so much discussed in _Collard's Case, Pop._ 49. The other instance in which a use could not be raised by parol was upon the grant of a rent, or upon a fine levied of a rent ; because, always, a rent could be created only by deed.

These are the two instances put in the passage cited from Gilbert, and none others can be found in the early cases, in which, prior to the Statute of Frauds, 29 _Car. II._, parol evidence, was held inadmissible to establish either a use on lands before the Statute of Uses or trust, since that Statute ;—trusts, since the Statute of Uses, having succeeded to all the incidents of uses before that Statute.

A further remark is necessary, with respect to bargains and sales, and the effect of their being required to be in writing, under 27 _Hen._, _VIII. C._, 16. It is not to be inferred that the effect of that Statute was to preclude parol trusts after the legal estate in lands came to be conveyed by bargain and sale.

·evidence, touching trusts of land, has ever been adopted
by statute, or at common law, in this State.   On the con-
trary, the continued omission, until this day, of that section
out of our Statute of Frauds, a statute which has been
in force as far back as 25 Geo. II., must be taken as a
legislative disapproval of the policy of that section ; and,
as might be expected, our Courts have never, in the face
of so clear an evidence of the will of the Legislature,
attempted to adopt such a rule, as a judicial one.   We
may, then, conclude that, in this State, there being no law
restricting the mode of creating or proving trusts of land,
they may be created and proved by parol.

This conclusion has been reached in other States
wherein the seventh section of the Statute of Frauds has
not been re-enacted, or had not been when the question
was raised.   It will be instructive to see how the subject
has been treated in these States.

---

The enrollment was required in consequence of the effect which, under the
same Statute, the bargain and sale was to receive as a new species of convey-
ance of the legal estate.  The Statute requiring enrollment, clearly, was intended
to guard against secret conveyances of the legal estate, and had no view to
creating any kind of evidence as to trusts which might be engrafted on the legal
estate;—and though logically, according to the old distinction, before stated
from Gilbert, when the bargain and sale as a species of conveyance was required
to be by deed, any trust of an estate passed under such deed should have been
by deed also, yet, it must be considered as certain, that parol trusts of lands held
under a deed of bargain and sale after the Statute of enrollments were sustained
as a parol bargain and sale to uses was before that Statute.  The question seems
never to have been raised and the Statute of Frauds passed so early as 29 *Car.
II.* disposed of the whole subject.  That Statute is itself demonstration that be-
fore its passage, trusts of lands were, to a large extent, raised by parol, and that this
must have been so with respect to lands passing by deeds of bargain and sale,
for that these deeds had long before the 29 *Car. II.*, taken the place of the old
common law assurances by feoffment and fine, and become the prevailing mode
of conveying real estate.

In Pennsylvania, prior to the adoption of the seventh section of our Statute of Frauds, in 1856, the decisions for a time fluctuated upon the question whether the old Statute of Frauds in that State, of 1772, did not, by some peculiar phraseology, prohibit parol trusts of lands ; but, finally, it was settled to the contrary by one of C. J. Gibson's masterly opinions in *Murphy vs. Hubert, 7 Pa., St.,* 420.   The Court, in that case, after finding no statutory prohibition in their way, proceed, without hesitation, to affirm the validity of a trust arising out of a verbal agreement by a grantee under a deed, absolute in form, to hold for the benefit of the grantor. .

In a case in Virginia, *Bank of the U. S. vs. Carrington et al., 7 Leigh,* 576, the question respected the admission of parol evidence to establish a trust resulting to one who had paid the purchase money, another being named as grantee in the deed.   The whole subject of parol trusts, express, as well as resulting, and the effect of the omission, in that State, of the seventh section of the English Statute of Frauds, was examined, the several judges who expressed opinions, all concurring in the validity of parol trusts, in the absence of the statutory prohibition.   Tucker, President, says : "Before that "Statute, declarations of trust might have been made by "parol, and as our Statute contains no provision on the "subject, it is possible that a verbal declaration of trust, "if clearly proved, might be sustained.   I imagine it has "not infrequently occurred in Virginia that husband and "wife have conveyed to a third person, with intent that "he should reconvey to the husband, but without any "written declaration of trust.   A case of this kind has "recently occurred and is under advisement.   Yet I have "never heard it questioned that it might be sustained, "though not in writing, and though it be not a resulting "trust.   So with respect to deeds, absolute on their face, "when the real transaction was a mortgage.   Whatever

" may be the doubts elsewhere, it has been, with us, long
" established, that the equity of redemption may be
" sustained by parol evidence, and that a deed, absolute
" on its face may, by such evidence, be turned into a
" mortgage."

In Ohio, the question arose in *Fleming vs. Donahoe,*
5 *Ohio,* 255. In that State there was no Statute against
parol trusts of lands before 1810. In 1808, lands of which
one Fleming held the equitable title, were conveyed
under his direction to his daughter Mary, by a deed, abso-
lute in form. The bill was filed by Fleming, heir-at-law,
against Mary's representatives, for a re-conveyance, upon
the ground that the conveyance to Mary was upon certain
trusts for the benefit of herself and her father, which had
expired upon the death of both. The answer denied the
trust, and testimony was taken. The Court say, touching
the absence of any Statute of Frauds, at the date of the
deed affecting the proof of trusts, "The Statute of
" Frauds in Ohio was passed in 1810. At that time there
" was no law in Ohio prohibiting parol contracts concern-
" ing lands, or the creation of trusts in them."

In North Carolina, where the English Statute has
never been re-enacted, the validity of parol trusts was
first questioned in *Foy vs. Foy,* 2 *Hayw.* 296, in 1801.
Thomas Foy, a brother of both the parties, held a tract
of land, together with the defendant, Foy, the legal title
being in the defendant Foy, but Thomas being equitably
entitled to one-half. Thomas dying intestate, as to this
land, the dispute concerned the succession to his equitable
moiety, the plaintiff, as one brother and heir-at-law,
claiming a share of the moiety, and the defendant, the
other brother, claiming to retain the whole of Thomas'
moiety under certain parol declarations to that effect made
by Thomas in his lifetime. The Court, upon objection
being taken that the moiety of Thomas "could not pass
" to defendant by Thomas' mere parol declarations," took
47

time to consider, and finally decided that the parol evidence was sufficient. They say, "the Statute of Frauds "in England enacts that no creation of a trust, or declara-"tion of one, shall be proved by parol evidence ; whence "it was to be inferred that before that act such parol "declaration was valid, and our law is the same as in "England before that Statute."

It should be here remarked, that in the long series of cases in North Carolina since *Foy vs. Foy*, in which parol trusts of lands conveyed by deed, absolute in form, have been so much considered, it will be found that the validity of such trusts has not been overruled, but the question has been, what species of evidence the Court should require to establish a parol trust against a deed, absolute in form, whether verbal admissions of the trust by the grantee are alone sufficient.

That is a question yet to be considered in this case.

In Tennessee, where the English Statute has not been re-enacted, it has been held to be well established that the Court of Chancery has jurisdiction " to enforce the spe-"cific excution of a trust, declared by parol, in relation to "real property, if plain and unambiguous in its terms and established by clear and satisfactory evidence." *Haywood vs. Ensley*, 8 *Hump.*, 466 ; 6, *Hump.* 99 ; 1 *Yerg.* 100.

We come now to the second question raised in the argument, touching the competency of complainant's evidence to establish the trust—viz : whether even if, in the absence of a prohibitory statute, parol trusts generally are admissible, one can be set up (as in this case is attempted) against the grantee in a deed, absolute upon its face, without an allegation and proof that a declaration of the trust was intended to be inserted in the deed, and was omitted through fraud or mistake.

The learned counsel for the defendant did not strongly press the argument so far as to exclude parol trusts alto-

gether, as against the grantee in an absolute deed, but they rested more on the ground, that, to charge the grantee, proof of his verbal declarations alone was insufficient. However, the scope of the argument and the authorities cited, drew into question the validity of any parol trust, however proved, if not in writing, when set up against an absolute deed, unimpeached for fraud or mistake.—The question must be considered ; for such an objection, if tenable, is decisive without going further.

The question, as it applies to this case, admits of two answers.

1. According to the allegations of the bill and the admissions of the answer, such were the relations of these parties, and the circumstances under which the deed was made, that to set up the form of the deed as conclusive against proof of the real transaction, would be a fraud on the part of Livingston. The case is this upon both bill and answer ; Hall, an illiterate, confiding young man, unable to read or write, with not the least knowledge of legal forms or instruments, wholly incompetent to manage his own affairs, becoming involved, and likely to lose his property, comes, somehow or other, it matters not to this point, how, under the advice and management of Livingston, who is his father-in-law, a man competent to deal with the business in hand, and to whom it is wholly confided by Hall. In all essential respects, Livingston assumed the relation or office of a guardian. The deeds are prepared by a scrivener whom he employs, under his exclusive direction, are taken to Hall's house, read over in the usual way, without explanation, either asked or given, and signed by him alone, his wife being then sick. It does not appear that the papers were left with Hall until his wife should be able to execute them ; the presumption is that they remained in the same custody, the scrivener's, and were kept by him until some three weeks after, when Hall and his wife went to Milford, and she

there executed the deeds. There is no proof of what transpired at Milford; and nothing is to be presumed. The whole is the ordinary case of the almost mechanical execution of papers which ignorant and confiding parties, unacquainted with legal forms, take for granted will effectuate the purpose intended.

Now, upon these undisputed facts, I take it to be clear upon principles of equity, so fundamental and settled as to need no reference to authorities, that Livingston, assuming the sole superintendence of the business for an ignorant and confiding son-in-law, was bound to see that the papers were such as would effectuate the intention of the parties, whatever that purpose might be. That, under such circumstances, to set up the absolute form of the deeds against evidence of his real transaction, would be contrary to good faith, and afford extreme facility for fraud, and, upon these two considerations, cannot be permitted in a court of equity. It matters not however innocently an omission in the deeds, supposing there was one, may have occurred in the first instance. Nor can it be that Livingston's duty in the premises was at all discharged by a mere formal reading of the papers in Hall's presence, as the usual preliminary to their execution; for it is not a natural or fair presumption that Hall would, from such a reading, comprehend the technical operation of the papers, but, rather, that he would unreflectingly accept them as answering the purpose, distrustful of his own ignorance, and confiding in his father-in-law. Touching his knowledge of such a transaction, so managed, nothing should be presumed.

Upon this ground, therefore, I must hold parol evidence admissible to shew the real object of these deeds. But,

2. In the second place a *patient investigation* of the whole subject leads to the conclusion that independently

of the special ground before referred to, a parol trust may, in the absence of any prohibitory statute, be set up, even against the grantee, under a deed, absolute on its face, and without any allegation in the bill that the trust was intended to be declared in the deed, and was omitted through fraud or mistake.

It is certainly true, that a deed cannot be contradicted, nor can its legal operation be varied by extrinsic evidence, no more by written than by parol—by nothing short of an instrument of like solemnity, *i. e.*, an instrument under seal.    This is a rule as binding in equity as at law ; for, though a court of equity may reform the writing, when, through fraud or mistake, its terms are not what they were intended to be, yet, so long as the instrument stands as the deed of the parties, it can no more be contradicted, or its legal operation impaired, in the one Court, than in the other.

But this falls short of this case.    The effort of the complainant is not to contradict or to impair the legal operation of the deed to Livingston, but rather to charge Livingston, as the legal owner under the deed, with a trust arising out of an agreement *dehors* the deed, touching its object and the uses of the estate conveyed.

There is a well recognized distinction between contradicting a deed or impairing its legal operation, and raising out of the transaction an equity *dehors* the deed, binding the grantee's conscience to hold the land for the real purposes of the conveyance, and not according to its legal operation, when the latter use of it would, under the circumstances, work fraud.    Such an equity is held to be independent of the deed, and not excluded by it as a mere conveyance of the legal estate, unless there be in it some terms or implication to that effect.    To support such an equity, parol evidence is admissible, not as contradicting the deed, but as explanatory of the transactions out of

which the equity arises.   In such case no allegation is,
necessary that a   declaration of  the equity or trust  was,
through fraud or mistake, omitted in the deed, because, as
the equity or trust arises out of the extrinsic circumstances,
and is not at all  dependent upon the face of  the deed, it
needs not, in order  to effectuate it, that  the deed be  re-
formed, or, which is the same thing, treated as if reformed.
It is when the trust  sought to be enforced is one  to be
raised upon the face of  the deed, and not out of  extrinsic
facts or agreement, that an allegation of fraud or mistake is
required.   .

Now, while it is certain that to charge the grantee,
under an ordinary deed, with a trust, upon extrinsic evi-
dence, especially upon parol evidence, is a jurisdiction to be
exercised with caution, and only under cogent proof, such
as the conscience of the Court cannot resist; still the
jurisdiction is unquestionable.   So far has the distinction
been carried, between contradicting a deed and enforcing
against the grantee equities springing out of the transac-
tion, that, as is now generally held, a deed absolute on
its face may, in a court of equity, upon parol evidence of
the real transaction, be enforced as a mortgage or security
for money, if the circumstances make sufficient equity to
have it so  treated, and that, too, although it may not
appear that a defeasance, intended  to be  inserted, was
omitted through fraud or mistake.  1 *Powell on Mortg.*, 151
*a* ;  1 *Hilliard on Mortg.*, 42 &c. ; *Hughes vs. · Edwards*,
9  *Wheat.*, 494; *Morris vs. Nixon's Ex'rs*, 1 *How.*, 121 ;
*Strong vs. Stewart*, 4 *Johns. Ch. R.*, 167 ; *Slee vs. Man-
hattan Co.*, 1  *Paige*, 48, *and 77 note* ; *Clark vs. Henry*, 2
*Cow.*, 324 ; *Van Buren vs. Olmstead*, 5 *Paige*, 9.

Whether in this State, an absolute deed may, upon parol
evidence and without any allegation of fraud or mistake in
the omission of a defeasance, be converted into a mortgage,
is a question not yet decided.  I forbear to express any opin-
ion upon it.   But there can be no doubt that the grantee of

the legal estate may be charged with trust *dehors* the deed, *i. e.*, one not declared in it, but springing from some agreement or arrangement contemporaneous with it, and of which the conveyance may, itself, be the consideration, and that, in the absence of any prohibitory Statute, such as the seventh section of the English Statute of Frauds and Perjuries, the agreement, or the circumstances which give birth to the trust, may be shewn by parol evidence if deed of bargain and sale is conclusive, so far as to pass the legal estate, no more ; that the beneficial interest attends the legal estate is always presumed and, *prima facie*, the legal estate passes clear of any trust ; but of this the deed is not conclusive. Of course I am understood to speak here of our ordinary deed of bargain and sale, which passes the legal estate without either declaring or excluding a trust. The usual clause in the deed, declaring the estate to be "to and for the only proper use and behoof" of the grantee, does not exclude proof of a trust. This phrase is added simply to raise a use which the statute can execute, and so pass the legal estate, but upon the legal estate thus created, a trust *dehors* the deed may be engrafted. This distinction between contradicting a deed and raising a trust upon it by extrinsic evidence, remains as one of the consequences of the complete separability of the beneficial, from the legal, ownership, although the difference between the legal estate and the use has become more technical than substantial. The distinction so pervades our law touching the conveyance of lands, and the creation of trusts, that only by legislation can it be controlled. Even the English Statute of Frauds did not abolish it. That Statute did not render a deed conclusive, as well of the beneficial interest as of the legal estate ; it permitted a trust to be raised *dehors* the deed. It only required that the evidence to prove such a trust should be written, and not parol, as before it might be, and this written evidence, required under the Statute, was far short of such as would be necessary, at common law,

to vary the legal operation of a deed ; any writing suffi-
ciently manifesting the real intention of the parties,
memoranda or letters of the party to be charged, were
held sufficient. *Lewin on Trusts*, (97 *Law Lib.*,) 63.

Thus the Statute itself in allowing a trust, *dehors* the
deed, to be raised by extrinsic evidence, provided it be
in writing, plainly demonstrates that both before and
under the Statute to charge a grantee with such a trust,
does not contradict the deed ; and, plainly, if the raising of
a trust under the Statute by means of any extrinsic, written
evidence, does not contradict the deed, no more can the
raising of such a trust by parol evidence, where the Statute
is not in force, be held to contradict the deed. And, accord-
ingly, in all those States where the Statute had not been
re-enacted (except perhaps Connecticut,) the grantee
under a deed has been held chargeable with a trust upon
extrinsic evidence, whether written or parol, and without
any restriction as to the kind of evidence admitted, ex-
cept that, in North Carolina, a trust when raised by parol,
must be by proof of facts and circumstances, excluding
mere verbal declarations of the party to be charged. In
one of these States, Ohio, there is a decision very direct
to the point and well considered. *Fleming vs. Donahoe*, 5
*Ohio*, 255, before cited. The facts of that case have been
already stated. It was a bill like the present one, for the
re-conveyance of lands which had been passed by a deed
absolute in form, upon the ground that the conveyance
had been, in fact, made upon certain trusts, to prove which
trusts, parol testimony was offered. The Statute of Frauds
had not then been enacted in Ohio. The Court say, " can
" a trust in lands be created by parol, and proven by
" parol under a conveyance *prima facie*, absolute ? It is
" conceded as a general principle that a deed or written
" contract cannot be varied by parol. But is this a case of
" that kind ? The object of the conveyance is not intended
" to be expressed in the deed. The grant and considera-

"tion only is set forth. No rule of the common law "prohibited the creation of a trust by parol," * * * "such a trust was not considered as varying the terms of "the deed, but as setting up an independent contract," " or, it might, be added an independent equity, "consistent "with it."

And so in Pennsylvania, in *Murphy vs. Hubert, 7 Pa. St.,* 420, before cited, the Court, by C. J. Gibson, having first decided that parol trusts were not then prohibited by Statute in that State, held that oral declarations of the grantee in an absolute deed, touching its purposes, were held admissible evidence to charge her with a trust. In Virginia, as we have seen in the extract from President Tucker's opinion in the case from *7 Leigh,* 576, it was treated as settled law that, inasmuch as the Statute of Frauds was not in force there, a trust for a re-conveyance by the grantee in an absolute deed might be shewn by parol, or an absolute deed might be shewn to have been given as a mortgage.

The only authorities, not agreeing with this course of decisions, are the cases cited from North Carolina and an early case in Connecticut. The North Carolina cases are, *Kelly vs. Bryan,* 6 *Iredell's Equity,* 283 ; *Sowell vs. Barrett, Busbee's Equity* 50 ; and three cases reported consecutively in 1 *Jones' Equity,* 184, 193, 195. The rule as announced by Pearson J., delivering the opinion of the Court in *Kelley vs. Bryan* and *Sowell vs. Barrett,* and by Battle J., in the cases from 1 *Jones,* treats parol evidence of any kind, whether consisting of declarations or of acts and transactions of the parties, as being contradictory to the deed, and therefore inadmissible to convert the grantee into a trustee or mortgagee, unless the bill alleged that the declaration of trust, or clause of redemption was omitted from the deed " through ignorance, fraud, mistake or undue advantage." *Busbee's Eq.,* 194-5.

48

On this point the cases cited from North Carolina are against the current of authority in that State. It is remarkable that in the very case, which in the two opinions of Pearson J., (7 *Iredell's Eq.*, 287 ; *Busbee's Equity*, 54,) is relied on as the leading case in North Carolina on this whole subject, and such it certainly is, *Streator vs. Jones*, 3 *Hawks*, 423, after great consideration, relief was given against the grantee in an absolute deed, by holding him to be a mortgagee, upon parol testimony of the transactions against the denial of the answer,—and this, not only without allegation or proof that a defeasance intended to be inserted, was omitted through fraud or mistake, but, although it was stated in the bill, and was proved that the grantor, after first insisting upon a written defeasance, waived it, and signed the deed in its absolute form, trusting to the word of the grantee. This was in 1824. Long before this, as early as 1806, in *Gay vs. Hunt*, 1 *Murphy*, 111, parol evidence was admitted to establish a trust against the devisees of one Breilly, the grantee under a deed which was absolute in form, but was, in fact, made upon trust for the benefit of the grantor's son. No fraud or mistake in the form of a deed was alleged. It was a case of pure confidence. The answer denied the alleged trust, and set up a purchaser. Upon evidence taken to prove the trust, the precise question was made and sent up to the Supreme Court of North Carolina, whether, as the deed was absolute and the trust denied by the answer, parol evidence of it could be admitted. The Court say, " whether parol evidence will be admitted to set up a " trust, where a deed is absolute, depends much upon the " particular circumstances of each case in which it is " attempted. " In the present case, the Court are of " opinion that the parol evidence should be admitted, as " grantee did not take possession of the premises con-" veyed to him, nor call upon those in possession for an " account of the rents and profits, and this being contrary " to the ordinary effect of a sale, gives an impression of a

"trust of some kind between the parties, and admits the "introduction of evidence to explain the trust." I *Wash. Rep.*, 14.

So, in the later North Carolina cases, the grantee under an absolute deed has been held upon parol evidence to be either a trustee or mortgagee, although no fraud or mistake in the form of the deed was alleged. Such were *Howlett vs. Thompson*, I *Iredell's Equity*, 369 ; *Kemp vs. Earp*, 7 *Iredell's Equity*, 167. The rule to be gathered from current of North Carolina decisions on this subject is, that the form of the instrument is not conclusive with respect to the uses or objects for which the land is to be held— that, although, made absolute on its face, with knowledge of the parties, without fraud or mistake, still the grantee may be held to be a trustee or mortgagee upon parol evidence ; with this qualification, however, that the evidence must not be mere declarations of the parties, but it must shew facts and circumstances inconsistent with the idea of a purchase. I cannot but think, with much deference to the two learned Judges who delivered the opinion, in *Kelly vs. Bryan*, and the cases immediately following that case, that, in their expression of the rule, this point now before us was not distinctly considered. For although in all those cases there was no allegation in the bills filed of any fraud or mistake, still the Court entered fully into consideration of the parol evidence adduced, and rested their decisions upon the insufficiency of the evidence, and not upon the absence of fraud or mistake in the form of the deed, which, under the rule as stated, should have prevented any further investigation.

Besides the opinions delivered by Judges Pearson and Battle before cited, only one other instance is found in which parol evidence of a trust has been held to be contradictory to an absolute deed, and relief denied because fraud or mistake in form of the deed was not alleged. That is an early case in Connecticut, *Dean vs. Dean*, 6 *Conn.*

285, decided in 1826. The complainant, a weak minded person under advice had, by an absolute deed, conveyed to his sister, under an agreement to hold for his use, and to execute a declaration to that effect, but through neglect no declaration was executed. The sister died, and the bill was filed against her representatives for a re-conveyance. Parol testimony of the agreement was offered and rejected. Daggett J. says, " There is no allegation of " fraud, accident or mistake. "

"* * * The object of the bill is to effectuate this " parol agreement or, in other words, to convert an estate " absolute in the grantee, into a mere legal right, and to " obtain a decree that the whole beneficial itnerest shall be " vested in the grantor against his clear deed for a valuable " consideration, acknowledged to have been received, con- " veying the entire estate to the grantee. To do this " would be to contradict the rules of the common law in " relation to deeds or other instruments in writing, and, " also, the Statute of Frauds and Perjuries."

This decision holds a deed unimpeached for fraud to be absolutely conclusive, as well of the equitable as of the legal estate, and excludes any trust not declared in the deed itself. It even treats, as of no effect, the agreement between the parties, that a declaration of the trust should be executed and the *laches* of the grantee under the deed in not executing it ; which was clearly relievable upon the ground of fraud. That must be a narrow system of equity jurisprudence which this case represents.

The conclusion upon this point is, that, in our State, a court of equity may establish a parol trust of lands against a grantee under an ordinary deed of bargain and sale, the terms of which neither declare nor exclude a trust ; and this, although no fraud or mistake in the frame or phraseology of the deed be alleged.

Opinion :—whether admissions alone are sufficient evidence.

This brings us to a third question much discussed in the argument, viz : whether, even if a parol trust may be established against an absolute deed, verbal admissions by the parties charged are alone sufficient evidence of the trust, or whether there should not be required, as is the rule in North Carolina, proof of facts and circumstances *dehors* the deed, such as, "to the apprehension of men " versed in business and judicial minds, are incompatible " with the idea of a purchase, and leave no fair doubt that " a security " (or trust,) " only was intended." C. J. Ruffin, in *Blackwell vs. Overly, Iredell's Equity*, 44. It will be observed, the effect of the North Carolina rule goes quite beyond subjecting the evidence of admissions to a cautious reception ; it renders admissions, under all circumstances, incompetent alone to support a decree. In no other of the states, in which the seventh section of the English Statute of Frauds is not in force, has this rule yet been adopted.

No such rule seems to be of force in this State,—none prescribed by statute,—none as a part of the general law of evidence,—none as yet adopted by our Courts as specially applicable to this subject. I am not able, after much reflection, to adopt it. Admissions of a party, though a species of evidence are certainly liable to fraud and mistake, —evidence which should be reviewed cautiously and tested by its consistency with collateral facts, may, nevertheless, under some circumstances, become proof conclusive upon the conscience of the Court ;—as where the admissions are proved by a number of independent and unimpeached witnesses, are made in clear and unequivocal terms, and have respect to specific transactions of the party himself about which he could not be mistaken, and as to which he speaks against his interest. Admissions, so proved, will rarely, if ever, be found to be out of harmony with the real transactions between the parties relative to the subject-matter, although there may be, in some particulars,

a seeming incongruity of conduct. Where, however, this appears, there will generally be found some explanation in the relations and circumstances of the parties, if all these can be got at. Now, it must be obvious to reflection that, as in all these cases, the truth of the case is to be deduced from a consideration of all the circumstances, including declarations, acts and transactions of the parties, and all these almost infinitely varying in each case, any attempt to measure by artificial rules the relative force of these different species of evidence, rather hinders than helps to a safe conclusion. The comparative weight of the admissions of parties, and of their acts, can best be determined by a sound judicial discretion, applied to the peculiar circumstances of each case.

The North Carolina rule rests upon the assumed danger of admitting parol declarations, alone, to engraft trusts of land upon deeds absolute in form. But such danger is more apparent than real. In no case can the title of the grantee, under a deed absolute, be drawn into question collaterally. A trust can be asserted against him only by a bill in equity for the specific purpose ; all who can be in any way interested are made parties. Each step is taken deliberately and with notice ; ample opportunity is afforded to guard against surprise or perjury ; the Court has power to protect innocent third parties who may have acted upon the faith of the deed as it stood, and throughout the whole proceedings the grantee has the protection of the strong presumption in his favor arising from the face of the instrument. Much more serious, on the other hand, would be the danger of giving facility to fraud by artificial rules, restricting the means of inquiry into the real transaction which a deed is intended to effectuate. For, generally, deeds are, and the present is a signal instance of it, executed without attention to, or ability to understand, their technical phraseology and precise legal operation ; while, at the same time, the

original transaction and its purposes are, for the most part, without written evidence, resting upon parol testimony, and not unfrequently between the parties alone ; so that to hold such testimony insufficient, would practically leave remediless the majority of cases in which, through fraud or mistake, a deed made for one purpose is sought to be perverted to another. The safer rule, for the general ends of justice, will be found to be to commit the question to the untrammeled conscience of the Court, upon such testimony as is admissible under the ordinary rules of evidence and appropriate to the transaction, at the same time, giving to the grantee the benefit of a strong presumption in his favor, arising from the absolute form of the deed, and requiring, in order to overcome it, such proof as, to a judicial mind, leaves no doubt of the existence and exact terms of the trust alleged.

Taking with us this test, we now approach the evidence in the cause, the weight of which covers the second general head of the discussion.

Having first examined and analyzed the evidence on both sides with the utmost thoroughness, considered each circumstance in detail, and then carried it, as a whole, upon my mind for several months, viewing it in every conceivable aspect, and testing, by time, the impressions made, I find it impossible to resist the conviction, and it is one free from doubt, that these conveyances were made in trust, that Livingston should, out of the rents and the proceeds of wood and timber to be cut and sold, pay Hall's debts, and then re-convey. The existence of this trust is proved by Livingston's admissions, frequent, unequivocal, and perfectly well established by proof. With respect to the acts and transactions of these parties, attending and following the conveyance, although some of them are, on their face, inconsistent with the idea of a trust, they do not overcome the force of admissions. And, first, as to the admissions, they are proved by the positive

testimony of eight witnesses, viz : Wm. Atkinson, Draper Hall, Rachel Hall, Andrew J.Maloney,Margaret Hall, Isaac Johnson, James Bradley and Joseph Parsons.—These wit-nesses are all unimpeached : five of them free from any supposed bias of relationship to complainant. They testify to admissions, distinct and independent, yet all consistent with each other, made at different times, extending through a period of six years, from 1859, to 1865.   They are en-tirely positive, all as to the purport, and some as to the language used by Livingston, and there were circum-stances naturally leading to the conversations, and impressing them upon the recollection of the witnesses. The declarations thus proved are unequivocal, bearing no other rational construction than that the lands were held in trust.   The subject-matter to which they relate was a transaction of a specific nature, to which Livingston was a party, and about which he could not have been mistaken.   They were seriously made.   No motive or object on the part of Livingston to give to this trans-action any false impression or color has been assigned, or is disclosed by the circumstances.  He appears throughout all these transactions a serious minded man, cautious and shrewd, not given to trifle, or to needlessly compromise his own interest, which was the manifest effect of such admissions.   Now, it must be evident, that, if such a body of admissions, so proved, may not support a decree, no amount of this kind of evidence, unaided by other proof, can be sufficient.   By discarding the evidence before us, the Court would practically reject, altogether, this species of proof, and enact, judicially, a rule of exclusion, although the Legislature, in adopting the other provisions of the English Statute of Frauds, and omitting the seventh section, manifestly intended there should be no restrictive rule, but that trusts should be established by any species or mode of proof sufficient to satisfy the conscience of the Court.

The incipient steps to this transaction are disclosed

in a transaction with Livingston and Parsons in 1864. From that conversatinn it appears that Hall, at first hoped to save two of his farms by selling one to pay his debts ; but that, on consulting Livingston to this point, and upon examination of the records at Dover, the liens were found to be more than one farm could pay ; then, according to the statement of Livingston, himself, there was made by him the proposal upon which it was that these parties finally acted. "He then told Hall," so he says to Parsons, that if he (Hall) would deed him all the land, he would pay all the debts, or assist Hall in paying them. That by this proposal the lands were to be cleared of debts, for Hall's benefit is not here expressed in terms ; but what could be more clearly implied? The saving of his lands, of two farms, at least, was the object for which Hall was seeking advice ; it was as a substitution for his own, ineffectual, plan for saving something, that Livingston proposed the deed to himself. Then, that the conveyance was to be temporary and provisional, merely, is demonstrated by the inducement, Livingston says, he held out to Hall, that after "he, (Liv-"ingston,) had a deed, no one else could enter judgment "against the lands,"—a reason which no ordinary purchaser, entitled to it by right of purchase, was likely to suggest, but a very sensible inducement to one about to convey land upon a secret trust for his own benefit. And so clear to the mind of Parsons was this, the object of Livingston's proposal, as Livingston then stated it, that Parsons instinctively inquired if Livingston " did not mean to deed "the land back to John Andrew Hall. Observe the sense " of the question ; not whether he would give, but whether "he would restore ; whether he would "deed the land back to Hall ;" and that Parsons, in this, rightly understood the sense of Livingston's proposal to Hall, the answer of Livingston conclusively shews ; for he does not as an absolute purchaser would have done, repel the suggestion as one unwarranted by what he had before said, but he

49

simply evades the question by saying that, "if he did, Hall would spend it." This would not have been the answer of an ordinary purchaser, neither, under the circumstances of these parties, can it be received as the answer of one meditating a gift of the lands to Hall, so far as to the obvious sense of the original proposal for the conveyance to Livingston, as he himself has related it. Proceeding further in this testimony, there needs to be no stress laid upon the testimony of Draper Hall, the complainant's father, although corroborated as it is by the statement of Livingston to Parsons ; there seems to be no reason to discredit it further than to suppose that Draper Hall's idea of a deed for seven years, he got from what he has since heard, and that it was not a deed for seven years, but simply a deed which he overheard Livingston propose to Hall. The deeds were made, bearing date, January 28th, 1859, but from the testimony, the execution, although begun by Hall on that date, was not perfected by the signature and acknowledgment of his wife until several weeks afterwards. Now it would be a fair presumption, were there no other evidence, that the conveyance was made pursuant to Livingston's proposal, as we have it in the testimony, and for its obvious object, viz ; to save the lands to Hall. But, waiving all presumptions, how abundant and conclusive is the testimony to that effect. And first is the conversation by Livingston with Sheriff Atkinson, which took place at the sale of Hall's goods, on the 28th of February, 1859, a month after the date of the deeds. Now, with respect to this conversation, there was a point much discussed which really does not seem material, viz : what Livingston meant by his inquiry of Atkinson on being informed that after the sale of Hall's goods, the next step was an inquisition which might result in condemnation and an elegit. I refer to Livingston's inquiry, whether he, Livingston, could not take the lands and pay the debts. Atkinson understood the sense of his question to be, whether he

could, after satisfying the conditions, hold the debts against the land so as to satisfy himself out of them. The defendant's counsel understood the inquiry to have been, whether he could not hold the creditors off for seven years if, within that time, he should be able to pay the debts. Now, upon either theory, thus much his inquiry certainly had in view, viz : to arrest further process, to pay the debts,—to save the land to some body; but whether he contemplated holding the creditors off for seven years until he could satisfy them out of the lands, or paying them speedily with his own means and reimburse himself out of the lands, is not certain, and is not of the least consequence. The material question is, for whose benefit were the lands to be cleared of debt, whether in the one mode or the other? was it to be for his own benefit, or for Hall's? On this point, at least, his language to Atkinson was unequivocal and conclusive. He says, that "he should have to take John's business in hand," it was then a wholly disinterested work he was proposing to himself, and as a reason for this, natural and creditable to himself, he adds, " John," he says, "had married his daughter ; he felt, therefore, an interest in him ;" ".John was not fit to take care of his own affairs." The witness further on his examination under the defendant's commission, stating the same conversation, adds some expressions, by Livingston, more explicit, yet hardly more conclusive in their effect. Livingston said "he "would have to take hold of John and straighten him up, "and try to save the land for him.'' This testimony is of great weight, because the conversation was an extended one, not casual, but deliberate, the statements by Livingston wholly unequivocal, made in Hall's presence while the transaction was fresh, the conveyance being then either *in fieri* or just completed ; and the conversation is narrated by a witness whose substantial accuracy cannot be questioned. So far, then, we have, from Livingston himself, the original proposal for this conveyance, that it

was to be made in order to clear the lands for Hall ; and then his express declaration, to the same effect, after the deeds were executed or part executed.   Next follows a series of like admissions made while he had the lands in charge.   First, early after the deed was made, in the declaration to Rachel Hall, the wife of John's half brother, who, hearing that John had been sold by the Sheriff, about ten years ago, as she says, and anxious to know how he was getting on, asked Livingston how John was "making along ; to which Livingston replied, " pretty fair now ; he (Livingston) had taken this plan " to rent ; he thought with the rents of the places, and "what timber he could slamber, he could pay Andrew's "debts, and Andrew would still have the land."   To her suggestion, that he should buy one or two of the places, Livingston replied, "he hadn't the means."   Livingston's declaration to Maloney, about the same time, in the first or second year after he took Hall's lands, is not so explicit, but the meaning is too obvious to be doubted.   To Maloney's inquiry whether "he thought he could clear "the land in seven years," Livingston replied, "if he "thought he couldn't, he wouldn't have taken it."   The language is very significant of the purpose of the trust, that it was not as an ordinary purchase, but to save the lands.   Observe also, that it was, as the witness states, "about John Andrew Hall's affairs," that they "fell to " talking, not about the ability of Livingston to disen- " cumber lands bought by him ; and manifestly it was with " reference to Hall's affairs and interests, that Livingston " was asked if he could clear the land in seven years."

Following these conversations with Rachel Hall and Maloney, was the conversation with Margaret Hall, John's step-mother, three or four years after Livingston had held the farms.   Taking an occasion to quiet some dissatisfaction on her part, at his holding the farms, Livingston says to her, assuringly, "Mother Hall, you have been very "much vexed with me about these matters,—1 just took it

"to be a friend of John Andrew's," and then to shew precisely how John was to be thus befriended by him, he adds, "when the seven years roll around, it will be John "Andrew's, and all will be free." ˙Again, he said, "you "have been vexed with me, because you thought I wanted "to keep this property. At the end of seven years, it will "all be John Andrew's again." The same assurance was given her in a conversation, later in the summer, before· Livingston moved to Milford, *i. e.*, the summer of 1865.

In 1864, from some cause, it matters not what, Livingston's connection with these farms became a topic of some special interest in the neighborhood. Three conversations on the subject within that year appear in evidence ; those with Johnson, Bradley and Parsons,— Johnson being the tenant of the Marsh farm, while talking with Livingston, as he says, one Sunday about the farm, asked him, "how long he had this land in hand," a question evidently suggested by some general neighborhood understanding than Livingston held these lands in trust. The reply was, "seven years and then the land went back to John Andrew Hall," not as we must understand Livingston that his estate was so limited by the deeds, but according to the purport of the conversations with Maloney and Mrs. Hall, in seven years the lands, it was supposed could be cleared of debts, and the trust being then fulfilled, they would beeome John's again. Another witness, Bradley, proposed to rent the farm if Livingston would build a new house ; which Livingston declined on the ground of his inability ; adding also, "that at the end of seven years he expected "it (the farm) to go back to John Andrew Hall, and he "ˌwasn't going to build for another man. The meaning of "this reply is too obvious to admit of the construction "attempted in argument, to be based upon the word "expected," viz ; that he, the absolute owner might voluntarily restore the lands to John, should he behave himself well. Livingston's declarations to Parsons in the

same year have already been examined. We have seen that though less explicit in terms; as to the object of the conveyance, they imply a trust almost as conclusively as words could declare it.

But to overcome the force of these admissions, it was insisted that certain transactions to which Hall was a party, were wholly incompatible with the alleged trust, and demonstrated that the conveyance was made to Livingston as a purchaser, such as the lease of one of the farms to Hall as a tenant in 1865; the written acknowledgement of sundry payments by Livingston, on account of the farms as property bought by Livingston—and the final acknowledgment of payments in full for the purchase. But these transactions, I feel obliged to say, find, in circumstances disclosed by the proof, an explanation not inconsistent with Livingston's admissions. That explanation is that Hall took part in them ignorant of their real nature, and confiding in Livingston that they were only carrying out the trust. Hall was not a *non compos;* not even a fool in the usual sense. He could buy and bargain and sell in the ordinary course of his business as a farmer. The defendant's evidence proves this degree of capacity, no more. But his weakness was an easy going temper, disposed to take for granted what should be scrutinized, a confidence overweening, where given at all, and these traits, together with his extreme ignorance and unfamiliarity with legal forms, made him easy to be imposed upon in such business. The proof of these characteristics is abundant.

Passing by the testimony of his relatives, Margaret Hall, William Hall, Rachel Hall and Draper Hall—other witnesses not connected with him, and disinterested, apply to him these terms, "he is yielding and obliging,"— "he is very ignorant,"—"he is very confiding,"—"those whom he considers his friends, can do anything with him." So say Johnson, Jester, Cullen, Polk, Parsons,

Maloney and Bradley. Jester adds, that "he is not fit to act for himself drunk or sober ;" that "he has no capacity "to keep his mind on business, or to understand anything beyond a plain receipt, or something of that kind." Cullen says, that he had no mind for business "at any time, drunk or sober," would "submit to anything," "always needed a guardian." Parsons says, that he does not know "when he is getting value received." Bradley, that he "thinks every body his friend." Moreover, these characteristics are manifested by Hall, in all the transactions proved before the Court. They appear in his conduct respecting the deed, whatever may be assumed as the object of them, even upon the defendant's theory as conveyances to a purchaser.

The consideration, as the defendant Livingston, alleges, was $2400 ; no part of this to be paid upon the execution of the deeds, but $1,800 to be either applied—the liens— the residue, to wit ; $600 was to be either applied in discharge of debts which were not liens as might be approved by Hall, or paid to Hall himself, as he should thereafter direct ; so says Livingston in his answer. Yet, for the due application of this consideration, amounting to $2400, being Hall's whole worldly estate, no security was required, no bond, no written engagement or evidence of Livingston's obligation, not even parol evidence of it. The same overweening confidence and inattention marks the other transaction of Hall, relied on by the defense—the lease, and the two receipts. The parties go together before some one capable of drawing a legal instrument. Every thing is done upon Livingston's suggestion,—the nature of the paper drawn, and to some extent, the language, is at his dictation. Hall's whole share in the transaction is, simply, assent ; his action is wholly formal and passive. He makes no suggestion, he asks no questions ; does or says nothing to indicate that he really understood the nature and legal operation of the papers signed. His utter inattention to self protec-

tion in the matter of legal instruments is, perhaps, most strikingly manifest in the circumstance that there was, but one lease drawn, of which Livingston took possession. So the witness thinks, and the lease now comes from Livingston's possession. That Hall understood the precise effect of the two receipts is left the more uncertain because, upon the theory of either party, that of a trust to apply rents, and proceeds of wood and timber towards Hall's debts, or that of a purchase, for consideration money to be applied in like manner, there was occasion for some written acknowledgment, by Hall from time to time, of the sums so applied by Livingston, and the effect of such an acknowledgment as evidence, either that the lands were held in trust or by purchase, would depend upon slight variations of phraseology such as, even upon the reading of the paper, might well fail to arrest, and, indeed, was little likely to arrest, the attention of a person both so illiterate and confiding. This observation does not indeed apply to the lease. Hall must be supposed to have understood the nature of that upon the bare reading of it. But the making of this lease (at the time when it was made) does not help the defendants ;—to have force as evidence of an absolute purchase, against the proved admissions of Livingston, that the conveyance was upon trust, a lease should have been a natural, spontaneous and immediate recognition of a real charge of title then made under the deeds, and of a then created relationship of landlord and tenant ; as to the farm occupied by Hall, it should have been an act springing out of and in that way illustrating the nature of the original transaction : it should have been cotemporaneous with, or, at least, not long after, the execution of the deeds : yet this lease was made nearly seven years afterwards ; and, meanwhile, Hall remained on the farm, not only paying no rent, but without any proved demand of it by Livingston or recognition of his title required by Livingston, though shewn by all his transactions to be shrewd and watchful of his

interests. The lease would have given some support to the theory of purpose then formed, to abandon a trust originally created, and thus to leave the conveyances absolute in fact as well as form, but this is not the case made by defendant's answer and therefore cannot be admitted.

The effect of the evidence as to this lease then, is about this: As an illustration of the original transaction and proof of a purchase from the beginning, its force is so far weakened by the long interval after which it was taken, that it does not overcome the proof or the effect of Livingston's admissions to the contrary. Then, again, what would have been a natural solution of the taking of a lease at a date long after the conveyance, viz: that the trust was abandoned is precluded by the answer. Now, what was the true explanation of this transaction, it is not material to inquire. I express no opinion about it and have sought to form none.

Some evidence was adduced by the defendants, of declarations made by Hall, inconsistent with the existence of the alleged trust. It consists of the testimony of White and Augustus Stutzer. White's testimony has been successfully impeached, and, under the rule of evidence, cannot be considered. As to young Stutzer, I do not question his veracity or even his accuracy. For supposing it to be true that Hall, understanding that the defendant, Stutzer, was in treaty with Livingston for some of this property, said that "he would make a good thing to buy it; that he (Hall) had owned (or had tilled) it and knew it was good land," still the force of such a declaration, by a party so ignorant and inconsiderate, weighs little, as against the oft-repeated and unequivocal counter declarations of Livingston. It must be set down as one of not a few incongruities presented between the conduct of each of these parties, and the theory of his case. On the whole, my conclusion is, that the transactions between these parties, are not, on their face, such

as might be expected from men of ordinary business capacity and experience in the case of a trust ; neither are they, in some respects, such as would usually attend a purchase, such as the total omission of any security, or acknowledgment for purchase money, and Hall's possession of one farm for six years, without any proved recognition, on either side, of a tenancy. Upon either theory of the transaction, Hall's conduct can be accounted for only by such a degree of ignorance and weakness, as leaves his transactions in business, involving any technical knowledge, without significance, and of not sufficient force to overcome the directness and conclusiveness of Livingston's repeated declarations respecting the trust. I feel obliged, therefore, to accept the declarations as evidence of the real transaction between these parties.

We now reach the special defense set up for Stutzer, which is that, holding the legal title by purchase from Livingston, for a valuable consideration paid, he cannot be affected by a prior equity without notice, and that he had no notice of the trusts, supposing there were any. That he purchased for a valuable consideration is not in dispute : but he is sought to be affected with notice, in having neglected to act upon the cautions received from William Hall and Jester, which it is insisted should have put him upon inquiry of John Andrew Hall himself.

Let us turn to the evidence upon this point. And first, as to the caution given by William Hall. Early in March, 1866, about three weeks before Stutzer's purchase, he called, in company with Joseph S. Lofland, upon William Hall, at Hall's residence. The object of this call was to ascertain if William Hall had any claim against the property, and particularly whether William Hall had any claim of title under the will of Winlock Hall, the grandfather of John Andrew Hall, under whom John Andrew took his title. Of the two witnesses examined to this interview, only William Hall undertakes to detail

the language of the conversation between himself and Stutzer. He states it thus ; Stutzer, "after a few words "of common talk, said ; 'have you anything against John "Andrew Hall?'" Witness replied, "Do not know whether "I have or not, do not know what you mean." Stutzer "replied, "Have you anything against his land?" Witness "replied that he had some judgments transferred to him "which were entered against the land. Stutzer said, "I "have bargained for one of the farms." Witness asked, "Who of?" Stutzer replied, "of Thomas M. Livingston." "Witness rejoined, "He has no more right to it than I "have ; he has never paid any more for it than I have, "and I have never paid anything." Stutzer said ; "he has "got a deed." Witness said, "If he has, it is all sham. "What are you to give?" Stutzer said, "Twenty-five "hundred dollars." Witness replied, "You have paid the "worth of it, now the timber is off." Stutzer said, "I do "not expect to keep it, but to put some improvements "on it, and sell it." He told Stutzer, the witness pro- ceeds to say—and here is the material point in the conversation—he told Stutzer "*that he understood that* "*Livingston had taken the land for seven years, to pay off* "*John Andrew's debts.*" Hall then adds to his testimony, some circumstances seemingly out of their natural order. He says, "I told Stutzer, if John Andrew Hall died with- "out lawful heirs," he, (witness,) would be entitled to a part of it (the land) under the will of his father. Lofland said "Stutzer paid him twenty-five or thirty dollars for "his right." Stutzer offered him twenty-five dollars for "his right. Witness declined to take it, saying he wouldn't "sell that he hadn't in his possession. Stutzer and "Lofland then left. Witness is certain he gave Stutzer "the information spoken of above."

The testimony of Lofland does not vary materially from William Hall's statement, except that he does not remember any suggestion by Hall, that Livingston held these lands in trust for John A. Hall, or that any question

of title was raised except as to William Hall's contingent interest under Winlock Hall's will. Lofland thinks he heard all the conversation. I am satisfied that William Hall did make the suggestion stated by him, viz: "that "he understood that Livingston had taken the land for "seven years to pay off John Andrew's debts," but that his remark made no impression upon the attention of either Stutzer or Lofland. Next as to the conversation between Stutzer and Jester, the latter states that "a little before "the time that Livingston traded the land for the store- "goods with Stutzer," he "heard the transaction spoken "of." He met, said Stutzer, in the town of Milford. Witness asked Stutzer if he and Tommy were going to trade. Stutzer replied, he "reckoned so ;—didn't know hardly." —Witness asked him if he knew whose land he was trading for. Stutzer replied, he did,—generally knew what he was about before he jumped into it. Stutzer then turned around and left. Whether this conversation occurred before, or after that with Wm. Hall, cannot be certainly determined from the testimony, though probably after, inasmuch as the confidence of Stutzer's answer implies that all objections to the title worth attention, as he supposed, were removed, and one, at least, remained at the time he visited Hall.

We are compelled to consider the effect of these cautions, for such is the proof relied on to affect Strutzer with notice of the trust.

To be sufficient prior notice of the trust, it must be found to satisfy a rule well settled, both in the courts of England and this country, which is this ;—It is upon the ground of *mala fides,* and not of mere want of caution, that the purchaser for value is affected with a prior claim, and, therefore, the notice to affect him must be more than would excite the suspicion of a cautious, and wary purchaser. It must have been so clear and undoubted, with respect to the existence of the prior right, as to make

it fraudulent in him, afterwards, to take and hold the property. It is not meant by this, that a purchaser can be affected only by some direct and positive communication from the party interested; notice may be implied from circumstances; but in such case, the circumstances relied on must be clear and unequivocal, *i. e.,* such as can be supposed to have left on the mind of the purchaser no reasonable doubt as to the existence of the prior right.

The leading authorities, among a great number on this point, are two decisions of Lord Hardwicke taken together, *Hine vs. Dodd*, 2 *Atk.*, 275; and *Le Neve vs. Le Neve*, 3 *Atk.*, 646; *Jolland vs. Stainbridge*, 3 *Ves. Jr.*, 478; and the late and interesting case of *Jones vs. Smith*, 1 *Hare*, 43, (23 *Eng. Ch.*); 1 *Phillips*, 244, (19 *Eng. Ch*). This case, decided as late as 1843, presents so elaborate a review of the prior English decisions, and, in its facts, so well illustrates the question, that we may well advert to it. The defendant, Smith, being about to advance money upon a mortgage of the husband's estate, inquired of the mortgagor and his wife whether any settlement had been made upon their marriage, and was informed that a settlement had been made of the wife's fortune only, and that it did not include mortgaged property, although, in fact, it did, and limited to the husband only a life estate with remainders in tail. Confiding in this representation, the defendant did not require the production of the settlement before advancing the money. After the husband's death, the bill was filed against the mortgagee in possession by the tenant in tail, under the settlement. It was conceded that the mortgagee had acted *bona fide*, but he was sought to be charged for his want of caution in resting satisfied with the statement of the parties, instead of requiring the production of the settlement for his inspection. The case underwent two arguments by very eminent counsel, among whom were Swanston, Turner, and Bacon, before Sir James Wigram, Vice Chancellor, and the other on appeal before Lord Lyndhurst,

both of whom, after full consideration, held the mortgagee not to be affected, The Lord Chancellor says, in conclusion, 1 *Phillips*, 257 : "I dont think, therefore, that the present " case goes beyond this ; that a prudent, cautious, and " wary person would have inquired further. The want of " that prudence, caution and wariness, is not sufficient " according to the decisions and principles which have " hitherto been acted on, to affect the party with notice. " I no not consider this a case of gross negligence ; and I " am of opinion that the party, having acted *bona fide*, " and having only omitted that caution which a prudent, " wary and cautious person might, and, probably, would " have adopted, is not to be fixed with notice of this " instrument."

Another apt illustration of the rule is the case cited from 8 *N. H.*, 244, *Rogers vs. Jones*, where a deed, having been executed and delivered, was handed back to the grantee to have it recorded. Instead of having it recorded, the vendor sold to another person, shewing him the deed, but stating that it had never been delivered. The purchaser was held not charged for his omission to inquire further. And so the same doctrine, that the purchaser is chargeable for *mala fides* and not mere incaution, has been uniformly held as against claims not of record, in this country under examinations of the question by the ablest Judges ; by Chancellor Kent, in *Dey vs. Dunham*, 2 *Johns. Ch. Rep.*, 182 ; by C. J.Gibson, in *Remo vs. Swope*, 2 *Watts*, 78 ; by C. J. Ruffin, in *Fleming vs. Burgin*, 2 *Iredell's Eq.*, 584 ; and by Judge Story, in *Flagg vs. Mann*, 2 *Sumn.*, 486. See also 4 *Kent*, (171) ; *Sugden on Vendors*, *Ch.*, 21, *Sec.* 5, *par.*, 40 ; *Cruise on Real Prop.*, *Title Deed*, *Ch.* 29, *Sec.*, 20, *&c.*, and note ; 2 *White and Tudor*, *Leading cases in Equity* 144, *&c.*

It may be observed that the cases, in which this rule has been discussed and settled, have chiefly arisen under registration acts, by which a prior unregistered deed is

postponed to the title of a subsequent purchaser for value
and without notice, and that Hall's claim is not within
our recording act. But there is no difference in principle,
or upon authority, between the kind or measure of notice
proper to affect the subsequent purchaser, whether his
title is challenged under a prior unregistered conveyance
of the legal estate, or under a mere equity or trust at-
taching to the legal title conveyed to him. The true
object and construction of our recording act is, to extend
to the purchaser ,for value, the like protection, and no
more against a prior secret conveyance of the legal
estate, which, without any statute, courts of equity have
always afforded him against prior equities, merely. If we
pursue this question further we shall find that the same
principle, which holds the grantor under a prior unregis-
tered deed to such notice as impeaches the *bona fides*
of a subsequent purchaser, applies with equal stringency
to the holder of a mere equity or trust, though it
is not within the recording act. The principle is, that
the prior grantee, under an unrecorded deed, is himself
in laches, in neglecting the legally prescribed mode of
protecting himself and all others by recording his deed ;
and thus the equities between the parties, so far as these
depend upon any question of diligence, are at least equal.
A prior claimant, who is himself in laches, cannot equitably
follow the land, against a *bona fide* purchaser for value
paid, merely because the latter has been betrayed into
some incaution, and that, it may be, through the very
neglect of the first claimant ; for it is presumable that the
due recording of the prior title would have deterred any
subsequent purchaser, at least, one who is shewn to have
examined the record, and hence it is upon a clearly
equitable ground, that, under the recording acts, in order
to effect a subsequent purchaser with notice, more than
mere want of caution must shewn ; there must have been
*mala fides*, or negligence so gross as to be demonstrative of
it. Now the same principle applies, as well, to prior equity

which are not within the recording acts;for here, too,it will be found, generally, is not always himself that the prior claimant has been in laches.   Take, for example, the case of Hall.   He sets up against a subsequent purchaser from Livingston, a parol  trust secretly reserved upon the con-veyance made by him to Livingston.   He was grossly negligent in not inserting the trust in his own deed, by doing which he could have effectually protected himself and all others seeking title under Livingston.   His negligence was further aggravated  by surrendering  to  Livingston, possession  of  the  two  tracts  bought  by  Stutzer, thus constituting Livingston, before all the world, the absolute owner, and enabling him, as far as it was possible, to perpetrate fraud upon purchasers.

Now, although his conduct may be attributed to his mental facility before commented on, that is, a considera-tion to affect only Livingston, the man who dealt with him, and not third persons.  There is another consideration applicable alike to all cases in  which a purchaser is sought to be affected by a  prior right, whether the recording acts, or otherwise, and leading to the same conclusion, viz : that the notice must impeach the *bona fides* and not the mere caution of the purchaser.  It is that sound policy forbids that a 'title bought in good faith, and paid for, should  be  hazarded  upon  the   question  whether  due diligence has been exercised in looking after prior latent rights, such as are  not disclosed, either by the record, or by the deeds under which  the purchaser takes his title. Such a question is altogether too uncertain to be a safe judicial test of the validity of the titles to real estate.

With respect to authority on this point, I find none which discriminates between the notice required to affect a purchaser in cases under the registry acts and in other cases.   As might be expected, the cases are few in which the prior claim is a mere equity, not capable of being registered ; but in such as have occured, a rule of notice no less strict has been applied.  Such was the early case of

*Wilgrove vs. Weyland,* adopted as a leading one in the text of Sir Edw. Sugden, *Ch.* 23, *Sec.* 1 *par.* 3 ; *Jolland vs. Stainbridge,* 3 *Ves. Jun.,* 474 ; *Flagg vs. Mann,* 2 *Sumn.,* 491. In one case, *Grimstow vs. Carter,* 3 *Paige* 421, the identity in principle between the position of a purchaser, in cases under the registry acts and in other cases on this point of notice, is expressly affirmed. A deed, absolute on its face but intended to operate as a mortgage, was given with a separate written defeasance, which latter was not recorded ; but the grantor remained in possession, and the question was, whether the grantor's remaining in possession was notice sufficient to affect a subsequent purchaser. Held by the Chancellor on appeal that, as possession of the estate by a person claiming a prior equity, not within the recording act, had been held to affect a purchaser of like effect, must be possession in cases under the recording acts ; because, as he says, there is no distinction between a purchaser in good faith, under the recording act, and a *bona fide* purchaser, within the decisions of courts of equity in other cases. *p.* 437.

We may now return to the testimony relied on to affect Stutzer with notice. The question will be, were the suspicions expressed by William Hall and Jester, sufficient notice of this trust to render it an act of bad faith in Stutzer to proceed without further inquiry to purchase the land and hold it against Hall ? I think not. Prior, and up to the conversation with William Hall, the *bona fides* and diligence of Stutzer is unquestionable. He had, upon two visits to Dover, with the aid of experienced counsel, examined the title papers and records, which is the mode legally prescribed and usually relied on for investigating title ; and against such defects and incumbrances as this examination disclosed, he had studiously guarded himself ; first by requiring Livingston's bond of indemnity against the liens ; then as to the risk of further issue of Draper Hall, John Andrew's father, which issue, if any, he was advised would be let into a share with John

Andrew, he had taken the pains to satisfy himself by seeing Draper Hall and his wife, that at their age there was no such possibility. Then again some claim on the part of William Hall, under the devise to John Andrew, having been suggested, we find Stutzer promptly repairing to Hall for satisfaction on this point. But William Hall's claim was to an interest contingent on John Andrew's dying without issue ; so remote a possibility that Hall himself thought it not worth bargaining for, answering to Stutzer's offer of twenty-five dollars for it, that "he did "not sell that he hadn't possession of." Stutzer now felt himself relieved of the last objection to Livingston's title, disclosed by the customary modes of examination, or in any way known to him ; for it does not appear that, up to this moment, he had received the least intimation of any claim on the part of John Andrew Hall. Is it then at all surprising that at this juncture, Stutzer, finding that the only two supposed defects of title disclosed by the title papers had come to nothing, should even, as an ordinarily prudent man, not have been impressed by what was a mere vague suspicion thrown out by William Hall in the course of a conversation, Stutzer's interest in which, was directed to another point, _i. e._ William Hall's own claim ? What Hall said, material to our purpose, was, "that he "understood that Livingston had taken the land for "seven years to pay off John Andrew's debts." Now as notice to affect Stutzer, this suspicion of William Hall's was defective in two respects ;—(1) It only upon common rumor which has long and uniformly been held insufficient to charge a purchaser for value. _Sugden on Vendors, chap._ 23, _sec._ 1, _par._ 2, 3, 4 ; _Wildgrove vs. Wayland, Gold,_ 147 _pt._ 67, cited in the text of Sudgen ; _Jolland vs. Stainbridge,_ 3 _Ves. Jr.,_478 ; _Jackson vs. Given,_ 8 _Johns.,_ 137. (2.) What Hall said "he understood," _i. e._ "that "Livingston had taken the land for seven years to pay off John Andrew's debts," taking it in the sense intended by Hall and understood by Stutzer, was fully answered by

the deed which Livingston held.   Observe here what was the gists of William Hall's objection to Livingston's title, viz : that he had no deed, or, if any, that it was a sham ; that he held a mere temporary possession and management of the land *i. e.* for seven years, to pay off the debts.   Neither Hall nor Stutzer were lawyers enough to know what, indeed, had been a point of serious discussion in this case, that John Andrew Hall could set up a trust against his deed.   At all events it is clear that it was not to such a trust, but to the absence of any valid conveyance to Livingston that Hall's suspicion pointed ; and this, to Stutzer's mind, was satisfactorily answered by John Andrew's deeds to Livingston.   Wishing to conform myself strictly to the proof, I say nothing of the effect which John Andrew Hall's conversation with young Stutzer must have had, if communicated to the father, in allaying all suspicion of claim from that quarter.

Then with respect to the conversation between Stutzer and Jester, the question put by Jester, whether he, Stutzer, "knew whose land he was trading for," expressed only vague and indefinite suspicion, pointing to nothing, and in itself carrying no notice.   Such a hint might affect a purchaser where, and only where, his conduct, on receiving it, evinced that he had a suspicion of the truth, and willfully evaded further information.   This would affect him with *mala fides* within one of the principles of implied or constructive notice, so clearly stated by Vice Chancellor Wigram, in *Jones vs. Smith*, 1 *Hare*, 55 (23 *Eng. Chan. Rep.*).   Now Stutzer's reply, that he did know whose land he was trading for, that he "generally "knew what he was about before he jumped into it," turning around and leaving, might, taken alone, bear this construction ; but construed by all the circumstances, his whole conduct throughout the negotiation, his abrupt treatment of Jester's suspicion more naturally expressed an over-confidence in the title he was bargaining for ; a confidence inspired by the removal of all objections ap-

pearing upon the usual course of investigation, a course of investigation which, as he supposed, must disclose any existing effect of title. His slang phrase "that he knew "what he was about before jumping into it," was a rough denial of what he took as an imputation upon his prudence.

On the whole, the testimony relied on fails to impeach the *bona fides* of Stutzer, shewing, at most, a want of extreme caution which is not sufficient to deprive him of his legal advantage against Hall, who stands affected by far more serious laches in having neglected to have the trust declared in his deed, not to speak of his omission, after knowledge of the negotiation which is proved, to caution Stutzer, his whole action, on the contrary, so far as it went, tending to allay suspicion of any claim on his part.

This view of the conclusiveness of the testimony is well supported by authority. In *Wildgrove vs. Wayland*, an early case cited in the text of Sir Edward Sudgen, one man came to a person about to buy a house and told him to take heed how he bought it, for the vendor had nothing in it but upon trust for A. ; and another person came to him and told him it was not so, for the vendor was seized of the land absolutely. The first proved to be correct ; yet the purchaser was held not to have notice. A later, perhaps a stronger case, was *Joyland vs. Stainbridge*, 3 *Ves. Jr.*, 478. It was a bill to set aside a long lease executed by the complainant's deceased father and which, by assignment, had come to the defendant. The complainant's claim was as issue in tail under a will of his grandfather, which will had not been registered so long as to give the assignee of the lease, the defendant, constructive notice. The bill charged actual notiee to the defendant before the purchaser of the lease, upon proof such as this ; that the complainant's mother had, on more than one occasion, before the defendant's purchase, cautioned him "not to have anything to do with the estate ;

"that it belonged to her daughter." The Master of the Rolls, Sir R. Pepper Arden, dismissed the bill, remarking, " I agree it is not sufficient to prove notice, to assert that "some other person claims a title ; yet all the evidence "given here is of that of sort." Upon these cases Sir Edward Sudgen, in his *Vendors and Purchasers, Ch.,* 23, *see.* 1, *par.* 2,3, 4, a book of authority in itself, lays it down that "vague reports, from persons not interested in the " property, will not affect the purchaser's conscience" and such has since been the acknowledged rule. *Hill on Trustees,* 762 ; *Sto., Eq. Jur.,* 400 ; 2 *White and Tudor's Lead. cas., in Eq.,* 148. It was applied by Kent C. J,, in *Jackson vs. Given,* 8, *Johns.,* 140, when the notice relied on to affect a purchaser was the statement of a third person about the time of the purchase, that " he had understood that Umphrey "(the vendor) had fooled away the lot and had sold it several times and did not consider " it worth his trouble to look about it ; " also by Judge Story in *Flagg vs. Mann,* 2 *Sumn.* 551.

Some cases were cited for the complainant to shew the sufficiency of notice in this case. In *Jackson vs. Cadwell,* 1 *Cow.,* 625, the defendant, at Sheriff's sale, under a judgment which had been paid, but not satisfied of record. He was held not to be a *bona fide* purchaser, partly because he was not proved to have paid any purchase money, and partly because he had been informed, on the day prior to the sale, that Edward C. Sanders (one of the adverse parties) "laid some claim to the premises" and had taken an indemnity against the claim. The taking of an indemnity was itself a clear ground upon which to affect the purchaser, and was the circumstance which controlled the decision. Savage, C. J., recognizes the authority of *Jackson vs. Given,* in *Pearson and wife vs. Daniel et al.,* 2 *Dev. and Bat,* 360, a purchaser of land against which the bill sought to establish a trust in favor of Pearson and wife, had been informed before the purchase by a third person, that "the Pearsons did have a claim to the land,

"although he believed they were too careless to prosecute "it." This was held to be sufficient notice; but the few words in which the Court dispose of this point, clearly disclose that the Court treated the purchase, not as an act of mere incaution, but of bad faith..

" Having chosen," says Garton J., "to speculate upon the title after receiving this information, the defendant must abide the result." The ground on which the defendant was charged was *mala fides*, and, so far, the case is in harmony with the established rule ; whether the proof was sufficient to shew *mala fides* might be doubted, were it not that, not merely the bare words of notice or information, but the whole prior conduct in all the circumstances of the case enter materially into the question of *mala fides*. The general impression of the case in *Devereux & Battle* was suspicious, and it was a fact noted by the Judge that there was no proof that this purchaser had actually paid anything. In *Blake vs. Hayward*, 1 *Bailey*, 208, the purchase, though for value, was affected by a degree in equity, for the payment of money, against the vendor, and such claim was held, under South Carolina Statute, to be a lien like a judgment.

In the case of *Polk vs. Gallant*, 2 *Dev. & Bat.*, 395, the defendant was a purchaser, at Sheriff's sale, of an equity, and not of the legal title, and it was held that even if he had taken the latter, and much more if only of the former, it would have been subject to all equities against the defendant in the execution.

None of these cases, therefore, will answer the purpose for which they were cited.

ISABELLA CORNOG,

*vs.*

WILLIAM D. CORNOG AND.ABNER CORNOG, EXECUTORS
    OF ABRAHAM CORNOG, DECEASED, WILLIAM HER-
    BERT, LATE SHERIFF, CATHARINE CORNOG, SARAH
    CORNOG, ABRAHAM T. CORNOG, FRANK CORNOG,
    ISABELLA CORNOG, ANNA CORNOG, MARGARET
    CORNOG, HENRY CORNOG, ULYSSES CORNOG, AND
    STEPHEN CORNOG, CHILDREN AND HEIRS AT LAW
    OF ABRAHAM CORNOG, DECEASED.

*New Castle, Sept. Term, 1869.*

In Delaware a widow is not dowable out of an equitable estate of her de-
    ceased husband.

The equity of redemption in lands mortgaged is, as against all persons except
    the mortgagee and his assigns, treated as the legal estate, and is subject to
    all the incidents of the legal estate. Therefore, under a foreclosure and
    sale of lands mortgaged by her deceased husband, the widow, though a
    party to the mortgage, is entitled to equitable dower out of the surplus pro-
    ceeds after satisfying the mortgage.

The widow's equity in such case is to receive interest during her lifetime upon
    one-third of the surplus only, and not upon one-third of the whole
    proceeds of sale, even though two-thirds of the proceeds may be sufficient
    to satisfy the mortgage.

BILL IN EQUITY FOR AN INJUNCTION, AND TO RE-
COVER EQUITABLE DOWER.—This bill was filed to recover
equitable dower out of the surplus proceeds of certain
real estate which was sold under a mortgage executed by
the husband and wife, in the husband's lifetime. The
facts were these :

Abraham Cornog, deceased, in his lifetime, to wit :
April 6th, 1857, together with his wife, the present com-

plainant, executed a mortgage of certain real estate, for $7,000, payable March 25th, 1862. Cornog died March 24th, 1868, leaving a will containing certain provisions for his widow and children, which, however, failed of effect in consequence of his insolvency. After his death, the mortgaged premises were sold at sheriff's sale under the mortgage, for $10,500. The debt, with interest and costs, was satisfied, leaving in the hands of the Sheriff, a surplus of $1,714.91. There were unsatisfied judgments against Cornog, at his decease, exeeding the surplus, to which it is applicable by the Sheriff, subject to the equity, if any, of the widow. Her claim by this bill is to dower out the surplus and is two-fold. (1st,) That *the whole fund* be invested for her benefit during her lifetime, the whole being less than one-third of the entire proceeds of the real estate ; or (2d,) that, at all events, *one-third part of the surplus* be so invested. The questions raised are whether, in this State, the widow is dowable, in equity, of the surplus proceeds of the lands sold under a mortgage of her deceased husband, she having joined in the mortgage ? and if so, then in what portion of the surplus proceeds is she so entitled ?

*Nields* for the complainant.

The seisin of Abraham Cornog, and his death, are admitted, also the fact and date of mortgage, the sale under it, and surplus. This raises the question whether the widow is dowable of the surplus.

1. In England, the question as to dower in an equity of redemption was unsettled until 1783. In 1732, in *Banks vs. Sutton*, 2 *P. Wms.*, 700, a widow was held dowable in an equity of redemption, though the mortgage was given before marriage. In 1783, in *Dixon vs. Saville*, 1 *Bro. C. C.*, 326, the widow was held not dowable, on the ground that it is a trust estate, and subject to the general

rule against dower in an equitable estate. This case was decided wholly upon precedent, and not on principle. It established the rule, and was followed until the Statute of 1834, when dower was given in an equity of redemption. This rule had its foundation in the nature of trusts *before* the Statute of Uses, when the *cestui que trust* had no *estate* for any purpose. The Statute reciting among the mischiefs that a widow is not dowable, made the use an estate. Then the husband was held entitled to curtesy in estates held under conveyances to uses ; but dower is denied. In *Banks vs. Sutton*, Sir J. Iekyll rightly held the widow to be ever more favored than the husband. *Dixon vs. Saville* is a decision not founded upon principle, and subsequently disapproved.

In 2 *Black. Com.*, 337, it is said that the equitable estate, being equivalent to the legal estate, was not subjected to dower, " more from cautious adherence to " precedents than upon any well-grounded principle."

In *Burgess vs. Wheat.*, 1 *Wm. Black.*, 110 *cited in Johns.* 281, Lord Mansfield characterized the rule as founded, not on reason, but practice founded on a wrong determination.

Lord Talbot remarked that the anomaly is presented here, that neither the widow of the mortgagee, nor of the mortgagor, is admitted : the former is excluded because it is the estate of the mortgagor, and yet his widow is also excluded. 2 *Chitty, Black.*, 108, *note* (30).

2. Contrary to the English practice, the American doctrine holds the widow dowable of an equity of redemption.

Laying aside the question as to dower out of equitable estates, *generally*, and considering the question as to equities of redemption, there is an essential difference between an equity under the English law and under ours ;

52

it there being purely an equitable estate, but *here* it is the real ownership, drawing to it all the incidents of the legal estate, except as against the mortagee, dower among the rest ; so that, as the mortgage is here regarded, the mortgagor is, as well for the purpose of dower as for all other purposes, " seised of the estate of inheritance," under the Act of 1816, subject to the mortgage, and the consequence of enforcing it.    As to the doctrine in other states, it is *not* founded on statutes, as is contended.

As to Massachusetts, see 1 *Scrib. on Dower*, 460.

In New York, the cases cited by me of dower allowed out of surplus were as early as 1809 and 1810, and running as far back as 1804, prior to the statutes referred to. 1804, *Waters vs. Stuart*, 1 *Caines*, 47 ; 1809, *Jackson vs. Willard*, 4 *Johns.* 41 ; 1810, *Hitchcock vs. Harrington*, 6 *Johns.*, 290 ; 1810, *Collins vs. Torrey*, 7 *Johns.* 277 ; 1814, *Tabert, vs.* 1 *Johns. Ch.*, 45., 1821; *Titus vs. Nelson*, 5 *Johns. Ch.* 452 ; 1 *Scribner on Dower*, 450.

The decisions in this State favor the widow.    *Robinson vs. Harris' lessee*, 3 *Harring.* 283, note ; *Cooch's lessee vs. Gerry*, 3 *Harring.*, 280.    In the latter case it was held that the mortgagor is *the real owner* for all legal purposes, and the mortgagee treated only as a personal security, and the mortagor was permitted to defend in ejectment, as against a person other than the mortgagee.

In two cases in the Orphans' Court, dower was allowed out of the surplus of administrator's sale, after paying a mortgage.

*James Breman's estate*, in 1859 or 1860 ; *Enoch J. Flemming's estate*, in 1861, or 1862.

Here the widow had, first, her dower by metes and bounds, out *of the whole*, and the mortgage, as well as other debts, were thrown upon the residue.

The Fennimore case, in Kent county, affirms the widow's right in the surplus.

3. Then comes the real question, to what extent did the wife relinquish her dower by joining in the mortgage?

The Dower Act of 1816, gives dower in all lands, of which the husband is seized during the coverture, unless relinquished by her own act. *Rev. Code,* 290, *Sec.* 1.

By joining in the mortgage, her relinquishment was *co-extensive with the mortgage,* so far as necessary to secure it. It precluded her dower so far, and only so far, as concerned the rights of the mortgagee—not as against any one else ; no one else could set up the mortgage, no stranger. The *existence* of the mortgage whithout foreclosure would not have barred her from an assignment of her dower out of the whole land. Now, the farm being sold under the mortgage, equity will treat the fund as substituted, and her rights, to the same extent, will attach to it. *Snow vs. Stevens,* 15, *Mass.* 277 ; *Collins vs. Terrey,* 7 *Johns.* 277.

4. Is the wife dowable in the surplus, as representing the equity of redemption, and to what extent? I find no case in which, the surplus of the proceeds of sale under the mortgage being brought into Court, the widow has taken, as her dower, one-third of the whole proceeds, the two thirds being sufficient for the mortgage. But in all the cases decided, the claim was against a purchaser under the the mortgage, none against a stranger ; so that, as to such a case, it is still an open question; and on the general principle that a stranger cannot set up the mortgage for any purpose, she must, as against them, be entitled to dower out of the whole, *i. e.,* out of the land before sale, and out of proceeds after sale. 1 *Scribner on Dower* 422, 532, 447.

In *Titus vs. Neilson, et al.,* 5 *Johns., Ch.,* 452, Chancellor Kent reviews the whole subject. This was a claim

by purchaser under the mortgage, and decree was allowed only on one-third of the surplus.

In *Hartshorne vs. Hartshorne*, 1 *Green's Ch., R.*, 349, the purchaser of a husband's equity took an assignment of mortgage and was not allowed to set it up against the widow's bill for dower. This decision does not give dower in the whole land, because the claim was against the assignee of mortgage.

· In this case the claim is against a stranger to the mortgage, viz : the executors and heirs of the mortgagor or creditors of mortgagor. She is, therefore, entitled to one-third of the whole, subject to the satisfaction of the mortgage. The proceeds were $10,500; the amount due on the mortgage, $8,785,09. This leaves $1,714.99, less than one-third of the whole.

We claim to have the whole invested for the widow's benefit during her life, or at least one-third of this surplus ; and in either case, the defendants are to pay the costs. She is here from necessity, having made her demand, which was refused.

Under the Maryland practice, an annuity is purchased out of the proceeds, equal to the interest.

No claim is made to recover dower with respect to rents received by the executors.

*Harrington*, for the defendants.

*First.* There is no dower in equitable estates. It is a legal right, and equity will not create it. 1 *Scribner on Dower*, 366. Before the Statute of Uses, there was no curtesy or dower in uses. The Statute converted the use into a legal estate, and so curtesy and dower, both, attached. Then followed the invention of trusts, as to which, though the Courts allowed curtesy, yet dower was refused. The

early decisions fluctuated. *Banks vs. Sutton* proceeded on the ground that the husband was entitled to a conveyance, and equity presumed that to be done which ought to be done ; and this was also confined to trusts *not* created by the husband. But at all events it has been over-ruled. *Chapman vs. Chapman,* 3 *P. Wms.* 229. *Atty, Gen. vs. Scott, Cas. Temp. Talbot,* 138 ; *Dixon vs. Saville,* 1 *Bro.,* 326 ; *D'Arcy vs. Blake,* 2 *S. and L.,* 387 ; 1 *Scribner on Dower,* 392 ; 4 *Kent Com.,* 43 ; *Park on Dower,* 58 *and* 62-63.

The Statute of 1833, (in the appendix to Scribner,) Sec. 2, gives dower in all equitable *estates.*

*Second.* In the United States, dower in equitable estates is allowed under statutes. (1.) In Massachusetts, in the early cases, the English rule was recognized, and it was held that the widow is barred as against a purchase of the equity, paying the mortgage and taking an assignment. *Masury vs. Putman,* 4 *Dane's Abr.* 183-676 ; *Popkin vs. Bumpstead,* 8 *Mass.* 491 ; *Bird vs. Gardner,* 10 *Mass.,* 364.

From this time, the practice in Massachusetts changed, and dower came to be allowed in the equity of redemption. Presumably, under Statute. 1 Scribner on Dower 28, referring to certain statutes, one in 1783, as giving dower in equities, also at page 450, referring to the Statute of 1798 as giving *right to redeem,* as well to the widow as other representatives of the husband, and to Statutes of 1836 and Statutes of 1860, expressly giving dower.

(2.) In New York, Scribner, at page 450, says the widow's right is "established, not only by judicial decision, but by legislative enactment." Chancellor Kent states the origin of the rule in New York. *Waters vs. Stuart,* 1 *Caine's Cas. in error* 47 (1804). The statutory provision as to foreclosure and sale after a husband's death,

giving dower in surplus, are 1 *N. Y. Rev. Stat,*, 740 *sec.* 6 ; 3 *Ib.* 31, *sec.* 6 ; cited 1 *Scribner on Dower* 476.

All the decisions cited are under the Statutes referred to. *Smith vs. Jackson*, 2 *Eden. Ch.*, 28 ; *Titus vs. Nielson*, 5 *Johns. Ch.*, 452 ; *Hawley vs. Bradford*, 9 *Paige*, 200 ; *Tabele vs. Tabele*, 1 *Johns. Ch.*, 45.

(3.) In Maryland, as to which, the practice was referred to by Mr. Nields but no cases cited. In 1818, dower was given by statute in equitable estates. 1 *Scrib. on Dow.*, 41 ; 3 *Dorsey*, 701. Under Statutes of 1715 and 1766 held not dowable,—not until the act of 1818. 1 *Scrib. on Dow.*, 452.

(4.) Other States are referred to in 1 Scrib. 402, &c.

*Third.* The law in this State. The remark of Chancellor Ridgeley quoted in *Robinson vs. Harris' lessee*, 3 *Harr.*, 283, was an *obitu dictum*, and was not made upon argument or consideration. It was certainly wrong as to English rule resting upon "hasty decision." It was "a "long established doctrine," so declared by Lord Hardwicke in *Godwin vs. Winsmore*, 2 *Atk.* 526.

See 1 *Scribner* 32, as to dower in Delaware. The course of the statutory law on the subject was as follows :

Act of 1683, 1 *Del. Laws, App.*, 16, *Sec.* 109 ; the old intestate law—wife one-third of "any estate." *Secs.* 110 and 172—another provision giving dower.

Act of 1693, 1 *Del. Laws, App.* 20. Sale of lands to pay debts ; dower under this, subject not only to creditors, but to power of devise by husband.

Act of 1697, *App.*, 24, Took away power to devise as against widow ; re-enacted in 1706. *App.*, 50.

Act of 1721, 1 *Del. Laws*, 31. Sale to pay debts, dower in lands of which husband died seized.

Act of 1742, 1 *Del. Laws*, 62. . Re-enacted.

Act of 1766, 1 *Del. Laws*, 419. No will to affect dower.

Act of 1816, Digest, 167. Then the Statute first made dower paramount to debts at large.

This Statute placed dower as it stood at common law, giving it only on lands of which husband had a *legal seisin* of an estate of inheritance, (except in cases of intestacy and claim against heirs.)

There is *no statutory* provision giving dower in equitable estates, or recognizing it except under the intestate law.

The course of judicial decisions are shown by two cases which we cite from Judge Harrington's notes— *Geo. Fennimore's estate in Kent, Mar. T.*, 1847—*Mrs. Darbey's claim for dower, Kent, Sept.* 1848. In the latter case *Comegy's*, in argument, cites cases from Ridgely's notes.

I think it uneccessary to discuss the claim to have the the *whole surplus* invested for widow.

The CHANCELLOR :

In this State, a widow is not dowable out of an equitable estate of a husband except in intestate lands. Our intestate law allows to the widow, dower, or, more properly speaking, her " thirds," out of any estate in lands, legal or equitable, which descend to the heir at law, the policy of this statute being to place the widow on an equal footing with the heir. But for all other cases, the right of dower is defined by the Statute of 1816—*Rev. Code, Chap.* 87, *sec.* 1—which gives dower only when the husband shall die " seized of an estate of inheritance in any lands or tenements within this State," &c. The term seized, here used, has always been construed, in its common law sense, as applicable to legal estates only, and the Statute has been received as a declaration only of the common law rule

of dower. This was adjudged in several cases in the Orphan's Court, soon after the passage of the Statute of 1816. They are found in Chancellor Ridgely's manuscript notes. The case of Whittington Johnson's widow, *3d. vol.,* 396, *in* 1821 ; *Lofland and wife vs. Phillips*, *4th vol.,* 152, *in* 1823, *and Bloxom vs. Hudson*, *4th vol.,* 238, *in* 1823. The decision by Chancellor Ridgely must be received as expressing his matured judgment upon the question. For they are subsequent to his dictum in *Robinson vs. Harris' lessee in* 1818, reported in 3d Harrington, note, to the effect that in this State the widow of a *cestui que trust* is entitled to dower. This dictum being for many years the only published expression of opinion by the Chancellor, threw some doubt upon the question, which was not removed until the year 1848, when, in the argument of a case of dower of great interest at the time, the unpublished decisions of 1821 and 1823 were brought to light, and these being approved and followed in the later case, the question was finally put at rest. The case last referred to was that of John M. Darby's widow, in the Orphans' Court of Kent county in 1848. On a most thorough consideration of the whole subject, this construction of the statute was adhered to, and the widow's application for dower refused out of lands in which her husband had held only an equitable estate, under alienation bonds. On appeal, this decision of the Orphans' Court was affirmed.

But it is equally well settled in this State that a widow is dowable out of an equity of redemption, except as against the mortgagee and his assigns, and that, whether the mortgage have been given prior to the marriage, or after the marriage, the wife joining in it. In the American Courts, mortgages, until foreclosure, though in form conconveyances, are treated as securities for the payment of money, the mortgagee taking but a chattel interest, and the mortgagor remaining seized, legally, as well as equitably, with respect to all the world except the

mortgagee and his assigns. His estate, until foreclosure, is subject to the incidents which attach to the legal estate, being inheritable, devisable, subject to execution for the mortgagor's debts, and entitling the mortgagor to all the rights of a freeholder. This view of a mortgagor's estate, though originally held in courts of equity only, was gradually adopted by courts of law, even in England to a considerable extent, and it is remarked upon by Chancellor Kent as "one of the most splendid instances in the "history of our jurisprudence of the triumph of equitable "principles over technical rules, and of the homage which "those principles have received by their adoption in courts "of law." 4 *Kent Com.*, 158.

The English Courts, however, did not admit the equitable doctrine so far as to allow dower out of an equity of redemption. The inconsistency and injustice of denying dower out of the estate of a mortgagor and out of equitable estates generally, the same estates being held subject to curtesy and to other incidents of a legal estate, has been felt and acknowledged by English judges. But the decision in *Dixon vs. Saville*, 1 *Bro. C. C.* 326, in 1785, denying dower in an equity of redemption had become the accepted rule, and was so generally acted upon by purchasers that it was felt to be necessary for the security of titles to adhere to it, until the English Statute of 1833, which gave dower in equitable estates.—Lord Redesdale in *D'Arcy vs. Blake*, 2 *S. and L.*, 388. The American Courts being free to carry the equitable view of mortgaged estates to its logical results, have, uniformly, allowed dower in equities of redemption, 4 *Kent Com.*, 45. The leading cases are, *Snow vs. Stevens*, 15 *Mass.*, 277 ; *Hitchcock vs. Harrington*, 6 *Johns.*, 290 ; *Collins vs. Torrey*, 7 *Johns.*, 277 ; *Coles vs. Coles*, 15 *Johns.*, 319. It is not true, as was suggested in the argument, that this class of decisions is founded upon statutes of the several States. There are found, it is true, in the Revised Statutes of New York and of Massachusetts, clauses declaring the widow entitled to dower in

an equity of redemption; but the decisions cited from those states were all prior to the enactment of their Revised Statutes, and the provisions referred to are merely declaratory of the rule, as one which had been already judicially established. In this State *Cooch's lessee vs. Gerry* 3 *Harring.*,280,adopts fully the doctrine that the mortgagor's equity before foreclosure, and as against all persons not claiming under the mortgage, is to be treated as the legal estate, and the mortgagor, was in that case, permitted to recover in ejectment.

Dower has been uniformly allowed in our Orphans' Courts out of the lands of mortgagors ; and under sales of lands by executors and administrators for the payment of debts of decedents where there has been outstanding mortgages, the practice, without exception, has been to secure to the widow, interest on one-third of the surplus proceeds of sale, after discharging the mortgage debts. Such being our law allowing dower out of the equity of redemption before foreclosure, it results that a court of equity will, after foreclosure and sale, secure to the widow a corresponding interest in the surplus proceeds of sale. That is but an application of a general principle of equity, that rights attaching to land shall be preserved as against the fund resulting from any judicial conversion of the land into money ;—so that dower being allowed at law out of the equity of redemption in the land, courts of equity, following the law, allow an equivalent for the dower out of the product of the equity of redemption, which product is represented by the surplus proceeds after satisfying the mortgage. *Titus vs. Neilson*, 5 *Johns., Ch. R.*, 453, is to this point. That was a bill for fore-closure filed in the husband's lifetime, to which the husband and wife were made defendants, together with a second mortgagee under a mortgage of the husband's equity. The wife had not joined in the second mortgage. After a decree for a foreclosure and sale of the premises, but before sale made, the husband died, whereupon the

widow, being already a party to the suit, filed a petition for dower in one-third the surplus proceeds after paying the first mortgage. Her claim was contested by the second mortgagee, but upon full consideration, the dower was allowed. So in *Tabele vs. Tabele*, 1 *Johns., Ch. R.*, 45 ; *Smith vs. Jackson*, 2 *Edw., Ch. R.*, 28 ; *Hawley vs. Bradford*, 9 *Paige, Ch. R.*, 200 ; *Keith vs. Trapier*, 1 *Bailey's Ch. R.*, 63 ; *Hartshorne vs. Hartshorne*, 1 *Green, Ch. R.*, 349.

But conceding to the widow equitable dower in the surplus, another question raised by the bill respects the extent of her right. The proceeds of sale were $10,500. The amount due on the mortgage $8,785.09, leaving a surplus of $1,714.99, *less than one-third of the whole.* The widow claims that this whole surplus be invested for her benefit, on the ground that, except as against the mortgagee, she is entitled, before sale, to dower in the whole estate, and, consequently, that after a sale, her dower attaches to one-third of the whole proceeds, except so far as the mortgage debt may exceed the two-thirds ; that as against the representatives and creditors of the mortgagor, who are the present defendants, her rights are as if the mortgage had never existed ; that a stranger to the mortgage cannot set it up.

This argument wholly overlooks the effect of a foreclosure and sale. The rule that a stranger to an outstanding mortgage cannot set it up against the widow, applies only to a mortgage not as yet foreclosed. Before foreclosure, the widow's relinquishment of dower, by her joining in the mortgage, remains contingent upon its being foreclosed. As yet, the mortgage money may be paid by the husband, or out of his personal estate after his decease ; or, the widow has, herself, the right, in equity, to redeem the mortgage ; and thus the equity of redemption to which her dower attaches, may become again the absolute estate. But by foreclosure and sale, the equity

of redemption is extinguished, and thereby her relinquish-
ment of dower, which before was contingent, has become
absolute.   The case then, comes within that provision of
the Statute which bars dower  in lands if the wife "shall
"have relinquished her right of dower therein by her own
"voluntary act, according to the existing laws of the
"State."   Under that Statute the effect of a mortgage
foreclosed upon dower in the mortgaged premises is the
same as of an absolute conveyance in which the wife has
joined.   If there remain other lands of the husband, she
takes her dower at law in them.   If there remain, of the
proceeds of the mortgaged lands, a surplus, as to this she
has no right at law, of dower, properly speaking.   But
equity treats the surplus proceeds after sale, as represent-
ing the equity of redemption in the land before sale ; and as
the  widow had dower in  one-third of the equity of
redemption, this Court allows her, as an equivalent, the
interest on one-third of the surplus proceeds.   This was
the whole extent to. which the Court went in *Titus vs.
Neilson,*\* and it is in accordance with the uniform practice
of our Orphans' Court in applying the proceeds of lands
which have been sold to pay the debts of a decedent,
where there are mortgages paramount to dower to be
paid out of the proceeds.   First, the mortgages are satis-
fied, then one-third the surplus is secured by bond and
mortgage for the benefit of the widow, the residue is
ordered to the executor or administrator, and the princi-
pal of the one-third is also secured to the executor or
administor, payable at the widow's decease.

---

\*In *Hawley vs. Bradford*, 9 *Paige, Ch. R.*,200.  The widow of a mortgagor
under circumstances similar to those of the present case, claimed interest on one-
third *of the whole proceeds* of the mortgaged premises on the ground that she
was equitably entitled, as a surety, to a preference over other incumbrances
than the mortgagee.  But the Court· held that the principle of suretyship did
not apply.

In the case of Fennimore's real estate in Kent, March T., 1847, the practice on this point came under review. Fennimore's administrator applied for an order to sell decedent's real estate *subject to dower*, the widow having declined to waive her dower by metes and bounds. The debts, consisted of a mortgage and several judgments, amounting in the whole, to more than the value of the real estate. The question was, whether the Court would allow a sale of all the lands *subject to dower*, and then give the widow dower out of the whole, and throw the judgment creditors on the residue, or whether it would so direct the sale as to pay the mortgage debt first and give the widow dower in the residue. The Court said, "The " widow is entitled to dower in all the lands of her hus- " band unless she shall have voluntarily relinquished her " right of dower,which she does by joining in a mortgage to " the extent of the mortgage,and in favor of the mortgagee. " Our order sells the lands absolutely, and discharges both " mortgages and judgment. It is, therefore, in effect, a " sale for satisfaction and in execution of the mortgage as " well as the judgments. How then, are the proceeds to " be applied ? Just as the parties' rights now are. The " mortgagor is paramount to the dower. It must be paid " first. The dower is preferred to the judgments. Dower, " therefore, must be allowed out of the residue, in prefer- " ence to the judgment creditors, as a sale on their liens " would be subject to the dower." The Court refused the order for sale subject to dower, inasmuch as it would result in giving the widow dower out of the whole instead of one-third of the surplus. Thereupon, the widow waived her dower by metes and bounds. A sale clear of dower was ordered, and the widow took her interest only in the surplus proceeds after payment of the mortgage.

In this case, the surplus is $1,714.91. A decree will be made that one-third of it, to wit : the sum of $571.64 be so invested that the income thereof may be paid semi-annually to the widow, and the principal remain subject

to the future order of the Court, and that the remaining two-thirds, after deducting two-thirds of the costs of this suit, be repaid to the Sheriff, to be applied by him according to law. One-third of the costs will be paid by the widow. This apportionment of the costs is in accordance with the general rule prescribed by the statute upon the assignment of dower in the Orphans' Court.

GEORGE WIEST,

*vs.*

RANDALL B. GARMAN, ALEXANDER McCONAUGHY AND JAMES B. RIGGS.

*Kent, March T., 1870.*

After the parties to a contract for the sale of lands have gone so far as to execute the contract by conveyance of title, the transfer of possession, and the payment or securing of the purchase money, the Court of Chancery will not unravel the transaction merely to relieve against the hardship, or even great injustice, of an unequal bargain. A contract executed will be set aside, only where either there has been mistake materially affecting the subject matter of it, and with respect to which the contract cannot be reformed, or where the contract has been procured by fraud, in some of its forms of misrepresentation, circumvention, or undue influence.

But misrepresentations made by the vendor to the purchases of a farm, at an exhorbitant price, as to the value of the crops produced and the cost of improvements made on it the preceding year, at the time of selling it to him, even if they form a material inducemement on the part of the purchaser to buy it, will not be ground for a decree rescinding the sale.

Two distinct classes of misrepresentations by vendors in a bargain are recognized with different effect. Against mis-statements which concern the essence or subject matter of the contract, equity will relieve, whether they be the result of fraud or mistake. But against such as concern merely the value of the property sold, equity will not relieve, so far as to rescind a sale already executed.

With reference to the effect of fraudulent misrepresentations by a vendor touching the property sold, there is a material distinction in a court of equity, whether the bill is for the specific performance of a contract yet unexecuted, or it is a bill to rescind a contract which has been executed. It is in this last class of cases that courts of equity so stringently apply the maxim *caveat emptor*, a hard, stern maxim, but one founded both on justice and policy.

Although for mere inadequacy of consideration, without other circumstances, a contract executed will not be rescinded, yet an unconscionable bargain made with a person of such weak understanding as to be incapable of self-protection, though not an idiot or lunatic, raises a presumption that it was procured through some fraud, or undue influence; and on this ground, equity will relieve such a person against a transaction which it would not, if it had been made with one of ordinary capacity. However, the court interferes in this class of cases with great caution, and only where the mental weakness to such a degree as disables the party for self-protection is clearly made out in the proof.

In all the cases in which the question of fraud, undue influence, or incapacity is raised, inadequacy of consideration is a material element; that is, by it proof on these points, which otherwise would be doubtful, may be rendered decisive. In a case where the capacity of a party to bargain is left in doubt, the very exorbitancy of the bargain may convince the court that the party must have been unfit to transact business, and have become the dupe of some imposition. But to have this effect, the inadequacy must be gross, and such as to shock the conscience and confound the judgment of any man of common sense. In all the cases in which inadequacy of price or value, has been treated as a material consideration, it has been of this gross character; and the inequality has not been less than half the value.

BILL IN EQUITY TO SET ASIDE A CONVEYANCE AND FOR AN INJUNCTION :—This was a bill for a decree to rescind the sale of a farm by the defendant Garman to the complainant, made in June, 1868, and executed by a deed dated August 7th, 1868. The consideration was $22,000, of which $1,000 was paid at the time of the bar-

gain, $7,000 more on the execution of the deed, and the residue of $14,000 secured by bond and mortgage, payable, .$4,000, April 1st, 1869; $1,000, January 1st, 1870, and $1,000 annually, thereafter, with interest,—with a clause making the whole debt payable upon default for sixty days in paying interest.

The bill charges fraud in procuring the sale, practiced by Garman, the vendor, and the other defendants, his agents, acting in concert. Sundry circumstances of suspicion are alleged, but the ground of relief chiefly relied on, is misrepresentation by Garman as to the amount and value of certain improvements he had put upon the farm, and as to the income derived from it in 1867. It is alleged that Garman represented his improvements as over $5,000, when, in fact, they did not amount to over half that sum; and his net income for 1876, he put at 4,000, whereas, he had not made $3,000. The bill also charges gross inadequacy in the value of the farm, it not being worth over $15,000:—also that the complainant was a stranger, a German, speaking English brokenly, inexperienced, wake-minded and credulous; and that he was imposed upon by the false statements of Garman, and by the fraudulent acts and practising of himself and his agent. The only other material allegation of the bill is, the omission in the deed of conveyance of a covenant of general warranty, and against incumbrances for which the contract of sale stippulated. Prayer for an injunction to restrain process taken for the collection of the mortgage, and for a rescision of the sale by a decree for a re-conveyance and for cancelling the bond and mortgage. There was no prayer for a decree that Garman execute a covenant of general warranty, &c.

The answers deny, generally, the equity of the bill. Garman's answer denies the complainant's alleged incapacity, and that the price of the farm is exorbitant. It admits that he represented that he had improved the

farm to the value of from $4,000 to $5,000, and alleges this to be true. As to the income for 1867 the answer states that he represented his gross produce at $4,000 in value, and alleges this to be true. It denies, generally, fraudulent acts and practices, and alleges that complainant bought upon his own judgment, formed upon personal and careful examination, after having visited other farms; that the price was his own offer made, and not accepted under several days.

The testimony on both sides was voluminous, going chiefly to the mental capacity of the complainant, the value of the farm, the improvements made upon it and the amount of income for 1867.

The bill was presented October 28th, 1869, and it was ordered that the application for injunction be heard December 1st, at which time the hearing was postponed to the 20th of the same month. On that day, after hearing argument by *Fulton*, for the complainant, and *Massey*, for the defendants, a preliminary injunction was ordered.

The cause came on for a final hearing on April 11th, 1870.

*Fulton*, for complainant.

1. The seller is held to a stricter rule as to representations than the buyer. 1 *Sugd. on Vend. Ch. I.Sec. III. Par.*, 39 *and* 58 ; *Mitchell vs. Zimmerman*, 4 *Tex.*, 75.

The income and value of improvements are material facts, and must have been truly represented. *Sugd. on Vend. Ch. I. Sec. III. Par.*, 57 ; *Irving vs. Thomas*, 18 *Me.*, 418.

2. The complainant is not affected by delay in seeking relief. In cases of fraud it is never too late. *White vs. Lightbourne*, 4 *Bro. P. C.*, 181 ; *Gould vs. Okedon*, 4 *Bro.*,

54

*P. C.*, 198 ; *Irwin vs. Kirkpatrick*, 3 *Eng. L. & Eq.*, 17 ; *Adams Eq.*,176 ; *Mitchell vs. Zimmerman*, *supra* ; *Hopkins vs. Beard*, 6 *Cal.*, 665 ; *Winslow vs. Bailey*, 16 *Me.*, 319 ; *Irving vs. Thomas*, 18 *Me.*, 418.

3. The rule *caveat emptor* does not apply in cases of fraud, which is an exception to every rule. *Sugd. on Vend. Ch. II, Sec. II, Par.*, 19 ; *Irving vs. Thomas*, *supra* ; *Crayton vs. Munger*, 9 *Tex.*, 285.

4. Mistakes, even innocently made, will be corrected in equity ; sometimes even mistakes of law, for example, as to the legal effect of a grant. *Green vs. Morris & Essex R. R. Co.*, 13 *N. J. Eq.*, 165, *Corse vs. Boyle*, 3 *Gr. Ch.*, 212 ; *Reynell vs. Sprye*, 3 *Eng. L. & Eq.*, 74. *S. C.* 11 *Bevan*, 618. Hence in this case, at least, the Court will reform the deed as to the omitted covenants.

5. A contract executed may be rescinded for fraud. There is no difference in cases of fraud between executory and executed contracts. *Adams Eq.*, 397 *and* 226 ; *Price vs. Price*, 12 *Eng. & Eq.*, 144 ; *Begre vs. Wentz*, 55 *Pa. St.*, 319 ; *Jackson vs. Summerville*, 1 *Harris*, 359 ; *Moreland vs. Atchinson*, 19 *Tex* , 303. It is true, as argued on the other side, that fraud must appear affirmatively, but no particular measure of proof is required. It need not be direct or conclusive, it may be circumstantial.

In questions of fraud, the price is material. Gross inadequacy is presumptive against the transaction, and calls for scrutiny, raises the question of fraud, and makes evidence of it significant. *Adams Eq.*, 79 *and note* ; *Hayes vs. Doane*, 11 *N. J. L.*, 84 ; *Stewart vs. Hubbard*, 3 *Jones Eq.*, 189 ; *Evarts vs. Evarts*, 55 *Pa. St.*, 110 ; *Brooke vs. Berry*, 2 *Gill*, 83 ; *Burte vs. Smith*, 15 *Tex.*, 219 ; *Argentei vs. San Francisco*, 6 *Cal.*, 677.

So, also, the condition and relative capacity of parties is to be considered upon the question of relief. If fraud

doubtful, even an unequal capacity is a ground of relief. *Green vs. Morris & Essex R. R. Co.*, 1 *Beas.*, 165; *Freeman vs. Griggins*, 2 *Jones Eq.*, 162; *Stewart vs. Hubbard*, 3 *Jones Eq.*, 186; *Praxton vs. Brown*, *Ib.* 494; *Bigler vs. Fleckenham*, 5 *P. F. Smith*, 279; *Kauffman vs. Swar*, 5 *Barr*, 230; 2 *Pars. on Cont.*, 774; *Moreland vs. Atchinson*, *Supra*; *Ellis vs. Matthews*, 19 *Tex.*, 390; *Causey vs. Wiley*, 27 *Ga.*, 444; *Johnson vs. Chadwell*, 8 *Humph.*, 148; *Hyla vs. Mason*, 4 *Sneed*, 497; *Belden vs. Hennquiz*, 8 *Cal.*, 87; *Hunt vs. Moore*, 2 *Barr*, 105; *Hall vs. Perkins*, 3 *Wend.*, 626; *Brook vs. Berry*, 2 *Gill*, 83.

A party deceived may always avoid a contract procured by fraud. *Winans vs. Winans*, 4 *C. E. Green*, 220; *Allaire vs. Whitney*, 1 *Hill*, 484; *Reynell vs. Sprye*, 13 *E. L and E.*, 174; *Remson vs. Musgrave*, 2 *Mood. and Rob.*, 92; *Sugd. on Vend. Chap.*, 6 *Sec.* 1 *Par.* 28; *Livingston vs. Penn Iron Co.*, 2 *Paige*, 390; *Wiswal vs. Hall*, 3 *Paige*, 313; *Hewitt vs. Crane.*, 2 *Halst. Ch.*, 159; *Maedows vs. Smith*, 7 *Iredell Eq.*, 7; *Rosevelt vs. Fulton*, 2 *Cow.*, 129; *Turnbul vs. Gadsden*, 2 *Strobh. Eq.*, 14; *Pinckston vs. Brown*, 3 *Jones Eq.*, 494; *Hunt vs. Moore*, 2 *Barr*, 105; *Kaine vs. Weigley*, 10 *Harris* 179 *and* 183; *Jackson vs. Summerville*, 1 *Harris.* 359; *Mc. Conkey vs. Grubb*, II *Harris*, 321, *Cornelius vs. Molloy*, 7 *Barr.*, 293; *Hall vs. Perkins*, 3 *Wend.* 626; *Prentiss vs. Russ*, 16 *Me.*, 30; *Winston vs. Bailey*, 16 *Me.*, 319; *Joyce vs. Taylor*, 6 *G. & J.*, 54; *Davis vs. Calvert*, 5 *G. and J.* 269; *Hazzard vs. Irwin*, 18 *Pick.* 95; *Ingersoll vs. Barker*, 21 *Me.* 474; *Irving vs. Thomas*, 18 *Me.* 418.

6. Intention may be ascertained from the agreement in order to carry it into effect, even after deed passed. *N. J. Zinc Co. vs. Boston Franklinite Co.*, 2 *Mc. Carter*, 418; *Tyson vs. Passmore*, 2 *Barr.*, 122.

The proper remedy is rescission. In nearly all the cases cited this was the remedy applied.

*Sugd. on Vend. Ch.* 2, sec. 3, *Par.* 26; 2 *McCord's Chy.*, 159; *Coote vs. Coote*, 2 *Iredell's Eq.*, 159; *Stone vs. Dewey*, 4 *Metc.*, 151; *Freeman vs. Wiggins*, 2 *Jones Eq.*, 162; *Moreland vs. Atchison*, 19 *Tex.*, 303; *Mitchell vs. Zimmerman*, 4 *Tex.*, 75; *Albeny vs. Brannon*, 7 *Cal.*, 503.

*Massey*, for defendant.

The Court may rescind a contract executed for fraud, but fraud is not to be inferred from slight presumptions, but must be clearly and conclusively proved. A clear and well defined distinction as to relief, is also made between executed and executory contracts and to induce a court of equity to rescind the former, requires proof strong and conclusive.

What is fraud? There must have been misrepresentations, false to the knowledge of the party making them, relied on by the other party, forming a material inducement to the purchaser, and of which, by ordinary care and diligence, he would not have ascertained the falsity. *Adams Eq.*, (177); *Taylor vs. Fleet*, 4 *Barb.*, 95; *Smith vs. Richards*, 13 *Pet. S. C.*, 26; *Livingston vs. Penn. Iron Co.*, 2 *Paige*, 390; *Rupert vs. Dunn*, *Rich.* (*S. Car.*), 104; *Sugd. on Vend. p.* 3-4; *Irving vs. Thomas*, 18 *Me.*, 418; *Dawes vs. King*, 1 *Str.*, 75; *Sandford vs. Rose*, 2 *Tyler*, 429; *Dunn vs. Chambers*, 4 *Barb.*, 376; *Tindale vs. Harkinson*, 19 *Ga.*, 448.

It will appear, from the cases cited, that relief has been granted to a vendor in three classes of cases.

1. Mistake on the part of both, or either, as to what was sold or bought. The rule stated generally is, that equity will relieve against mistake of both parties as to the substance of the thing conveyed, or fraud, or misrepresentation of one as to substance, but not for mis-

representation as to quality or value, except subject to the rule before stated from Adams.

In the cases of misrepresentation cited by complainant, either the vendee had no opportunity to examine, or the representations concerned a subject of peculiar skill and judgment.

2. When the parties were not on an equal footing as to information respecting the property, and the vendee had not opportunity to examine.

3. When one of the parties, by force of peculiar circumstances, is shewn to have relied on misrepresentations of the other, who sustains such a confidential relation to the vendee as to be able to exert an undue influence. When there is a legal capacity equity will not undertake to measure it.

Further, even when the relations are confidential, or where there is imbecility, also, it must appear that undue influence was, in fact, exercised. *Deaton vs. Monroe*, 4 *Jones Eq.*, 39 ; *Taylor vs. Taylor*, 6 *Ired. Eq.*, 26 ; *Rippy vs. Grant*, 4 *Ib*, 443 ; *Hunt vs. Hunt*, 2 *Beaslee*, 161 ; *Wendell vs. Rensellaer*, 1 *Johns. Ch.*, 350 ; *Russell vs. McNamara*, 14 *Ves.*, 91.

The inadequacy of price charged is not proved, but if it were, in no case is that alone, however gross, a ground of relief, except between persons standing in confidential relations. *Chesterfield vs. Janssen*, 2 *Ves. Sr.* 125 ; *Purcell vs. McNamara, supra* ; *Osgood vs. Franklin*, 2 *Johns., Ch.*, 23, *and cases there cited* ; *Seymour vs. Delancy*, 3 *Cow.*, 446 ; *Moth vs. Atwood*, 5 *Ves.*, 845 ; *Murray vs.* 2 *Sch. & Lef.*, 488.

The facts in this case do not bring it within any of the classes of cases in which equity has interfered, and fail to afford a ground for the relief sought.

THE CHANCELLOR :—

It is a rule well settled, that after the parties to a contract for the sale of lands have gone so far as to execute the contract by the conveyance of title, the transfer of possession and the payment or securing of the purchase money, this Court will not unravel the transaction merely to relieve against the hardship, or, even great injustice, of an unequal bargain. A contract executed, will be set aside only where either, 1st, there has been a mistake materially affecting the subject-matter of it, and with respect to which the contract cannot be reformed ; or, 2d, where the contract has been procured by fraud in some of its forms of misrepresentation, circumvention, or undue influence.

The present case goes upon the ground of fraud. It is alleged that this was an exorbitant bargain, procured through fraudulent misrepresentations and arts, practiced by Garman and the other defendants in concert, upon a weak and credulous purchaser mentally incapable of protecting himself. Such is, in substance, the case made by the bill. This charge of fraud was, in the argument for complainant, sought to be maintained upon two general grounds. Each of them has received a distinct and careful consideration. The first of these grounds is the alleged gross and fraudulent misrepresentations by Garman, as to the value of the improvements made upon the farm, and the income received from it for the year 1867. The allegation on this point is, that pending the negotiation, in June 1868, and while the farm was under examination by the complainant, Garman, as an inducment to the purchase, represented, 1st, that he had put upon the farm, improvements "to the amount and value of $5000;" and 2d, that "he had made $4000 off it the year before." The bill then denies that Garman had made improvements to more than one-half the amount of $5000. It also denies that he had made off the farm $4000, or even $3000.

The first step in the investigation of this charge should be to ascertain, precisely, what were the representations which, according to the record, Garman must be taken to have made. Let it be here observed that no person, other than the parties to this bill, viz : the complainant, Garman, McConaughey and Riggs, were present during the negotiation, in the course of which, the statements by Garman, as to improvements and income, are alleged to have been made ; nor is there proved any admission on the part of either of the defendants, as to what transpired during that interview. The whole transaction rests in the bosom of these parties, and we have, in the cause, no disclosure touching any representations made by Garman, except the allegations of the complainant in his bill, and Garman's counter-statement in his answer. McConaughey and Riggs, in their answers, are silent on this point. Garman's answer, not being made to interrogatories filed with the bill, is not, under the recently adopted rules of Court, evidence in his favor ; yet it may be used by the complainant against him as an admission in the cause, so far as it may go to support the complainant's allegation ; and it is only by using Garman's answer on this point, as an admission, that the complainant can draw from the record any proof whatever as to the representations made by Garman during the negotiation. It is hardly necessary to add, that Garman's statement, if used as an admission and is uncontradicted by evidence, must be accepted as it is made.

This result obliges the Court to one of two alternatives, that is, either to dismiss from consideration, as wholly unproved, the alleged false representations touching the improvements and income of the farm, or to consider this allegation of the bill upon the assumption that the representations made were such as Garman's answer states them to have been. This leads directly to what is the only admissible inquiry under this branch of the case, viz ;

how far the evidence, as to the value of the improvements and the amount of income, supports the representations which Garman admits that he made on these points. And first, as to the improvements. Garman admits his having stated to the complainant that improvements had been made "to the value of between $4000 and $5000." To what extent, then, were improvements made in 1867 ? The testimony at large shows that fruit trees were set out, new fences set, and the old repaired, lime extensively spread, and other fertilizers used ; that there was ditching and underdraining, a new carriage house and stable built, the dwelling house repaired and the grounds improved. The fact that these improvements were made is not disputed. It is their amount and value that is in controversy, and about which we proceed to inquire. Let us premise the inquiry by a very material and obvious consideration. It is, that for the purposes of this cause, the amount and value of these improvements need not be so exactly ascertained, as would be necessary in an action to recover their cost ; but rather, the question is, whether Garman's representations were so wide of the truth as not to be accounted for by the usual disposition to over-estimate the value of one's own property, especially the value of improvements attempted upon any considerable scale, a disposition stimulated, it may be, to some exaggeration by the effort to drive a good bargain ; in other words, whether there were over-statements so gross as to be attributable only to a fraudulent design to cheat and over-reach. I am not able, upon the proof, to reach this conclusion. After collating the testimony of all the witnesses as to the several items of improvement, and calculating their cost, it does appear that their total cost could not have fallen much, if any, short of $4000. If this be so, then a statement by the vendor, made in driving a bargain, to the effect that he had improved to an amount of from $4000 to $5000, though somewhat exaggerated, cannot be treated as willfully false and fraudulent, such as to lay a ground for rescinding the sale.

We next take up the other alleged fraudulent misrepresentation, the one touching the income for 1867. Garman admits.that, pending the negotiation, he did say to the complainant that "during the preceding year (1867) he had produced from the farm crops, which, in the aggregate, had amounted to $4000." The difference, on this point between the bill and answer, is, doubtless, as to the sense in which the word "made" was used; whether the statement that Garman had " made" $4000 off the farm," applied to the gross value of the produce, or to the net income of the business of the year. ·The latter construction, which is that given by the bill, is unsupported by any evidence. The only evidence adduced, Aaron Wiest's testimony, falls short of it. He says, "I heard Randall B. Garman tell my father, George Wiest, that he made $4000, off the farm in 1867." Four thousand dollars was the net value of the crops. I heard him tell my father so." The date of this conversation here becomes material. It is fixed by the cross-examination. "He told my father," says the witness, "the farm was very good and that he (Randall B. Garman) made $4000 from it in one year, viz : 1867, clear of all expenses." "This conversation," the witness proceeds to say, "occurred in 1868, in the month of August, in the afternoon." This, in the words of the witness, is the whole testimony as to what Garman said at any time on this subject. I am unable to accept it as proof of this allegation of the bill : First, because it does not go to the time of the negotiation, which was in June. The witness speaks of a conversation held in August, after the purchase had been made. Such representation then made, is not in accordance with the allegation, and what is of more consequence, it could not, under the rule of law, be material ; for a false representation, in order to be ground for rescinding a sale, must have been made before the sale, and have been an inducement to it. Nor, again, can the fact that such a representation was made in August, after the purchase, support an inference that a like statement had been
55

made previously, in June, pending the negotiation.    It would be dangerous in the extreme to subject executed sales of real estate to the risk of being set aside upon inferential evidence so slender as this.    Thus appears the insufficiency of this evidence, even supposing Aaron Wiest to have correctly understood Garman's meaning.    But here arises a second observation to which this testimony is open, and that is, the inherent infirmity of testimony which does not concern some act or transaction, about which the witness could not be supposed to be mistaken, but which rests upon the witness' impressions as to the terms or purport of a conversation, a conversation held, as in this case, eighteen months ago, and on a point so liable to misconstruction as whether Garman, speaking of the productiveness of the farm, referred to its gross produce or its net income.    Without questioning, in the least degree, Aaron Wiest's veracity, I should be unable, if the case depended upon it, to accept his impressions of that conversation, standing alone as his testimony does, as evidence of that clear and satisfactory nature which is necessary to warrant so serious an interference of the Court, as is the setting aside a contract deliberatly executed, such as this has been.

There remains then, to the complainant, as his only means of showing that any representations as to income were made, pending the negotiation, Garman's answer used as an admission.    It goes to this extent, that he represented the value of the crops produced in this year 1867 at $4000.    Then the only inquiry open to us is, how far does the evidence sustain this admission by Garman?    Let us see.    Dougherty, who measured and delivered the corn crop and took receipts for it, puts it at nearly 2200 bushels. He is corroborated by B. F. Hurlock, who helped get out the corn, also by J. A. Hurlock who bought part of it— 1700 bushels—at $1.00 per bushel.    Crawford, the complainant's witness, estimates that there were 1800 bushels raised.    The positive statement of the measurer must be

preferred to any estimate. This gives, at least, 2100 bushels, which, being sold at $1.00 per bushel, was worth $2,100. Dougherty also measured the other crops, the wheat crop at 550 to 560 bushels, say 550 bushels ; the oats at 250 bushels, and the potatoes at 260 bushels. The wheat was sold at $2.50 per bushel, the potatoes at 85 cents. What the oats sold for does not appear, but the market price at the time, Hurlock states, as 60 cents. Taking these quantities and prices, the gross value of the products of the year was $3,846.50, falling, it is true, a little short of $4,000 ; yet certainly not sufficiently so to stamp, as fraudulently false, a statement by Garman 'that the crops had amounted to $4,000. This is the extent of his admission in the answer, and nothing beyond this is proved. The conclusion to which this examination of the evidence leads is, that the alleged fraudulent misrep-resentations touching improvements upon the farm and its income, are not proved.

But, again, even supposing that Garman's represen-tations to the complainant, as to the improvements and income, were more in excess of the truth, and formed a material inducement to the purchase, this would not be ground for a decree rescinding the sale. In the course of the decisions touching misrepresentations by vendors in a bargain, two distinct classes are recognized with different effect. First, are those which concern the essence or subject-matter of the contract ; as, for example, a represen-tation that the property contains a valuable gold mine, when, in fact, there is none. Against a misstatement of this nature, whether it be the result of fraud, or only of mistake, equity will relieve ; and this, because the pur-chaser does not get the thing which he contracted for ; of this class were the cases cited for the complainant from 2 *Paige's R.* 390 ; *Livingston vs. The Penn Iron Co.*, 3 *Paige's R.*, 313 ; *Wiswell vs. Hall, and Rosevelt vs. Fulton*, 5 *Johns. Ch. R.*, 174. 2 *Cow.*, 129. The other class of representa-tions are those which concern, not the essence or subject

Opinion :—what representations will warrant a rescission of the sale.

matter of the contract, but the value of the property sold ; such as the usual commendations made by the vendor, and rarely without exaggeration, touching the fertility, productiveness, improvements, income and general advantages of the property. Representations of this nature, a purchaser is not presumed to rely upon. If material at all, they should put him upon examination or inquiry ; and the omission of a purchaser to exercise his own judgment in such matters upon examination or inquiry, or to seek disinterested advice, should his own experience or judgment not be reliable, equity will not relieve against ; that is, observe, not so far as to rescind a sale already executed. To this rule there are some exceptions. These are, where, under special circumstances, an examination of the property is very difficult, or the misstatement concerns a matter of peculiar skill and judgment on the part of the vendor, or there is an abuse of confidential relations between the parties dealing, or imposition upon a mental capacity too feeble to bargain. In these exceptional cases— and I have endeavored to comprehend all—equity excuses the purchaser's reliance upon the vendor, and his omission of the usual precautions for self protection ; but otherwise, the maxim *caveat emptor* applies to all such representations by a vendor as relate to the value, quality and advantages of the thing sold. For illustrations of this rule, take a few of the adjudged cases in which relief has been refused. In *Fenton vs. Brown*, 14 *Ves. Jr.*, 144, a leasehold estate offered for sale was stated to be nearly equal to a freehold, being renewable upon a small fine. It turned out that the lease of the premises, being held of Magdalen College, Oxford, was renewable only at the discretion of the College, by which a large fine (£700.) was demanded. In *Scott vs. Hanson*, 1 *Sim.* 13, the land was described as "uncommonly rich water meadow land," whereas it was imperfectly watered. In *Taylor vs. Fleet* 4 *Barb., N. Y. Repts.*, 95, the misstatement charged in the bill was, that a farm on Long Island was full as early, if

not earlier, than any other land on the west end of Long Island for raising market produce, which was the object of the purchaser. It turned out that there was earlier land on the Island. There was some contrariety of evidence as to what were precisely the vendor's statements, but the Court held that, at all events, these were not such representations as a purchaser should rely upon without examination and inquiry, and that his disappointment was not a sufficient ground to rescind the sale. A case more striking, and in its facts much like the present one, is *Tindall vs. Harkinson*, 19 *Ga.*, 448. The bill charged that Tindall, desiring to invest in lands, and being inexperienced, applied to Harkinson for truthful information as to his lands, which Harkinson promised to give. After showing Tindall a portion of the lands, Harkinson assured him that the rest was equally good ; that he had made 40 bales of cotton that year (1853) ; that the land yielded 800 to 1200 lbs. of cotton per acre, and 15 to 20 bushels of corn ; that land in the neighborhood sold for $14 per acre, the price he asked for his ; that it was a lively, thrifty soil and well remunerative ; all which statements Tindall confided in, and bought the land at $10 per acre. The bill charged falsehood in all these statements. The case came up on a motion to dissolve an injunction after answer filed, denying the charges of the bill ; but the Court distinctly considered the sufficiency of the bill on its face and expressed a strong opinion against it.

The cases cited for the complainant, such of them as were accessible, have been examined. They range themselves clearly within the exceptions before referred to, in which the purchaser is excused from diligence. In some of them there were confidential relations between the parties, as in *Pinkston vs. Brown*, 3. *Jones Eq.*, 449. *Hunt vs. Moore*, 2 *Barr*, 105. In one, *Corneilius vs. Molloy*, 7 *Barr*, 293, the misstatement related to a matter depending upon skilled judgment, and not discoverable by inspection, it being a sale of composition metal represented to be cop-

per. Others, such as *Jackson vs. Summerville*, 1 *Harris*, 359, were cases of imposition upon extreme old age and imbecility, and in that case this was connected with gross inadequacy. The case most relied on for the complainant, *Irving vs. Thomas*, 18. *Me.*, 418. A lessee of a tavern took the lease at a high rent under a misrepresentation by the owner as to the profits of the business. He paid part of the year's rent, and being sued at law for the balance, defended upon the ground ·of fraud. The Court sustain the defense. They do so, however, with this express qualification, that the misrepresentation would not have been a sufficient ground to set aside the lease, so as to enable the lessee to recover back what he had paid, but that it served only as a defense against any further claim for rent.

It is very material to a right decision as to the effect of fraudulent misrepresentations by a vendor touching the property sold, whether lands or goods, to observe how the question comes before the Court, whether the fraud be used as a defense in a suit at law for the price, or as the ground of an action for deceit ; or, if in Equity, whether the bill is for the specific performance of a contract yet unexecuted, or as here, it is a bill to rescind a contract which has been executed. It is in this last class of cases that Equity so stringently applies the maxim *cavaet emptor* ; a hard, stern maxim, but one founded upon both justice and policy ; upon justice, because a purchaser, who is not within the exceptions before stated, may reasonably be required to exercise the ordinary means of self-protection before asking the aid of the law to undo his bargains ; and a maxim of sound policy, also, since without it, business dealings must become greatly unsettled.

To return to the case before the Court. The evidence upon the record, discloses nothing which can excuse a purchaser from forming his own judgment by personal

inspection as to the improvements which Garman had made, or by inquiry as to the productiveness of the farm. The means of doing so were accessible. No artifice to prevent examination or inquiry is in proof. To some extent, the subject was one upon which the vendor must be supposed to be more accurately informed than others could be, yet there was no question of peculiar skill or experience involved, such as any purchaser of ordinary intelligence could not, by reasonable care, judge of, so as to protect himself. Again, there were no confidential relations between these parties to warrant a reliance upon Garman's sole statement ; and finally, and what perhaps is the more material point in this cause, I am unable, as the sequel of this opinion will more fully show, to find, from the evidence, such a degree of mental incapacity on the part of the complainant, as to exempt him from the ordinary diligence required of purchasers who seek the aid of this Court to set aside their contracts.

We now come to the other general ground, upon which,in the argument,the charge of fraud in this contract was maintained. It was insisted that, although no direct acts of fraud, such as misrepresentation, circumvention, or imposition, might be disclosed in proof, nevertheless, the making of so unconscionable a bargain as this is alleged to be, with a weak and credulous purchaser, is of itself fraudulent, and a ground of relief in Equity. It is true that although, for mere inadequacy of consideration, without other circumstances, a contract executed will not be rescinded, yet an unconscionable bargain, made with a person of such weak understanding as to be incapable of self-protection, though not an idiot or a lunatic, raises a presumption that it was procured through some fraud or undue influence ; and on this ground, equity will relieve such a person against a transaction which would bind one of ordinary capacity,exempting him from the maxim *caveat emptor* before considered. It is, however, material to observe that the Court interferes in this class of cases with

great caution, and only where the mental weakness is to such a degree as disables the party for self-protection, is clearly made out in the proof.    This I gather as the result of the authorities.  It is unnecessary to review them. *Shelford, on Lunatics*, 1 *Law. Lib.*, (267.)  1 *Fonblanque's Eq. B. I. Ch.* 2, *Sec.* 3, *n.* (2).  1 *Sto. Eq. Jur. Sec.*, 235.  6 *Clarkson vs. Hanway*, 2  *P Wms.*, 202.  *Bennett vs. Vade*, 2 *Atk.*, 324.  *Gartside vs. Isherwood*, 1 *Bro. C. C.*, 558. *Blackford vs. Christian*, 1 *Knapp*, 77, cited in 2 *Sto. Eq.*, *sec.*, 237.  Of this class are the cases cited for complainant from 4 *Sneed*, 498.  8 *Hump.*, 145, 27 *Ga.*, 444, and 19 *Tex.*, 390.

Unquestionably, the bargain in this case is a hard and improvident one ; but is the complainant a person of such weak understanding as to bring him within the principle of these authorities ?  The opinions of the complainant's witnesses, who are numerous and respectable, do go to the extent of holding him wholly incompetent for any serious business transactions.  But the opinions of witnesses upon a question so uncertain as that of mental capacity, is not a safe, nor a sufficient ground for judicial action of so grave a nature as is here sought, unless these opinions be well supported by the facts entering into the history, acts and transactions, of the person whose capacity is in question.  A degree of mental incapacity for business, such as should exempt one from the ordinary requirements of diligence and precaution, and justify the Court in undoing his transactions, must have shown marked results in his past business life.   Either the affairs of such a person will be found to have slipped out of his hands and have come under the management of others, or his own management, if allowed to continue, must have been attended with disaster beyond the making of one improvident bargain.   Again, such a degree of incompetency could hardly fail to have left traces of itself in his mode of dealing, in the particular transaction inquired of.  Now, I am not able, by these tests, to find the complainant incom-

petent to the degree required. In the first place, the complainant, during more than half an ordinary lifetime, has been in active business, pursuing several avocations, farming, milling and merchandizing, in all which he has managed his own affairs ; and although, doubtless, not with as much wisdom or thrift as have many or most others in his sphere of life, yet without any marked failure or miscarriage, except that, as testified by one witness, he lost money at storekeeping, which a farmer, or miller, however competent for his own business, is very likely to do. And through all, he has reared a family, maintained a fair status in society, and, until this purchase, accomplished, if not any marked success, yet not a failure in business life. In the next place, looking to this purchase, and to the circumstances attending it, we do not observe, in his acts and mode of dealing, the marks we should expect to find of signal incapacity to bargain. In carrying out his purpose to buy lands in Delaware, he acted deliberately, made several visits, not less than three to Delaware, visited lands in both Kent and Sussex counties, examined three farms near Camden, and contracted for one on terms not so hard upon himself, but that the vendor, Mc-Bride, retracted. In the negotiation with Garman, even taking the statement of the bill, there was not betrayed undue haste, excitability or extreme credulity. He personally examined the farm, formed a judgment upon it, good or bad, and, as the circumstances of the case indicate, he made his offer, left, returned in a few days from below, found his offer accepted, and closed the bargain. In all this, there appears nothing but what ordinarily attends such transactions, even if we include no small anxiety, on the part of Garman, to sell, and of the land agents, to forward the sale. It is also a noticeable and significant fact, that throughout the complainant's efforts to buy land in Delaware, and especially during the two months which elapsed after the purchase from Garman, before it was completed, no interest, anxiety or interference appears on

56

the part of his friends to see that he might not be im-
posed upon.

But now we come to the unhappy feature of this case,
one which, more than all besides, has brought into ques-
tion the complainant's mental capacity.  That is, the
exorbitant price at which he bought.  It is evidently upon
the folly of this purchase that the witnesses have formed
their opinions.  The most emphatic among them—Delaware
witnesses—could have nothing else to rest upon, for they
have known him in no other transaction.  Their opinion
is based upon the assumption that the price was about
double the value of the farm, their average estimate of
the farm being $12,000, against a price amounting to
$22,000.

Now, it is certainly true that, in all cases in which
the question of fraud, undue influence, or incapacity is
raised, inadequacy of consideration is a material element ;
that is, by it, proof on these points, which otherwise would
be doubtful, may be rendered decisive.  In a case where
the capacity of a party to bargain is left in doubt, the
very exorbitancy of the bargain may convince the Court
that the party must have been unfit to transact business,
and have become the dupe of some imposition.  But to
have this effect the inadequacy must be gross.  1 *Sto. Eq.*,
*Sec.* 246.  The bargain must be, as described by Lord
Hardwicke in *Chesterfield vs. Janssen*, 2 *Ves. Sr.*, 155 ;
"such as no man in his senses and not under delusion
"would make, on the one hand, and as no honest and fair
"minded man would accept, on the other ;" or, as Chan-
cellor Kent puts it, in *Osgood vs. Franklin*, 2 *Johns. Ch.
R.*, 23, "such as to shock the conscience and confound the
"judgment of any man of common sense."  In all the
cases in which inadequacy of price or value has been
treated as a material consideration, it has been of this
gross character.  The inequality has not been less than
half the value, the English and American cases seeming

practically to apply what, in the civil law, was an artificial rule on this point. In the cases cited for the complainant, there was in none no less disparity than one-half the value, in many of them, much more. For example, in *Stewart vs. Hubbard*, 3 *Jones Eq.*, 186, sixty dollars was paid for a share in an unsettled estate, the share being worth $1200. In *Brooke vs. Berry*, 2 *Gill*, 84, three thousand seven hundred dollars was the consideration for land valued by the Court at six thousand five hundred and twenty dollars. In *Bruch vs. Smith*, 15 *Texas*, 219, two hundred and fifty dollars was the consideration for a widow's interest in an unsettled estate of her husband, worth eighteen hundred and seventy-three dollars and fifty-seven cents. Now to apply this test to the present case ,—it is true that the complainant's witnesses estimate this farm at an average value of only $12,000, which is but little above half the price paid, $22,000. But their estimates manifestly do not include the improvements put upon the farm in 1867, at a cost, clearly proved, of hardly less than $4000. The witnesses, fourteen in number, being cross-examined as to these improvements, six profess to know nothing about them, and six more speak of them very partially and express themselves as unable to set a value upon them.

Two of them, Crawford and Ross, undertake to estimate the value of the improvements, but at a value much below their proved cost, not equal to half of it. It must be fair to assume that from 1866, when Garman bought at $11,000, to 1868, when he sold, the enhanced value of the property, in consequence of improvements, was at least equal to their cost, say $4000; and as upon the testimony of all the witnesses, prices of real estate had not begun to decline in the summer of 1868, it may be considered that in June, 1868, this farm had a market value of from $15,000 to $17,000; that is, estimated according to the prices and expectations which then prevailed, and not under the depression which afterward

followed. Then the question remains, and it is the final and decisive one, is this so gross a disparity of value as can be accounted for only on the ground of imposition upon mental weakness, so as to be, as the phrase goes, "demonstrative" of incapacity and fraud? I conclude it is not, but rather that the case must be treated as one of the unfortunate fruits of the speculation in real estate prevalent in this State for some years, and which culminated at about the time of this sale. All have seen, and not a few have felt, its effects. The ordinary and reliable valuations of real estate resting upon sober calculations as to productiveness and income, gave place to fanciful and false estimates based upon exaggerated prospects of advanced prices destined never to be realized ; and these again, by a natural law, are succeeded by depression, and a decline of prices quite below the real value. Our own people largely fell under this influence, and immigrants from other States much more so. Now, there are in every community—we may see such any day—persons inexperienced, ill judging, over-sanguine and visionary, who, in these periods of inflation, fall into rash and improvident bargains. Such cases appeal strongly to our personal sympathies, but in the absence of fraud the law cannot relieve against these follies. To do so would largely unsettle the business of society.

Decree affirmed by the Court of Errors and Appeals at the June Term, 1870. See 4 *Houston's Del. Rep.*, 121.

## CHARLES F. MACLARY

### *vs.*

## JOHN P. REZNOR AND WILLIAM WILDS, SHERIFF.

*Kent, Sept. T., 1870.*

R., having recovered judgment against M., under which execution had been taken, and property levied on, sufficient to satisfy the entire judgment, made a settlement upon payment of less than the amount of the judgment, and executed a formal release, under seal, of "all further liability" on the judgment, Held, that being an executed contract under seal, no consideration was necessary to make it effectual.

Part payment of a debt is not a sufficient consideration to support an executory promise to discharge the debtor, and where there is an agreement to release a debt, on the part payment of it, still remaining *in fieri*, the defence of want of a valid consideration for it, will be available. But a release, under seal, complete in its terms and duly executed, needs no consideration to support it, beyond what the seal imports. It will be effectual, even if it be wholly gratuitous, and without the payment of one cent by the debtor.

A man may give a voluntary bond, or he may gratuitously release, to another, any right whatever, provided he does not thereby defraud his creditors, and execute the bond release, or other instrument, with the due legal solemnities, as by writing, sealed and delivered.

When a complainant seeks relief against the collection of a judgment, claiming, as the ground of equity, payment of part, and release of the residue by writing, under seal, voluntarily delivered, and the answer admits these facts, but alleges that the execution of the release was procured through misrepresentation and concealment, it is an answer by way of confession and avoidance, and not a denial of the equity of the bill, such as is required to sustain a motion to dissolve a preliminary injunction.

When a part of the sum paid in settlement of a judgment, was secured by note not properly stamped, and the maker of the note seeks, by injunction, to restrain further proceedings under the judgment, he must be required to do equity, while himself seeking it, and, if found entitled to a perpetual injunction, it will be decreed upon terms protecting the defendant's rights under the note.

False and fraudulent misrepresentations, or concealment of material facts, unless they appear to have induced the party creditor to compound the release, the whole debt upon the payment of a part of it, will not invalidate, or avoid, an executed release of it. But, where the debt consists of a judgme..t, recovered in an action recently instituted, on which an execution has been issued and levied to the full amount of it, if the creditor be guilty of negligence in compromising it without consulting his attorney who was cognizant of the levy, as to the condition and security of the claims, false and fraudulent misrepresentations made by the debtor before the compromise, of his inability to pay the whole debt, and his concealment from the knowledge of the creditor of the fact, well-known to him, that the execution had been levied on his goods, and that they were sufficient to pay the whole amount of it, will not avoid an executed release of the entire debt made in consideration of the payment of a part of it.

In order to avoid a transaction on account of false representations, three things are requisite. 1st. The misrepresentation must relate to something material and substantial. 2nd. The transaction sought to be avoided, must appear to have been induced by it. The party aggrieved must have been actually misled by it. 3d. His confidence must have been a reasonable one.

Concealment, by one of the parties, in order to avoid a transaction, must be of facts which he was under an obligation to the other to communicate. The duty of disclosing facts, which may influence the adverse party to a transaction, springs either from some fiduciary relation between the parties, or from a trust understood to be reposed by one in the other about a matter of which the latter has peculiar means of information.

BILL IN EQUITY FOR AN INJUNCTION.—The facts of this case, as made by the record were, that Maclary and one Frederick W. Ridgely and Reznor had formed a mercantile copartnership of equal interest, under the name and style of Ridgely & Maclary, and had commenced business at Ridgely Station, on the line of the Maryland and Delaware Railroad, in Caroline County, Maryland, in the summer of the year 1867, and that, in the month of October following, Reznor sold his interest in the firm to him and Ridgely, and retired from it. That the two then formed a new partnership, and continued in the business under the same name as a firm, and made and delivered to Reznor, for a part of the price agreed to be paid him

for his interest in it, two promissory notes, dated October 21st, 1871, one for $500, payable to his order in four months, and the other for $1000, payable in like manner in eight months, at his office, No. 335 South Sixth Street, Philadelphia. And that, early in August, 1868, he, Maclary, sold out his interest in the firm to one James S. Dungan, who continued the business under the name and style of Ridgely & Dungan.

The bill alleged that it was then expressly stipulated and understood, that the last mentioned firm should assume and pay all the outstanding liabilities of the firm of Ridgley & Maclary, including the said notes to Reznor; and, therefore, he afterward gave himself no concern about them, and heard nothing of them until sometime in the spring of 1869.

The defendant, however, in his answer, denied that he was a party, or was privy to, or in any manner bound by, the alleged agreement between the complainant and the firm of Ridgely & Dungan, to pay off the notes; he could believe, as alleged, that complainant had given himself no concern about them, and knew nothing concerning them, although he (Maclary) well knew, and ought to have known, in the meanwhile, that they had not been paid. One reason why, during that time, he heard nothing concerning them was, that the defendant did not know where complainant was, and had been informed that he and his partner, the makers of them, were insolvent, which made him more lax in looking after and endeavoring to collect them than he otherwise would have been.

It appeared by both bill and answer, that on or about the 3d of April, 1869, the complainant went to Philadelphia, in response to a telegram from Reznor, to the effect that it would be greatly to complainant's interest to see Reznor immediately.

At this interview, as to most of which the statements of the bill and answer do not materially differ, Reznor

. informed him that he had sent for him to come and see him about the notes; that they had not been paid; that he looked to him for the payment of them, and was willing, under the circumstances, to accept from him the sum of one thousand dollars in payment of them.

To this offer, the complainant replied that the offer was a very liberal one, but, as the complainant says, he wished to wait until the affairs of the firm of Ridgely & Dungan should be closed and settled, to which Reznor made no objection, but said he was willing to accept the sum of one thousand dollars in settlement and payment of the two notes. The answer says that, while complainant did say that the offer was a very liberal one, he did not accept, or offer to accept, or shew any disposition to accept it; on the contrary, he declined and refused to accept it until the affairs of Ridgely & Dungan should be wound up, about which he then knew nothing, and over which he had no control. But the offer was made for prompt payment, and not for future acceptance, after the affairs of that firm should be wound up, and was so fully understood to be by him at the time when it was made. He did not, however, say, or even intimate, that he would then be willing to accept it, but only said he wished to wait till they were wound up, which he, the defendant, regarded as a mere evasion and excuse for not settling at all, and, therefore, he pressed the matter no further. But he did not assent to the proposed delay, or say, or in any manner intimate, that he had no objection to it, for he had no thought of assenting to it. Nor could the complainant have understood him to make no objection to it, as was apparent from a letter which he received from him, written on the 23d day of October, 1869, which was as follows:

"CLAYTON, DELAWARE, Oct. 23d, 1869.
Judge, J. P. Reznor, Philadelphia, Pa.

Dear Sir: Being absent from home has caused the delay in reply to your letter which is now before me. As

you persist in having the money on those notes imme-
diately, I can only say to you that to cancel those notes I
will make to you a full and perfect title to those lots at
Ridgely, which is the only property I own in this world,
or if you prefer, I will give you one hundred dollars in
cash. You may choose between the two, which is the
best I can do. Hoping soon to hear from you, I remain,
Respectfully yours,

C. F. MACLARY.

P. S.—You could hold those lots, or you could sell
them for more than one hundred dollars. I was offered
that. Yours, Maclary."

The bill further alleged that the firm of Ridgely &
Dungan continued in business until January 1st, 1869,
when it became totally bankrupt and insolvent, and unable
to meet its engagements with reference to the payment
of the notes; and that Ridgely, one of its members, had
died a short time before the conversation, above stated,
between the parties to this suit. The defendant denied
any knowledge of these facts, or their pertinency to the
subject-matter of the complaint.

It further appeared that Reznor brought suit in the
Superior Court in and for Kent County, and recovered
judgment, for want of affidavit of defense, at the October
Term, 1869, for $1633, and on November 3d, the day
following the recovery of the judgment, there was issued
a writ of *fieri facias*, which was in evidence, and under
which a levy was made, as the return shews, November
3d, 1869, upon stock of merchandise to the amount of
$2500.

Immediately after the levy was made, there was
another interview between the parties, in Philadelphia.
The answer, however, sets forth, with respect to the cir-
cumstances under which the parties met, that, upon making
the levy, the Sheriff agreed, with the complainant, to leave

with him the possession and disposition of the goods upon his giving a forthcoming bond, and accepted his father, John Maclary, who was good and ample security, for the amount. At the time of the interview, the bond had not been completed, but his father had consented to become surety. Meanwhile, the defendant alleged that, at that time, and for a long time thereafter, he was in ignorance of the issue of the execution, the obtaining of a levy on the goods, or that the complainant was the owner of any property whatever.

At this juncture, then, November 8th, 1869, the complainant visited Reznor in Philadelphia and proposed to make a settlement of the notes as before proposed by the payment of $1000. An agreement for a settlement was entered into upon that basis. The complainant gave Reznor a check for $200, and it was arranged to pay the residue at Clayton, the residence of the complainant, where the defendant agreed to come the next day, and did come the next day but one, at which time a full settlement was made by Maclary giving another check for $300, which, with the prior one, was duly honored, and also a judgment note under seal, at four months, for $500 and interest, all of which were accepted in full satisfaction of the notes and the judgment thereon, upon Maclary's paying, in addition thereto, the costs, and defendant's attorney's fees in the suit. Reznor then signed, sealed and delivered to complainant the following receipt and release :

"CLAYTON, DELAWARE, November 10th, 1869.
"Received of Chas. F. Maclary five hundred dollars in "cash, which, with his judgment note at four months, for "five hundred dollars, is in full and complete settlement and "payment of a judgment in the Superior Court of the State "of Delaware, in and for Kent county, at my suit against "Frederick W. Ridgely and the said Chas. F. Maclary, the "same being No. 149 of the continuances to the October "Term, A. D. 1869 of said Court; and I do hereby ex-

"pressly release, exonorate, acquit and discharge the said
"Charles F. Maclary of and from all further liability
"thereon, he paying costs in the above case, and attor-
"ney's fees."

Signed J. P. Reznor, and sealed as above mentioned.

The answer, while admitting what was done at this
interview, as has been stated, alleged that the settlement
and the execution of the release were obtained by means
of fraudulent concealments and misrepresentations. That
Maclary stated, in the interview at Philadelphia, as often
before, that he had no property of his own, but that he now
had a friend who would help him, if he could get an abate-
ment of the amount and indulgence in time, and unless
he could get that, he was not able to pay, and could not
pay, or be compelled to pay anything ; but that he never
even mentioned, or alluded to the fact that a judgment
had been obtained against him on the notes, or that any
execution had been issued thereon, or that any levy had
been made upon it ; on the contrary, he studiously and
fraudulently concealed the knowledge of these facts
entirely from him.

That trusting the representations and the supposed
honesty and fair dealing of Maclary, and urged thereto, by
his pretended haste and pretence, that it was necessary
for him to return home by the next train, he (Reznor,)
hastily, ignorantly and unadvisedly consented to the
abatement of his just demands, and to the manner of pay-
ment as hereafter stated, and thereupon received from
him his check for $200, and in pursuance of the understand-
ing and appointment, visited Clayton and signed the paper
which the complainant had prepared, and presented to
him for his signature ; that he was not at Clayton ex-
ceeding an hour and a half on that occasion ; that all the
business was transacted between them in that brief time,
and without any advice of counsel on his part, that out of

the amount received on the checks, he had to pay his attorney the sum of seventy-five dollars as his fee in the suits mentioned, while the last note referred to was without any revenue stamp upon it, which rendered it invalid, if not worthless, and was indorsed by the same person who witnessed it. And that, although the complainant was informed of those imperfections immediately on defendant's return from Clayton, by letter, and requested to correct and perfect the same, he had hitherto, altogether declined to do so.

The answer further alleged, as indicating a deliberate design on the part of the complainant to deceive and defraud the respondent in the transaction, that, after his return from Clayton, he wrote a letter to him requesting information on several points, and a copy of the receipt or settlement which he had signed ; but instead of giving the information desired, complainant sent him only a simulated copy of the receipt, with the very material alteration of the capital letter " I" inserted in the last line of it, immediately preceding the words, "attorney fee," and making it read, instead of "he" the complainant, " paying costs in the above case and attorney fee," "he paying costs in the above case and I attorney fee" and as proof that the alteration was intentional and not accidental, he never offered to pay it until it was formally tendered to his attorney on the day, and only an hour before his bill of complaint was filed, and after he had absolutely repudiated and refused to abide by the fraudulent settlement and imposition practiced upon him. And, as further evidence of the bad faith of the complainant, and of the false and fraudulent misrepresentations made by him in the matter, by which he had purposely misled and entrapped him into such a settlement, the answer set forth copies of several other letters received by him, from the complainant, between the 12th of October and the 6th of November, 1869, professing an earnest desire, but asserting his utter inability, to pay the notes, and expressly

stating, among other things, in one addressed to him on the 2d of November, 1869, in the following words : "I own " nothing only as I wrote to you some time ago. I have sold my store some time since, but to satisfy you I would " be willing to pay you what I can afford :" and even when he visited Clayton, on the 10th of that month, he again assured him that he was worth nothing, and had no property or money with which to pay the demands, and again affirmed that he had sold his store. But on no occasion, nor in any letters, did he mention or allude to the suit instituted on the notes, or the judgment, execution or levy ; nor had the defendant, until after the date last mentioned, and after the settlement made and receipt given, received any information or advice, whatever, from his attorney concerning them.

After setting forth the settlement made, as the bill further stated, that the complainant had since paid the costs to the Sheriff, and prior to filing his bill of complaint, had duly tendered to the attorney for the plaintiff in suit, seventy-five dollars, the amount of his fee agreed upon between them, which he had declined and refused to accept, and which amount he had, thereupon, deposited in the hands of the Register in Chancery, subject to the order of that Court. That the writ of *fieri facias* still remained in the hands of the sheriff, who, by the instructions of Reznor, through his attorney, was proceeding with the execution of it against him, contrary to the said agreement, settlement and release of the said judgment, most wrongfully, and unjustly, and contrary to equity and good conscience, to the great injustice, detriment, and injury of the complainant, unless restrained by the injunction of that court. The prayer of the bill was, therefore, for a preliminary, and also a perpetual, injunction, restraining the sheriff, Reznor, and his attorney, from proceeding further in the execution of the judgment against him.

At the Sept. Term, 1869, upon answer filed, a motion was made on behalf of the defendants to dissolve the injunction, upon which argument was heard, Dec. 22, 1869.

*Fulton,* for the defendants.

1.   The bill shews no equity.

The paper set forth as a release, appears, by the bill, to have been without consideration.   The paper, being under seal, would, taken. alone, import a consideration ; but this presumption is removed by the statement of facts. From this, it appears that for the promise to accept the $1,000, in full, the complainant suffered no loss, and the defendant gained no advantage.   The whole debt was due presently, and in course of collection.

2.   Since the answer responsively denies the equity of the bill, if there be any, the injunction should be dissolved.   *Manchester vs. Dey,* 5 *Paige* (*N. Y.*) 112 ; *Perkins vs. Hallowell,* 5, *Ired. Eq.,* 24 ; *McDaniel vs. Stoker, Ib.,* 274 ; *Trustees Newark Co. vs. Gilbert,* 1 *Beaslee,* 78 ; 3 *Dan. Ch. Pr.* (*Ed'n,* 1865) 1786.   The exception, founded on the doctrine of irreparable injury, applies only to torts or cases of that nature, such as waste, infringement of patents, or copy-right, or abuse of partnership rights. The doctrine is in no instance applied to injunctions restraining legal proceedings.   Irreparable injury cannot result from compulsory payment of money, for that may be repaired by money ; nor does the ability of a party to refund, enter into the question.   It is a legal question depending upon the nature of the injury, and not upon the special circumstances of the parties.

*Massey,* for the complainant.          •

1. As to the defendant's second ground, dissolving a special, as distinguished from the common, injunction of the English practice, is not a matter of course, but rests in sound discretion. *Poor vs. Carleton*, 3 *Sumn.* 70. A dissolution will not be decreed when it would work irreparable injury. *Roberts vs. Anderson*, 2 *Johns. Ch.*, 204; *Bank of Monroe vs. Schemmerhorn*, 1 *Clarke*, 303; *Swindall vs. Bradley*, *Jones, Eq.*, 353. This is, upon the facts, such a case.

2. The answer does not deny the facts, out of which the equity arises, but confesses and avoids. The answer must deny all the circumstances alleged. 1 *Sm. Ch. Pr.*, 601 *note*. This answer admits all the facts alleged,—the agreement to compound the debt, the payment of the $200, the giving of a new note, the execution of the release and tender of counsel fees, and sets up a new case, that is, that the release was obtained through fraud and circumvention. *Minturn vs. Seymour*, 4 *Johns. Ch.*, 173; *Ches. & O. Canal Co., vs. B. & O. R. R. Co.*, 4 *G. & J* 7; *Livingston vs. Livingston*, 4 *Paige* (*N. Y.*) 111; *Wakeman vs. Gillespie*, 5 *Paige* (*N. Y.*) 112; *Everly vs. Rice*, 3 *Gr. Ch.*, 553; *McFarland vs. McDowell*, *N. Car. Law Rep.*, 110; *Gibson vs. Tilton*, 1 *Bland*, 353; *McNamara vs. Irwin*, 2 *Dev. & Bat.*, 13; *Lindsay vs. Ethelridge*, 1 *Dev. & Bat.*, 36; *Adams, Eq.*, 431-(196.

3. The injunction cannot be dissolved if the answer is contradictory to itself. *Town vs. Oliver*, 1 *Bland*, 199.

4. The first ground of the motion,—want of equity in the bill has three distinct answers.

(1.) It is an objection which comes too late, after the answer is filed. It must be taken before answer, by which the defendant is estopped from denying the equity of the bill.

(2.) There was, in fact, sufficient consideration for the release, in the undertaking for counsel fees which was no obligation, and the immediate cash payment.

(3.) The seal imports consideration not merely as an inference of fact but a legal consequence. It is a release *executed*; a present and absolute discharge of the judgment, effectual, whether voluntary, or upon consideration.

THE CHANCELLOR :—

The motion is to dissolve the injunction issued in this cause, and is made upon two grounds.

*First.*   The want of equity in the bill.

It is insisted for the defendant, that his promise to accept $1000, in full satisfaction of the debt due from Ridgely & Maclary, was without consideration, and that this appearing on the face of the bill, removes the equity which, *prima facie*, the complainant has arising out of the written release executed by the defendant.

We need not consider whether, supposing Reznor's promise to compound this debt still remained executory, there arose out of the circumstances a sufficient consideration to make it obligatory. That is not the question, but, rather, what is the legal operation of the paper executed by Reznor. A copy is set forth in the bill. It is a formal release to Maclary of "all further liability" on the judgment, signed, sealed and delivered. Being an instrument under seal, no consideration is required to make it effectual. A man may give a voluntary bond, or he may gratuitously release to another, any right whatever, provided he does not thereby defraud his creditors, and executes the bond, release, or other instrument, with due legal solemnities, as by writing, sealed and delivered. This technical effect of a sealed instrument is too familiar

to need authority ; yet I may refer to 2 *Black. Com.*, 446 ; *Plowden*, 308 ; *Cruise's Digest* ; *Tit. Deed*, *Ch. II*, *Sec.* 33. *T. T. R.*, 475. The effect is the same in equity as at law. 1 *Fonblanque*, 334. (*Ed'n of* 1793) ; *Chitty on Cont.*, 5.

*Second.* The other ground of the motion to dissolve is that the answer denies the equity of the bill. I am not able so to read it. The relief sought by the complainant is against the collection of the judgment. His equity arises out of the payment of part and the release of the residue by writing under seal, alleged to have been voluntarily delivered by Reznor, the release to be upon condition that Maclary pay the defendant's counsel fee and all costs. It is alleged that the costs were paid and counsel fee tendered and refused. It is now brought into Court. These facts the answer admits, or, certainly, does not deny; but it alleges in defense that, although true it is, that Reznor did so execute and deliver the release, yet that he did it in ignorance of judgment having been obtained, and execution issued and levied, whereby his debt had been secured ; that had he known these facts, he would have chosen to abide by the judgment and execution ; that it was the duty of Maclary to have communicated these facts ; that the omission to do so was a fraudulent concealment ; that he also falsely represented that he had sold his store, and had no property, except some lots at Ridgely, worth about $100. In all this, the defendant does not deny the execution of the release, which is the ground of the complainant's equity, but he sets up a counter equity in himself, to be relieved against the release upon the ground of mistake and fraud. It is plainly an answer by way of confession and avoidance, and not a traverse ; and, according to the settled practice, it does not sustain a motion to dissolve the preliminary injunction. *Adam's Equity* [196], note and cases cited.

This is not like the case put in argument for an answer, alleging that a paper, relied on by the bill, as a release, has

58

been stolen or obtained by artifice, or otherwise than by a voluntary delivery. Such an answer would, in effect, traverse the execution of the release ; for a voluntary delivery of the paper is one of the legal requisites. But in this case, all the requisites to the execution and legal effect of the release are admitted, *i. e.*, that, in terms, it discharges the judgment, and that is was signed, sealed and delivered.

The motion to dissolve the injunction must be denied.

There is an allegation in the answer which may properly be noticed at this stage of the cause. It is the absence of a revenue stamp on the note for $500, given by Maclary as part payment of the judgment. The complainant will be required to do equity while himself seeking it ; and if, at the hearing of this cause, he shall be found entitled to a perpetual injunction, it will be decreed upon terms protecting the defendant's rights under this note:

The decision of the motion to dissolve was rendered January 5th., 1870, and on February 5th., following, the cause came on to a final hearing. It was proved by a deposition read for the defendants, that the complainant was in mercantile business at Clayton, in October 1869, and also in the spring of the year. The other matters of evidence were certain facts agreed upon by the counsel to be considered as if proved, viz ;

1. That the paper set forth in the bill as a release is a true copy of the original, which was duly executed.

2. That the costs on the judgment and execution were paid by complainant as alleged in the bill.

3. That the copies of defendant's letters set forth in the answer, are true copies of the originals.

4. That since the present was filed, George W. Kugler. as a creditor of the defendant, attached the complainant

as a garnishee of the defendant, and recovered judgment against him for $417.55, which has been paid.

*Massey,* for the complainant.

The paper alleged as a release is such in form and effect, and discharged the judgment unless impeached for fraud. This it is sought to do, alleging that it was obtained by fraudulent misrepresentations in the letters of October 23d and November 2d, 1869.

Misrepresentation, even if proved, does not avoid a transaction, unless it appears that it was relied on and was the inducement. 1 *Sto. Eq. Jur., secs.* 191-195 ; *Doggert vs. Emerson, et al.,* 3 *Sto. C. C.,* 700. There was misrepresentation in the letters, but it does not appear that Reznor relied upon it, and was induced by the letters. His offer was first made in the spring without any prior representation by complainant.

Concealment is only fraud when it is of facts peculiarly within a party's knowledge. *Pierce vs. Wood,* 3 *Foster,* 520 ; *Reynolds vs. French,* 11 *Vt.,* 674. The execution here alleged to have been concealed was a matter of record. The judgment is mentioned and released in the paper signed. Defendant had counsel, and was bound to inquire as to the condition of his claim, and between the 12th October, when the representations complained of were made, and the 8th and 10th of November, when the bargain was made and the release signed, he was in communication with his counsel and had ample opportunities to inquire.

*Fulton,* for the defendant.

1. There was, in fact, no consideration for the settlement. The seal imports one, but that is a mere

presumption, which may be, and, in this case, is, rebutted by the facts. *Cabot vs. Haskins*, 3 *Pick.*, 83 ; *Sweeny vs. Hunter*, 1 *Murph.*, 181 ; *Smith vs. Bartholomew*, 1 *Metc.*, 276 ; *Shorb's Ex'r. vs. Shultz*, 43 *Pa. St.*, 207 ; *Crowhurst vs. Laverack*, 16 *Eng. L. & Eq.*, 497.

2. Acceptance of part of a debt is no satisfaction when the whole is due. *Lovelace vs. Cocket, Hobart*, 68, and notes ; *Geäng vs. Swain*, 1 *Lutw.*, 464.

3. The misrepresentation is admitted. For what purpose was it, if not to influence Reznor. The motive was unquestionable, and a court of equity will not relieve a party confessedly guilty of fraud and falsehood. The concealment alleged is not of the judgment, but of the execution. The facts constitute a case of fraud under the authorities. *Maddeford vs. Austwick*, 1 *Sim.*, 89 ; *Lewis vs. Gamage*, 1 *Pick.*, 374 ; *Reynolds vs. French*, 11 *Vt.*, 674.

THE CHANCELLOR :—

This case draws into question the validity of a release under seal by the defendant, Reznor, of a judgment held by him against the complainant, Maclary, for $1633.33, recovered in the Superior Court, at the October Term, 1869.

That the release was executed and delivered, and is in due form, is not disputed ; but the defendant insists that it is invalid upon two grounds ; (1) that it was without consideration ; and (2) that it was obtained by fraudulent misrepresentation.

The first of these grounds of defense, viz ; the want of consideration, has been, heretofore, argued and disposed of upon the motion made to dissolve the injunction for want of equity in the bill. Part payment of a debt is not a sufficient consideration to support an executory promise to discharge the debtor, and were this the case of an

agreement to release, remaining still *in fieri*, the defense of want of a valid consideration would be available. But this being a release under seal, complete in its terms and duly executed, it needs no consideration to support it beyond what the seal imports. It would be effectual, even had it been wholly gratuitous and without payment of one cent by the debtor. This point is more fully stated, and the authorities cited, in the opinion given upon the motion to dissolve.

The other defense, and the one mainly relied upon at the hearing, was fraud in obtaining the release. And the fraud was alleged to have been twofold, viz : misrepresentation by Maclary as to his means of payment, and the concealment by him of the fact that an execution had been levied to an amount sufficient for the whole debt. These two charges admit of separate consideration.

1st. As to the alleged fraudulent misrepresentations. The facts material to this point are these : The notes of Ridgely and Maclary, upon which the judgment was recovered, being one for $500, at 4 months, the other for $1,000, at 8 months, both dated October 21, 1867, matured, the former in February, 1868, the latter in June of that year. Reznor took no steps toward their collection until the 3rd of April, 1869, when, by a telegram, he invited Maclary to visit him in Philadelphia, with a view to a settlement. His inattention to the notes until that date, are explained in his answer, by the fact that he had been informed, and supposed, that both Ridgely and Maclary were insolvent, and further, that he did not know where Maclary then resided, the latter having left Maryland, in which state Reznor had last known him ; that, being, about this time, informed that Maclary was residing at Clayton, in this State, he sent the telegram with a view to obtaining some settlement of the notes. Maclary promptly responded by calling on Reznor in Philadelphia,

and thereupon Reznor voluntarily offered to take $1,000, cash, in full settlement. This offer, as the answer shows, was not induced by any representations then made by Maclary, as to his means, nor even by any solicitation on his part. It was made, as Reznor states, in view of the information he had previously received, that Ridgely and Maclary were insolvent, and also upon his considering that, even, if they were not wholly insolvent, he might be put to expense, delay, and risk in the collection. So, being anxious to stimulate Maclary to prompt effort, and to save something without further delay or risk, he proposed to accept the $1,000 in full, intending thereby to make a liberal and tempting offer. Maclary, however, did not then accede to it. Whether, as he alleges, the offer remained a standing one, subject to his further consideration, or whether, as the defendant insists, it was then rejected and withdrawn, is not material. There was no further negotiation until October, 1869, when some correspondence ensued, caused, doubtless, by the institution of the suit, but resulting in nothing. Soon after, a judgment being recovered, execution was issued and levied, November 3rd, 1869, upon a stock of merchandize valued at $2,500, in Maclary's possession at Clayton, where he was in business as a merchant. The levy quickened Maclary's diligence, for, having induced the Sheriff to defer closing the store until the 9th of November, by undertaking, in the meantime, to give security for the forthcoming of the goods, he repaired to Philadelphia on the 8th of November, and in an interview then held with Reznor, the latter again assented to accept $1,000, with the costs, and his attorney's fee, in full discharge of the judgment. Whether his proposal to do so was, as before, voluntary, or whether induced by any representations on the part of Maclary, made during that interview, does not appear, nor is this material. A check was given by Maclary for $200, and a meeting appointed, at Clayton, on the 10th of November, to carry out the settlement.

On the day appointed, Reznor attended at Clayton, where he received another check for $300, and a note under seal at four months for $500, making up the $1,000 to be paid, and thereupon the release was executed.

Now, the fraudulent misrepresentations relied upon as avoiding the release are contained in two letters from Maclary, dated, respectively, October 23d, and November 2d, written shortly prior to the settlement. In the letter of October 23d, he writes, "As you persist in having the money on those notes, immediately, I can only say to you that to cancel those notes I will make to you a full and perfect title to those lots at Ridgely, which is the only property I own in this world, or, if you prefer, I will give you one hundred ($100) dollars in cash. You may choose between "the two, which is the best I can do." He adds in a P. S., "You could hold those lots, or you could sell them for "more than one hundred dollars, as you choose ; I was "offered that." In the letter of November 2d, writing of his desire to compromise, he says, "I own nothing only "as I wrote you some time ago. I have sold my store "some time since, &c."

These representations were false, for Maclary, at the time of writing these letters, was still merchandizing, and held a stock of goods valued at $2500, which had not, so far as any evidence shows, been sold by him, as was stated in his letter of the 2d of November, but were on the next day, 3d of November, levied on as his goods, and he gave a forthcoming bond for them.

Nevertheless, I am of opinion that these false representations do not, under the circumstances, avoid the release ; and this for two reasons. In the first place, it does not appear that it was by Maclary's statements that Reznor was induced to compromise the debt. His original offer, in April, 1869, to accept $1000 in settlement, was made as the answer itself shows, under no inducement

proceeding from Maclary, but was prompted by Reznor's own distrust of the debt and his anxiety to avoid trouble, caused by rumors of the insolvency of Ridgely and Maclary. This belief of the insecurity of the debt, and his willingness to settle at $1000, continued to possess his mind; nor can I see that the representations in Maclary's letters made any impression upon him. The same distrust and anxiety for a settlement which prompted his first offer to accept $1000, was the continuing inducement to accept it at the last, and would have led to precisely the same result had Maclary written nothing about his means. But the other, and perhaps, upon the facts, a less questionable ground for sustaining the release, arises out of Reznor's negligence in compromising the debt without inquiry of his attorney, who was cognizant of the levy, as to the condition and security of the claim. The most ordinary diligence in this respect would have brought full information of the levy.

The rule of law as to the effect of false representations is a clear and settled one. In order to avoid a transaction on account of them, three things are requisite. 1st. The misrepresentation must relate to something material and substantial. 2d. The transaction sought to be avoided, must appear to have been induced by it. The party aggrieved must have been actually misled by it. And 3rd. His confidence must have been a reasonable one ; as where the matters misrepresented are such as, from their nature, rest peculiarly in the knowledge of the party making the statement, or where there are fiduciary relations between the parties to warrant the trust reposed ; or where the party misled is of such weak mental capacity as to be exempt from the requirement of ordinary diligence. Except in these cases, even betrayed confidence is not a ground of relief. Where no confidential relation exists, nor mental incapacity, and the means of information are open to both parties, a diligent use of which would have prevented the injury, Equity will not interfere, *Vigilantibus non dormientibus leges subveniunt.* 1 *Sto. Eq. Jur. Sec.* 191.

2d. The other circumstance of fraud relied upon, as avoiding the release is, that Maclary, pending the negotiation, did not disclose the fact that an execution had been levied on his goods to the full amount of the debt. But to this the obvious and conclusive answer is, that he was under no obligation to communicate these proceedings to Reznor. They were proceedings had under Reznor's own process, directed by his attorney, and with respect to which it was his duty to seek information from his attorney. He was not warranted to rely, and in fact did not rely, upon Maclary. The duty of disclosing facts which may influence the adverse party to a transaction, springs either from some fiduciary relation between the parties, or from a trust understood to be reposed by one in the other, about a matter of which the latter has peculiar means of information. But these parties were dealing at arms' length, and the fact not communicated, to wit ; the levy of the execution, was equally ascertainable by both. " The true definition " says Justice Story," of undue concealment, which amounts to fraud in the sense of a court of equity, and for which it will grant relief, is the non-disclosure of those facts and circumstances which one party is under some legal or equitable obligation to communicate to the other, and which the latter has a right, not merely in *foro conscientiæ* but *juris et de jure* to know. 1 *Sto. Eq. Jur. Sec.*, 207 ; 2 *Kent. Com.*, 482, and *note (a,)* 5*th. Ed'n.*

Were this the case of a mere agreement to discharge the judgment remaining still unexecuted, a court of equity might, considering the advantage gained, to be an unconscientious one, refuse to enforce it upon a bill for specific performance ; but the release having been executed, and being such as, under the circumstances, the Court would not, on a cross-bill avoid, I feel obliged to give it its legal effect.

Decree affirmed by the Court of Errors and Appeals, at the June Term, 1871. See 4 *Houston's Del. Rep.*, 154.

ALFRED R. CROCKETT,

*vs.*

WILLIAM GREEN.

*New Castle, Sept. T. 1870.*

Upon an agreement which was written and signed by the defendant in the words following, viz: " I agree to sell to Alfred R. Crockett two acres "and 150 square perches of land, commencing 170 feet from the south side " of Green street, running parallel to Green street, with a front of one acre " on Broad street, at $1225." *Held* ,

1. That the agreement was too uncertain to be enforced by a decree for specific performance.

2. That the description of the premises sold, fails to satisfy the requirements of the Statute of Frauds.

3. That the land mentioned in the agreement, being parcel of other land of the defendant, and not capable of identification as a distinct and separate hold-ing,the metes and bounds cannot be ascertained, without supplying the defect, by parol evidence, of something not referred to in the contract.

A deficiency in the memorandum as to the terms or subject-matter of the con-tract, cannot be supplied by any extraneous evidence, whether written or parol, unless the extraneous matter be referred to in the memorandum, so as, in legal effect, to be incorporated into it.

A defendant may fully admit a contract, resting wholly or partly in parol, as alleged, and, at the same time, avail himself of the Statute by insisting upon it.

Parol evidence is admissible, in aid of written contracts, only for the purpose of interpreting the meaning of words and phrases used in the writing, and not in any case to supply a deficiency of expression, and this restriction would seem to apply more stringently to cases in which the contract or instrument is one required, by the Statute of Frauds, to be in writing, than to those which may be good, without writing.

Parol evidence of the intention of parties cannot be admitted to give a con-struction to the words of a written instrument,—in no case to vary or control the sense of plain and unambiguous words, and not to explain doubtful or ambiguous words in those written instruments which are re-

quired, by statute or by the nature of the transaction, as the only evidence of the transaction.

A re-argument permitted after the opinion of the Court was read, but before decree entered.

BILL FOR THE SPECIFIC PERFORMANCE OF A CON-TRACT IN WRITING FOR THE SALE OF LAND.—The memorandum was drawn and signed by the defendant, on the 30th of July, 1867, and is in these words :

"1 agree to sell to Alfred R. Crockett, two acres and 150 sq. perches of land, commencing 170 feet from the south side of Green street, running parallel to Green street, with a front of one acre on Broad street, at (*the rate*) *of $1225.00.

```
┌───────────┐
│ U. S. REV. │
│  STAMP    │        (Signed.)      W. GREEN.
│   IOC.    │
└───────────┘
```

The bill alleged that the lot intended to be sold was one situated in Middletown, Delaware, and was more particularly described in a deed which the complainant, after the sale was made, caused to be prepared and tendered to the defendant for execution, together with $1225.00, the price stipulated, which deed the defendant refused to execute. The complainant tenders himself as still ready to pay the price, and prays a decree for specific performance.

The answer of the defendant, in substance, admits the allegations of the bill, but insists upon the insufficiency

---

*The words "*the rate*" were written in the original agreement, and then stricken out with a pen, leaving an awkward expression by inadvertence.

of the agreement under the Statute of Frauds, and claims the benefit of that Statute. The grounds of insufficiency alleged were, first, that the memorandum of the contract was not signed by both parties ; second, that it is uncertain in not designating the estate, in the premises, intended to be sold, and, third, that the description of the premises is not sufficiently certain and complete to locate them.

There was evidence adduced for the complainant, among other things, tending to identify the premises sold. It was proved that on the same day on which the contract was entered into, a surveyor, Joseph Roberts, in company with the parties, and with their assistance, surveyed the lines of the lot intended to be sold, locating it upon the east side of Broad street, 170 feet south of Green street, in Middletown. No plot was made, but the surveyor's field notes were proved in his deposition.

The lot formed part of a larger tract of land in Middletown, owned by the defendant, which he had laid off in squares and streets. Green street and Broad street were among these streets. There was also evidence of conversations between the parties at different times containing admissions tending to identify the lot sold:

*G. B. Rodney* and *J. H. Rodney*, for the complainant.

The construction given to the Statute of Frauds, requires signature of the contract only by the party sought to be charged. *Sugd. on Vend.*, 70, 94 ; *Jeremy's Equity*, 435 ; *Martin vs. Mitchell*, 2 *Jac.· & Walk*, 418.

This case rests, mainly, upon the question whether the contract is good within the Statute of Frauds. The objection taken is, that the contract is too uncertain to admit of a decree for its execution. Our answer is two-fold:—

*First.* We claim that this contract is sufficiently ·certain. It locates the land with sufficient accuracy. By

its terms, the defendant is bound to convey the land on certain streets, assuming that they are in Middletown, and the complainant is entitled to a deed and may find the lot. The agreement is free from ambiguous terms, the doubt arises only when you attempt to locate, That doubt the complainant may take, if he choose. The statute prescribes no new element for contracts for sale of land which would not be necessary for other purposes, only that it be in writing ; and that merely a "memorandum," not a formal technical instrument," and that the Court can act upon it,

*Secondly.* If it be not sufficiently certain, the parol evidence offered is not to set up a parol contract, not to add to a written one, but only to apply to the subject-matter the terms of a written one.

The answer admits seisin of the lot described in the contract. This is not an admission of a parol contract, but of the written contract, alleged, and as to the location of the land, mentioned. This is admissible, though the statute be pleaded. *Barry vs. Coombe*, 1 *Peters, S. C. R.*, 652 ; *Fish vs. Hubbard's Adms*, 21 *Wend.*, 653 ; *Ogilvie vs. Foljambe*, 3. *Mer.*, 61 ; *Stokes vs. Moore*, 1 *Cox C. C.*, 219 ; *Keiselbrack vs. Livingston*, 4 *Johns. Ch.*, 144 ; *Doe vs. Burt*, 1 *Term*, 701 ; *Gillespie vs. Moon*, 2 *Johns. Ch.*, 585 ; *Gerrish vs. Towne*, 3 *Gray*, 82 ; *Woods vs. Sawne*, 4 *Gray*, 322.

Parol evidence is admissible to explain, though not to contradict or vary. 1 *Gr. on Ev., secs.* 275, 288, 301; *Coutt's Trustees vs. Craig*, 2 *Hen. & Munf.*, 618 ; *Fonnereau vs. Poyntz*, 1 *Bros., C. C.*, 472 ; *Shelburne vs. Inchiquin*, 1 *Bro. C. C.*, 338 ; *Goodtitle vs. Southern*, 1 *M. & S.*, 299 ; *Brown vs. Thorndyke*, 15 *Pick.* 388 ; *Beach vs. Earl of Jersey*, 1 *Barn. & Ald.*, 550; *Baker vs. Seekright*, 1 *Hen. and Munf.*, 177 ; 2 *Evans' Pothier*, 184 &c.

The contract having been *written* and signed by defendant, his position is inequitable. He cannot object to uncertainty caused by himself. *Clermont vs. Tasburgh,* 1 *Jac. and Walk.,* 115 ; *Caldicot vs. Hodgson,* 2 *Vern.,*593 ; 1 *Chit. Gen. Prac.,* 838.

Parol evidence may .be given of the construction placed upon the agreement by the acts of the parties, as in this case by the survey. *Cook vs. Booth, Cowp.,* 819 ; *Livingston vs. Ten Broeck,* 16 *Johns.,* 24 ; *Doyle vs. Teas,* 4 *Scam.,* 202. The rule applies which permits patent ambiguities to be explained. 3 *Ph. on Ev.* 1359, 1361, 1298-9, 1400 ; *Colpoys vs. Colpoys,* 1 *Jac.* 451.

*W. S. McCaulley,* for the defendant.

The policy of the Statute of Frauds is a beneficial one, and to be strictly enforced, more so under later decisions, contrary to the earlier ones. 1 *Wh. & Tud. L. Cas. in Eq.,* 745 ; *Throop on Verbal Agreements,* 76 *note.*

The allegation is of an agreement in writing, exclusive of any parol stipulation or feature. The proof must be confined to the allegation, otherwise we are surprised.

Independently of the statute, a written contract is conclusive of the intent of the parties. *Sugd. on Vend.,* 82 ; *Parteriche vs. Powlet,* 2 *Atk.,* 384. There is a distinction between contracts, executed and executory ; in the former, a construction must of necessity be admitted. 2 *Stark on Ev.,* (755.)

The attempt is, here, not to prove an independent fact, the effect of which is to identify the premises, but mere declarations of the defendant.

Where, as in this case, the instrument is so doubtful that something is needed to shew the meaning of the parties, it is a patent ambiguity not admitting of parol evidence. 3 *Ph., on Ev.* 1360 ; 2 *Wh. and Tud. L. Cas. in*

*Eq.*, 709 ; *Westlake vs. Westlake*, 4 *Barn and Ald.*, 57 ; 1 *Gr. on Ev., sec.* 300 ; *Brodie vs. St. Paul*, 1 *Ves. Jr.*, 333 ; *Powell vs. Edmunds*, 12 *East*, 6 ; *Parkhurst vs. Van Cortlandt*, 1 *Johns. Ch.*, 273 ; *Hammer vs. McEldowney*, 46 *Pa. St.*, 336 ; *Morris vs. Stephens*, 46 *Pa. St.*, 200 ; *Maguire vs. Stevens*, *Am. Law. Reg., Aug.*, 1870.

Viewing or surveying the lot was not a part performance. *Sugd. on Vend.*, 85. The contract must be certain on its face. *Goldsmith Eq.*, 80 ; 1 *Madd. Ch. Pr* , 540 ; *Worthington vs. Hylyer*, 4 *Mass.*, 204 ; *Abeel vs. Radcliff*, 13 *Johns.*, 300 ; *Clinan vs. Cooke*, 1 *Sch. and Lef.*, 22 ; *Boardman vs. Reed's Lessees*, 6 *Peters*, 345.

This contract is replete with uncertainties ; it mentions no place in which the streets are, nor which side of the street is the beginning, no courses and distances, nor how much front on Broad street, no date and no quantity of estate. Words of limitation are necessary in executory contracts as well as in executed ones. 6 *T. R.*, 352.

The jurisdiction involved is discretionary, and should be exercised only where the party claiming relief brings before the Court a contract, clear and free from doubt.

THE CHANCELLOR :—

This is certainly a case of great merit on the part of the complainant, and it would be doing exact justice between the parties to grant the prayer of the bill.

But the Statute of Frauds presents an insuperable bar. The written contract of sale relied upon, fails, in its description of the premises sold, to satisfy the requirements of the Statute. The defect is such as cannot be supplied by parol evidence, unless there had been a part performance ; and even the admission made by the answer of quite enough to ascertain and locate the premises,

cannot avail the complainant. A defendant, while admitting a contract to have been made as alleged, may plead the Statute none the less effectually, which has been done in this case. These are the general conclusions to which the investigation has led. Let us examine them more particularly. And, first, is the memorandum on its face sufficiently certain in its description of the premises to satisfy the Statute ? It would be almost impossible, nor can it be necessary, to review all the cases bearing upon this question. The rule to be extracted from the unquestionable current of decisions, touching the decree of certainty required by this Statute, is very clearly and concisely expressed by C. J. Shaw ; " the contract, or memorandum," says that learned judge, " must express the substance of the contract, with reasonable certainty, *either by its own terms, or by reference, to some other deed, record, or other matter, from which it can be ascertained with like reasonable certainty."* Atwood vs. Cobb, 16 *Pick.*, 230.

Technical precision or minute detail is not required, for such contracts are mostly drawn by unprofessional persons ; they are merely executory, and the Statute itself, in using the term " memorandum," must have contemplated such writings to be wholly informal. Nevertheless, the substance of the contract,—all that is necessary to enable the court to execute it, such as the subject—matter, the price, and all material stipulations essentially must appear, however informally ; either by the terms of the memorandum, or, as C. J. Shaw expresses it, " by reference to some other deed, record, or other matter." The principle material to be here more particularly stated is, that a deficiency in the memorandum as to the terms or subject—matter of the contract cannot be supplied by any extraneous evidence, whether written or parol, unless the extraneous matter be referred to in the memorandum itself, so as, in legal effect, to be incorporated into it. *Clinan vs. Cooke, Sch. & Lef.*, 22, a leading

case, affords an apt illustration of the principle. There Cooke had advertised certain premises to be leased *for three lives or thirty-one years*, with a reference for information to himself and one Meagher, his agent. The plaintiffs, the Clinans, seeing the advertisements, applied to Meagher and a memorandum of agreement for a release was signed. Through oversight the memorandum was defective in not stating the terms for which the lease was to be made. Lord Redesdale (*p.* 33) held, that parol evidence was inadmissible to connect the memorandum with the advertisement, so as to supply the deficiency, and that only by a reference in the memorandum itself could the two be connected, so as to render the advertisement admissible under the Statute to supply the term of the proposed lease. " If," he says, "the agreement had referred to the advertisement, I agree parol evidence might have been admitted to shew what was the thing (namely, the advertisement) so referred to; for then it would be an agreement to grant for so much time as was expressed in the advertisement, and then the identity of the advertisement might be proved by parol " evidence ; but there is no reference whatever to the "advertisement in this agreement." The Massachusetts case before referred to, *Atwood vs. Cobb*, illustrates the application of the same principle where the reference in the memorandum was to matter *wholly parol*, and not to a collateral writing, like the advertisement in *Clinan vs. Cooke.* The contract in that case was for the sale of premises which the vendor had previously purchased from the vendee, and the agreement was to re-convey, not for a consideration specified in amount, but expressed thus : "In consideration of the same sum which I paid him for " the same, with interest from the time when I purchased "the same," &c. The Court held that the reference in the memorandum to the price which the vendor had paid for the premises in his purchase, opened the way for proof to shew what that price was, as the consideration for the

60

present sale. The principle now under consideration is well supported by the authorities. The leading ones are *Brodie vs. St. Paul*, 1 *Ves. Jr.*, 326 ; *Clinan vs. Cooke*, before cited, in which Lord Redesdale reviews all the prior cases, which, therefore, need not be here cited, and a case, *Blagden vs. Bradbear*, 12. *Ves.*, 470, following *Clinan vs. Cooke*. There, Sir William Grant held that the receipt of an auctioneer, being relied on as a memorandum within the statute, but failing to express the price, the defect could not be supplied from the conditions of sale, because the receipt contained no reference to the conditions. "The receipt," he says, in substantially the language afterwards used by C. J. Shaw, "must contain in itself, or, by reference to something else, must shew what the agreement is." Precisely the same construction has been given to the Statute of Frauds in this country, as will be sufficiently shewn by the Massachusetts case of *Atwood vs. Cobb*, 16 *Pick.* 230, and especially by *Parkhurst vs. Van Courtlandt*, 1 *Johns. Ch. Rep.*, 273, in which Chancellor Kent, upon a full review of the cases prior to and after *Clinan vs. Cooke*, and both in law and equity, holds it "as a settled "principle, that if the Court cannot ascertain, with a "reasonable certainty, the terms of the agreement, from "the writing, or from some other paper to which it refers, "the writing does not take the case out of the Statute." The Chancellor's decree in this case was reviewed in the Court of Errors, 14 *Johns. R.*, 15 ; but the reversal was upon the ground that the memorandum in question, in that case, was not intended as the contract of sale, but only as a license to take possession preliminary to sale ; that the contract of sale was wholly by parol, and was admissible on the ground of part performance. The rule announced by the Chancellor, as to what is a sufficient memorandum under the Statute, was expressly recognized · by the Court of Errors.

We may now proceed, in view of what we have seen the Statute requires, to examine the memorandum of this

Opinion:—this memorandum would have to be supplemented by evidence.

sale. It describes the property sold as "two acres and "one hundred and fifty square perches of land, commenc-"ing 170 feet from the south side of Green street, running "parallel to Green street, with a front of one acre on "Broad street." The first step toward locating the lot is to find Green street, and Broad street. The memorandum fails to tell us in what village, town or city, these streets are to be found. Also, on which side of Broad street the lot lies, yet according to the weight of authority, these omissions are fatal, as not matter of description. The terms 170 feet from the south side of Green street, on Broad street, are not so vague, indefinite or insensible, but that they may, with reasonable certainty, be applied to their subject–matters by proof that the defendant actually held land lying upon Broad street, south of Green street, in Middletown, where both the parties resided. Such proof is made under the ninth interrogatory. Evidence of this nature is considered as not supplementing the memorandum, but goes only to the fact that the vendor owned certain property answering the description given, and such proof being of independent facts, and not of statements of the parties, its admission is held not to contravene the policy of the Statute. To this extent many of the cases cited for the complainant sustain him. Such as *Ogilvie vs. Foljambe*, 3 *Mer.*, 42; where the contract being by letter, the property was described as "Mr. Ogilvie's house," connected with other references, showing that the house intended was the one Mr. Ogilvie then occupied. So, *Barry vs. Coombe*, 1 *Peters S. C. R.*, 652, where the contract was for "your one-half part E. B. wharf and premises," a description which was held to be reduced to sufficient certainty by proof that the vendor held a moiety of a wharf property situated upon the Eastern Branch, and that it was known as the Eastern Branch wharf property. So, *Gerrish vs. Towne*, 3 *Gray*, 86, where the contract was for "the wharf and flats occupied by Towne and Hardin, and owned by Francis

Head," without reference to any city or town.  In these and other like cases, the description, though general, and not sufficient, as on its face, to locate the premises exactly, was held sufficient for a specific performance, if it might be reduced to reasonable certainty by extrinsic evidence of facts, touching the situation, use, occupation, or known designation of the property.  Such evidence is held to construe or apply the terms of description used and not to supplement further terms.  Where the terms used are too vague or insensible to be rendered certain by extrinsic facts, touching the property, so that something further must be incorporated to enable us to locate the premises, then the rule before stated applies that such additional matter cannot be introduced except by means of a reference to it in the memorandum itself.

And such, unfortunately, in this case, on another point. For after we have found Broad Street referred to, and also the place of beginning, viz; 170 feet from the south side of Green, on the east side of Broad, it will still remain to trace the boundaries of the two acres and one hundred and fifty square perches of the land.  The testimony shews, the lot sold was previously held by Green, not as a separately bounded lot, but as parcel of a larger tract which he had laid off in squares and streets.  What was intended to be sold could not be identified, as is usually done, by an actual separate holding of the premises under lines before established, but it remained yet to be carved out from the main tract which surrounded it, except on the street side, and it could be identified only by running new lines.  For doing this the memorandum fixes the place of beginning, viz :—170 feet from Green street but nothing more ; does not enable us to move another step. It gives neither the depth nor front.  "A front of one acre " on Broad street," mentioned in the memorandum means nothing.  Here, then, though we are at the place where the lot is to be located, the memorandum affords us no means by which to do it.  If the Court should as it is

urged to do, locate this lot by means of the survey made
by Roberts on the day the contract was entered into, July
30th, 1857, in the presence of these parties, it will go
wholly outside of the written contract and find its subject-
matter, not by applying, through extrinsic facts, any terms
used in it, as it might do, but by evidence entirely ex-
traneous, and thus the Court will execute a contract
resting partly in writing and partly in parol. Parol
evidence can no more supply defects in an agreement
than supply the entire want of one: Sir Wm. Grant in
*Blagden vs. Bradbear*, 12 *Ves.*, 470 ; Chancellor Kent in
*Parkhurst vs. Van Cortlandt*, 1 *Johns. Ch. R.*, 281.

The fatal defect in this case is, that the lines were not
previously run and incorporated in the contract; or the
depth or front of the lot given, or if the metes and bounds
were to be ascertained by a subsequent survey, that some
reference was not made to such contemplated survey so
as to make its results a part of the contract, according to
the rule before referred to, as announced by C. J. Shaw,
Lord Redesdale, and Chancellor Kent.

I have read with care all the cases cited on this point
for the complainant. They are all distinguished from this
one by the fact that, in them, the property sold was held
by some previously established and known boundaries,
and that the terms of description used applies to the
premises as so held, such as " Mr. Ogilvie's House," being
his house and premises as then occupied, in *Ogilvie vs.
Foljambe*, 3 *Mer.*, 52 ; " a wharf and premises," in *Barry
vs. Combe*, 1 *Peters S. C. R.*, 652; " the wharf and flats
occupied by Towne and Hardin," in *Gerrish vs. Towne*, 3
*Gray*, 86 ; " a tract of land in Southborough known by the
name of the Mill Spot," in *Woods vs. Sawin*, 4 *Pick*, 322 ;
" a tenement, in the occupation of Hicks and Campbell,
which contains two stores, the small built house which Dr.
Cringan has his shop in, and a large lumber house, and
the lot of ground extending to Crouch's line," *Coutts'*

*Trustees vs Craig*, 2 *Hen. and Mun.* 618. In all these, and like cases, it will be observed that there was no question as to boundaries to be newly run, but the premises sold being previously held by known boundaries, the general identification of the premises sufficiently ascertained their boundaries. It was very much insisted that the survey of the lot on Broad Street, made on the same day on which the contract was entered into, and the subsequent declarations of the defendant tending to identity the lot, may be received as cotemporaneous acts, and admissions of the parties, explanatory of their under-standing and giving a construction to the contract. But the rule which admits acts of the parties (I do not find that it includes their declarations) to explain a contract, applies only for the purpose of construing doubtful or ambiguous terms, as the case cited well illustrate. For example, in *Cooke vs. Booth, Cowper*, 819, there was a lease for three lives, with a provision for its renewal upon the expiration of any one of the lives, and so from time to time, the renewals (as it was expressed) to be under the same rent, and *subject to the same covenants* contained in the original lease. There were several successive renewals executed under this clause, in all which there was inserted a like covenant for renewal. Finally, the lessor, upon the expiration of a life, and application for another renewal, refused to grant one containing the usual covenant for renewal, and the question was, whether the phrase in the original lease, "subject to the same covenants," included or excluded the covenant for renewal. This was a mere question of construction as to the meaning of a phrase in itself ambiguous, and the Court held proof admissible to shew how the parties themselves had construed this phrase, by inserting this covenant in all the prior renewals. So, in *Livingston vs. Ten Broeck*, 16 *Johns. Rep.*, 14, the case turned upon the construction to be given to a license contained in a deed "for cutting and hewing of timber for building or firewood." The question was, whether it

carried the right to cut for fences. This right having been in fact, conceded and exercised for a series of years, so as to include fences. This usage between the parties was admitted as their own construction of the terms used in granting the license. In all this class of cases, acts of the parties are admitted as evidence only to construe ambiguous words or phrases used in the written instrument,—never to supply the use of terms, or stipulations, or matter of description inadvertently omitted. That is the necessity here,—something by means of which to locate the boundaries of this lot, as to which the memorandum is a blank. I pass now to two special grounds of relief. One of these was the fact that the memorandum was written by the defendant, who, therefore, ought not, in equity, to be admitted to take advantage of its uncertainty. The answer to this is, that the Court is restrained by the positive requirement of the Statute from dealing with these parties according to the equities of the particular case. The Courts have, it is true, gone so far as to relieve against fraud arising out of part performance of a contract not in writing, but no further. The controlling force of the Statute over all equities arising out of special circumstances, except in cases of part performance, appears in the rule now so well settled, (notwithstanding the doubts of Chancellor Kent in *Gillespie vs. Moore*, 2 *Johns. C. R.*, 585,) that the Court will not, for the purpose of decreeing a specific performance, reform a written contract in a case of omission through fraud or mistake. This very familiar branch of its jurisdiction, the Court will not exercise when asked to do so for the purpose of a decree for specific performance, because that is held to contravene the policy of the Statute. The authorities cited for the complainant, would not sustain a decree in his favor, upon the ground that the defendant wrote the contract. The other special ground for relief insisted upon was, the defendant's admission by answer that the lot described in the deed tendered to him for execution, was the lot contracted for. The

defendant's answer, frankly admits all that the bill alleges touching the meaning and object of the contract, and the identity of the lot sold. It insists upon the benefit of the Statute. Now it has long ceased to be a matter of controversy, that a defendant may fully admit the parol contract as alleged, and, at the same time, avail himself of the Statute by insisting upon it. Nor is this privilege limited, as was argued, to the case in which the contract admitted to have been made, rested wholly in parol. It applies as well where the admission respects a contract defectively reduced to writing, as to one not reduced to writing at all. There is no conceivable ground, nor any authority, for the distinction suggested.

I am, therefore, brought to the conclusion that the bill must be dismissed. The effect of the decree will be to work injustice in this particular case, but that is a less evil than to compromise the policy of a wise and beneficial law. I cannot do better than apply here the observations of an able writer, treating of this very statute. "Where," he says, "integrity is a victim to the "Statute, it suffers the consequences of its own neglect of "the means thereby provided for its security against "fraud, and of the rational maxim of law, *vigilantibus non* "*dormientibus leges subveniunt.* The principle of law and "government require that particular hardship, and cases "even of transient injustice, must be endured, rather than "that the standing policy of justice should be disturbed. " A law composed with the design of obstructing the facili- "ties for fraud, and removing the temptation to perjury, is "baffled in its general policy by a subjection to rules of a "fluctuating operation ; and the anxiety to take cases out " of the Statute is the source of the inconvenience which "has been reproachfully imputed to the Statute itself." *Roberts on Frauds*, 151.

Let a decree be entered dismissing the bill, but without allowing costs to the defendant. As he is brought

here in consequence of his own blunder in drawing the memorandum, I think it equitable that he pay, at least, his own costs.

UPON APPLICATION of complainant's solicitors, after the opinion of the Chancellor was read, but before decree and entered, the case was re-argued.

*J. H. Rodney*, for the complainant.

The expression "a front of one acre," means such a front as a square acre would make,—The term " front " being used antithetically to *back and sides*—giving 208 9-12 feet.

This expression is not unmeaning. It is a phrase susceptible of a meaning which may be shewn by parol evidence. 1 *Gr. on Ev., Sec.* 295.

Now the evidence afforded by the Surveyor's notes of survey, under the discretion of the parties, affords a construction to this phrase in accordance with the above suggestion.

*Mc. Caulley*, for the defendant.

Mr. Rodney's construction introduces something not there, in order to give sense to a phrase which has no meaning. A phrase or expression which is without meaning, as applied to the subject-matter, *i. e.* a line, cannot receive a sense by extraneous evidence. It applies to an area, not a line. The attempt is to supply 280 $\frac{9}{12}$ feet on the front line. That is not in the contract by any expression, or by *necessary implication*. An acre may be of any shape. How is it assumed that the shape is to be rectangular with a front of one square acre ? Even with such a shape, the front is not fixed. How is it known

61

that Green had land sufficient to be included in the rectangle ?

The parol evidence relied on does not sustain the construction insisted upon, *i. e.*, a rectangle, with the front of a square acre.

*G. B. Rodney*, for the complainant—in reply.

1. In the language of surveying, "an acre of land" means an acre by square measure. Therefore, even without evidence, a "front of an acre" might be construed a front of a square acre.

2. Even were it not so, it is still open to shew what the parties meant by it—which is done by the survey directed by themselves. *Sugden on Vend. Ch.* 1, *Sec.* 4.

Besides, it may be shewn that the phrase has, by *local use*, the sense attributed to it.

If it be considered that the *local usage* of a word or phrase must be proved as a fact, and that, on that point, there is no evidence, the Chancellor may yet satisfy himself by ordinary proof, this being the only point of objection to relief.

THE CHANCELLOR :—

I have considered with care, and, so far as I can know myself, with candor, the views presented, upon 'the reargument, by the complainant's counsel, of the point on which the opinion heretofore announced, rested, viz ; the failure of the written contract sufficiently to locate the bounds of the lot intended to be sold. The rule of law which has been applied to the case is not questioned, that is, that the description of the premises, like all the essentials of a contract, must, under the Statute of Frauds,

be ascertained *with reasonable* certainty, either by the language of the written contract, or by some writing or other matter referred to in it.

Parol evidence, to a considerable extent and variety, is admissible in aid of written contracts ; but it is admissible only for the purpose of interpreting the meaning of words or expressions used in the writing, and not, in any case, to supply a deficiency of expression. And this restriction would seem to apply more stringently to cases in which the contract, or instrument, is one required by statute to be in writing, than to those which may be good without writing.

Now the argument, conceding these principles, claims that there are, on this memorandum, expressions which, even if not sufficient, taken by themselves, are yet so explained by the evidence as to ascertain the boundaries of the lot. A "front of one acre," is an expression relied on as fixing the length of the front line ; the running parallel of Green street, applied to the lot as a whole, is supposed to ascertain its shape to be a paralellogram ; and thus the length of the front line and direction of the sides being found, the quantity sold, *i. e.*, one acre and 150 square perches, would locate the back line. The whole of this argument rests upon the assumption that "front of one acre" means a line of such length as equals one side of a square acre. Does it then appear,—not conjecturally,—not as an inference from the impossibility of giving any other sense to these words, but does it appear with that reasonable certainty which the policy of the Statute requires, that such is the sense of these words ? Now, in answer to that question, we observe, first, that this phrase, "front of one acre," has no proper application to a line, and has not a natural or generally acknowledged and received sense, such as is here claimed for it. Again, although it is unquestionably true, that the words may have such a sense by usage, either local or

among surveyors, as a class, still such usage has not been proved, as it must be when relied on to interpret a written instrument; nor can the Court, as was suggested by the senior counsel for the complainant, now, after a hearing, admit evidence of usage, even were an application made, because no satisfactory reason could be assigned for the omission to take such proof at the proper stage of the cause. Then we are brought to the precise point chiefly relied on, viz : that the survey, which is in evidence, may be taken as a cotemporaneous exposition, by the parties, of the sense in which they used the terms "front of an " acre,"&c.

To give to the survey the effect here desired, would solve the difficulty, and, probably, effectuate the real purpose of the parties. But to do so, would violate a settled rule of law, viz: that parol evidence of the intention of parties in the particular transaction, cannot be admitted to give a construction to the words of a written instrument ; in no case to vary or control the sense of plain and unambiguous words, and not to explain doubtful or ambiguous words in those written instruments which are required by statute or by the nature of the transaction, as the only evidence of the transaction. Let us examine this point, carefully.

*First*, it must be observed that the proposed use of this survey has no direct bearing upon the sense of these words, " front of an acre, " like the effect of the ordinary, recognized words of interpreting words by ascertaining in what sense they have been used, either locally, or in some act, science or trade to which they relate, or even by the parties themselves in prior transactions, so that having, by such means, ascertained the sense of the words, the Court can read in them the intention of the parties without any extrinsic proof of that intention. But the attempt is to reverse this, the legitimate mode of interpretation ; it is first to prove by the survey, as a part of

the *res gestae*, independently of any words in the contract, what land was intended to be sold, and then to construe the words in question, so as to give effect to that ascertained intention, so that instead of drawing the intention of the parties in the transaction from the sense of the written words, which was what the Statute sought to secure, the sense of the words is to be drawn from parol proof of the intention of the parties, which is, in effect, to establish the contract upon mere parol proof, the very mischief against which the Statute was designed. The effect, in this respect, is precisely the same, whether the intention is sought to be gathered from the acts, or from the declarations of the parties as to what they intended ; and yet, I apprehend, it was never attempted to construe the words of a written instrument, by proof of declarations or admissions by the parties, as to their real intention in the transaction.

Taking such to be the real effect of the survey as sought to be used, it is encountered by the rule that parol evidence of the actual intention of parties cannot control or influence the construction of written instruments.

In no case can such parol evidence contradict or vary the clear sense of written words ; whether they are admissible to explain a doubtful or ambiguous sense (which is the case with these words) may depend upon these circumstances. If the transaction to which the writing relates, be such as might be proved by parol, not being required to be in writing, parol proof of intention might be deemed admissible, merely to explain the sense of doubtful words, not contradicting the written evidence adopted by the parties, nor violating any statute prohibition against parol evidence of the transaction. It is only on this ground that the case of *Gray vs. Harper*, 1 *Sto. R.*, 594, and others like it, can stand, when under a contract for a purchase of a certain work at cost, a contract which might have been wholly by parol, conversations of

the parties were admitted to explain what sense they attached to the word "cost." *Spicer vs. Cooper*, 1 *G. and D.* 52, and *Selden vs. Williams*, 9 *Watts*, are cited as similar cases. 1 *Gr. on Ev.* § 281, *n* 5, *p.* 383, *n.* 1. But where, by statute or by the nature of the transaction, a written instrument is required, parol evidence of intention is wholly inadmissible, not only to contradict or vary, but equally inadmissible to explain or remove obscurity, or in any way to influence the construction of words. One exception only to this remark is stated by C. B. Abinger in *Doe vs. Hiscocks*, 5 *M. and W.* 367-8, where, speaking on this point, he says : " Now there is but one case in which it appears to us that this sort of evidence of intention can properly be admitted, and that is, where the meaning of the testator's words is neither ambiguous nor obscure, and where the devise is, on the face of it, perfect and intelligible, but from some of the circumstances admitted in proof, an ambiguity arises, as to which of the two things, or which of the two or more persons (each answering the words in the will) the testator intended to express.

Subject to the exception stated by C. B. Abinger, it is the rule that, where writing is required as evidence of intention, doubtful words in it cannot be solved by parol proof of the actual intention, 1 *Jarm. on Wills*, states this as a broad and clear rule in the case of wills ; excluding parol evidence either to " contradict, add to or explain " (*p.* 349.) or "for the purpose of controlling or influencing," (*p.* 358). It is supported by many authorities upon wills. An early one was *Strode vs. Lady Falkland*, 3 *Ch. Rep.*, 98, where the question being, whether the words of a devise "all other my lands, tenements and hereditaments "out of settlement" should include a reversion, it was unanimously agreed by Lord Chancellor Cowper, the Lord Chief Justice, and the Master of the Rolls, that evidence to prove the intention to include such reversion was inadmissible, "for that where a will was doubtful and

"uncertain, it must receive its construction from the "words of the will itself; and no parol proof or declara-"tion ought to be admitted out of the will to ascertain it." In a modern case, *Doe vs. Hiscocks*, before cited, in an elaborate opinion by C. B. Abinger, the same rule was held, excluding all parol proof of intention when, adduced, as he expresses it, "either to supply some deficiency, or "remove some obscurity, or to give some effect to ex-"pressions that are unmeaning or ambiguous." And he puts the broad exclusion upon the requirement that a will should be in writing. "It appears to us," he says, "that "in all other cases"(that is, except the one case before put of what Lord Bacon calls "an equivocation,") "parol "evidence of what was the intestate's intention, ought to "be excluded, upon the plain ground that his will ought "to be made in writing ; and if his intention cannot be made " to appear by the writing, explained by circtmstances, "there is no will." It need hardly be said that the same principles must apply to contracts for the sale of lands, since these, like wills, are required by statute to be in writing. They must, upon the like reason, apply to all cases in which, either by statute, or from the nature of the transaction, the written instrument is required ; as to wills, deeds, mortgages or contracts respecting lands.

It is not meant that words may not be construed or applied by means 'of extrinsic evidence ; but that such evidence must not be proof of intention in the particular transaction. The extrinsic evidence, admissible in aid of written instruments, is of certain, well-defined sorts, and may be reduced to two general classes, depending upon the object for which extrinsic evidence is needed. The object is two-fold. It may be to apply terms plain and unambiguous on their face to their subject-matter, or for the purpose of identifying the person or thing to which they relate. For such a purpose, considerable scope is allowed in proving the situation or qualities of the thing mentioned in the instrument, the fact that a party holds

certain property, and the manner of holding it, in the case of a testator, the condition of the family and affairs, of his property or business, and all the circumstances in which a testator, or any party to an instrument, was placed. 2 *Phillips, on Ev.*, 292- 3. The other object for which extrinsic evidence may be needed, is to interpret the instrument on its face, the necessity arising out of the fact that its language is foreign, or that terms are employed which are doubtful, ambiguous or technical. In such cases, the appropriate modes of interpretation are, such as translations, if the language be foreign ; or proof of usage to explain the sense of idiomatic or provincial expressions, or ancient words, or terms of art, science or trade ; or it may be proof of the manner in which the parties have, in other like transactions, employed the same terms. It has been the disposition of the courts in all well considered cases, not to go beyond these appropriate and recognized modes of interpreting and applying written instruments A marked example of this is the case of Lady Hewley's charities, *Atty. Gen. vs. Shore*, 11 *Sim.*, 592, in which the admission of extrinsic evidence to assist written instruments, was largely examined by the twelve Judges of England, who were called to assist the House of Lords in that case. Then the Judges refused to admit evidence drawn from the known opinions of the founder of a charity, upon subjects to which the charity related, to aid in the construction of words defining the objects. The devise was for the benefit of "poor and godly preachers of Christ's Gospel." The question was whether these words included Unitarians. Among other kinds of evidence, the religious opinions of the testatrix as a trinitarian were adduced. The Judges, though holding Unitarians to be excluded, upon other considerations, excluded evidence of her religious opinion to give a construction to the devise. C. J. Tindall and Baron Parke, whose opinions were the leading ones, and are now received as controlling authorities on the whole subject, both

adhere strictly to the modes before stated, of interpreting and applying written instruments. Baron Parke, after stating the two descriptions of extrinsic evidence just referred to, adds (*p.* 626-7) that, "No extrinsic evidence "of the intention of the party to the deed, from his "declarations, whether at the time of his executing the "instrument or before or after that time, is admissible," "* * The excepted cases in which such evidence is admissible, if, indeed, there be more than one excepted case, "that is, where there are two subjects, or two objects, "both described in the instrument, and each equally "agreeing with it, having no bearing whatever on the "present question." This one excepted case, put by the Baron, is the same stated by C. B. Abinger in *Doe vs. Hiscocks*, before cited. It is evident that Baron Parke, in here stating the excluded evidence to be that of declarations, puts them as only an illustration of the rule—as only one of the excluded modes of proving intention by parol; for he afterwards says, that the sense of the terms, "poor and godly preachers" must be ascertained from legitimate sources, such as the usage of the words and the situation and circumstances of the party, which he had before explained, and adds, that the sense being so ascertained, "no parol declaration of Lady Hewley, that she intended "only a particular class or sect, or individuals with par-"ticular opinions, would have been admissable; nor could "evidence of her conduct, character, habits or opinion, "have been receivable to raise an inference of such "intention." C. J. Tindall, (*p.* 631-2,) after enumerating the several admissible modes of interpreting instruments, doubtful on their face, as by translations of a foreign language, or proof of usage, or custom, as applied to technical, ancient or idiomatic expressions, proceeds to say; "but while evidence is admissible in these instances "for the purpose of making the written instrument speak "for itself, which, without such evidence, would be a dead "letter, or would use a doubtful tongue, or convey a

62

"false impression of the meaning of the party, *I conceive*
" *the exception to be strictly limited to cases of the descrip-*
" *tion above given, and to evidence of the nature above*
"*detailed;* and that, in no case whatever, is it permitted
" *to explain* the language of a deed by evidence of the
" private views, the secret intentions, or the known princi-
" ples of the party to the instrument, whether religious,
" political or otherwise, any more than by express parol
" declarations made by the party himself, which are uni-
" versally excluded."

     I must, in candor, confess myself unable to go with
this decision to its full extent. It would seem that in
the administration of a charity, which is rather an execu-
tive, than a judicial act, where the object of such a charity
is the propagation of certain · doctrines or opinions,
religious or otherwise, the opinions of the founder upon
the subjects to which the charity relates, may be a
legitimate subject of inquiry, without other restriction as
to the sources of inquiry, than that they do not contradict
the written evidence. On these more liberal principles, a
religious charity of like nature, was dealt with in *Atty-
Gen. vs. Pearson*, 3 *Mer*. 353, 7 *Sim.*, 290 ; and the like
principle was applied to Lady Hewley's charity, by Lord
Chancellor Lyndhurst, when the case was before him. 7
*Sim.* 309, *n.* But the opinions of the Judges in the
House of Lords are useful for our purpose, because they
establish a clear line of discrimination which, on the
one hand, admits extrinsic evidence of that general nature
which consists of facts connected with the subject-matter
of the instrument, tending to identify the person or thing
referred to, and necessary to apply language, plain on its
face, to the subject-matter, and evidence which consists of
translations or usage as means of interpreting language,
not intelligible on its face, but, on the other hand, excludes
all evidence not bearing directly on the words, and merely
showing, independently of the words, what the parties in-
tended in the particular transaction, whether such evidence

is drawn from the declarations, admissions, acts, or opinions of the parties, either cotemporaneous with, or subject to the transaction. That must be taken as the great principle which must be considered as established by this interesting case ; whether or not it was well applied to exclude evidence of the opinions of a founder, in aid of the administration of a charity, is not here material.

And now we may proceed a step further and inquire, how far this principle has been observed in those adjudged cases in which the attempt has been to construe written instruments by the acts of the parties, which is the kind of proof adduced in this case. The precise question has been much discussed in a class of cases arising under leases for lives, with a covenant for perpetual renewal. In these cases the question was, whether the covenant for renewal was to be construed so as to exclude or include in the new lease a like clause of renewal, and the attempt was to construe the covenant according to the acts of the parties under it. The first of these cases was one sent from chancery by Lord Bathurst for the opinion of the Court of King's Bench. *Cooke, vs. Booth, Cowp.*, 819. This was a lease for three lives with a covenant for renewal. There had been several successive renewals granted by the lessor, the new leases each containing a like clause for renewal as the first, but after the lessor's death, his devisee refused, upon the expiration of one of the lives, to grant a new lease with a like clause of renewal. The Court of King's Bench held him bound, upon the ground that the parties having four times successively renewed under it, had put their own construction upon it. This decision gave great dissatisfaction to the English equity judges. Lord Thurlow, who sat upon the return of the certificate in that case, disapproved of it, although feeling himself bound to decree in accordance with it. 3 *Ves. Jr.*, 298. Afterwards the principle of *Cooke vs. Booth* was condemned by Lord Alvanley in *Baynham vs. Guy's Hospital*, 3 *Ves. Jr.*, 295,

and in *Eaton vs. Lyon, ib,* 690 ; by Sir Wm. Grant in *Moore vs. Foley,* 6 *Ves. Jr.,* 231, *a* ; and by Lord Eldon in *Iggulden vs. May,* 9 *Ves. Jr.* 325. In this latter case also, the opinion of the judges at law was taken upon the construction of a like covenant of renewal, first in the Kings Bench, 7 *East,* 237, and afterwards upon a writ of error in the Exchequer Chamber, 2 *N. R.,* 449. Both these courts, contrary to the case of *Cooke vs. Booth,* rejected evidence of the acts of the parties in prior renewals as construing the covenant in the original lease. In the King's Bench, Lord Ellenborough distinguishes the case from *Cooke vs. Booth,* upon the ground that it did not appear affirmatively from the pleading in the case before him, that the prior renewals had all included the clause for renewal, whereas, such did appear to have been the fact in *Cook vs. Booth.* But he refers to the principle of *Cook vs. Booth,* as being subject to " grave and serious doubts." In the Exchequer Chamber, however, *C. J. Mansfield,* delivering the opinion of the Court, wholly repudiates the admissibility of this sort of evidence, and says of *Cook vs. Booth,* that it was " the first time that the acts of parties to a deed " were ever made use of in a court of law to assist the construction of that deed."

In another and later case in the Exchequer, *Maxwell vs. Ward* 13 *Price,* 674, the same view is said to have been strongly taken. (3 *Ves. Jr.* 299, *note* 2, 696, *note* 3). I have not been able to find the case. Sir Edward Sugden, upon a review of this course of decisions in 1 *Sugd on Vend. Ch. III, Sec.* 10, *par.* 14, concludes that " it appears " to be now clearly settled that in the *construction* of an "agreement or deed, the acts of the parties cannot be taken into consideration." A decision by the same learned author, as Chancellor of Ireland is cited by Green-leaf, (sec. 295 n.) From *Atty. Gen. vs. Drummond,* 1 *Dru. and War.,* 353, to the point that the acts of a founder of a charity may be shown in aid of the deed ; and there is also

cited *contra*, *Atty. Gen. vs. Glasgow College*, 10 *Jurist*, 676. These cases I have not been able to see. *

The editors of Sumner and Perkins' edition of Vesey Jr., in their notes to the cases before cited, which were before Lord Alvanly, Sir Wm. Grant and Lord Eldon, (3 *Ves. Jr.*, 294; 2 *Ib.*, 690; 6, *Ib.* 237;) have questioned the accuracy of the principles stated by those Judges, that

---

* The case of *Atty. Gen., vs. Drummond*, here referred to, will be found, upon examination, not to bear out fully the impression given by Greenleaf's citation of it, without respect to its subject-matter.

The deed there under construction was made by certain members of trinitarian dissenting congregations to etablish a trust for certain purposes, viz : first, to support the protestant dissenting interest against unreasonable prosecutions; secondly, to educate youth designed for the ministry amongst protestant dissenters; and thirdly, to assist poor protestant dissenting congregations. The information was filed to prevent the application of any portion of the fund, in aid of the teachers of doctrines at varience with belief in the Trinity, and the case involved an inquiry into the construction of the deed with reference to the doctrinal character of the beneficiaries. The Lord Chancellor discussed, very much at length, the question, what kind of parol evidence was admissible to construe a deed.

In the course of the opinion, there occurs a passage which gives his con-clusion, and is probably the foundation of the citation in Greenleaf; "I reject, "therefore, at once, all evidence, which goes to show what the founders "thought, what their opinions were, in order to put a construction on this "deed; but I shall not exclude evidence which informs me what they did. I "shall receive evidence, which goes to show, to what places of worship they "resorted, or what their acts were, although this may not throw any light upon "the construction of the deed. I am clearly at liberty to receive such evidence, "because this deed proceeds upon certain existing foundations, which, it was "intended, should be continued and maintained for the future. I must, therefore, "inquire what were the foundations referred to by this deed, and I cannot do "so without knowing how far the founders were mixed up with these establish-"ments, not as to their individual opinions, but as to their acts, in forming a "part of the general body, whatever their opinions were, who resorted to these "foundations.

"Nobody will dispute, that I am entitled to evidence (indeed, I am "bound to know it without evidence) of the opinions professed by the general "body of Presbyterians. I am at perfect liberty, with evidence or without it,

the construction of a written instrument cannot be affected by the acts of the parties; without, however, any discus-sion of the subject by the editors, the doubt being rested only upon a reference to several American cases. One of these, *Stone vs. Clarke*, 1 *Mctc.*, 378, together with *Choate vs. Burnham*, 7 *Pick.*, 274 ; and also, *Livingston vs. Ten Broeck*, 16 *Johns.*, 14, are the only American cases I have met with relevant to the question. In the New York case, in order to shew the extent of an equivocally expressed privilege to the grantee in it for cutting wood from other premises of the grantor, evidence was admitted of the subsequent acts of the parties in the exercise of the privilege ; but the admission of this evidence was based upon the antiquity of the deed, and the consideration that as, after so long a lapse of time, a general usage of such words could not be expected to be proved, the acts of the parties might be accepted as the next best evidence. In *Choate vs. Burnham*, the first of the Massachusetts cases, where the question concerned the extent of a right of way under a deed, the Court considered the language of the grant, of itself, conclusive, but remarked, generally, that, were it

---

"to resort to the " Westminster confession of faith," whether Presbyterians "subscribe it or not. If I find them in connection with the Synod of Ulster, "then I must inquire, what was the practice of that Synod, in matters of "religion, before I decide whether Unitarians are, or are not, included in the "trusts of this deed; I must know all about the foundations established before "the execution of this deed, to enable me to decide who come within the trusts "which it has created."

The case of Lady Hewley's charities, before referred to, was then pending in the House of Lords, and Sir Edw. Sugden declined to make a final decree in the case before him, until that case should be concluded. It will be observed, however, that the the views expressed by this distinguished judge and author, in this case, are, in no respect, antagonistic to the principles laid down by the Chancellor in the case reported in the text; and, with respect to the subject-matter of the case of *Atty. Gen. vs. Drummond*, they do not go further, if, indeed, so far as does the Chancellor in his observations upon the case of Lady Hewley's charities.

doubtful, acts of the parties which had been put in evidence might be accepted to aid the construction. *Stone vs. Clark* is the case which evidently prompted the notes in Vesey. But that case presented that kind of latent ambiguity referred to by C. B. Abinger and Baron Parke, as the one exception to the rule excluding evidence of intention. The question was, whether a mortgage of a large tract, included, also, a small lot lying with it, the terms of description being general and fully satisfied, either by excluding or including the lot. The words were perfectly intelligible on their face, but applicable equally well to two different subject-matters, and, therefore, consistently with the ruling of the English cases, the subsequent acts of the parties under it might determine the application of the words one way or the other. Upon this ground, alone, the case may be supported, though the language of Judge Wilde goes beyond it.

Upon the whole, the rule to be gathered seems to be that, where a written instrument is required by statute, or by the nature of the transaction, such as a will, deed or contract respecting lands, parol evidence of the intention of the parties in the transaction, whether shewn by declarations, or acts, at the time of, or after, the transaction, is inadmissible as well to explain or construe doubtful or insensible words, as to contradict plain and ambiguous words. The admission of such evidence opens a door to the uncertainties and dangers of parol testimony, which it is the very object of statutes, such as those of wills and of frauds, effectually to prevent. It is not surprising if courts, under the pressure of an inclination to give some construction to instruments of an executed character, under which the rights of parties are involved, one way or the other, such as wills and deed, should, sometimes, yield admission to strong evidence of intention, to construe doubtful words, especially in states where there is no equity jurisdiction for reforming instruments according to the intention of the parties. But we are free from any

such embarrassment. For as to executed instruments, we have an ample jurisdiction to reform them, and make them speak unequivocally the real intention, and in a case such as the present, in which the contract is executory and the parties remain in *statu quo*, there is no interest involved so serious as to sway the Court from maintaining the wholesome policy of the Statute of Frauds, by requiring a written contract, unaided by parol proof of mere intention, leaving the terms subject to what we have seen are the ordinary, recognized modes of interpretation.

The decree must, therefore, be entered as already directed.

---

PHILIP PLUNKETT,

*vs.*

PATRICK DILLON.

*New Castle, Feb. T., 1871.*

Where the bill was filed to restrain a suit for damages, for the failure of complainant to satisfy a judgment, entered upon a bond given for an alleged advance of money, under a written agreement for the joint purchase of land, and a division of the profits accruing from the venture, the claim that a balance remains unpaid, for which the defendant is liable, either as a co-partner or as a trustee, is an equitable defense which will justify the withdrawal of the controversy into the Court of Chancery.

An agreement in writing between P. and D. for the joint purchase of land for improvement and sale, with money advanced by P., who is to be repaid, principal and interest, together with two-thirds of the profits, if any, the other third to go to D., and a loss, if sustained, to be borne in the same proportion, P. being secured by the judgment bond of D. for the amount of the advance, is not, upon its face, a cover for usury under the guise of a partnership. The feature which saves it is the liability of P. for a share

of the losses. Though the terms of an agreement are grossly unequal for a partnership, and open to suspicion of usury, if the transaction is asserted by the bill to be a partnership, and no usury appear upon its face, the Court cannot assume it, in the absence of evidence.

Where the case, presented by the answer, is not a failure to satisfy a judgment properly entered, but the entry of a judgment upon a bond, under which nothing remained due and unpaid at the time of entry, an injunction against a suit for damages caused by the failure to enter satisfaction of the judgment will not be dissolved, because it would send the parties out of this Court, only to return to it upon a bill filed for a decree, declaring the judgment fraudulently entered, as preparatory to the suit for damages.

A judgment cannot be impeached collaterally, but only directly, by proceedings to vacate or set it aside. These may be taken, either in the Court when it was entered, or by bill in equity; but except in very simple cases, the latter is the better proceeding.

A cross-bill ordered to be filed by the defendant, where it was, shewn by the bill and answer, to be necessary to put the cause in such condition as that a decree might be made in any event, to settle all controversies, between the parties, raised by the pleadings.

BILL IN EQUITY TO RESTRAIN PROCEEDINGS AT LAW, AND FOR AN INJUNCTION; MOTION TO DISSOLVE.—The bill was filed to restrain two suits at law brought by the defendant against the complainant, one being an action of assumpsit, upon the common counts, to recover a balance due upon various transactions between the parties, and the other an action for damages accruing from the entry of a judgment upon the defendant's bond for $3000, which, it was claimed by the defendant, was fully paid prior to the entry of judgment, and which was also alleged to have been originally usurious and void.

The bill alleged an agreement between the parties in August, A. D. 1864, for the joint purchase of land, and for the sale of the same upon partnership account, which agreement was afterwards reduced to writing as follows :—

"Wilmington, Delaware, August,—A. D. 1864. This "is to certify and show, that P. Plunkett, of the city of
63

"Wilmington, New Castle county, and State of Delaware,
"and I Patrick Dillon of the same city and State, purchased
"from Ferris and Garrett, three hundred and seventy-five
"feet (375) of land, fronting on Madison street from Second
"to Third streets, and in depth ninety-seven (97) feet,
"Philip Plunkett paying for the same the sum of three
"thousand (3000) dollars, for which I received the deed for
"the same. But I acknowledge and agree for myself and
"my heirs, that said Plunkett is to be paid back his three
"thousand dollars (3000) with interest, and receive as his
"share of the profits, if any there shall be, two-thirds, and
"I one-third, and if a loss should be sustained, we are to
"bear it in the said proportion. In consideration of my re-
"ceiving the deed, I executed, this day, a judgment bond
"for three thousand dollars (3000), for which I hold myself
"accountable until the property shall be sold, when the
"proceeds of such sale shall go to pay off said bond.
"Witness my hand the day and year above written."

It was also alleged that the complainant advanced
the sum of $3000 to pay for the land, and receive, as se-
curity therefor, a bond of the defendant for that amount,
with interest upon which judgment had been entered on
November 10th, 1869, and which was still unpaid. That the
arrangement was for mutual benefit, and that defendant,
who was a master carpenter, had frequently been accom-
modated by complainant with loans, for use in his business
of erecting houses, and improving and selling land.

In the present case the defendant went into posses-
sion, improved some lots, and sold some with, and some
without, improvements. For a share of the profits upon
which operations, the bill claims that the defendant was
liable under the agreement.

The complainant claimed, in addition to the sums
due upon the said bond, and for profit on the land
purchased, that defendant was indebted to him for sundry

other sums, viz : loans on due bill, amounting to $954 ; stone furnished to the value of $28 ; a balance of indebtedness on book account of $341.77 due from defendant, as the survivor of the firm of Dillon & Plunkett, and a due bill for $10, dated November 21, 1868.

The bill further alleged that, on June 28, 1869, the parties had met and adjusted their accounts and ascertained a balance against defendant of $334.18, for which amount he had given complainant his due bill of that date which complainant still held, unpaid. At the same time the due bills for $954 were delivered to defendant.

The bill then recited the suits in the Superior Court, averring that, in the bill of particulars filed, in the suit upon the common counts, the judgment bond for $3,000, is a principal item, and that all the other items arose out of the before—mentioned transactions, and that no credit is given to complainant therein for profits in the land transactions, nor for the amounts of the due bills surrendered, of which complainant has no evidence except what he can derive from the defendant. The complainant alleges that he does not object to a re-opening of the accounts, but cannot safely go to a trial at law without a discovery by the defendant, and a production of evidence from him touching the settlement of June 28, 1869. And the complainant alleges that there were errors against him in the said settlement, in the failure to credit him with two-thirds of the profit on portions of the land sold or retained by the defendant, and with the debt due from Dillon & Plunkett.

The prayer of the bill is for answer, account of the judgment, discovery respecting the settlement and its establishment, with rectification of any errors against the complainant, or, if the settlement be rejected, then for an account in full between the parties and payment of balance due complainant, and for injunction against the suits at law ; also for other relief and for subpœna.

The answer denied that there was any such agreement either verbal or written, as alleged, or that defendant signed any such paper knowing the contents thereof, and that if the defendant did sign the paper set up in the bill it was done ignorantly, and the signature was obtained upon fradulent and false representations by the complainant. On the other hand, the defendant claimed to have purchased the land in question on his own account, without consultation with complainant, and after having completed his contract of purchase, he borrowed of complainant the sum of $3,000, which was paid for the land and for which the latter took defendant's bond as security for an ordinary loan. The defendant entered into possession of the land, and he alleges that he agreed to repay the said loan to complainant, with six per cent. interest, merely, and utterly denied the alleged agreement for a joint purchase. Complainant did afterwards suggest the payment to him of a share of the profits in view of the great advantage derived by defendant from the purchase, but defendant neither acquiesced in, nor declined, the proposition.

The answer admits the entry of judgment on the bond, but avers that it was done contrary to the express agreement of complainant not to enter it, and now claims that nothing is due upon it, but that the complainant is largely indebted to him.

The defendant admits his occupation as a builder, but denies having been engaged in joint business enterprises, with complainant. The answer sets forth in detail the disposition of the land, the sale of portions in lots, and the improvement and sale of other parts, and the prices realized from the same. It admits some items of other indebtedness to complainant, as set forth in the bill, to have been proper claims, but denies any indebtedness to complainant remaining upon a correct statement of their mutual accounts. That such a settlement was ever made

is denied, but it is alleged that complainant exhibited to defendant what he termed a statement of their accounts, claiming a balance of $334.17 for which amount defendant gave him a due bill without examination, reposing undue confidence in the complainant. The answer then sets forth the particulars in which defendant alleges that the so called settlement should be corrected in his favor, by reason of which the defendant claims that there is due to him in a proper settlement, the sum of $5001.87, with interest from Febuary 1st, 1870, to recover which the suit, No. 49, to the May Term of the Superior Court, 1870, was instituted.

The defendant alleges, with respect to the other suit, No. 143, that it was brought to recover damages for the refusal of complainant to enter satisfaction of the judgment for $3000., which, it is charged, was entered with the vindictive desire to injure defendant, and, that its effect was the destruction of his business and has already compelled him to make an assignment by interfering with his business of selling real estate, and has damaged him to the amount of $10,000.

At the February Term, 1871, the answer having been filed, a motion was made on behalf of the defendant, to dissolve the injunction so far as it restrains the defendant from prosecuting the suit for damages.

*Gordon* and *G. H. Bates*, for the defendant.—

This motion may be sustained upon two grounds.—1st Want of equity in the bill. 2nd. The denial of the alleged equity of the bill in the answer.

*First.* As to the equity of the bill.

1. The paper writing relied on is not, on its face, a valid contract of partnership.

(1.) It is an usurious contract. *Colly. on Partn.*, *Sec.* 63 ; *Morrisset vs. King*, 2 *Burr.*, 891 ; *Jestons vs. Brooke*, *Cowp.* 793 ; *Morse vs. Wilson*, 4 *Term*, 353 ; 2 *Pars. on Cont.*, 420.

(2.) It is without mutuality and consideration, and wholly within complainant's control ;—not, therefore, of force as a contract.

2. Even admitting the contract as alleged, it appears, by the accounts, that there is nothing due on the judgment.

*Second.* The effect of the denial of the answer.

The denial is full, (1) as to any *verbal* agreement of partnership, (2) as to the execution of the paper writing, and (3) that there is any balance due on the judgment. The last point is conclusive, because that is the only material fact touching our right to enforce satisfaction of the judgment. An examination of the accounts, presented by the bill, shows errors which, when presented, leave a large balance due the defendant.

We might claim a dissolution of the injunction as to both suits, but we are satisfied to leave in this court the suit on the common counts, because it involves an examination of accounts.

So far as the bill seeks discovery, the answer satisfies it, and for that purpose the injunction cannot stand. As to the relief sought, viz :—restraining the suit for not satisfying the judgment,the sole question is as to payment, and to that the answer is full, while the bill alleges that the complainant has no evidence but defendant's answer.

With respect to the discretion of the court,—the injunction works irreparable injury to defendant, having already compelled an assignment and greatly embarrassed him. On the other hand, to dissolve it works no injury to complainant, for the defendant cannot recover in the suit, but *on proof of full payment of the judgment. Hilliard on Inj.*

*sec.* 39, *p.* 27.    There is no difficulty in a dissolution of the injunction in part.    *Ib.*, *sec.* 105, *p.* 134.

*Patterson,* for the complainant.

The equity jurisdiction is clear, springing from the contract, which is either a partnership or a trust.    The case also involves either mistake or fraud in the settlement, which, on the statement of the defendant himself, needs to be reformed.    And there exists still another ground in the necessity for a discovery.

The question of dissolution is one of discretion, and there are many exceptions to the rule which dissolves upon a denial by the answer.    1 *Sm. Ch. Pr.*, 587 *note* 6, also 600-1 *note c* ; again, it is not right to dissolve the injunction here, because that would dispose of the case. *Church vs. Legeyt*, 1 *Price*, 301 ; *Eden on Inj.*, 146.

The application is defective as being to dissolve the injunction in part ; it must be dissolved altogether,or stand as a whole.    *Hoffman vs. Livingston*, 1 *Johns. Ch.*, 211.

The answer does not deny the equity of the bill. Even with respect to the contract, his denial is, that "he ". signed, knowing the contents thereof."    If he signed, he is presumed to have known, and denial of knowledge is not sufficient without some facts shewn to the contrary, to establish duress, fraud, or the like.    The form of statement is a mere conclusion, without setting forth the facts which would excuse the want of knowledge. · The denial, therefore, rests upon mere opinion of defendant, which is insufficient.    1 *Bland*, 335.

The admission includes the original contract, the settlement and the due bill, and alleges fraud in obtaining the contract, and mistake in the settlement, and, that nothing is due.    This is matter of avoidance, admitting a case of equitable jurisdiction.    A substantive, distinct defense must be pleaded.    *Minturn vs. Seymour* 4 *Johns. Ch.*, 497.

To dissolve the injunction is to remit us to the court of law, and to deprive us wholly of our equitable defense. A trust is involved here which would not be cognizable at law.   1 *Sto. Eq. Jur.*, secs. 29-32.

THE CHANCELLOR :

This bill is filed to restrain the further prosecution of two suits at law brought by the defendant, Dillon, against the complainant, Plunkett, one being an action of assumpsit on the common counts, to recover a balance, alleged to be due from Plunkett to Dillon upon settlement of sundry transactions, the other being an action for damages resulting from the entry and lien of a judgment for $3000, still unsatisfied on the record, which Dillon alleges to have been entered fraudulently upon a bond, which, at the date of the entry of judgment, was fully paid.  The answer also alleges that the bond was void, originally, for usury.

The equity of the complainant to be relieved against the action upon the common counts, as set forth in the bill is, that Dillon's claim, disclosed in the bill of particulars filed in that action, arose out of partnership transactions, which are cognizable only in a court of equity ; that, upon a fair and full accounting and settlement between the parties, in this Court, Dillon will be found indebted to him ; in corroboration of which statement, the complainant exhibits what he claims to be an account stated between them on the 25th of June, 1869, of their transactions to that date, including the debt secured by this bond, and showing, on its face, a balance, then due to Plunkett, of $334.17, for this balance Dillon gave his due bill, which is yet unpaid. The bill specifies sundry errors in the account, alleging that were it opened and re-settled, a still larger sum would be found due to him.  The bill further states that the complainant cannot safely go to trial at law without a discovery of some of these transactions by

Dillon, there being no evidence of them ; and the interference of a court of equity is claimed, both on account of the partnership relations of the parties, and for the purpose of obtaining a discovery. With respect to the action for damages by reason of the alleged fraudulent judgment for $3000, the bill claims that the same has not yet been fully paid, and invokes this Court to withdraw the controversy into its jurisdiction, because, as is alleged, the bond on which the judgment has been entered was given for advances made by Plunkett to the partnership to be repaid out of the profits of the business that, therefore, the question of payment depends upon the result of a partnership account to be taken in this Court. These are, in substance, the grounds of equity relied on by the complainant.

The defendant, by his answer, without admitting the alleged partnership, nevertheless does not resist the injunction so far as it restrains the action upon the common counts ; and he submits to an account and settlement in this Court of all outstanding claims between the parties. But, with respect to the action for damages, the defendant moves for an order to dismiss the bill, and to dissolve the injunction. The motion is argued, (1) upon the want of equity on the face of the bill, and (2) upon the denial by the answer of those allegations upon which the complainant rests his equity.

1st. As to the equity of the bill—I am still of the opinion formed when the injunction was ordered, that the bill, on its face, entitles the complainant to protection against a trial at law of the question whether the bond for $3,000 had been paid. The equity to this relief rests upon the allegation made, in effect, that the bond was given, not for a loan from *Plunkett to Dillon*, but in order *to secure an advance for the purchase of real estate on the partnership account, and to be repaid only out of the proceeds of the real estate.* The theory of the bill is, that

64

inasmuch as Dillon was to hold the title to the real estate, and to receive and control the proceeds of it, the bond was given as a security for the re-imbursement of Plunkett's advance out of the proceeds, as they should come to Dillon's hands. Upon the case thus made, Dillon's responsibility under the bond was either as a co-partner, which is according to the construction of the contract given by the bill, or, at least, his responsibility as trustee ; in either of which capacities he is accountable only in a court of equity. Now, Dillon's suit for damages against Plunkett for keeping open the judgment, proceeds upon the ground that the bond has been fully paid. Plunkett's defence is, that a balance remains unpaid for which Dillon is liable, on account of sufficient proceeds having been received by him, and with which he is chargeable, under the contract, either as a co-partner, or as a trustee, it matters not which. Such a defense is an equitable one ; and hence I felt justified, taking the case to be as alleged in the bill, in withdrawing the controversy into this Court.

It is true, from all that appears, Plunkett need not have resorted to this equitable defense,—but might have stood his ground at law. For, on the suit at law, the bond would have been treated as Dillon's absolute debt, and he would have been held to proof of full payment, in order to sustain the suit. Nevertheless, if the bond was, in fact, given to carry into effect transactions cognizable in this Court, as we must assume, while considering the sufficiency of the bill on its face, that consideration entitles the complainant to relief here.

It would be otherwise did the question of payment depend upon a transaction cognizable in a court of law ; as if the case made by the bill, were the ordinary one of a judgment recovered for an individual debt, and the questions were whether it had been paid, the fact of payment to be shown by the usual evidence of receipts, admissions, &c. In such a case the question of payment

can be as well tried at law, and no ground exists for withdrawing it into this jurisdiction. It was very much urged in argument, and so the answer alleges, that this bond was given for a loan to Dillon, and was payable as an ordinary debt, no question of partnership or trust being involved. But whichever may have been the real transaction between these parties, I must, at this point, assume that it was what the bill alleges ; for we are considering only the equity of the bill on its face.

A distinct ground upon which the equity of the bill was controverted in argument was, that the contract alleged was, on its face, a cover for usury under the guise of a partnership. I cannot so read it. The feature which saves it from the taint of usury is that, according to its terms, Plunkett is liable, in all events, for a share of the losses, and, therefore, his principal is at risk, *i. e.*, the risk of the adventure and not of Dillon's solvency, merely. This clearly distinguishes it from the authorities cited from *Cowp.* 793 ; 4 *T. R.* 353 ; 2 *Parsons on Cont.* 420. The terms are grossly unequal for a partnership, and open to suspicion of usury ; but the transaction is asserted to be a partnership, and no usury appearing on its face, we cannot assume it at this stage of the case.

Another ground taken in support of the motion to dissolve, for want of equity in the bill, was that, even admitting the contract to be as alleged, still the account annexed to the bill, and relied on by the complainant as showing a balance of $334.17, due him on 28 June, 1869, would, if corrected, show a large balance in favor of the defendant, after the full payment, the judgment being included in the account. One very gross error is pointed out—Dillon is charged $2,656, as the full proceeds of 166 feet of land sold, and is credited $409.33 as his share (one third) of profits on the same sale, whereas, according to the contract relied on in the bill, Dillon was chargeable with nothing arising out of this transaction except

Plunkett's share (two thirds) of the profits, which share, taking the cost of the land per foot, and the proceeds of sale to be as shown in the bill and account, was $885.34. Here, even taking the contract as alleged by the bill, is an overcharge against Dillon of $1,361.33, the correction which would far more than sink the balance in Plunkett's favor upon the account as it now stands. Other errors also are alleged. But with respect to them all, it is enough now to say that the bill charged this to be a settlement between these parties, mutually agreed upon, with a balance struck and accepted by Dillon as correct, even to the extent of his giving his due-bill for it. It is competent for the defendant to deny by answer that he was a party to any such settlement, and if, on such an issue, he is sustained, the account goes for nothing. So, even, if he were a party to it, he may, by a cross-bill, have it reformed for error. But in considering the equity of the bill upon a motion to dissolve the injunction, I must take this transaction to be as the bill alleges it, *i. e.*, a settlement to date and, while so treated, as being obligatory on the parties.

2d. I next proceed to consider the motion, so far as it is supported by the denial of the answer.

The answer denies the existence of any partnership, and insists that the bond was given for money loaned to Dillon, to be repaid at all events ; it positively alleges that the bond has been fully paid ; more than this, that it was paid prior to the entry of the judgment. The giving of the due-bill on the 28th, June, 1869, for $334.17, as a balance then due to Plunkett, is admitted ; but it is denied that this was a balance struck upon a settlement mutually made upon investigation. The due-bill was given, as the answer alleges, in order to satisfy a demand on the part of Plunkett, and on his representation, in which Dillon then had confidence, that there was such a balance due Plunkett. The answer states that the account appended

to the bill, as showing a settlement on the 28 June 1869, and a balance of $334.17, then due to Plunkett, was made out by himself without Dillon's knowledge ; that after it was made and the due-bill given, sundry gross errors in it were discovered by Dillon, which are set forth in the answer ; that the correction of these would shift the balance largely in Dillon's favor, after fully paying the bond and all other just claims of Plunkett. No question of usury is raised by the answer.

The answer directly traverses the bill in its two material allegations, viz : that the bond was given for a partnership advance, and that there is a balance still unpaid upon it. If the case, as left by the answer, raised only the question whether a judgment, legally entered, has since been paid, I should dissolve the injunction, and remit the parties to the action at law, considering that the simple question of payment, as before suggested, could be as well tried at law as here. But the case made by the answer, as well as that of the bill, is one cognizable only in equity, and the effect of dissolving the injunction would be to send the parties out of this Court only to return again upon a bill to be filed by Dillon, for a decree declaring the judgment void, preparatory to the further prosecution of this action for damages. It will be observed that, upon the case made by the answer, Plunkett is chargeable in damages, not for neglect to enter satisfaction pursuant to the statute, of a judgment originally valid but paid since it was entered, but for having fraudently caused the entry of a judgment upon a bond which, it is alleged, had been paid before the judgment was entered. Now, a judgment cannot be impeached collaterally, but only by a direct proceeding to vacate it or set it aside. Such a proceeding may be taken either in the court where the judgment was entered, under the equitable jurisdiction which every court exercises over its own records ; or it may be by a bill in equity in this Court. The Superior Court has heretofore declined, except in very simple cases, to enter-

tain applications to vacate judgments, deeming the proceeding by bill to be generally a better mode of investigation. It is certain that the Superior Court would not, in the action for damages, allow the judgment to be impeached by evidence of payment prior to the entry of the judgment ; and it is doubtful whether that court would entertain an application to its equity jurisdiction to vacate the judgment upon grounds requiring the investigation of numerous transactions and matters of account. Considering, then, that the whole controversy must be adjudged in this Court as well as with respect to the validity of the judgment upon the questions of usury and payment, as with respect to the balance upon a final accounting between the parties, the better course will be to continue the injunction, and put the cause in such condition as will bring the validity of the judgment to an early decision. This is proper in order that if fraudulently entered and kept on foot, Dillon may be relieved from it as soon as possible. It will be necessary that Dillon file a cross-bill, alleging his objections to the judgment, and praying that Plunkett be perpetually enjoined from collecting it. Should such a decree be obtained, the injunction now pending will be dissolved, leaving Dillon free to seek his redress at law in damages. For another purpose, also, the cross-bill might become necessary ; that is, to enable the Court to reform the account of June 28th, 1869, and to decree, in Dillon's favor, any balance which may be found due to him on the final settlement. While the case stands upon Plunkett's bill only, no decree can be made in favor of Dillon beyond dismissing the present bill, even though the proof might show a balance due to Dillon. The Court can deal fully and effectually with the whole controversy only by means of a cross-bill, embracing the object of both of Dillon's suits at law. It should seek (1) relief from the judgment, and (2) an account and settlement of all transactions between the parties, setting forth, for the latter object, a full statement of Dillon's claim, and praying a decree in his favor for any balance which may be found due to him.

Let an order be entered that the defendant file a cross-bill in this cause by the first day of June next ; that the present complainant answer the cross-bill within twenty days after the same shall be filed ; and that, upon the filing of the answer, the complainant in the cross-bill have ten days to except. This will enable either party to bring the cause to issue by the first of July, and to a hearing at the September Term.

The injunction will stand continued, so far as concerns this action for damages, No. 143, to May Term 1870, to which action the motion applies. I observe, however, a clause in the injunction which gives it too large an operation. In its terms, it restrains the defendant from commencing in any other court, pending this suit, any suit, action or plaint against this complainant, touching, concerning, connected with, or arising out of, the matters stated in the bill. The objection to this is, that it leaves open the question whether a suit, which might be hereafter brought, does or does not arise out of the matter stated in this bill. The injunction under this clause has not the requisite certainty. It should operate upon subject-matters so specific, that the party restrained may certainly know what he is forbidden to do. On the other hand, so general a clause is not necessary for the complainant's protection ; for after any suit brought to the prejudice of his remedy here, he can at once apply to have the injunction extended. I shall, therefore, order the injunction to be amended by striking out that clause.

## JACKSON AND SHARP COMPANY,

### *vs.* .

## THE PHIADELPHIA, WILMINGTON AND BALTIMORE RAIL ROAD COMPANY.

*New Castle, Feb. T. 1871,*

Amendments to injunction bills, after answer, to be without prejudice to the injunction, are allowed with great caution and upon special grounds.

Such amendments must be of new matter not inconsistent with the original bill, verified by affidavit, in such season as not to prejudice the defendant and upon allegation of a sufficient excuse, shewn by affidavit, for the defectiveness of the original bill.

INJUNCTION BILL. APPLICATION FOR LEAVE, TO AMEND THE BILL AFTER ANSWER* :—This was a bill in equity for an injunction to restrain the defendant, a railroad corporation, from removing a side track which connected the railroad with the car works of the complainant, located adjacent to the road, which side track had been used by the complainant in the receiving of material and the delivery of finished cars, into and from its works. The defendant, having filed its answer, moved to dissolve the injunction, both for the want of equity in the bill and upon the denial, by the answer, of all its material allegations. After a partial argument of the motion, at Chambers, the Chancellor expressed his opinion against the motion so far as it rested upon the latter ground, but directed further argument on a future day, as to the sufficiency of the bill.

*For fuller statement of the facts, see the same case on the merits, to be reported in 4 *Del. Ch. R.*

The controversy on this point was, whether the bill contained a sufficient allegation of any agreement between the parties, made prior to the erection of the car works, binding the Rail Road Company to construct and keep such a side track for the use before stated. At the time appointed for further argument, the motion being called up, the complainant applied for leave to amend the bill by inserting a more direct and specific allegation of such an agreement without prejudice to the injunction. The proposed amendment was submitted in writing, and the facts alleged in it verified by the oath of the President of the Jackson & Sharp Company. Also, there was filed the President's affidavit of certain circumstances relied on as excusing the omission to insert originally in the bill the facts now sought to be incorporated.

*T. F. Bayard*, in support of the application.

*N. B. Smithers*, *contra*.

THE CHANCELLOR:—

Amendments to injunction bills, after answer, to be without prejudice to the injunction, are allowed with great caution and on special grounds. Upon the best authorities, four things are held requisite to support such an application. (1). The proposed amendment must be stated in writing and verified by affidavit. (2). The matter of it must be in addition to the original bill and not inconsistent therewith. (3). A sufficient excuse must be shewn, by affidavit, for the defectiveness of the original bill. Generally, such excuse is that the new matter has come to the knowledge of the complainant since his bill was filed. If it were then known to him, the omission to incorporate it must be very satisfactorily accounted for. The complainant is held strictly to state his whole case

at first, and is not allowed " to split and retail out his equity." Lord Hardwicke in 2 *Ves. Sr.* 21. (4.) The application to amend must be made in such season that the defendant be not prejudiced by it in bringing the cause to a hearing. If necessary, terms to this end will be imposed upon the complainant. *Rodgers vs. Rodgers*,. 1 *Paige,* 424; *Norris vs. Kennedy,* 11 *Ves.,* 565 ; *and note* (1) ; *Bliss vs. Boscawen,* 2 *V. & B.* 181 ; *Sharp vs Ashton*, 3 *V. & B.* 144 ; *Mair vs. Thelusson, Ib.* note (*a*).

This seems to be the rule generally observed upon applications to amend injunction bills, after answer filed and not excepted to, or to which exceptions have been disallowed. With respect to applications to amend before answer or after answer, to which exceptions have been allowed, the practice has not been uniform. I would be understood as not announcing any rule for such cases.

In the. present case, (which is one after answer,) I think the application sufficiently supported. The proposed amendment is fully stated and sworn to. The matter of it is consistent with the case made by the bill. It is merely a more direct and specific allegation touching an agreement between the parties, upon which it was manifestly intended, in the original bill, to rest the equity of the case. Further, upon the facts disclosed by affidavit, the bill appears to have been framed under extreme haste, caused by the short notice of the defendant's final determination to take up the side track and its refusal, when applied to, to extend the time. To this urgency rather than to laches of the complainant, the defectiveness of the bill in not fully developing this case is fairly attributable. Lastly, the application is made seasonably. The answer was filed too late in the vacation preceding the February Term to bring the cause to a hearing before the next September Term.

The proposed amendment need not delay the hearing beyond that term, so that the defendants are not pre-

judiced by reason of the time at which the application has been made.

The amendment is allowed; but short rules will be entered for filing an answer to the matter newly alleged, and for excepting to such answer to the end that the cause may be put to issue and reach a hearing at the ensuing September Term.

# APPENDIX.

In the report of the case of *State vs. Fleming, ante p, 153,* the opinion, as has been already stated, (p. 158 note,) was omitted, because it was largely confined to the discussion of the facts respecting the charges of mismanagement in the administration of the estate. The impression of the reporter, already alluded to, that it would be desirable, in some form, to publish the substance of the opinion, was confirmed, upon consultation with others whose judgment was entitled to be regarded with deference. The subsequent discussion, during the late session of the General Assembly, of the character of the trusts under which the Potter estate is held, and the methods of its administration, seemed to indicate a general interest in the subject, which would warrant the publication, for the information of the people of the State, of an opinion which, as concerning facts only, would be of no such interest to the legal profession as to warrant its insertion in the body of our reports.

The opinion, as here printed, is from the notes of the Chancellor, which were prepared only for the information of the counsel at the decision of the cause, and were never revised by him with a view to publication. The charges of the bill are specifically considered, both with respect to the management of each farm, separately, and, also, of the trust, generally. After very much reflection, it has seemed best to publish, fully, and in detail, even so minute an examination of facts, which concern a property, literally, of the public,—at least in Kent county.

---

STATE OF DELAWARE,

*vs.*

CHARLES T. FLEMING.

*Kent, Sept., T. 1867.*

The views of the Chancellor, upon the facts of the cause, as expressed at the time of rendering his decision, were as follows:—

*The Winsmore and New Wharf Farms.*

With respect to these farms, the bill makes three charges of mismanagement. I will take them in order. The first of them is that, during the period between the Trustee's appointment in 1847, and the date of the improvement-leases made in 1863, these farms were let at greatly inadequate rents. It is alleged that the New Wharf Farm, alone, at Potter's death, was well worth, and could have been rented for, $400 per annum, and at any time since, for $250, yet, that during all the period referred to, John Redden was permitted to hold both farms at $160. Let us examine the evidence with respect to the rental value of the New Wharf Farm, at Potter's death. The highest figure shewn in evidence is by the testimony of Henderson Collins, who states that, three years before Potter's death, he paid for this farm, $300. That was, say, in 1840, for Potter died in 1843. This may be so; but according to the average estimate of the witnesses for the relators, this would have been excessive, as rent. In 1843, when Potter died, Griffith, who was Potter's tenant of the Winsmore Farm, a witness for relators, says, there were but fifty to sixty acres of arable land. Estimating the productiveness of the New Wharf Farm, at that date, the witnesses do not, upon the average, state more than five hundred bushels of corn, fifty bushels of wheat, one hundred bushels of oats, and twenty-five bushels of rye. This is precisely the statement of Griffith, who seems to have been most familiar with these two farms. He was tenant of the Winsmore Farm in Potter's lifetime, and, since then, has resided, most of the time, on the farm adjoining the New Wharf Farm. The prices of grain I take as given in the accounts passed for 1847, and the two or three succeeding years, $1.10 for wheat, forty-five cents for corn, thirty-eight cents for oats. The price of rye I do not find. None of the witnesses put the customary landlord's share at more than one-half. Assume this as the proper rent; then what is the result. Taking the crops of the New Wharf Farm at Potter's death, to be as estimated by the relators' witnesses, and allowing *one-half* for rent, and then, supposing that this farm remained equally produtive until 1847, when Fleming became Trustee, and to have been then rented to Redden on the usual terms, viz; one-half in kind, it would have yielded the Trustee, say *two* hundred and fifty bushels of corn, at forty-five cents, twenty-five bushels of wheat, at $1.10, and fifty bushels of oats at thirty-eight cents, making, as the produce of these crops, $144.05. Add to this, the value of, say twenty-five bushels of rye, and we have certainly about all that could have been realized as rent from the New Wharf Farm in 1847. Now to the rental of the New Wharf Farm, must be added so much as could have

STATE *v.* FLEMING.

been made out of what Redden cultivated of the Winsmore Farm. But this, according to the testimony, did not exceed seventeen acres; that was all of the Winsmore Farm left tillable at Potter's death. It must be remembered that, according to the testimony of all the witnesses, the Winsmore Farm was left, by Potter, in an utterly desolate condition, almost without building, and growing up in pine wood. Griffith, a witness for the relators, who lived on it in his lifetime, states the arable land there to be only fifty to sixty acres, and the rent to have been $75; and soon after, according to Anderson, this farm became tenantless, and the old house on it was. at one time, used for small-pox patients, the land continuing to grow up in pine, leaving only seventeen acres of tillable land. So it stood when Fleming took it in charge, and rented to Redden in 1847. It does not appear to me, from the testimony, that the whole property, New Wharf and Winsmore, as it stood in 1843, could have yielded a rental greatly, if at all, exceeding $160, nor in the interval between 1843 and 1847, were there any means whatever, and there was not, even then, any Trustee, to improve it. Manifestly, the best and only course left in 1847, was to till the seventeen acres with the New Wharf Farm, to let the pine growth mature, sell it off, and then make a farm out of this Winsmore tract, and that has been done. Under these considerations, I cannot hold the Trustee chargeable with mismanagement, in 1847, in then renting at $160, the New Wharf Farm, with the small part remaining tillable, of the Winsmore Farm. Nor can he be so charged for continuing the farms at the like rent until the improvement-leases were made, notwithstanding such advance as there may have been made in the prices of grain; for against these there, must be set the continuing depreciation of the buildings and lands for the want of repairs and fertilizers. The witnesses do not impute bad husbandry to the tenant, but some, the contrary; what they speak of, is the inevitable deterioration from constant tillage without fertilizers. These, there were not means to provide, no system of improvement being adopted by the Court, until January, 1860, a delay, the causes of which will be hereafter explained.

The next charge as to mismanagement of the Winsmore and New Wharf Farms is the waste of wood and timber. And, first, as to the alleged waste on the Winsmore Farm. The charge is that, on this farm, wood and timber was largely cut, that it was cut by Redden, the first tenant, while he held it; afterwards, by the Andersons, the next and present tenants; also by other persons, not named in the bill, but who, from the testimony, must be understood to be J. B. Davis and Nehemiah Davis.

### STATE v. FLEMING.

Let us examine the evidence, and, first, as to Redden.  He has held the New Wharf Farm since 1848, and, in connection with that farm, tilled what was arable of the Winsmore Farm until the year 1863. It then remained vacant until January, 1866, when the Andersons took it, under an improvement-lease, for twenty years from January 1, 1866.

Now what is the proof as to cutting, by these tenants?  First, as to Redden, there is no evidence further than this statement by Dorsey, in reply to the fourth interrogatory in chief, which relates to the Winsmore Farm.  "John Redden is the only tenant, to my knowledge, who "has cut any wood, and I don't think he cut more than ten or fifteen "cords.   I think he hauled and sold it to Milford."   Now Redden was tenant of the New Wharf Farm while James. B. Davis was cutting and hauling under a woodleave from Winsmore Farm, and Mr. Dorsey had just before stated that Redden was engaged with Davis in cutting and hauling.  Redden's hauling, therefore, might be accounted for by the fact that he hauled for Davis, and such would be the fair inference unless the evidence definitely pointed to his hauling for his own use, fraudulently. This Mr. Dorsey's statement does not do.   It is indefinite as to time and circumstances, and not positive in what he does state.   It would be weak testimony upon which to convict Redden of fraud, and is no testimony at all to affect Fleming, whose connivance is not charged; nor, considering the small quantity supposed to be hauled, could even neglect, be inferred.   Then, next, as to the alleged cutting by the Andersons, they who, as already stated, took the Winsmore Farm, in January, 1868, under an improvement-lease.

In their lease. they stipulated to cut off, clear, and bring into cultivation, certain specified portions of the wood-lands, to sell such wood as might not be suitable for building or fencing, and to. apply the proceeds to the improvement of the farm, in certain particulars. The cutting was a duty, not a privilege.  Such a provision was rendered proper; it might be said, necessary, by the peculiar condition of the farm.   It had a very sandy, poor soil, not profitable for cultivation, and it had been judged best to leave it to grow up in young pine, so much that, at this time, there remained only about seventeen acres of arable land.   In a tabular description of the several parcels of the trust estate, returned to the Chancellor by the Trustee in 1851, it is described as "a wilderness of young pine and other growth."   It had now become an object to get the land cleared, enclosed, and fertilized.   Bell, one of the relator's witnesses, gives the opinion that the land was worth more cleared, than with the wood; that the wood was not valuable.   Prior to the year 1862, as appears by the Trustee's Annual Report of that year, in order to get the land cleared,

he had offered the wood, or certain portions, to any one who would clear off, grub, and prepare it for cultivation, but no responsible person would undertake it. Some portions of it, about this time, were sold under woodleaves. This mode of clearing off the wood, left the land to be grubbed, fenced, and prepared for cultivation; and as the young pine wood was of small value, sales of the woodleave were probably of no greater advantage than to have given the wood for the clearing, grubbing and preparing the lands, as at first offered by the Trustee. It was to carry out this object, *i. e.*, to get the lands cleared, and under tillage, and to make this tract a farm, which it had not really been, that the Trustee, in leasing to the Andersons, took from them the stipulation to cut off some of the wood. I can see no fair ground of objection to it, especially as the stipulation expressed, secured the proceeds for the benefit of the farm, the Andersons' share in which benefit was their whole return for the labor to be bestowed by them. Now there is testimony that the Andersons did cut and sell wood from this farm in 1866 and 1867. The material question, then, is, did they cut and sell more than they were authorized to do under the lease? There is no evidence to show that they exceeded their authority, or, I might rather say, their duty. B. D. Anderson testifies that they cut about twenty acres, and that the wood was cut under the provisions of the lease, and proceeds applied as required by it. I cannot find anything to controvert this statement. The relators' witnesses give estimates of the quantities of wood cut on the Winsmore Farm. Most of them estimate only the whole amount cut, both by the Andersons and by the purchasers of the wood. From these we can conclude nothing, as to how much the Andersons cut. Some of the witnesses undertake to estimate the quantity cut and sold by the Andersons, only. But their estimates are so widely diverse that they prove nothing except the inherent infirmity of such testimony. For example, Nehemiah Davis supposes they sold one hundred cords. Dorsey, one thousand two hundred, to one thousand five hundred cords; and Griffith goes as high as one thousand five hundred, to one thousand six hundred cords. Eubanks, hitting a medium, puts it at five hundred cords. William Hill, from six hundred to eight hundred cords. Joshua Hill supposes they cut from fifteen to twenty acres. These witnesses are honest, but to what judicial conclusion can such testimony lead? Certainly, inasmuch as the Andersons had authority to cut, I must refer their cutting to the authority given them, and require some more decisive evidence before pronouncing them and the Trustees guilty of a fraud upon the trust. Next arises a question which, though not in issue, I could not exclude from attention, *i. e.*, whether the Andersons put the proceeds of the wood sold back upon

66

the land. The improvements stipulated for, in return for the proceeds of the wood sold, and other benefits of the lease, were to be a new two-story dwelling house with brick wall, stabling and outbuildings, the old to be used as far as suitable; the cleared lands to be laid off in three fields, with five hundred bushels of lime used, annually, and orchards to be set out. I find, by the testimony, without any controversy, that all these stipulations have been fulfilled, and, without any doubt, that the Andersons have put upon the farm as much, if not more, than can have been taken from it in wood.

Then we come to that part of the charge which alleges waste by persons, other than the tenants, Redden, and the Andersons. There is no testimony whatever of wood or timber being cut on this farm by such "other persons", except by James B. Davis, and Nehemiah Davis. Now the two Davis' and R. C. Hall were, together, purchasers of large woodleaves on the two farms, Winsmore and New Wharf, which lay adjoining each other, J. B. Davis and Hall having ninety-two acres of the Winsmore Farm, and Nehemiah Davis ninety acres of the New Wharf Farm, over one hundred and eighty acres in all. They had three years for getting off the wood; and were engaged, through that period, in cutting and hauling from the two farms. It is not surprising if, without transgressing the limits of the purchased woodleaves, they seemed to get off and haul large quantities of wood. Doubtless they did so. But the material question is, is there proof that they cut beyond their limits? Both Nehemiah Davis and J. B. Davis are witnesses, the former for the relators, the latter for the defendant. Their testimony is, that what wood they did cut was under their woodleaves. Against this statement there should be some evidence; such evidence might be two-fold, either (1) direct testimony that they cut in some other part of the farms not included within the woodleaves; of this there is nothing whatever; or (2) the evidence might shew the hauling of quantities of wood so great as could not have been yielded by the number of acres sold on woodleaves, and thus it might appear, inferentially, that the purchasers had cut beyond the authorized limits. I, therefore, have examined carefully, the estimates of the witnesses as to the quantities of wood hauled by the woodleave purchasers. Some of these estimates are mere guesses given by witnesses who profess to have had little opportunity to know; but taking those of witnesses whose opportunities were better, they led to no conclusion. Besides the uncertainty inherent in all estimates of quantities and values, those given by the witnesses of wood cut on the Winsmore and New Wharf Farms, are inextricably confused from this circumstance. One of the wood-leaves embraced adjoining parts of both farms.

STATE *v.* FLEMING.

The quantity cut from each farm was, of course, indistinguishable by those who only saw the hauling to market. It is manifest, in reading the answers to the separate interrogatories respecting each farm, that some of the witnesses, in answering as to each farm, inadvertently give their estimate of the whole wood cut from both farms, while some attempt to estimate the quantity cut from each farm. Hence, a more than usual diversity. For example, Dorsey says, that from the Winsmore Farm, J. B. Davis and Redden cut and hauled to New Wharf landing five hundred and twenty-five cords, while J. Davis says, that J. B. Davis and Nehemiah Davis cut two thousand cords. Now Nehemiah Davis' woodleave was on the New Wharf Farm only; so that this witness' estimate clearly included both farms. The only estimates I have observed, made by a witness of full opportunity, and which clearly distinguished between the two farms, are the estimates of Griffith, who resided within one mile and a half of these farms. He considered that, on the Winsmore, Farm there were from seventy-. five to one hundred acres cut; that J. B. Davis, who alone had the woodleave on this farm, got one thousand five hundred cords; that on the New Wharf Farm, there were from fifty to sixty acres cut; that Nehemiah Davis, who had a woodleave on the New Wharf Farm, exclusively, got one thousand cords; and J. B. Davis, whose Winsmore woodleave extended into the New Wharf Farm, got from the latter, from three hundred to four hundred cords. These estimates are partly within the woodleave sold. But there is another class of estimates which, if made by witnesses having knowledge, are less unreliable than estimates of the number of cords. I refer to estimates as to the number of acres cut. These I find to be much less variant and uncertain than the estimates as to the number of cords hauled. Now it is very observable that the estimates of witnesses, as to acres cut, do not at all exceed the number of acres actually sold for the wood leaves.

The highest of them for the Winsmore Farm is Dorsey's, at seventy-five to one hundred acres, and, for the New Wharf Farm, Watson's, at ninety acres. Observe, that there were sold from the Winsmore Farm, ninety-two acres, and from the New Wharf Farm, ninety acres.

As the Winsmore and New Wharf Farms are taken together by the bill, we refer next, to the specification of waste upon the New Wharf Farm. There is no charge of waste by the tenants of this farm; but the allegation runs thus; " that one James B. Davis, and other " persons, have cut and carried away from this farm, and the said " Winsmore Farm, several thousand cords of wood and large quanti- " ties of timber, and converted the same into money, which has never " been accounted for by the said Trustee. "

The evidence bearing upon this specification has already been unavoidably examined in connection with that relating to the Winsmore Farm. We have seen that N. Davis purchased a wood leave on the New Wharf Farm of ninety-two acres, that there is no direct evidence of his cutting beyond his lines, and that the estimates as to the number of cords hauled, or of number of acres cut, do not shew such an excess in the quantity of wood cut and hauled, above what ninety-two acres would afford, as to demonstrate that, under color of the woodleave, wood was cut in parts not sold.

There is a third charge of mismanagement as to the Winsmore Farm, viz; that the improvement-lease made to the Andersons for twenty years, from January 1st, 1866, was at an inadequate rent.

The objection made by the bill and in argument to the improvment-leases was general, applying to several farms; and as the same considerations will be found to apply to all, it will be more convenient to reserve this topic for a separate examination, having considered the other charges of mismanagement as to the several farms.    I proceed, therefore, to the Carmean Farm.

*The Carmean Farm.*

Respecting this farm, the only charge made by the bill is, that during the interval from the appointment of a Trustee in 1847, until the farm was leased to James Thompson in 1862, it was rented at a grossly inadequate sum, only $60, whereas, as the bill alleges, it could have been easily rented to good and reliable farmers, for $200 per year. This allegation that the farm was worth a rent of $200, is wholly unsustained. Even Henderson Collins estimates the rental value, in Potter's lifetime, as from $100 to $150. James Davis, another witness for relators, puts the rent, in Potter's lifetime, at $80. These are the only estimates made by witnesses, on either side, as to the rental value, at Potter's death. Taking the average between them as a basis, say $100 or $110, and allowing for the inevitable depreciation, during the three years following Potter's death, while there was no Trustee, we should not expect to find, in 1847, when Fleming was appointed Trustee, a productiveness which would yield a rent of more than $60 or $70. Certain it is, from the accounts of the rents received by Fleming, immediately after his appointment, which were rents in kind, one-half, that these figures cover the rents then actually yielded. Thus, for 1845, the corn rent produced $53.40, wheat and oats $5.68, total $59.08.

## STATE v. FLEMING.

In 1846, the rent received was six bushels of wheat, $5.25; ten bushels oats, $3.75, and seventy-five bushels corn, which, being sold in the spring of 1847, at the then advanced price of eighty cents, brought $60, making a total rent for that year of $69. In the next year, 1847, the farm yielded the landlord a share of only seventy bushels of corn, and the price falling in the spring of 1848, to forty cents, only $28 was realized. There was, in all this, certainly a reasonable inducement to the Trustee to substitute, as the accounts shew he then did, a certain rent instead of a rent in kind. For one year after this, the year 1848, there was a certain rent of $70. After that, it stood at $60, until the year 1862, when James Thompson took the farm under an improvement-lease, at $100.

The small productiveness of this farm, as shown by the accounts, is consistent with the testimony. It was a small farm, containing, according to the survey of record, 59 acres of arable land, with a soil naturally good, but overworked and unfertilized. Of wheat and oats it would yield very little. It was available only for corn. This is the concurrent testimony of the tenants. The buildings, as left when the Trustee took the farm, were hardly tenantable; "the dwelling not fit "to live in," is the language of the witnesses on both sides, "not fit "for a human being to live in," says Richards; "not comfortable for "man or beast," says J. Potter. As to outbuildings, they are spoken of by one, as "none that could be called such," by another, as "exceed-"ingly sorry and not worth mentioning;" by another, as "none of any "account." One witness (Jester) describes them as "mere pens made "of cedar poles." It is proved that, from time to time, some repairs were made to preserve the property from utter destruction, as roofing the dwelling house, keeping up the gates, &c. No permanent improvements could be made, without rebuilding out and out. Looking the whole matter over, I am unable to see how the Trustee, with the limited means he had, could have done more to improve this farm, or to increase its productiveness, until this Court should adopt some general system for improvement which it was not warranted to do, and did not do until after the litigations ceased, in 1859.

The bill next proceeds to the *Anderson Farm*.

The charges, in the bill, touching the management of the Anderson Farm, are two:—First, that the farm is, *at this time*, intrinsically of less value than at the death of the testator, by reason of improper culture, neglect of repairs, and the waste and destruction of the wood

and timber.    Secondly, that it is now rented, under the improvement-lease, to Cubbage, at less than one-half what might be obtained therefor : The latter charge, I reserve for consideration in connection with the subject of improvement-leases, and take now, the first charge as to the alleged depreciation, in value of the farm.    .

This allegation, applied, as it is, to the farm in its present condition, since the adoption of the system of improvement-leases, is not sustained by the evidence.   So far as *opinion* goes, the weight of opinion, even of the witnesses for the relators, is, that the property is intrinsically worth more than at Potter's death, not to speak of it, as it came into the Trustee's hands, three years afterwards.   Many of these witnesses say directly that, by the repairs, and by the bringing in of more land into cultivation, the farm has been increased in value ; and other witnessess, who do not directly state this result, imply it in the estimate they give of the present rental value of the farm, all putting it higher than formerly.   But facts more than opinions are decisive on this point.   The facts are these.   At Potter's death, the buildings and fences were poor, and the soil thin and not productive.   So say J. Davis, J. Hill, Griffith, Eubanks, Henderson and W. Hill, witnesses for relators.   On the other side, the testimony of J. Potter, Redden, Thompson, Jester, D. B. Anderson, Herring, J. B. Davis, Richards, Hammond and Henderson, show that the dwelling was a two-story house, the lower story of logs in a dilapidated condition, without substantial barn or outbuildings, the soil poor and much overrun with Sassafras and other under-growth.   The rents from 1847, when Fleming became Trustee, until 1852, were small and irregularly paid, with not less than four changes of tenants.   In 1852, Joseph Wyatt became the tenant at a rent of $37.50, a larger rent than is shewn by the previous accounts.

In 1857 Eli Hammond took the farm at $45, a small advance, and held it until 1863, when it was rented to Cubbage, under an improvement-lease, at $100.   Since 1863 the land has been cleared up and put, as the witnesses say, "into farm-like shape," and new buildings erected.    There are a new two-story frame dwelling, with a back building of a story and a-half, a covered porch, back and front, new smoke house, new garden-fences, new brick well.   The old dwelling has been repaired and fitted up into a barn and carriage-house.   The cost was from $1500, to $1700.   This is the testimony of the carpenter who did the work.

Now the highest estimated rental value, at Potter's death, is $100. J. Davis puts it at $100.   Henderson Collins at $80.   No other estimates are given.   That it yielded materially less when Fleming was appointed,

is apparent from the proved condition of the farm, as well as from the accounts. The relators' witnesses now estimate the rental at various figures, but all higher,—$100, $125 and $150, so that, as to the charge that the farm is now deteriorated through "improper culture" and "neglect of repairs,".the proof is directly the contrary. Then as to the other alleged cause of deterioration, viz; the waste of wood and timber, it is enough to say that, of this, nothing is proved beyond the cutting by purchasers of woodleaves, sold under the order of the Chancellor. Nothing is said in the testimony of any cutting by tenants, or by the Trustees, but only by Wm. Tharp or Daniel Griffith. This was under a woodleave of forty acres of pine, struck off to Tharp, but returned by the Trustee as sold to Griffith.

The bill next proceeds to the *Reeson Farm.*

Respecting the Reeson Farm, the charges of this bill are two: One is, that the Trustee, in 1863, discharged Morgan, the former tenant, notwithstanding he was a good farmer and offered an advanced rent $205, and leased the farm to Reedy, an inexperienced and inferior farmer, at a lower rent, $100, or $150.

The alleged offer by Morgan to remain at a rent of $205, is wholly unproved. As the answer neither admits nor denies such offer, it could, if made, have been established by the testimony of Morgan alone. Yet, though a witness in the cause, he is silent on this point. The only testimony touching such an offer, are the hearsay statements of Watson and H. Collins, statements legally inadmissible. Wilson says, "I *think* said Morgan paid Charles T. Fleming about $125, before "the new building was erected, and he offered about $200 for it "after the new building was put up, and it was rented, as *I have under-* "*stood,* for less money than what said Morgan offered, *but I can't* "*speak positively as to this fact.*" Here is a statement upon mere rumor, ascribed to no source, and made in very doubting terms. It affords an apt illustration of the uncertainty of hearsay testimony. For the proof by Morgan himself is, that before the new building was erected he paid $75. rent, (not $125 as the witness understood,) and that, after the new building was erected, instead of offering about $200 rent, he held the farm two years at $100 rent. The other witness, Henderson Collins, bases his statement on the information of Morgan. He says, "at the same time," *i. e.,* when Reedy became tenant, "Morgan of- "fered Charles T. Fleming, so called Trustee, $205 rent if he would "let him stay, but notwithstanding he rented said farm to James Reedy "for $150., *as Wm. Morgan himself told me.*" Now I cannot receive

as evidence, the unsworn statement of Morgan, made outside to Henderson Collins, of a fact which Morgan, though examined as a witness and inquired of as to the point, has not seen fit to state, under oath, in in the cause. The statement is not only inadmissible under the rules of evidence, but is against all probabilities. Then we pass to the other ground of the charge of mismanagement in the change of tenants, viz: that Reedy was an inferior farmer. I have carefully read all the expressed opinions of the witnesses, and noted the results of the respective modes of farming by these two tenants, Morgan and Reedy.

It does not become necessary to make comparisons between them : it is enough to say that the divided weight of opinion of the witnesses, and the admitted improvement in the condition of this farm, shew that Reedy, though originally a shoemaker, became a competent farmer. The testimony is that he was sober, industrious and thorough-going, of good character and competent means ; that he has done much hard work, cleared up and brought into cultivation new land, repaired fences, laid the farm out into four fields, sowed grass seed, put on lime, and tilled the fields with rotation of crops, so that the whole farm has improved in general appearance and condition. This is stated, in detail, by witnesses who have not been themselves tenants of the trust estate, as J. Potter and J. A. Potter, and they are corroborated by all the defendant's witnesses who speak to this point at all; almost all the witnesses for the relators admit that Reedy has tilled the farm as well, and some say better than Morgan did. One of them, Bell, says of Reedy, "I regard him as an excellent farmer; in my opinion the farm "has never been so well tilled as it has under Reedy." "Its present "condition, as to fertility, exceeds what I have ever known before." Only two witnesses, out of the whole number, think Morgan a better tenant than Reedy; yet both of these admit the farm to be now in a much improved condition.

I, therefore, dismiss the whole charge of the bill based upon the change of tenants.

The other charge of mismanagement respecting the Reeson Farm is, that the tenant, Reedy, was permitted greatly to waste the wood and timber. This charge against Reedy is twofold; *First*, that he had cut off, and, at filing of the information, was still cutting and hauling away and converting to his own use, large quantities of cord-wood. *Second*, that he hauled away posts and rails and used them on his own farm, without accounting for them to the Trustee. First, as to the cord-wood. It appears from the evidence, that when Reedy took this farm under an improvement-lease, in January, 1863, there was a point

STATE *v.* FLEMING.

of woodland of about seventeen acres, which it was necessary to cut and clear, in order to divide the farm into four suitable fields for tillage. Reedy, by his lease, stipulated to cut and clear this part of the woodland. The timber was to be made, so far as might be, into posts and rails. What could not be thus used, was to be sold by Reedy, and the proceeds to be applied in permanent improvements, under the supervision of the Trustees. Reedy, being examined as a witness to this point, states that he cleared the seventeen acres, made into posts and rails what could be so used, and cut the rest into cord-wood, about one hundred and seventy-five cords; that he used his fire-wood out of it, and sold the balance, about one hundred and twenty-five cords, clearing about $1 per cord. He distinctly asseverates that all that he cut off, not used in fencing, was put back on the farm; that out of the proceeds he built a new brick milk-house, at a cost of $75, put a pump in the well, costing $14, and the balance expended in lime; that he put on more lime than he was bound for by his lease. Now, with respect to the quantity cut and hauled by Reedy, his statement does not so far vary from the estimates of the witnesses for the relators, as to be discredited. Their highest estimates are two hundred cords, some are less; Griffith's, one hundred cords; Eubank's, fifty to one hundred. As to the disposal of the proceeds of the wood sold by him, the testimony for the relators' witnesses is silent : the testimony for the defendant, strongly corroborates Reedy's statement. Several of these witnesses, as James Potter, Cubbage and Yardley. understood, at the time of the cutting, that the proceeds were to go for fertilizers and improvements; James H. Potter, Cubbage, Yardley and Jester, testify to the improvements, particularly to the use of the posts and rails in the setting of a considerable amount of new fencing, and repairing of the old fences.

Next, is the charge that Reedy hauled away and used, on his own land, posts and rails, without accounting for them. Reedy, it seems, owned a farm in the neighborhood of the Reeson Place, and three witnesses, Davis, Griffith and Morgan, testify to having seen him, several times, haul, Griffith says, posts and rails, and Morgan says, cedar poles, to his farm. It does not appear that the witnesses saw these posts, rails or poles, taken from the Reeson Farm, or were, in any way personally cognizant that they were so taken. Davis indicates no personal knowledge on the subject. Griffith says, that he only saw the posts and rails hauled on Reedy's farm, and that he could not say that they came from the Reeson Farm. He says he believes they did ; but his belief is not evidence. Morgan, in his examination-in-chief, speaks of the poles as hauled from the Reeson Farm to Reedy's farm ;

but his examination shews that, as to their being taken from the Reeson Farm, he had stated his inference, and not his personal knowledge; for upon examination, he states what he did see, and that was, Reedy with his wagon hauling poles on his own land. This is the precise state of the proof. Now I could not, from such evidence, the mere inference or belief of witnesses as to what they profess no knowledge of, judicially conclude that the posts and rails were taken from the Reeson Farm. It is, at most, sufficient, only to excite suspicion. Yet, suspicion is not a ground for legal judgment. This evidence, however, infirm as it is, does not stand unopposed. It is encountered by the denial of Reedy, who, on his examination as a witness, positively avers that he never did cut or haul any wood or timber on this farm, except what went to the use of the farm in materials or proceeds. His denial, though that of the person interested, must stand against statements resting merely upon suspicion, and not proof.

The bill next proceeds to the *Evan Morgan* or *Tanyard Farm*.

The only charge touching this farm is founded on the transfer made by Joseph Yardley, the former tenant, under an improvement-lease, to the Barkers, who are the present tenants. Yardley took the farm under an improvement-lease for twenty years, to commence January 1st, 1864, at a rent of $150.00; of which, for fifteen years, $50.00, was to be expended in permanent improvements, and, for the last five years, $25.00 to be so expended. There were various stipulations for improvement by the tenant. Now, the charge is, that, shortly after the execution of this lease to Yardley, he, the said Yardley, transferred the same to one Charles Barker, and another at an advance of $1000, or more, which sum of $1000, or more, the said Yardley kept for his own private use, and in no manner accounted therefor. The facts in relation to this transfer, rest upon the sole testimony of Yardley, a witness unimpeached and entitled to full credit. He states that the Tanyard Farm was leased to him in the fall of 1863, possession to be given January 1st, 1864. That, in fact, possession was not given him until February, 1865. The cause of this delay appears by other evidence as well as Yardley's. Evan Morgan, the former tenant, refused to yield up the premises in January 1864. Proceedings under the Landlord's Act followed, pursuant to which judgment was rendered against the Trustee. A *certiorari* to these proceedings was taken, and the judgment reversed by the Superior Court; subsequently, a writ of possession was obtained by the Trustee. These proceedings involved delay through the year 1864. In January 1865, the Trustee, with the

## STATE *v.* FLEMING.

Sheriff and Yardley, went to the farm in order to the execution of the writ of possession. Upon the entreaty of Morgan for ten days' delay, in order that he might find a home, and, with Yardley's consent, the Trustee postponed, until a future day, the execution of the writ. At the appointed time, upon returning to the farm with the Sheriff and Yardley, Morgan was not there, but in his place was Henderson Collins, claiming to be in possession as Morgan's assignee. As the writ was against Morgan, by name, the Sheriff declined to dispossess Collins; whereupon the Trustee himself forcibly ejected Collins and put Yardley in possession. A few weeks afterwards, in February, during Yardley's absence from home, Morgan and his two daughters obtained possession of the house, and, on Yardley's return, attempted, forcibly, to hold it, stating that they had been advised to this course. He forcibly ejected them, was afterwards indicted for assault and battery on the daughters, and incurred a small fine with costs. Discouraged by these annoyances, Yardley sought to dispose of his lease, and agreed with the Barkers, for a transfer, subject to the approval of the Chancellor, which, under the terms of all these leases, was required to give validity to any assignment. The Chancellor approved of the transfer, and in order to carry it more conveniently into effect, the old lease was surrendered by Yardley, and a new one, with precisely the same stipulations, was granted to the Barkers, commencing January 1st, 1865. Yardley, after renting in the fall of 1863, expecting to take possession in January 1864, had incurred considerable expense in getting rails and posts for fencing, had purchased mules, harness, &c., and hired a man. Failing to get possession, he had been obliged to rent a house and provide for his man and mules for nearly a year, expecting, from time to time, during the year 1864, to get possession. As an indemnity for his expense and trouble, the Barkers, by agreement, paid him $500. It is not shewn that the Trustee was privy to the transfer, that he shared in the money paid to Yardley, or even had any knowledge of it, or that he derived any benefit whatever from the transaction. His answer denies that he had any knowledge of the payment until after the transfer had been completed.

Now in all this transaction, I can see nothing which implicates the Trustee. The lease to Yardley was granted with the approval of the Chancellor, and upon terms which, to my own judgment, on examination of the facts, appear just and reasonable. In the obtaining of this lease no collusion, whatever, between the Trustee and lessee appears. The subsequent desire of Yardley to get rid of the lease is naturally accounted for, and, under the circumstances, it was the duty of the Trustee and Chancellor to relieve him, if this could be done without prejudice to

the estate, and the result has been advantageous to the estate. That Yardley should receive from his assignees indemnity for his expenses, was reasonable; at all events it was a matter which concerned them alone. The Trustee had no claim, legal or otherwise, to anything except what was reserved to him under the original lease. Nor in the re-letting should a higher rent have been exacted from the Barkers; for this would have been in violation of the right of Yardley to the benefit of an assignment of his lease, as it stood, which, in substance, the transaction was intended to be.

Next in order, is the farm known as the *Clark Farm*, in tenure of Herring. As to this farm, the charges of mismanagement are two. One concerns the terms of the lease, it being an improvement-lease, for twenty years, from January 1st, 1866. Reserving this charge to be considered in connection with the improvement-leases generally, I proceed to the other charge, which is, that the tenant of this farm, Herring, has cut and carried away "several hundred cords of wood, besides "large quantities of timber, which he has converted into money, none "of which has been accounted for in any manner whatever."

This charge must be founded upon some misapprehension. For all the wood and timber upon the same, was sold to Hazzard, Carlisle and Curry, in April 1860, and was cut off by them before Herring took the farm.

This farm, at Potter's death, was out at commons. It consisted of ninety-eight acres and sixteen perches of arable land, and two parcels of woodland and wood cripple, one of seventy-four acres, the other of fourteen acres. Both these parcels of woodland were sold to Hazzard, Carlisle and Curry, at the sale of April 1860, and are exactly described in their contract. In accordance with the fact that all the wood was cut off at the date of the lease of Herring, he stipulated to enclose the new ground, so as to make four fields of the whole, and provision is made for getting rails, not on this farm, but on other parts of the trust estate.

In the testimony relating to this farm, and Herring's occupation of it, two witnesses, Joshua Hill and Dorsey, charged him with having hauled timber, wood, bark and posts from this farm. The witnesses may have confounded this farm with other parts of the trust estate, some of which were contiguous to this. At all events, however, I lay out of consideration this testimony as connected with this charge of the bill. It will be adverted to in another connection.

STATE *v.* FLEMING.

The next charge in the bill is, that the Trustee leased other and smaller tracts to William Burton, to Daniel Curry deceased, and to other persons, "at merely nominal rents, grossly inadequate, and far "below what might be obtained therefor, from good and reliable "tenants."

` There was an improvement-lease to Dr. Burton, of the Cullentown and Reuben Turner tracts, in all, forty-five acres, near Milford, for ten years from January 1st, 1863. I pass this for the present. No lease of any part of the trust estate appears to have been made to Danl. Curry. As to the "other persons" referred to in this charge as having taken leases at "merely nominal and grossly inadequate rents," they are not specified in the bill, nor has the argument or evidence enabled me to find them.

Respecting the Cullentown tract, there was a charge made in argument, though not in the bill. It was this; that upon the granting of a new lease to Van Vorst, the present lessee, to carry into effect an assignment from Burton, the original lessee, Van Vorst should have been required to pay an additional rent commensurate with the improved condition of this tract, subsequent to the leasing to Burton. But it should be observed, that the improvement was the result of the labor and outlay bestowed by Burton, and for which he was entitled to' remuneration, either in his continued possession of the tract for the term of the lease, or by compensation from Van Vorst, his assignee. According to the past effect of the lease, the improvements were to inure to the benefit of Burton, over and above the rent, during the term, and to the benefit of the trust estate at the expiration of the term. Therefore, upon an assignment of the term, (which all the leases provide for, subject to approval,) compensation for the improvements made by the lessee, is due to him and not to the estate. Nothing can be clearer than this. It should be added, that the terms of the lease to Van Vorst were for a longer term than that to Burton, being for twenty years instead of ten, and that, for the latter part of the term, under the new lease, a large rent was reserved, leaving, however, the terms unaltered during the original ten years.

I will next take up a charge of waste committed by James S. Richards; also by Marshall Taylor. The bill charges that these men were in the habit of cutting and hauling away woods-timber from the trust estate at large, and of converting the same to their own use.

It is proved that Richards did haul, from different tracts, white oak saw-logs. From New Design, H. Collins supposes he hauled·as many three hundred logs. J. B. Davis puts it one hundred. From the

STATE *v*. FLEMING.

Chambers tract, Collins says he hauled twenty logs. From the tract of one hundred and fifty acres adjoining Yardley, (the Haslet tract,) Hett says he hauled some logs; the number is not estimated. Griffith says twenty were hauled from the tract. This is all the testimony as to the hauling of logs. All the witnesses say they were hauled to the Haven Mills.

Now the Haven Mills were run by Richards. According to the answer and testimony of Richards, also of Herring, Richards was employed by the Trustee to haul and saw lumber to be used in building and repair on the farms. Richards states that he did so through several years; that he hauled for Fleming, and also for some of the purchasers; that what he hauled for Fleming was sawed at his mill into building materials; and that the whole of it was hauled back again to the farms and then used; that he was paid for his services, in part, by Fleming, and in part by some of the tenants; and he sets forth a statement of the quantities secured and the amounts received by him as compensation.

Richards further states that he never cut any wood or timber from the trust estate, except while lessee of the Clark farm, for a short time, he cut some wood and put back the proceeds in fertilizers on the farm.

With respect to the saw-logs, there is no evidence whatever against the answer, and Richard's testimony; and I must consider the hauling of these logs, as sufficiently explained.

Griffith, in connection with what he says about saw-logs, states, that Richards hauled eight or nine cords of wood to his house in Milford for fire-wood. The statement does not purport to be made upon the witness' personal knowledge, nor can I so assume it. I could not, in any case, much less, considering how much of the testimony has been taken without discrimination between hearsay and direct evidence. So general a statement, which may have been upon hearsay only, can not weigh against the positive denial of Richards that he ever has converted to his own use any wood and timber from this estate.

The charge that Marshall Taylor was permitted, frequently, and in large quantities, to cut, and convert to his own use, wood and timber, rests solely upon the statement of H. Collins that, on one occasion, while Taylor was building a barn, he cut and hauled from the Evan Morgan farm, a large white oak tree. The witness does not state this. He expressly says, he does not know that Fleming was cognizant of any such thing as of his own personal knowledge. All the other witnesses expressly disclaim any knowledge of Taylor's having ever cut wood or timber. This charge is not sustained.

STATE *v.* FLEMING·

We have now examined, in order, all the special charges of the bill touching the mismanagement of the different farms, and parcels of real estate, except the charges as to some of the farms that they were let under improvement-leases upon terms grossly inadequate. These I propose to consider together.

The whole subject of improvement-leases, so far as it concerns the responsibility of the Trustee, (which alone is the issue here,) might be disposed of by a single observation ; that is, that the system of improvement-leases was adopted by the late Chancellor, upon his own judgment, guided by the recommendations of the Commissioners appointed to consider and report upon the condition of the trust-estate, and the best means for its improvement, and not under the advice or influence of the Trustee ; further, that in applying the system, each lease has been, before it took effect, submitted to the Chancellor for his approval, an approval not merely formal, but always made upon examination of the case. The duty of the Trustee is to negotiate, in the first instance, the terms of the letting, and to submit to the Chancellor the result with proper information. His responsibility is to act with good faith in procuring the best terms which offer, and to lay them before the Chancellor, giving him the information necessary to his exercising an intelligent judgment upon the case.

Now, there is no evidence of any act of bad faith, misrepresentation or concealment, on the part of the Trustee: nor of any renting to unsuitable persons, (for all objections of that kind have been disposed of,) nor is there evidence of any rejection of more advantageous offers, or of fraudulent collusion with any tenant. The evidence of Bell, respecting his offer for the wharf property, leased to McColley, is not an exception to this remark. McColley held a lease of this property for six years at $30 rent. Upon his application to the Chancellor for an extention of the term, upon the same rent, that was refused. Afterwards a general order was made, on December 18th, 1866, for the perpetual leasing of certain parts of the trust estate, not suitable for either annual or improvement leases ; and among these, it was contemplated to include some parcels already under leases for short terms, provided any such lessee would surrender his original lease, and consent to pay, as an annual rent, such sum as disinterested men, mutually agreed on by the Lessee and Trustee, should determine to be equal to six per cent. on the fee simple value of the premises. Under this order, McColley agreed to surrender his lease and take a perpetual one on the terms provided for in the order. The referees were chosen, and made their award at $50, and, pursuant to it, the Trustee, as Mr.

Bell's testimony shews, was preparing the lease.  At this juncture Mr. Bell offered $75.  The Trustee replied that it was too late, considering that, by the arrangement so far executed, Mr. McColley was entitled to a lease upon the terms awarded.  I should have so considered it myself, had the matter been reported to me.  Now, though it might have been prudent in the Trustee to have reported the circumstances, still I can see no ground upon which to impute to him bad faith or improper motives in the omission to do so.

We observe then, the charge of mismanagement, in the granting of these leases, rests, not upon any proved acts of fraud, collusion or bad faith in the Trustee, but solely upon the alleged inadequacy of the rent reserved.  But considering that the terms of the letting were approved by the Chancellor, and upon a fair submission of the terms to his examination, which, in the total absence of evidence to the contrary, we must take to have been made, and I have no doubt whatever on this point;  considering this, the objection brings into question, not the conduct of the Trustee, but, rather, the judgment of the Chancellor in approving these leases.  Now I do not propose to review or reconsider the approval of these leases, because it would be to no purpose in this cause, since, whether the Chancellor erred or not, it does not affect the trustee, he not appearing to have either misled the Chancellor or to have withheld any information within his power, and,

But, I am also persuaded that no opinion now formed, as to what terms of leasing it was expedient, under the circumstances then existing, to grant, can be so reliable as a judgment exercised by the Chancellor upon the circumstances at the time.  More especially must this be true as to the leases approved by the late Chancellor Harrington, and which have served to guide in those since approved.  In sound, practical knowledge and judgment, the late Chancellor was surpassed by few, if by any; and the records shew that he gave to this estate, and particularly to the system of improvement-leases, his special attention and interest.  I find among the papers, the original draft, in his handwriting, of the advertisement offering these farms upon improvement-leases, setting forth the advantages to lessees, and inviting persons interested to consult with himself, personally.  I am well satisfied that he brought his own judgment to bear on each case, and his judgment exercised in view of the depressed condition of the property, and the unsettled situation of the country, and the difficulty in obtaining suitable tenants, circumstances better understood and appreciated then, than they can be now, is certainly a better test as to what then were adequate and proper terms of letting, than any opinion now formed can be.  Because, opinions now formed are insensibly influenced by two

STATE *v.* FLEMING.

circumstances, the improved condition of the property resulting from these very leases, and the enhanced value of real estate, generally, from circumstances which have since occurred, such as the termination of the war, and the increase of immigration and of railroad facilities. Before, however, quitting this topic, in order that the omission, formally, to re-examine the terms of these leases may not be subject to misconstruction, I will say that the investigation of this case has left on my own mind a clear conviction that the terms of these leases were, under the circumstances, reasonable and adequate, and the best that could have been obtained.

We pass now to another topic, *i. e.*, the charge of improper conduct in the sale of woodleaves.

The Court, on January 30th, 1860, directed the sale of woodleaves in order to raise money to improve the land. Pursuant to the order, the Trustee made four sales, on the dates of April 5th, 1860, May 3rd, 1860, November 7th, 1861, and November 19th, 1861.

The charge of the bill is two-fold. (1.) That defendant, at one of these sales, rejected the bid of H. Collins, who, it is alleged, was a responsible bidder. (2.) That there was general partiality and contrivance to sell to favorites at inadequate prices.

The defendant did refuse to receive Collins' bid. This was at the sale of April 5th, 1860. It is not necessary to enter into the considerations and circumstances bearing on this transaction. I have read and carefully considered all the evidence relating to it; and, on reflection, find no ground on which to arraign the discretion of the Trustee making such sales, to accept the "highest and best bidder." I think this discretion was honestly exercised.

Then, as to the charge of general partiality and favoritism. I have scrutinized the evidence in order to gather some act or transaction, if such there were, indicative of partiality, favoritism or unfairness of any kind. There is nothing. The whole testimony to this point, apart from what relates to Collins' bid, already considered, is this:—

Collins is the only witness who positively charges partiality. He says it was shown to Tharp, Curry, and proceeds to base the charge on the fact that these men went out to the woods before the sales, and fixed the price they were to give. But he says nothing to connect Fleming with them in so doing. He further states that, at a sale, April 5th, 1860, of a woodleave, on the Clark Farm, Fleming rejected his bid and sold to Tharp, who was his uncle. But Tharp did not buy

68

STATE *v.* FLEMING.

at that sale. All he bought was on the Anderson tract, at a sale, November 7th, 1861, eighteen months after the sale of the Clark tract. The buyers at that sale, when Collins' bid was rejected wère, Hoy, Carlisle and Curry.

Joshua Hill says, "I am not able to say whether the defendant in "this cause, so managed or conducted said sales or some of them, as "to secure his own personal friends or relatives to be the purchaser or "purchasers thereof, but I am rather inclined to think that some par- "tiality was shewn by the said Fleming to his friends."

Watson says, "I am inclined to believe that he (Fleming) was "partial to his own personal relatives."

Dorsey says, "I believe the aforesaid defendant in this cause, did so "manage, or conduct said sales or some of them, as to secure his own "personal relatives or friends, to be the purchaser, or purchasers "thereof."

Again, "my opinion is, that there was an understanding between "Fleming's friends, that they should buy the aforesaid woodleave at "a reduced price."

S. Collins says, "I am inclined to believe that the defendant "shewed partiality towards his friends in the sale of the aforesaid wood leave."

These are all of the witnesses for relators who speak adversely to the fairness of the sales. Others of them who attended the sales, received no impression that partiality was shewn, and one of these, Wm. Hill, who attended two of the sales, one being that at which the Clark tract woodleave was sold, says, "I consider that all of the sales I attended "were fair sales."

It would not be respectful to counsel to discuss the point that the suspicions of witnesses, however respectable, prove nothing. The integrity of the defendant in these sales can be impeached only by facts. The only two facts suggested by the bill, and by any witness, are, (1,) the rejection of Collins' bid, which had been already noticed, and, (2,) an alleged inadequacy of the prices obtained. With respect to the prices of the woodleaves, opinions of witnesses, even those of the relators, differ widely. As to the Mispillion sales, all agree that they brought full value. As to the woodleaves near Milford, my impression, from the testimony, is, that some of them did sell below their value.

## State v. Fleming.

I say some of them, not all. For as to some of these woodleaves, the witnesses generally agree that a fair value was obtained. That some of the tracts should have sold low, is not extraordinary, for all such purchases are made upon speculative estimates of value and of profit, and cautious purchasers allow themselves a good margin. There was no such inadequacy as to be at all demonstrative of any fraud or collusion.. At best, it could only induce scrutiny into the proceedings, to see that they were regular and fair. In this respect, I can find nothing defective. The woodleaves were fully advertised by bills well circulated, and offering all proper inducements to bidders, and the sales were fairly conducted. They were duly returned to the Chancellor, the Trustee setting forth his proceedings in detail, and no objection or complaint was made at the time. These sales were, in fact, made at a period of general depression, early in the civil war, and there is one fact disclosed by the testimony of William Hill, which makes the want of full value in some of the sales, more apparent than real. It is this; the sales were largely of pine wood, over three hundred acres, against less than two hundred acres of other kinds of wood, i. e., of the woodleaves around Milford. As to the Mispillion wood-leaves, there is no complaint. Now, pine wood, during the course of the war, and after these sales, rose to an unprecedented price. The cause must readily occur to any mind ; the exclusion of the Southern pine from market. The effect of the rise continued, and no doubt has influenced, insensibly, the estimates of the witnesses. None' of these, except Wm. Hill, distinguish between the value of pine, at the time of those sales, and afterwards. He states that the biddings for the pine were of its fair value, and all it would bring at the time.

But whatever may have been the cause of the sales of any of the woodleaves below their full value, I cannot, by any facts proved, trace it to the defendant's default.

Another charge in the bill is, that Fleming removed one of the boundary stones of the Clark tract so as to give to the adjoining owner, Eli Hammond, several acres; that this was done corruptly, in order to propitiate Hammon, who had previously been his enemy.

The answer flatly denies the removal of this, or of any other boundary stone, to the prejudice of the trust estate.

Against the answer, stands the testimony of H. Collins and Joshua Hill.

Collins says, "The said defendant has removed, or consented to a "removal, of a boundary stone or mark on a portion of the said trust

STATE v. FLEMING.

"property, commonly called the Clark tract.  Chas.  T. Fleming
"caused the said boundary stone to be moved ; when it was so removd,
"I went with Evan Morgan, found the hole from which the boundary
"stone was taken, and measured the distance it had been carried,
"which was about nine feet.  This was done to give Eli Hammond a
"portion of the Potter land.  I have no recollection, precisely, when
"this occurred, but it must have been seven or ten years ago.  I think
"Eli Hammond got about two acres of land by the removal of this
"boundary stone.  Eli Hammond was not friendly with said Fleming
"at this time, and said Fleming gave these two acres, more or less, to
"purchase his friendship."

Here the witness discloses no personal knowledge of the fact of
removal, but only his own previous suspicion, founded upon what he
does not state, and acting upon this, he looks for, and, as might be
expected, finds a hole somewhere near where the boundary stone stood.
The statement falls far short of proof where there is nothing to the
contrary.

Joshua Hill puts the matter in quite a different shape, but not
stronger.  He says, "I know" (how he knows does not appear) "that
"Eli Hammond has taken from one-eighth to one-fourth of an acre from
"the Evan Morgan farm (not the Clark farm) and enclosed it.  I
"*think* he did it with the permission of Chas. I. Fleming, the Trustee."

Here is no knowledge testified to of anything.  Though witness
professes to know that Hammond took in some land, he shews no
ground of knowledge, which only the Court could receive as evidence
against Hammond.   But as to Fleming, the witness professes to know
nothing.  He only thinks or suspects.

This is not the evidence of two witnesses required by the rule of
equity in order to rebut the denial of the answer, even if these state-
ments stood alone.   But they encounter also Hammond's testimony,
which flatly denies the whole charge, and positively asserts that the
boundary stones between his land and the Clark tract, stand as they
always have stood since he knew the properties.

Now I do not question that the statements of Collins and Hill
were honestly made.   But they were made upon rumor, a rumor which,
under the manifest readiness of many to suspect all that Fleming did,
might well have sprung from the fact disclosed by Cubbage, that on one
occasion, Fleming did remove a boundary stone of the Anderson Farm,
while running the line between that and the Owens farm adjoining.
According to the plot, the stone was found to be within the line of the
Anderson tract, and he set it out on the line, as he claimed it to be, thus
giving the Anderson tract more land.

STATE *v.* FLEMING.

*Compromise with Dorsey.*

The next charge in the bill is, that Fleming, having obtained an injunction to restrain the laying out of a certain public road, which was proposed to be laid out across one of the trust estates in such manner as greatly to injure it, did afterwards, while the injunction was pending, agree with Wm. Dorsey that it should be dissolved, provided that an indictment then pending against him for assault on Dorsey with intent to kill, should not be further prosecuted.

This charge is answered by the records of the injunction suit, and of the indictment, together with Wm. Dorsey's testimony. The answer is, the fact, that the injunction was dissolved some two months before the assault on Dorsey was committed. Six months before the indictment was compromised.

The facts are these;—on the 25th of September 1861, Fleming, upon his petition to the late Chancellor, obtained an injunction to restrain the laying out of the road in question, under proceedings then pending, pursuant to the Act of Assembly passed January 1861. There had been several attempts to procure this road; first by proceedings in the Court of General Sessions, under which the free-holders, appointed by the original order, had recommended the road, but other free-holders, under an order of review, had rejected it. Then the Legislature intervened by the act referred to, and appointed free-holders *to open the road,* and make return to the Levy Court, subject to its approval. Under this act, a majority of the Commissioners laid out the road and returned it to the Levy Court, which, approving the same, appointed Dorsey overseer to open the road. To restrain him from so doing, the injunction was obtained, grounded upon alleged defects in the Act of the Legislature, and an objection also to its jurisdiction. This was in September 1861. At the ensuing session of the Legislature, that body again intervened by an act of January 31st, 1862, which declared the road laid out under the previous act, to be a public road, and ordered the overseer peremptorily to proceed and open it for travel. Manifestly, the act was intended to over-ride the injunction. The petition for the injunction was not followed by a bill, and was dissolved upon motion, April 1st, 1862. What were the considerations which induced the Trustee to desist, it is not material to inquire. His annual report to the Chancellor, made September, 1863, assigns, as the reason, that he yielded to the manifest determination of the Levy Court and Legislature to have the road. The answer alleges that Dorsey, after being served with the injunction, resigned his overseership, and so the proceeding failed for want of a party-defendant.

STATE *v.* FLEMING

However this may be, there is no evidence that any *corrupt* motive influenced the Trustee in abandoning the injunction.    That he was not induced, as was alleged, by a compromise of the indictment, is certain. For it was *after* the injunction was dissolved, that is, in May 1862, that the assault on Dorsey was committed.   So he states in his examination. The first indictment for this assault, the one which charges the intent to kill, was found in Oct 1862, and continued to the April Term 1863. At that Term a *nolle prosequi* was entered, and a new bill found, charging only an assault and battery.    This was done, not as part of the compromise, for Dorsey, in his testimony, alleges that it was brought about through the influence of Fleming's friends with the Attorney General.    Then, after the second bill was found, and, as Dorsey says, on the morning fixed for its trial, in April 1863, one year after the injunction had been dissolved, a compromise of the second indictment was effected through the mediation of George S. Grier.   The terms of the compromise were fixed in a conversation between Dorsey and Fleming alone.   Dorsey, in relating that conversation, does state, that one of the terms of the compromise (among others) was, that the injunction should be dissolved.     But Mr. Dorsey speaks several years after these transactions, and, doubtless, under a confused relation of the circumstances.    That might well be, without any intention to misstate.

His testimony, even were it not in conflict with the transactions, as of record, could not, as the testimony of one witness, prev..il against the denial of the answer.    There was no other witness to the conversation, Grier having retired when he brought the parties together.

### *The offer of $1500 per annum.*

There is still another charge in the bill.    It is, that the Trustee has refused to accept an offer, made by good and responsible persons to lease the whole trust estate at an annual rent of $1500, with a stipulation to pay the taxes, maintain repairs, and protect the property from pillage and destruction.

This charge may be disposed of briefly, by three observations.

I. There is no sufficient proof that such offer was made.    The inquiry is put under the 17th interrogatory-in-chief, to each of the witnesses for the State, none of whom profess any knowledge upon the subject, except, that H. Collins, in the course of his answer to the 13th interrogatory-in-chief, makes this statement ;—

## STATE v. FLEMING.

After he " (Fleming) " was appointed, several good and responsible men offered $1500 per year beyond all reprises; that is to say, ground rents, all taxes, and the keeping up of repairs. · Among these men, Davis Walton, John Maston and others, offered to take said property for ten years or longer. The witness states nothing as of his own knowledge. I cannot take it as amounting to more than hearsay or rumor ; and, as a rumor, it is surprising that it came to the hearing of none of the other witnesses who were inquired of about it. But,

II. The Trustee had no authority to lease the lands and could be in default in not accepting such an offer, if it were made. Had there been any such serious and responsible offer made before the improvement-leases were given, it would have been proper for him to report the fact to the Chancellor. The evidence creates no reason to doubt that he would have done so.

III. Again, it may be remarked as extremely doubtful, whether such an offer, if made, ought to have been accepted, or would have been. Its rejection would have been but the exercise of a fair discretion and involving no culpability. The question would have been between the expediency, on the one hand, of yielding the lands up, say, ten or more years, to persons interested to overwork and exhaust, rather than permanently to improve them, and, on the other, to put them in a course of gradual and permanent improvement and of future productiveness at some present sacrifice. The two policies are antagonistic. The latter was recommended by the Commissioners, and approved by both Chancellors, Johns and Harrington; and we must presume any contrary proposal would not have been entertained. I am not at all · prepared, from the consideration I have given the subject, to question the judgment of my predecessors on this subject.

We have now examined all those charges in the bill which are supported by specifications. It is upon these, as before stated, that the real issues in the cause are raised. Were this a cause involving only private interests, I should feel bound here to close the investigation, leaving untouched some other charges, which are wholly general, unsupported by specifications, and also some matters, introduced into the testimony, which are not covered, even by a general charge. But, considering that this case involves the administration of a public charity, and that the transactions inquired of. are those of the agent of this Court, I have not felt warranted in closing my eyes to anything which the record might show relevant to the object of the bill; and, therefore, have examined, to these points, the whole evidence presented,

with the determination that, should the record disclose any facts gravely impeaching the fidelity or competency of the Trustee, which, from the want of sufficient specifications in the bill, there had not been a fair opportunity given him to deny or to disprove, I would direct such further investigation as the case might require.

The first of these general charges is a very grave one. It is alleged that the Trustee has, at different times, received large "sums " of money from the said trust property, which he has not accounted for " to this Honorable Court, but which he has applied and appropriated " to his own private use, thereby enriching himself to the great wrong " and detriment of the poor white citizens of Kent County, outside of " the walls of the poor house."

Certainly such a charge ought not to be made except upon facts, ascertained with a good degree of certainty, and specifically alleged, that the Trustee might be able to answer them and adduce counter proof. To the charge, made as it is, however innocent he might be, he can oppose nothing but a general denial. This he has done. What, now, is the evidence relied on to countervail his denial.

The Trustee filed in this Court, annually, since his appointment in 1847, accounts of his receipts and disbursements. These have been put in evidence and examined by the counsel for the State.

The result of that examination was stated at the bar of the Court. It was that the Trustee had omitted to charge himself with sundry rents, as follows :

(1.) The Winsmore and New Wharf Farms. These were rented, from 1848 to 1863, to John Redden, at an annual rent of $160. The counsel for the State alleged a deficit of $467.50. Upon a careful examination of the accounts, I find the rents of the whole period, from 1848 to 1863, at $160 per annum, accounted for, except the sum of $60. My additions are short that amount.

(2.) The Anderson Farm. It was alleged that the Trustee had not accounted for a rent of $37.50 due from James Wyatt for 1853. The Trustee charges himself, in January, 1855, with $15.08, recovered from Wyatt by suit, before a Justice, for rent in arrear in 1854. This leaves a deficiency of $22.42. The allegation at the bar also extended to 1855 ; but Wyatt did not remain tenant that year. So I conclude from the evidence. This farm was poor and almost without any improvements, as represented on all sides, and unfortunate in its tenants from 1847 to 1858, when Ellis Hammond took it, and seems to have been without a tenant for several years after Wyatt left it.

STATE *v.* FLEMING.

3. The Reeson Farm. It was alleged that the rent of this farm for 1855, which was seventy-five bushel of corn from the tenant Morgan, was not accounted for. This rent does not appear in the account for 1855, as copied on the record of the Potter Charity, to which record the counsel referred in their examination, but it does appear in the original account, and was doubtless omitted in the copy of record through inadvertence of the Clerk.

Again, it was alleged that, according to the testimony of Morgan, the then tenant of this farm, some improvements were put upon this farm about 1861, after which he was to pay a certain rent of $100.00; that the Trustee charges himself with $100.00, for the year 1861, and only with $50.00 for the year 1862. Such is the state of the account. It is not, however, true that Morgan testified to his having actually paid the whole $100.00 due for 1862. The effect of his testimony is that, after the house was put up, his rent was $100.00, not that he actually paid it.

4. The Mispillion Farms. From one of these, the farm occupied by John Brown in 1849, it was alleged that the rent for that year, $50, was not accounted for. This is true.

No other deficit in the accounts was alleged at the bar. The result then, is, that the Trustee has not charged himself with the following sums as rent: $60.00 from the Winsmore and New Wharf Farms, $22.42 from the Anderson Farm, $50.00 from the Reeson Farm, and $50.00 from one of the Mispillion Farms.

Now, with respect to these omissions, it is to be observed,—

1. There is no evidence, whatever, that the rents omitted to be charged against the Trustee had been collected.

2. The Court will not presume they were collected. Fraud is *never* presumed. This is a fundamental rule, as well of law as of charity. It applies generally; a *fortiori* in this case; for of these charges, no notice, by allegation in the bill, or otherwise, has been given. The defendant has had no opportunity to oppose them by a specific denial, or by counter-proof, but the general charge he has met by a general denial, the only kind he could make, and his general denial is positive and unqualified.

3. The true and proper effect to be given to these omissions was, to call for explanation to the Chancellor at the time these accounts

69

were passed. As they were submitted to his examination, and were approved and passed by him, I will not unravel them without some evidence of fraud, or, at least, some stronger suspicion of it than arises from the omission of four rents, or parts of rents, occurring in accounts, embracing so many parcels of property, and extending through a period of eighteen years.

A second charge, made generally and without specifications is, that the Trustee cut, and converted to the use of his own farms, wood and timber, posts and rails, from the trust estate.

The Trustee, by his answer, positively denies this.

I have reflected upon the statements of several witnesses, relied on to support this charge, and do not find them sufficient, either in legal or moral force, to outweigh the Trustee's denial under oath.

First, are the statements of Collins and Morgan that, *many years ago*, they saw Fleming's boy cutting wood. Each speaks of a different transaction. Both are vague and indefinite statements, and made by exceedingly prejudiced witnesses, at open quarrel with the Trustee. Neither, however, undertakes to charge Fleming with knowledge of his boys cutting. The same is true of Morgan's statement, that he one day saw Cyrus Stockley, a negro tenant of " a small house of Fleming's, " cut kindling in the Anderson woods." The negro, when accused by Morgan, said, that Fleming gave him permission. This is certainly not evidence to charge Fleming; it is not even a ground of reasonable suspicion. It was a natural excuse for a negro caught in a trespass.

Again, Eubanks and Collins state that the Trustee got from the trust estate, some gate posts. Collins does not say how many. Eubanks saw two gate-posts, in Fleming's pound which he supposed " came off " the Potter land." Neither of the witnesses fix any time. This testimony finds a full explanation in the Trustee's account, passed in 1853. There were two division gates between his farm and one of the trust farms, which were put up at the joint expense. There were four posts got off the trust estate, valued at $1.50. The total cost of posts and gates was $11.25 which was divided, the estate and the Trustee each paying one-half. All this is plainly stated in the account, and one circumstance, besides, which in this transaction shews all possible exactness; for one of the gate-posts proved unnecessary; and for the value of these the estate is credited in the account.

Again, it is stated in the settlement in Dorsey's testimony, that the Trustee permitted Wyatt, tenant of the Anderson Farm, from 1853 to

1855, to skin bark for one half the proceeds; how much is not stated. That is true; but it is also true, that in his account for 1853 and 1855, the proceeds of bark sold by Wyatt are accounted for.

Then, again, Eubanks states "that he saw Fleming remove a fence "from the lane of the Anderson Farm, and put it on his own farm." Dorsey also says "that, between the Anderson Farm and Fleming's, there was a lane, fenced originally on both sides; but that Fleming's fence, being a poor one, he took to his own side the one between the Anderson Farm and the lane, leaving the Anderson Farm without any fence." How he knew this is not stated. The explanation is given by Cubbage, who was tenant on the Anderson Farm and Littleton Daniel, tenant of Fleming's farm. They both state that Fleming had a fence on his, the side lane, which stood unchanged. Before Cubbage moved to the Anderson Farm, rails had been provided for a new fence on the Anderson side of the lane; but the posts giving out, the rails were laid temporarily along the lane on Fleming's side. Being an obstruction to the use of the lane, Fleming directed Cubbage to haul them away and fence other parts of the Anderson Farm, stating that, other rails could be procured for the lane fence, when the posts were ready. The witnesses declared that the rails were all used on the Anderson Farm and none on Fleming's.

There is another charge of the same nature as those before stated, made by Mr. Dorsey in his testimony. It is that, about twenty years ago, Fleming, by a ditch, made under an Act of the Legislature passed, had taken ten acres off the New Wharf Farm, and ever since used it with his own farm. The statement is general and does not purport to be made upon personal knowledge. It finds its explanation in the fact that, in 1845, Fleming bought ten acres of meadow adjoining his, and the Potter land, which was sold by the Constable, Jos. S. Truitt, for taxes under a ditch law.

A third general charge in the bill is, that the Trustee allowed the woodland to be wasted and pillaged by the tenants and other persons.

Following this general charge, there are made, in connection with the alleged mismanagement of certain farms, specifications of the waste of timber on those farms. These have been considered. But in addition to these specifications of waste in the bill, testimony was adduced to shew that there had been smaller pillages at different times, not specified in the bill. It is these which now come under examination.

On this point, the largest amount of the testimony is that which goes to implicate several of the tenants in getting wood and rails from

the two tracts, known as New Design and the Phillips or Chambers tract. These are Reedy, Herring, the Barkers and Yardley. They were tenants of the farms lying along the road from Milford to Dover, contiguous to each other, i. e., the Reeson, Tanyard and Clark farms, and also adjoining two distinct tracts of woodland, the tract called New Design of forty acres, and a tract of forty-eight lying back of the Milton lot; being tracts N. and P. on the recorded plot. The three farms, when leased to these tenants, had very little woodland. What woodland there had been, lay in such positions that it was deemed expedient to sell the principal portions in wood-leaves, so as to allow of a proper division into arable fields, and to supply the necessary materials for fencing and other uses from the adjoining tracts of wood-land, N. and P., reserving them for the common use of the farms. A large amount of wood was necessary for farming and building materials on all these farms. For, in all of them, new land was brought under cultivation, and the Clark farm was wholly to be fenced and buildings to be erected. Hence, in these leases to Reedy, Herring and the Barkers, permission is given for getting, from these adjoining tracts, rails and other necessary wood materials, and connected with this fact, is the evidence that these tenants did, under their leaves, proceed to put upon their respective farms extensive improvements in fencing and otherwise. These circumstances are a satisfactory explanation of the statements made by some of the relators' witnesses as to the cutting of wood and rails by Reedy, Herring and the Barkers. I have read all these state-ments. They are very general and indefinite, mostly upon hearsay and, as to quantities, are but guesses. Against Yardley, who preceded the Barkers, there is but one statement, i. e., by H. Collins, who says that Yardley got rails from New Design. Doubtless, he did; for it is in evidence that, under the stipulations of his lease, he had got out some rails for the farm before assigning his lease to the Barkers. There was, in all these leases, a stipulation that any bark pealed from the timber cut, should be sold by the tenant, and the proceeds, less expenses, paid to the Trustee. How much bark was pealed, or whether all was accounted for, cannot be definitely ascertained. The Trustee, in his accounts, charges himself, at sundry times, with proceeds of bark. In the absence of evidence to the contrary, it is fairly presumable that the bark was accounted for.

Next, I notice some statements, by the witnesses, of acts of small pil-lage by four persons who were not tenants; two of them negroes. None of them are charged upon personal knowledge of the witness, except one, a negro. I will not name these persons, being unwilling to implicate them upon hearsay charges. I am, however, satisfied that some small

STATE *v.* FLEMING.

sort of pillaging has been committed in the woodlands near Milford, by persons not tenants, but this was not to any considerable amount, nor moie than a large estate in woodlands, not privately owned, must be liable to. I am also satisfied that, on the Mispillion lands, some of the tenants have, at different times, cut and carried away wood not within the privilege of a tenant, and to a considerable amount. But with respect to all these acts of pillage, there is no evidence even tending to connect the Trustee with them. On the contrary, the evidence of the relators discloses efforts ʳn his part to detect and punish pillagers of the Mispillion lands.

The only testimony, even tending to connect the Trustee with any acts of unauthorized waste, is the statement of Eubanks, that he saw Redden hauling to Milford some wood from the New Wharf Farm, a week or two before the witnes s was examined, and that Redden then told him that "Fleming had given him two or three acres of beautiful "fine timber." But what Redden said to Eubanks is not evidence to be regarded under any circumstances, especially not, considering that Redden was himself a witness in the cause and not examined to this point. The statement is not only legally inadmissible, but so highly improbable as to carry no moral weight.

We proceed to another among the grounds of complaint in argument, though not made the subject of any specification in the Bill. It is the omission of the Trustee to improve certain portions of the estate. These are the tracts known as the Chambers tracts, the Haslett tract, and the Mispillion farms. The Chambers land is a small tract of seventy acres of wood and old field, left at Potter's death without improvements, and not rented. It adjoins the Anderson Farm, and had hitherto been used to supply that farm with wood-materials. The Haslett tract contains one hundred and ninety-five acres of wood and old field, grown in pine and cedar, with a small portion enclosed, on which is a small house. The Mispillion Farms are two, one of three hundred, the other of two hundred acres of wood and poor land, with inferior buildings, poorly fenced, and soil not productive. The general condition of these tracts, at the filing of the information, was about the same as at Potter's death. They were not improved, and yielded no more to the trust fund.

That these portions of the trust-estate remained unimproved, up to the filing of this information, carries the impression of neglect, somewhere. But, if any impartial person will patiently trace up the history of this trust, and consider all the embarrassments which have

STATE *v.* FLEMING.

attended it, yielding, at the same time, just credit for the improvements which have been made upon the estate, as a whole, he will hesitate before ascribing the delay to bring up these tracts, to gross neglect, if to neglect at all. Up to the year 1860, any permanent improvement of the lands, or of any part, was impossible, through want of means, and the inability of the Court, in consequence of successive litigations affecting the title to the estate, to provide means by sales of wood and timber. And when, in the years 1860 to 1862, these sales were made and means raised, sufficient, as was then supposed, and the necessary improvements were undertaken, the sums raised were exhausted, and a considerable amount beyond, in improving the farms at Milford Hundred, which, not unreasonably, were the first objects of attention, so that nothing was left for the Haslet and Mispillion tracts. In 1862 these farms were first offered for improvement-leases. But the work, as we can readily see, was attended with difficulties. There was required not the ordinary class of country tenants, able to till for the time being, in the usual way, and render a share, but those of sufficient means and force of character, to undertake and carry out, through a series of years, a system of improvements. The class of such men, both capable and willing to undertake, was limited, and yet quite a number of farmers offered. That the Trustee experienced this difficulty, appears in his report, in September 1863, which, as part of the history of the estate of record, and having been made long before this controversy arose, is entitled to credit. Though the lands were extensively advertised in May, 1862, by an advertisement most attractively setting forth their advantages, drawn by the late Chancellor Harrington, and now among the papers proved, still, up to January 1863, there were but three leases obtained; one other in January 1865, and three, not till January 1866. It was then that this information was filed; from three to four years only, after the system of improvement-leases was inaugurated. Now, I cannot feel that, under all these manifest difficulties in finding suitable lessees, willing to take these lands, the lapse of three or four years, from 1862, when the order for leasing was made, until early in 1866, when this information was filed, is sufficient to convict the Trustee of culpable negligence in failing, within that time, to get all of these farms under improvement-leases. The further lapse of time since 1866, affords no ground upon which to charge neglect, because I have known, officially, the fact, that effort has been made to lease these remaining farms, efforts which have resulted in putting the two Mispillion Farms under improvement-lease in the year 1868. At this time all the lands are under improvement-leases, except the Haslet tract, several small tracts of woodland

STATE *v.* FLEMING.

contiguous to farms, and used to supply them, and also some very small parcels of land, not of sufficient size to lease for farming purposes, and which, under a general order of the Court, made in December, 1866, have been put under perpetual leases, at an annual rent equal to six per cent. upon their fee simple value, the value ascertained by impartial judges.

We will pass now to notice three points of a general nature, upon which much testimony was taken, and stress laid in the argument, and strongly relied on as supporting the charges made by the information.

(1). First, is the large body of testimony for the relators, consisting of the opinions of witnesses, that the Trustee has not managed this estate with due diligence and fidelity. Having considered all the facts and cirumstances relied on as demonstrating fraud, neglect or mismanagement, what effect now should be given to the general opinions of the witnesses, as evidence?

It should be remarked that, were opinions on such a subject a proper ground for the judgment of the Court, it would be difficult to pronounce against the Trustee, because he stands sustained in the testimony by opinions, alike positive, of witnesses equal in number and credit to those who impeach him. But the more correct view of this point is, that opinions on such a subject are of no weight, as evidence, beyond the facts testified to. It is not a case for experts. It is for the Court, not for the witnesses, to adjudge the question of neglect, bad faith or mismanagement: this judgment to be formed upon the facts and circumstances to which the witnesses testify; opinions adverse to the Trustee may rightly induce and stimulate scrutiny and caution; no more effect should they receive; and this much has been given to them. Every circumstance, stated in the evidence, has been carefully weighed, and every view of the case presented in the argument has been considered.

(2). A second ground relied on in general support of the charges of the bill, was the opinions of witnesses that the trust estate had, since Potter's decease, greatly deteriorated, so that its intrinsic value, estimated without reference to the general advance of real estate, is less now than at Potter's death; or, in other words, if the general market value of lands were, now, no more than at Potter's death, these lands would not be worth as much as they were then. The point of this objection must be, that there has been a *deterioration in the actual condition of the property* as to improvements and fertility.

STATE *v*. FLEMING.

Some deterioration occurring, anterior to the year 1860, would not prove neglect or mismanagement; for, up to that time, there were no sources for the permanent improvement of the property known to this Court, nor has the evidence or argument disclosed the existence of any such resources. Further, up to that date, no scheme for raising means, as by sale of wood and timber, could have been adopted, because, until about that time, the title to the land was in litigation. But *if it were true that subsequent to 1860, since when the property* has been under a scheme of improvement, no improvement has, in fact, resulted, but, on the contrary, a continued, serious deterioration, this would argue a sad mismanagement somewhere, which the Court should promptly seek to discover and remedy. To this point, therefore, I have given earnest attention. One source of the alleged depreciation in value, and one which enters largely into the estimates of the witnesses for the relators is, a waste of wood and timber. Some loss was sustained in the pillaging of the woodlands in the earlier period of the trust. The amount cannot be estimated from any data afforded by the testimony; nor is this necessary; since, as to these early pillages, the Trustee is not implicated. Wood and timber, to considerable amounts, were cut under sales ordered by the Court. But the proceeds of all this went to improve the arable portions, in the way of buildings, fencing and fertilizers. This fully appears by the accounts, by the testimony of many witnesses, and by the improvements themselves, on the farms, patent to all the world. So that what was lost in value to the woodlands, was gained to the arable lands; and for the objects of the charity, the gain exceeded the loss, inasmuch as the improvement went directly to the increase of the rents, which alone are, by the will of Col. Potter, devoted to the charity.

The sale of the wood-leaves did not, in its result, cause any general depreciation of value, but the contrary. What then, it remains to ask,—and it is the really material question,—what is the present condition of the arable lands as it respects buildings, fences, number of acres in cultivation and fertility of soil, and other improvements, as compared with their condition at Potter's death?

Now, while it is true that these tracts, as the Mispillion Farms and the Haslet and Chambers tracts, do still remain unimproved, it is impossible to shut our eyes to the marked improvement of the large body of these lands. Two farms, the Clark and Winsmore Farms, may be said to have been created under the trust. The Clark Farm was abandoned *to common by Potter in his lifetime, and was* left without any buildings, or a panel of fence, or improvments of any kind.

STATE *v* FLEMING.

There are now a good two-story frame dwelling, 16 x 40 feet, with a story and a half back-building, two porches and cellar, new smoke house, new barn of two stories, with stable, wagon house, carriage house and cow sheds, yard and garden paled in, and brick well settled; also a house for a farm hand. The farm is divided into four fields (under fence) on which five hundred bushels of lime have been put, annually, and the whole, according to the general testimony, is in a good state of cultivation. On the Winsmore Farm, at Potter's death, there were two old one-story houses joined together with posts, rotted, and the weather-boards gone, and no out-buildings, no well, no garden. What had been arable land had become a wilderness of young pine and cedar, leaving but a small portion fit for cultivation, only sufficient to be tilled in connection with the adjoining farm. Now, on this farm there is a new two-story cottage-built house, with two-story back buildings and porch, a new smoke house, a new stable for four horses, a carriage house, a barn, not built at the taking of the depositions, but stipulated for in the lease; the farm divided into three fields, and five hundred bushels of lime annually applied. Then, as to the other farms, the New Wharf, the Carman, the Anderson, the Reeson, and the Tanyard, though at Potter's death there were some improvements, it is the concurrent testimony of the witnesses on both sides, that the improvements were very inferior, the dwelling houses hardly tenantable, fences invariably poor, and soil worn out and unproductive. All these farms formerly yielded, in the whole, a rental of $465, subject to taxes and repairs, under exhausting tillage, and with no stipulation for improvement by the tenants. They are now all supplied with new and substantial dwellings and out-buildings, corresponding with those on the Clark and Winsmore farms, already described, are divided into the usual number of fields, well fenced, tilled with a proper rotation of crops, and annually supplied with fertilizers. The same marked improvement is true of the Cullentown tract. These farms embrace substantially all the arable portions of the estate, except the Mispillion and Hazlet farms.

(3.) There remains a third ground relied on in general support of the charges of the information. That is, the fact that, to this time, after a period of, say, twenty-five years since Potter's death, the trust estate has yielded no net surplus to be applied to the charity, whereas, it is estimated by sundry witnesses for the relators, that the estate, with due care and management, would have yielded a net rent, clear of taxes and repairs to a large amount. The estimates vary from $1200 to $2000.

70

Now this objection receives its force from these estimates. But I am obliged to say that these estimates, though honestly made, are not reliable. For, besides the infirmity which inheres in all estimates of quantities and values, and particularly, it would seem, in what concerns real estate, these present estimates are subject to several special objections.

(a.) One is, that they are based upon the present improved condition of most of the farms, and are estimates of what the farms, so improved, would yield under the ordinary mode of renting, in which the whole rent is paid in money, and, not as under these leases, part in money and part in improvements to be put on by the lessees.

(b.) Another objection to these estimates is, that they are made without a due appreciation of the extreme embarrassments which have attended the management of this estate, as all shall presently see, growing out of its naked and impoverished condition when taken in charge, and the inability of the court, until a recent date, to undertake its improvement. Very probably the hindrances to the improvement of the estate were not fully known to many of the witnesses, nor were distinctly before the minds of any of them. And this brings us to notice the true cause of the failure of the estate, so far, to yield a net revenue. It is this ;—

From 1843, when Col. Potter died, to 1860, the Court was disabled, by a series of litigations affecting the title to the trust estate, from carrying into effect any system for permanent improvement. Measures to this end were twice undertaken, but were arrested and held in suspense. Meanwhile, the rents of the estate, which were small, and could not be materially increased, were absorbed by expenses and repairs.

Adverting now to the hinderances encountered by the efforts to improve this estate, it will be remembered that, though Potter died in 1843, the trust was not established until 1849. The validity of the devise of these lands to charitable uses was contested by Col. Potter's heirs-at-law, under the advice of three of the most able and eminent counsel. The Court of Errors and Appeals, at the June Term 1849, affirmed the validity of the devise. Immediately, thereupon, the then Chancellor ordered a survey of the whole real estate with a view to locate the several tracts and settle the boundaries preparatory to the adoption of some system of improvement. The survey was accomplished in 1850. Just at this time, a bill in equity was filed in behalf of the legatees under Col. Potter's will, for raising, by sale of part of the real estate, a

portion of the legacies, the personal estate of the testator having proved insufficient to pay them. This claim was adjudged by the Court of Errors and Appeals in favor of the legatees, and, therefore, a portion of the real estate was sold to satisfy the legacies. These proceedings reached to the close of the year 1854.

The trust being now established and all claims upon it satisfied, the then Chancellor, Johns, in 1845 appointed three citizens of the county, Peter F. Causey, Joseph P. Comegys, and James S. Buckmaster, Commissioners to consider and report a scheme of improvement. But just at this juncture, an Act of the Legislature was passed, directing the sale of the whole real estate, in its then condition, and the investment of the proceeds upon the like trusts. This measure arrested further progress towards the improvement of the estate. The validity of the act for the sale of the whole estate was drawn into controversy, and the question finally determined, in the Court of Errors and Appeals, in June 1858, against the validity of the act. Thereupon the Commission ordered by Chancellor Johns was issued. The Commission made report in October 1859. The Commissioners reported that the lands were not then sufficiently tenantable to command that class of tenants suitable to take them upon improvement-leases. They recommended that portions of the wood and timber should be sold, and the proceeds applied towards the erection and repair of buildings and improvements preparatory to a system of long leases. In accordance with this recommendation, the late Chancellor Harrington, in December 1857, ordered the sale of certain portions of wood and timber, and the application of the proceeds, with the accruing income of the estate, to repairs and improvements. Under this order, sales of woodland were made in February and April, 1860, and still later, in November 1861, another sale was made. After the first two sales, proposals on the part of builders were advertised for, and the work put under contract, and the improvements and repairs detailed in evidence, were made on New Wharf, Anderson, Carmean, Reeson and Tanyard farms.

These improvements being completed, the Chancellor, in April, 1862, made an order reciting that many of the farms had been put in a condition to be leased under improvement-leases, and directing the Trustee to advertise for suitable tenants, and negotiate terms, subject to the Chancellor's approval; and an advertisement drawn by the Chancellor was extensively circulated. Then followed, from time to time, the leases which have been made. .

Thus, the estate unavoidably remained from 1843 to 1862, without such permanent improvements as were necessary to render it more

productive. The rents, when the Trustee took charge of the estate, were about $500 in all, including some rented lots at Milford, which were afterwards sold under the decree of the Court, to pay legacies. In the later years of this period, the rentals were raised so as to yield some $700. The annual compensation allowed to the Trustee, was $200; nor can this be considered unreasonable. The taxes amounted then, to about $100, in later years, to about $140. Here was an annual deduction of at least $300. Besides, were occasional expenses, caused by constant litigations, which I have not deemed it necessary to foot up. The surplus rents were needed for repairs, to save the estate from utter ruin, and were so applied. Any better disposition of them can hardly be suggested, and it must be conceded that the failure of the trust estate to yield a revenue up to 1862, is due, not to a faulty administration of the trust, but to uncontrollable embarrassments. These are very clearly and impressively summed up by the Commission to examine the estate, in 1859.

Since 1862, the system of improvement-leases has been in operation. The lease of the Carmean Farm to Thompson, commenced in January, 1862, of the Reeson Farm to Reedy, in January, 1863, of the Cullentown tract to Geo. Burton, in January, 1863, of the Tanyard farm to the Barkers, in January, 1865, and of the Clark farm to Herring, the Winsmore farm to Anderson, the New Wharf farm to Redden, and the Jester tract to Causey, in January, 1866, and the Mispillion farms from January, 1869. The rents now received from the whole estate improved and unimproved, amount to $880, out of which the Trustee had, under some of the improvement-leases, stipulated to return certain sums in fertilizers, amounting to $200, leaving, net, $680. In some of these leases the tenants are required, after a portion of their lease has expired, to pay an additional rent, after which time, the rents will amount to $1100. As the tenants under improvement-leases stipulated for taxes, and repairs and insurances, the estate should not be, henceforth, chargeable for these farms, and, so far, there is an improvement in the rentals which would have resulted in a net revenue, were it not that, in carrying into effect the general order made in January 1860 for permanent improvements, the expeditures exceeded the sums realized from the sales of wood-leaves, to the amount of about $1500, which deficiency has fallen upon the income of the estate accruing under the improvement leases, and is thus far absorbing what, otherwise, would be some surplus of annual rents over and above current expenses. And, without engaging anything for the future, beyond the best efforts this Court can render, I may venture to express the hope that, after the deficiency referred to has been met, the estate

STATE *v.* FLEMING.

will begin to yield a net revenue, which may be applied to the charity contemplated. Certainly it is an object most to be desired, and one with which the Court is in hearty sympathy, that the persons contemplated by the founder of this charity, should speedily realize its benefits. But it must be clearly unreasonable to expect this as yet. The Commissioners, upon actual examination of the estate and consideration of all the embarrassments, thus express themselves, speaking in 1859 before this suit was instituted. "Much time and " good management will be necessary to such a result. No reasonable "person can expect that the present generation will derive much "benefit from the charity estate. It is reserved for those who come " after it to reap the benefit of the testator's bounty. "